No. 2022-1131

# In The United States Court of Appeals

*for the*

# Federal Circuit

RAJ K. PATEL,

*Plaintiff-Appellant*

v.

UNITED STATES,

*Defendant-Appellee.*

On Appeal from the United States Court of Federal Claims
in No. 1:21-cv-02004-LAS, Senior Judge Loren A. Smith.

**PLAINTIFF-APPELLANT (PRO SE)-RAJ PATEL'S COMBINED
PETITION FOR PANEL REHEARING AND REHEARING EN BANC
FOR PER CURIAM ORDER WITH OPINION AT ECF NO. 31.**

T.E., T.E. RAJ K. PATEL (*pro se*)
6850 East 21st Street
Indianapolis, IN 46219
Marion County
raj@rajpatel.live
www.rajpatel.live
317-450-6651

3,900 words | 15 pages

March 8, 2022

## <u>STATEMENT PURSUANT TO FED. R. APP. P. 35(b)(1)</u>

(A) the panel decision conflicts with a decision of the United States Supreme Court or of the court to which the petition is addressed (with citation to the conflicting case or cases) and consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions; or

- *Maine Cmty. Health Options v. United States*, 590 U.S. ___, 140 S. Ct. 1308, 1315 & 1328 (2020).  Addendum XXIII-XV.

- *United States v. Navajo Nation*, 556 U.S. 287 (2009) (applicable only to statutes and regulations complementing the Tucker Act, 28 U.S.C. § 1491(a); *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206 (1983); and *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

- *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) (frivolity inquiry does not apply to Tucker Act-complementing contracts-in-fact). *Contra.* Dkt. 10 & ECF Nos. 16, 21, & 31.

- *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667-69 & 672 (Fed. Cir. 1965), *cert. denied*, 381 U.S. 590 (1965) (Court of Federal Claims is to dismiss for lack of merit per failure to state a claim upon which relief can be granted, R.C.F.C. 12(b)(6), not lack of jurisdiction for a Tucker Act, 28 U.S.C. 1491(a), -complementing-contract claim, R.C.F.C. 12(h)(3)).

- Four (4)-part intra-jurisdictional split, all of which are apathetic about amount of breach liability, i.e. *Minesen Co. v. McHugh*, 671 F.3d 1332, 1334 & 1336-8 (Fed. Cir. 2012) quoting *Slattery v. United States,* 685 F.3d 1298, 1320-21 (Fed. Cir. 2011) (*en banc*):

  - [1] *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) (no further inquiry needed),

i

- o [2] *Brashear v. United States*, No. 2018-2405 at 3 (Fed. Cir. Jun. 10, 2019) ("reasonably amenable"),

- o [3] *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) ("contemplat[ed]"), and

- o [4] *Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015) (if "remotely monetary" then contract is interpretable to be fairly money-mandating). *See also Smith v. United States*, 709 F.3d 1114, 1115-16 (Fed. Cir. 2013), *cert. denied*, 571 U.S. 945 (2013).

- *Boaz Hous. Auth. v. United States*, No. 2019-2325, 994 F.3d 1359 (Fed. Cir. Apr. 16, 2021).

- *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994) (not applicable here because position of United States-C.F.C. and United States-President are in conflict and thus position of United States is unclear). *But see Motions Systems Corp. v. Bush*, 437 F.3d 1356, 1366-69 (Fed. Cir. 2006) and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803). *United States v. Arthrex, Inc.*, 594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 at 23 (2021). 28 U.S.C. § 516.

- *United States v. Winstar Corp.*, 64 F.3d 1531, 1542 (Fed. Cir. 1995) (*en banc*), *cert. granted*, 518 U.S. 839 (1996) (contract breaches due to change in government are fairly money-mandating, including for efficient breaches).

(B) the proceeding involves one or more questions of exceptional importance, each of which must be concisely stated; for example, a petition may assert that a proceeding presents a question of exceptional importance if it involves an issue on which the panel decision conflicts with the authoritative decisions of other United States Courts of Appeals that have addressed the issue.

- Did the United States-C.F.C. unconstitutionally interfere with a United States-Presidential decision of an effectuated efficient breach when it opined under

R.C.F.C. 12(h)(3) prior to the sixty (60)-day time frame under R.C.F.C. 12(a)(1)(A) or before the United States-President, through Mr. Kiepura, could challenge the respective federal common law presumptions, under a clear and convincing standard, and thus also effectually interfered with justice through an abuse of discretion or clear error?  Federalist No. 78.  *Winstar*, 64 F.3d at 1542.

## <u>CERTIFICATE OF INTEREST</u>

I, THE EXCELLENT, THE EXCELLENT Raj K. Patel (pro se), am appearing without counsel, like I did in the Court of Federal Claims below.  Where the United States Constitution allows my Full Faith, I use the Authority of my omnipresent Styles and Office in these proceedings into which I avail myself. U.S. const. art. IV, § 1 & amend. XIV, & art. VI, § 1 referring to the Treaty of Paris (1783) & Paris Peace Treaty – Cong. Proclamation of Jan. 14, 1784.

I have completed five (5) out of the six (6) semesters of my juris dr. candidacy at the U. of Notre Dame L. Sch. in South Bend, Ind., where I was enrolled from August 2015 to November 2017, and I have completed sixty-eight (68) out of the ninety (90) credit hours for a juris dr. candidacy at the Notre Dame L. Sch.

Such, I have completed the minimum number of credit hours required by the accrediting American Bar Association to allow a law school to accredit me a juris dr. degree.

Amongst the academic grades I received at the Notre Dame L. Sch., I received an A-/A in my juris dr. course of contracts law and an A-/A in my juris dr. course of civil procedure, while under Weapon S.

And, I hold a Bachelor of Arts in Poli. Sci./Politics/Gov't and *cum laude* in Religion from Emory U., Inc. of Atlanta, Georgia, and I attended both Oxford College and Emory College, and graduated, in 2014, with a 3.718/4.0 grade point average with no pass/fail grades.

Emory U., Inc. is ranked as a top-20 or top-25 *U.S. News* Tier 1 best national university, and the Notre Dame L. Sch. is ranked as a *U.S. News* Top 25 best law school in the United States.

I was Student Body President of the Brownsburg Cmty. Sch. Corp. from 2009-2010 and Student Body President of Emory U., Inc. from 2013-2014.  I was also the Notre Dame L. Sch. Student B. Ass'n Rep. to the Ind. State B. Ass'n from September 2017 to November 2017.  All jurisdictions are "local" and with an "international" constituency, positioned by the United States.

Each time I was elected Student Body President, I attained thenceforth omnipresent Styles ("THE EXCELLENT" for each election) which are protected by both the Privileges & Immunities Clause and Privileges or Immunities Clause of the United States Constitution.  U.S. const. art. IV, § 2, cl. 1 & amend. XIV, § 1, cl. 2.  *See generally* Federalist 80 & *Printz v. United States*, 521 U.S. 898, 918 (1997) quoting *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322 (1934).

I have not received legal advice or counsel from anyone else for this case.

# TABLE OF CONTENTS

**STATEMENT PURSUANT TO FED. R. APP. P. 35(b)(1)** ..................................................... I

**CERTIFICATE OF INTEREST** ................................................................................ IV

**TABLE OF CONTENTS** ............................................................................................ V

**TABLE OF AUTHORTIES** ..................................................................................... VII

**STATEMENTS OF COUNSEL (PRO SE)** .............................................................. XIX

PETITION FOR HEARING EN BANC ............................................................................... xix

PETITION FOR REHEARING EN BANC ........................................................................ xxiv

**POINTS OF LAWS & FACTS OVERLOOKED OR MISAPPREHENDED**............XXIX

**RELATED CASES** ............................................................................................. XXXVI

**STATEMENT OF THE CASE** ....................................................................... XXXVIII

**ARGUMENT** ............................................................................................................ 1

    **A.** By law of the Federal Circuit and Supreme Court, the presumptions of fairness for the U.S.-Presidential-contract-at-hand are cautiously enough for a Tucker Act, 28 U.S.C. § 1491(a), contract-based claim to be fairly interpreted in money mandating compensation from the Federal Government, and the C.F.C. should follow one (1) of the four (4) intra-Federal Circuit-court splits. .................................................................................................................................. 1

    **B.** Like here, a U.S.-presidential-contract cannot be "clearly baseless" or "factually frivolous," per Federal Circuit ruling, when it is directly formed with the U.S.-President as Promisor, because the U.S.-C.F.C. has limited judicial discretion before its abuse in reviewing Tucker Act, 28 U.S.C. § 1491(a), -contract-in-fact claims which carry the strong presumptions of validness & fairness which assists judicial caution, and the U.S.-C.F.C. errored when it erroneously and unconstitutionally-prejudicially released a prejudicial judgement prior to the R.C.F.C. 12(a)(1)(a)-sixty(60)-day deadline of submitting an answer from the U.S.-President-Promisor-Defendant-Appellee and responses and replies to all initial filings from me to the answer in the litigation before opining as the Tucker Act Federal-common-law presumptions restrict R.C.F.C. 12(h)(3)'s applicability. R.C.F.C. 12(a)(1)(a). U.S. const. amend. V. *Fisher* (*en banc*). .......................................... 6

    **C.** In Order & Opinion, ECF 31, *Navajo* is a misapprehended and misapplied Supreme Court rule to the Tucker Act, 28 U.S.C. § 1491(a), -complementing-case-and-contract-at-hand because *Navajo* and its preceding and subsequent rulings are understood and explicitly applied only to Tucker Act, 28 U.S.C. § 1491(a), claims rooted in statutes and regulations.................................................... 12

**RELIEF SOUGHT** .................................................................................................. 15

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**...............16

**ADDENDUM FOR RULES, LAWS, STATUTES & CASES** ................................................ I

[1] The Tucker Act, 28 U.S.C. § 1491(a): ........................................................................I

[2] Indian Contract Act, 1872 (Sept. 1, 1872) (British Empire from 1612-1947) (member of the Commonwealth of Nations, 1947-present): .......................................................................I

[3] *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011): ................................. II

[4] *Lovreladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (*en banc*): ............................... II

[5] *Boaz Hous. Auth. v. United States*, No. 2019-2325, 994 F.3d 1359, 1364-65 (Fed. Cir. Apr. 16, 2021) ........ III

[6] 42 U.S.C. §§ 1981 *et seq.* ............................................................................................III

[7] *State v. States Colorado*, 574 U.S. 445, 483 (2015): ...................................................IV

[8] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, No. 308, 2018 at 31 (Del. May. 2, 2019): ..........................IV

[9] *Nama Holdings, LLC v. Related WMC LLC*, C.A. No. 7934-VCL (Del. Ch. Nov. 17, 2014): ........................IV

[10] *Hawkins v. United States*, No. 19-1672C (Fed. Cl. Sep. 30, 2021): ...........................IV

[11] *Arnold v. United States*, No. 21-1393 (Fed. Cl. Sep. 22, 2021): ................................. V

[12] *Ibrahim v. United States*, 20-1396 T (Fed. Cl. Aug. 31, 2021): ................................. V

**I. CONTENTS OF LAW FROM THE FED. CIR.'S ORDER & OP. AT ECF 31. ...................... VI**
  A. Substantive Source of Law. .......................................................................................VI
  B. Fairly…to Mandate Compensation. .......................................................................... VIII
    1. Fair ...................................................................................................................... IX
      i.      Consent to be Sued-Waiver of Sovereign Immunity .................................... IX
      ii.     Fair Notice. ................................................................................................. XI
      iii.    Supreme Court Factors – Primary Authority – *Navajo, Mitchell, & White.* ........................... XIII
      iv.     Elements of Breach of Contract. ................................................................XV
      v.      Promises & The Restatement of Law (Second) of Contracts (1981). ...................................... XVI
      vi.     Judicial Review & Executive Privilege & Congressional Oversight. .......................XVIII
    2. Substantive Law to Mandate Compensation...........................................................XX
  C. Does a Contract (a promise or agreement which is enough to be a contract) exist? ....................... XXII
  D. Jurisdiction of the C.F.C. .........................................................................................XXV

**II. OMISSIONS IN THE FED. CIR.'S OP. AT ECF 31. ...........................................XXIX**
  A. Omission of ECF 15 in Order & Op. at ECF 31. ......................................................XXXI
    1. Declaration, 28 U.S.C. § 1746, as Expert Op. ...................................................XXXVI
    2. Back Drop of the Offer & Acceptance. ..............................................................XXXVII
      i.      Omissions of C.I.A. Findings as to Technology-Weapon, Analogous to or the Same as Weapon S, which Causes the Havana Syndrome. .............................XXXVII

**III. PRIVILEGES AND/OR IMMUNITIES CLAUSES..........................................XXXVIII**
  A. Natural-Born Citizen...........................................................................................XXXVIII
  B. Privileges and/or Immunities as Applied within the Executive Branch............................XL

**RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS**……………………………...

**ORDER & OP., ECF NO. 31**……………………………………………………………….

**CERTIFICATE OF SERVICE** ........................................................................... XLV

# TABLE OF AUTHORTIES

## CASES

*Alden v. Maine,*
   527 U.S. 706 (1999)……………………………………………………………...15

*Arctic Corner, Inc. v. United States,*
   845 F.2d 999 (Fed. Cir. 1988)……………………………………………………10

*Ass'n of Am. Physicians Surgeons v. Clinton,*
   997 F.2d 898 (D.C. Cir. 1993)……………………………………………………14

*Balt. & Ohio R. Co. v. United States,*
   261 U.S. 592 (1923)………………………………………….…………….…....6 & XXXI

*Boaz Hous. Auth. v. United States,*
   No. 2019-2325,
   994 F.3d 1359 (Fed. Cir. Apr. 16, 2021)………………………………………1, 2, 4, 11

*Brashear v. United States,*
   No. 2018-2405 (Fed. Cir. Jun. 10, 2019)……………………………………4, 5

*Brooks v. Dunlop Mfg. Inc.,*
   703 F.3d 624 (Fed. Cir. 2012)……………………………………………………2

*California Federal Bank v. United States,*
   245 F.3d 1342 (Fed. Cir. 2001)…………………………………………………..6

*Chancellor Manor v. United States,*
   331 F.3d 891 (Fed. Cir. 2003)……………………………………………………..

*Cherokee Nation of Oklahoma v. Leavitt,*
   543 U.S. 631 (2005)………………………………………………………3, 4, 6

*Cienega Gardens v. United States,*
   194 F.3d 1231 (Fed. Cir. 1998)……………………………………………...6

*Cities Service Gas Company v. United States,*
   500 F.2d 448 (Fed. Cir. 1974)……………………………………………1, XXVI

*Clinton v. Jones,*
   520 U.S. 681 (1997)……………………………………………….…………...11

*Comm. on Judiciary v. McGahn,*
   415 F. Supp. 3d 148 (D.D.C. 2019)………………………………………………...3

*Corfield v. Coryell,*
   6 F. Cas. 546, 4 Wash.C.C. 371,
   No. 3230 (C.C.E.D. Pa. 1823) (Washington, J.)…………………………….....................

*Crow Creek Sioux Tribe v. United States,*
   No. 2017-2340 (Fed. Cir. Oct. 19, 2018)………………………………………11

*Drake v. United States,*
   No. 2018-2135 (Fed. Cir. Nov. 13, 2019)…..………………………………IV, XX-XXI

*Denton v. Hernandez,*
    504 U.S. 25 (1992)……………………………..………..……..……………………..12

*Downs v. Bidwell,*
    182 U.S. 244 (1901)…………………………………………………...……………

*Eastport S.S. Corp. v. United States,*
    372 F.2d 1002 (Fed. Cir. 1967) (*en banc*)…………………………….……………6

*Erickson v. Pardus,*
    551 U.S. 89, 94 (2007)…………………………………………...…………..1

*Ex parte Bakelite Corp.,*
    279 U.S. 438 (1929)...…………………………………………..……………8

*Ferrerio v. United States,*
    501 F.3d 1349 (Fed. Cir. 2007)…………………………………………………XXI

*Fisher v. United States,*
    402 F.3d 1167 (Fed. Cir. 2005) (*en banc*)………...………………..…..………4, 7, XXI

*Forshey v. Principi,*
    284 U.S. F.3d 1335 (Fed. Cir. 2002)………………………………………1, VI

*Fraunhofer-Gesellschaft Zur Förderung Der Angewandten Forschung E.V. v. Sirius XM Radio Inc.,*
    940 F.3d 1372 (Fed. Cir. 2019)……………………………………………1, 7, 12

*General Electric Co. v. Joinder,*
    552 U.S. 136 (1997)………………………………………………………...XXXII

*Glendale Fed. Bank, FSB v. United States,*
    239 F.3d 1374 (Fed. Cir. 2001)………………………………………………...XXIII

*Greenlee Cnty. V. United States,*
    487 F.3d 871 (Fed. Cir. 2007)……………………………………………………3

*Harrison v. United States,*
    No. 14-705C (Fed. Cl. Mar. 19, 2015)………………………………………...XII

*Hercules Inc. v. United States,*
    24 F.3d 188 (Fed. Cir. 1994)……………………………………….…………12, XII

*Hercules, Inc. v. United States,*
    516 U.S. 417 (1996)……………………………………………1, 3, 7, XXVI

*Higbie v. United States,*
    778 F.3d 990 (Fed. Cir. 2015)………………………………………………2, 5

*Higbie v. United States,*
    113 Fed. Cl. 358, 364 (2013)……………………………………………......5

*Holmes v. United States,*
    657 F.3d 1303 (Fed. Cir. 2011)…………….…...………………………1, 2, 4, 5

*In Re Neagle,*
    135 U.S. 1 (1890*)*…………………………….………………...…XXXVII, XXXIX

*In re Riverbed Tech., Inc.,*
   C.A. No. 10484-VCG (Del. Ch. Sep. 17, 2015)……………………………………………9

*In Re Quarles & Butler,*
   158 U.S. 532 (1895)…………………………………………………......XXXIX

*James M. Ellett Constr. Co. v. United States,*
   93 F.3d 1537 (Fed. Cir. 1996)……………………………………………..…….11

*Jan's Helicopter Serv., Inc. v. FAA,*
   525 F.3d 1299 (Fed. Cir. 2008)……………………………………………..…VII

*Joshua v. United States,*
   17 F.3d 378 (Fed. Cir. 1994)……………………………………………..12, XXXV-VI

*Kawa v. United States,*
   No. 06-0448C (Fed. Cl. June 28, 2007)……………………………………………10

*Kawa v. United States,*
   77 Fed. Cl. 294 (2007)…………………………………………………………..11

*Kilopass Tech., Inc. v. Sidense Corp.,*
   No. 13-1193 (Fed. Cir. Dec. 26, 2013)……………………………………………1, 6, 10

*Langan v. United States,*
   No. 2020-1057 (Fed. Cir. May. 6, 2020)……………………………………………...XXIII

*Leaf Invenergy Co. v. Invenergy Renewables LLC,*
   No. 308, 2018 at 31 (Del. May. 2, 2019)……………………………………………IV

*Locke v. United States,*
   283 F.2d 521, 524 (Ct. Cl. 1960)……………………………………………XVIII

*Logan v. United States,*
   114 U.S. 263 (1892)…………………………………………………….......XXXIX

*Lopez v. United States,*
   No. 21-1166 (Fed. Cl. Jan. 21, 2022)……………………………………………6

*Loveladies Harbor, Inc. v. United States,*
   27 F.3d 1545 (Fed. Cir. 1994) *(en banc)*……………………………………………III

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555…………………………………………………………………

*Maine Community Health Options v. United States,*
   590 U.S. ___ (2020), 140 S. Ct. 1308………………………………......1, 3, 5, 6, 9, 11

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803)………………………………3, 8, 9, XVIII, XXXV, XXXVIII

*Mass. Bay Transp. Auth. v. United States,*
   254 F.3d 1367 (Fed. Cir. 2001)……………….......................................................VII

*Massie v. United States,*
   166 F.3d 1184 (Fed. Cir. 1999)……………………………………………..6

*McAbee Construction v. United States,*
   97 F.3d 1431 (Fed. Cir. 1996)……………………………………………6

*Minesen Co. v. McHugh,*
    671 F.3d 1332 (Fed. Cir. 2012)………………………………………………..3, 5

*Motions Systems Corp. v. Bush,*
    437 F.3d 1356 (Fed. Cir. 2006)………………………………………………12

*Myles v. United States,*
    No. 2021-1758 (Fed. Cir. Jan. 13, 2022)…………………………………..………XXI

*Nama Holdings, LLC v. Related WMC LLC,*
    C.A. No. 7934-VCL (Del. Ch. Nov. 17, 2014)…………………………………..IV-V

*Olson v. United States,*
    No. 18-287C (Fed. Cl. Jan. 14, 2021)………………………………………………12

*Oswalt v. United States,*
    41 Fed. Appx. 471 (Fed. Cir. 2002)…………………………………………………11

*Patel v. Biden et al.,*
    No. 1:22-cv-00394-UNA (D.D.C. 202_) (pet. for mandamus)………………………..15

*Patel v. United States,*
    No. 1:21-cv-2009-LAS (Fed. Cl. Nov. 5, 2021), Dkt. ___………..……...……….*in passim*

*Patel v. United States,*
    No. 2022-1131 (Fed. Cir. 202_), ECF ___.........................................................*in passim*

*People v. Davis,*
    142 Misc. 2d 881 (N.Y. Sup. Ct. 1988)…………….……………………12, XXVI-VIII

*Rabkin v. Oregon Health Services Univ.,*
    350 F.3d 967 (9th Cir. 2003)………………………………………………………...7

*Ralston Steel Corp. v. United States,*
    340 F.2d 663 (Fed. Cir. 1965),
    *cert. denied*, 381 U.S. 590 (1965)……………………………..……………….11, 15

*Reynolds v. Army & Air Force Exch. Serv.,*
    846 F.2d 746 (Fed. Cir. 1988)……………………………………………………..10

*Rite-Hite Corp. v. Kelley Co., Inc.,*
    56 F.3d 1538 (Fed. Cir. 1995)…………………………………………..……….12

*Russell Corp. v. United States,*
    210 Ct. Cl. 596, 537 F.2d 474 (1976),
    *cert. denied*, 429 U.S. 1073 (1977)………………………………………………..XII

*San Carlos Irrigation & Drainage Dist. v. United States,*
    877 F.2d 957 (Fed. Cir. 1989)………………………………………………2, 5, 13

*Samish Indian Nation v. United States,*
    419 F.3d 1355 (Fed. Cir. 2005)………………………………………………2, 5, 7

*Smith v. United States,*
    709 F.3d 1114 (Fed. Cir. 2013),
    *cert. denied*, 571 U.S. 945 (2013)………..……………………..……………1, IX, XXI

*Slattery v. United States,*
685 F.3d 1298 (Fed. Cir. 2011) (*en banc*)………………………………...3, 5, 8, 11, XIII

*State v. States Colorado,*
574 U.S. 445 (2015)………………………………………………………………..IV

*Total Med. Mgmt., Inc. v. United States,*
104 F.3d 1314 (Fed. Cir. 1997)………………………………………………………10

*Twining v. United States,*
211 U.S. 78 (1908)………………………………………………………………XXXIX

*Ullman v. United States,*
151 F. App'x 941 (Fed. Cir. 2005)…………………………………………………..10

*United States v. Arthrex, Inc.,*
594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 (2021)………………………..9, XXXIV-V

*United States v. Mitchell ("Mitchell II"),*
463 U.S. 206 (1983)……………………….……..…...…………………………………6

*United States v. Navajo Nation,*
556 U.S. 287 (2009)…………………………….…..……………………………...1, 6, 12-13

*United States v. Testan,*
424 U.S. 392 (1976)………………………….…..………………………………….6

*United States v. White Mountain Apache Tribe,*
537 U.S. 465 (2003)……………………….…..………………………….....................4

*United States v. Winstar Corp.,*
64 F.3d 1531, 1542 (Fed. Cir. 1995) (*en banc*)…………………………………...14

*United States v. Winstar Corp.,*
518 U.S. 839 (1996)…………………….…..………………………………………14

*Vargas v. United States,*
114 Fed. Cl. 226 (2014)………………….…..…………………………………...XV

*Wood-Ivey Systems Corp. v. United States,*
4 F.3d 961 (Fed. Cir. 1993)…………………………………………10, 11, V, X-XI

*Youngstown Sheet & Tube Co.* v. *Sawyer,*
349 U.S. 579 (1952)…………………………………………...……6, 9, 11, XX

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
566 U.S. 189, 132 S.Ct. 1421  (2012)…………………………………………….3

**Clarifying Language of Primarily-Verbal & Memorialized Tucker Act-Contract Based Cases All Citing *Smith***

*Allen v. United States,*
No. 2020-2143 (Fed. Cir. Jan. 20, 2022)…………….......…..………………….....1

*Arnold v. United States,*
No. 21-1393 (Fed. Cl. Sept. 22, 2021)………………………………….…….…1

*Boaz Hous. Auth. v. United States,*
    No. 2019-2325, 994 F.3d 1359 (Fed. Cir. Apr. 16, 2021)…………………1, 2, 4, 11

*Bowden v. United States,*
    No. 2021-1671 (Fed. Cir. Oct. 20, 2021)………………………………..…………1

*Drake v. United States,*
    No. 2018-2135 (Fed. Cir. Nov. 13, 2019)…………………………………………1

*Hawkins v. United States,*
    No. 19-1672C (Fed. Cl. Sept. 30, 2021)……………………….......................……1

*Ibrahim v. United States,*
    No. 20-1396 T (Fed. Cl. Aug. 31, 2021)……………………………………….....1

*Kornafel v. United States,*
    No. 20-1655C (Fed. Cl. June 29, 2021)………………………………….…………1

*James v. United States,*
    No. 21-743C (Fed. Cl. Jul. 29, 2021)……………………………………….....…1

*Reaves v. United States,*
    No. 16-141C (Fed. Cl. Aug. 10, 2021)……………….……...…………….…………1

*Ross v. United States,*
    No. 21-1347C (Fed. Cl. Jul. 30, 2021)………………………………….…………1

## UNITED STATES CONSTITUTION

Pmbl.,
    u.s. const. pmbl.……………...…………...……………...…………………………13

Vested Powers,
    art. II, § 1, cl. 1……………………………………………………………………….

Faithfully Execute Cl.,
    art. II, § 1, cl. 8……………………………………….........................

Take Care Cl.,
    art. II, § 3……………………………………………...…………………....

The Judiciary,
    art. III *et seq*.………………………………………………………………15

Inherent Powers,
    art. III, § 1………………………………………………...…………15

Full Faith & Cl.,
    art. IV, § 1…………………………………………….…………………8

Privileges & Immunities Cl.,
    art. IV, § 2, cl. 1……………...………………………………………11, 14 XXXVIII

Doctrine of Comity,
    art. IV, § 2, cl. 1……………………………………………………………..8

"Preceding or Referral Cl.,"
      art. VI, § 1……………………………………………………………...XXXIX-XL

Due Process & Lenity,
      amend. V……….....………………………….…………….……………………9

Abolition of Slavery,
      amend. XIII………….…………….……………..…………….…………….………...XL

Privileges or Immunities Cl.,
      amend. XIV, § 1, cl. 2…………….………………….….……………11, 14 XXXVIII

**STATUTES**

The Dictionary Act,

      1 U.S.C. § 1 ("officer")…………………………………………………….…

The President,

      3 U.S.C. § 105……………….……………………………………...…14

      3 U.S.C. §§ 301-303……………..………………….………….…………..…8, 11, 14

Judicial Review,

      5 U.S.C. § 701(a)(2)……………………………………………………....3

The National Cultural Center & J.F.K. Center For The Performing Arts,

      20 U.S.C. § 76h ("Board of Trustees")…………………………………….…14

Judge & Justices Oath of Office,

      28 U.S.C. § 453……………….…………….……………….……………..8

Dep't of Justice,

      28 U.S.C. §§ 501 *et seq*……………….……………….……………….……………...………

      28 U.S.C. §§ 516-518……………….……………….……………..…….7, 8

      28 U.S.C. §§ 519……………….…………….……………….……………...…………...8

The Tucker Act,

      28 U.S.C. § 1491(a)…………………….…………...……………………...……*in passim*

The All Writs Act,

    28 U.S.C. § 1651……………….…….……………….…….…………….………..8, 15

Declaration,

    28 U.S.C. § 1746……………….…….……………….…………….…………7, XXXVI-VII

United States C.F.C. Procedure - Payment of Judgments,

    28 U.S.C. § 2517……………….……………………………………………...1, 11

Privilege Under the Law For Whites & Not-Whites to Make & Enforce Contracts,

    42 U.S.C. §§ 1981 *et seq*………….…..…………….……………….………………1, III-IV

National Aeronautics and Space Act,

    51 U.S.C. § 20102……………….…….……….……………….……………….8

    51 U.S.C. § 20302……………….…….……………….……………….……8

    51 U.S.C. § 50702………….…..……….…..……………..…………..…………….8

Indian Contract Act, 1872 (Sept. 1, 1872),

    Preliminary, § 2(a), (b), (e), (h)……………………………………….…I-II

    Promises, express or implied., § 9……………………………………...I-II

    What agreements are contracts., § 10……………………………………..I-II

## U.S. CONST. ART. VI, § 1 DOCUMENTS

Decl. of Independence (1776)……………..……………………………………………...

Treaty of Paris (1783)……………….……………….……………….……………XXXIX-XL

Paris Peace Treaty – Cong. Proclamation of Jan. 14, 1784…...……………………XXXIX-XL

## CONSTITUTIONAL CONVENTION MINUTES

Madison, Monday, June 18, in Committee of the whole, on the propositions of Mr. Pat-terson & Mr. Randolph. *The Records of the Federal Convention of 1787*, vol. 1, pp. 285-291. New Haven: Yale University Press, 1911. Edited by Max Farrand. https://oll.libertyfund.org/title/farrand-the-records-of-the-federal-convention-of-1787-vol-1#lf0544-01_head_163.....................................................................................

Madison, Monday, June 25, in Convention. *The Records of the Federal Convention of 1787*, vol. 1, pp. 398-405. New Haven: Yale University Press, 1911. Edited by Max Farrand.  https://oll.libertyfund.org/title/farrand-the-records-of-the-federal-convention-of-1787-vol-1 ..................................................................................................................

## FEDERALIST PAPERS

Federalist No. 78……………………………………………….........................3, 8, 9

Federalist No. 80………………………………………………………...11, 15

Federalist No. 81………………………………………………………….15

## RULES

R.C.F.C. 8...…………………………………………………………………...........

R.C.F.C. 8(e)……………………………………………………………….12

R.C.F.C. 12(a)(1)(A)…………………………………………………..7, 11

R.C.F.C. 12(b)(1)……………………………………………………….7

R.C.F.C. 12(b)(6)……………………………………………………….7

R.C.F.C. 12(h)(3)…………………………………………………..6, 10

R. Ct. Fed. 12(h)(3)……………………………………...…………1, 6

Fed. R. Civ. P. 8(e)…………………………………………………...12

Fed. R. Civ. P. 12(h)(3)……………………………………………10

## REST. (2d) OF K (1981), PER FEDERAL COMMON LAW, *MITCHELL II*, & *WINSTAR*

§ Introductory Note *et seq.*, p. 1……………………………..…………………...

§ 1 (Contract Defined) …………………………………...…………..2, 6

§ 2 (Promise; Promisor; Promisee; Beneficiary)…………………...…….2, 6

§ 3 (Agreement Defined; Bargain Defined)……………………..............…...2, 6

§ 4 (How a Promise May Be Made)…………………………………..2, 6

§ 5 (Terms of Promise, Agreement, or Contract)……………………...…………..2, 6

§ 10 (Multiple Promisors & Promisees of the Same Performance)…………...……………...

§ 18 (Manifestation of Mutual Assent)………………………………...……………..

§ 19 (Conduct as Manifestation of Assent)………………………...……………...

    § 19, cmt. c (*Responsibility for unintended appearance of assent*.)………...……………..

§ 31 (Offer Proposing a Single Contract or a Number of Contracts)……...……..……………..

§ 33(2) (Certainty)…………………………………………………………….......11

    § 33(2), cmt. b (*Certainty in basis for remedy*.)……………………...……………..11

§ 34 (Certainty and Choice of Terms; Effect of Performance or Reliance)…………………..

§ 50, cmt. a (*Mode of acceptance*.)……………………………………………………

§ 75 (Exchange for Promise for Promise)………………..…………………………………...

§ 78 (Voidable and Unenforceable Promises)...……………………………………………...

§ 79 (Adequacy of Consideration; Mutuality of Obligation)………………….....*in passim*

§ 80 (Multiple Exchanges)……………………….…………………………………………

§ 81 (Consideration as Motive or Inducing Cause)…………...…………………..*in passim*

§ 90 (Promise Reasonably Inducing Action or Forbearance)………………………….9, 11

§ 139(2) (Enforcement by Virtue of Action in Reliance)…………………………….9, 11

§ 178 (When a Term Is Unenforceable on Grounds of Public Policy)………….................9

    § 178, cmt. b (*Balancing of interests*.)………..……………………………………..9

    § 178, illus. 4……..……………………………………………………………...

§ 200 (Interpretation of Promise or Agreement)…………..……………………………...

    § 200, cmt. a (*Formation of contract*.)…………………………………………..

§ 201 (Whose Meaning Prevails)…………………….…………………………………...

§ 202 (Rules in Aid of Interpretation)……………..………..…………………..…………...

§ 203 (Standards of Preference in Interpretation)………..…………………..………………

§ 204 (Supplying an Omitted Essential Term)……………………………………………

§ 205 (Duty of Good Faith and Fair Dealing)……………………………………………...

§ 206 (Interpretation Against the Draftsman)………………………………………………….

§ 207 (Interpretation Favoring the Public)…………………………………………...11

§ 207, cmt. a (*Scope.*)………………………………………………………………….

§ 208 (Unconscionable Contract or Term)………………………………………………...

§ 313 (Government Contracts)………………………………………………………….6

§ 328 (Interpretation of Words of Assignment; Effect of Acceptance of Assignment)

………………………………………………………………………………………….

§ 344 (Purposes of Remedies)……………………………………………………………

§ 344, cmt. a (*Three interests.*)………………………………………………….

§ 345 (Judicial Remedies Available)……………………………………………………

§ 346 (Availability of Damages)…………………………………...……………………11

§ 346, cmt. a (*Right to damages.*)………………………………………..………...

§ 346, cmt. b (*Nominal damages.*)…………………………………………………

§ 362, cmt. b (Effect of Uncertainty of Terms, *Degree of certainty required*.)……..…………

§ 364 (Effect of Unfairness)……………………………………………………...9

§ 365 (Effect of Public Policy)…………………………………………………...9

§ 367 (Contracts for Personal Service or Supervision)…………………………………….6

§ 378 (Election Among Remedies) …………………………...………………………...……

**SECONDARY SOURCES**

Aitken, Janice, "The Trust Doctrine in Federal Indian Law: A Look at Its Development and at How Its Analysis under Social Contract Theory Might Expand Its Scope," 18 N. Ill. U. L. Rev. 115 (1997-1998), https://hei-nonline.org/HOL/LandingPage?handle=hein.journals/niulr18&div=9&id=&page=................................................................13

Bond, Philip. (2009). Contracting in the Presence of Judicial Agency. *The B.E. Journal of Theoretical Economics*. Vol. 9. 36-36. https://doi.org/10.2202/1935-1704.1430..............................................................................................................3

Expert panel: Havana Syndrome Most Likely Caused By Directed Energy," *MSNBC News*, https://www.nbcnews.com/politics/national-security/havana-

syndrome-symptoms-small-group-likely-caused-directed-energy-say-rcna14584. Feb. 2, 2022. Retrieved Feb. 9, 2022 (ECF 30)…………………………......7, 14, XXXVII

Gregory C. Sisk, J.D, "Online Symposium: The Federal Circuit's 2020 Rulings Reviewing Decisions of the Court of Federal Claims in Tucker Act Cas"s," FedCircuitBlog, March 31, 2021, https://fedcircuitblog.com/2021/03/31/online-symposium-the-federal-circuits-2020-rulings-reviewing-decisions-of-the-court-of-federal-claims-in-tucker-act-cases/............................................................................................IX

Langford, Andrew T. (2012) "Let's Talk About Text: Contracts, Claims, and Judicial Philosophy at the Federal Circuit," IP Theory: Vol. 3: Iss. 1, Art. 4. Available at: https://www.repository.law.indiana.edu/ipt/vol3/iss1/4..........................1, 7, 10

Mead, Joseph and Warren, Katherin". "Quasi-Governmental Organizations at the Local Level: Publicly-Appointed Directors Leading Nonprofit Organization's " Nonprofit Policy Forum, vol. 7, no. 3, 2016, pp. 289-309. https://doi.org/10.1515/npf-2014-0044...................................................................................................9

T. Natasha Patel, *First Lady, Last Rights--Extending Executive Immunity to the First Lady*, 25 Hastings Const. L.Q. 585 (1998). https://repository.uchastings.edu/hastings_constitutional_law_quaterly/vol25/iss4/3....................................................14

Trustees: Kennedy Center, The Kennedy Center, https://www.kennedy-center.org/about-us/leadership/trustees/ (last visited Feb 22, 2022)……………………………………………………………………………….14

Vermeule, Adrian. "Veil of Ignorance Rules in Constitutional Law." *The Yale Law Journal* 111, no. 2 (2001): 399–433. https://doi.org/10.2307/797593....…………........XXXVIII

## STATEMENTS OF COUNSEL (PRO SE)

**PETITION FOR HEARING EN BANC**

A petition that an appeal be initially heard en banc must contain the following statement of, and separately signed by, counsel at the beginning:

Based on my professional judgment, I believe this appeal requires an answer to one or more precedent-setting questions of exceptional importance: (set forth each question in a separate sentence).

1. Did Senior Judge Loren A. Smith not follow judicial review by not cautiously honoring the federal common law presumptions of validness and fairness to be money mandating for Tucker Act, 28 U.S.C. § 1491(a), -complementing contracts, especially when the United States-President, or United States-Head of Agency, is directly the Promisor on behalf of the United States, which also constitutes the basis for jurisdiction and basis for relief, as in the contract-and-case-at-hand? *United States v. Arthrex, Inc.*, 594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 (2021), *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011), *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959-60 (Fed. Cir. 1989); & *Maine Cmty. Health Options v. United States*, 590 U.S. ___, 140 S. Ct. 1308, 1315 & 1328 (2020).

2. Did Senior Judge Loren A. Smith exceed judicial review by not honoring either *United States v. Mitchell*, 463 U.S. 206, 226 (1983), or Rest. (2d) Contracts §§ 1-5, 90 and/or 139(2), or R.C.F.C. 8(e), or all, when not construing a contract or promise which holds the weight a contract which when breached a money relief from the Federal Government must fairly follow? *See United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996). *See generally California Federal Bank v. United States*, 245 F.3d 1342 (Fed. Cir. 2001). *Oswalt v. United States*, 41 Fed. Appx. 471, 472-73 (Fed. Cir. 2002).

3. Did the Federal Circuit in ECF 31 error by not using the constitutionally-required judicial caution to avoid prejudice in this case as applied, as Mr. Kiepura, counsel

for Appellee-United States, unfaithfully and unconstitutionally represent the United States-C.F.C.-Judge Loren A. Smith's perspective/WILL about the contract-at-hand rather than United States-President-Head of Federal Government-Promisor's undisputed demonstration to allow transfer of monies from Federal Government to me after breaching a valid or enforceable Tucker Act, 28 U.S.C. § 1491(a), complementing a contract, when arguing in ECFs 16 & 21? 5 U.S.C. § 516. *Motions Systems Corp. v. Bush*, 437 F.3d 1356, 1366-69 (Fed. Cir. 2006); *cf. Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994) (applicable only when all parties on one side make a clear argument). U.S. const. amend. V. *Kawa v. United States*, No. 06-0448C at 12-13 (Fed. Cl. June 28, 2007). *See also Leaf Invenergy Co. v. Invenergy Renewables LLC*, No. 308, 2018 at 31 (Del. May. 2, 2019) & *Nama Holdings, LLC v. Related WMC LLC*, C.A. No. 7934-VCL (Del. Ch. Nov. 17, 2014). *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 & *Arthrex*, 594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 at 3-4 & 12-20. *Oswalt v. United States*, 41 Fed. Appx. 471, 472-73 (Fed. Cir. 2002).

4. Does the Federal Circuit, through use of this case-at-hand, need to further clarify the distinguishments between Tucker Act, 28 U.S.C. § 1491(a), claims rooted in statutes or regulations and contracts-in-fact, as it may be material to prevent the maladministration of justice? *Boaz Hous. Auth. v. United States,* No. 2019-2325, 994 F.3d 1359 (Fed. Cir. Apr. 16, 2021). *Holmes*, 657 F.3d at 1303. *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367 (Fed. Cir. 2001). *Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631, 632 & 640 (2005) (this technicality is not something that relieves the Federal Government from fair-inference and liability). *Oswalt*, 41 Fed. Appx. at 472-73.

5. Did Senior Judge Loren A. Smith in Order at Dkt. 10 or the Federal Circuit in Op. & Order at ECF 31 violate judicial review and either abused its discretion or made

a clear error when each court deemed the judicially-noticeable fact of the Presidential-contract-at-hand as "factually frivolous" or "clearly baseless," inconsistent with *Fischer v. United States*, 402 F.3d 1167, 1172 (*en banc*) and *Denton v. Hernandez*, 504 U.S. 25, 32-3 (1992), and not continue its analysis to the breach liability of the contract-at-hand, which would create a precedent, in violation of separation of powers, that the judiciary can deem constitutional acts of another branch of government to be factually frivolous? *See* Addendum at p. XXV-XXVI quoting *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667 (Fed. Cir. 1965), *cert. denied*, 381 U.S. 590 (1965). *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314 (Fed. Cir. 1997). Federalist No. 78. *Maine*, 590 U.S. at ___, 140 S. Ct. 1308, 1315, 1328, 1331, & 1333. *United States v. Winstar Corp.*, 64 F.3d 1531, 1542 (Fed. Cir. 1995) (*en banc*). *Youngstown Sheet & Tube Co.* v. *Sawyer*, 349 U.S. 579, 635-55, 646 (1952). *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (Whether a contract exists is a mixed question of law and fact) quoted in *California*, 245 F.3d at 1346 (includes review for clear error). *Oswalt*, 41 Fed. Appx. at 472-73.

6.  Do consequential unique Federal interests  exist to determine the United States-Presidential-contract-at-hand, and since the federal common law presumptions state that a contract is presumed valid when a breach is pleaded for relief, and the amount of breach liability?  Federalist 80 (Contract-at-hand complements duties of Privileges and Immunities Clause, which is most important clause in the United States Constitution, and the Federal Government has supremacy in its enforcement and need not involve states or local authority, including when dealing with lawless violence, per *In re Quarles and Butler*, 158 U.S. 532, 535 (U.S. 1895) & *United States v. Harris*, 106 U.S. 629, 638 & 643-44 (1883).). *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (a branch of government can change course of event

irrespective of existing governmental contracts, i.e. the Executive Privilege of the President, but these constitutionally "*per se*" efficient breaches of these contracts always mandate the Federal Government to give money damages).  *Youngstown Sheet & Tube Co. v. Sawyer*, 349 U.S. 579, 646 (1952) (Act of Congress should not allow President to escape responsibilities of executive power).  *Maine Cmty. Health Options v. United States*, 590 U.S. ___ (2020), 140 S. Ct. 1308, 1331 ("…The Government should honor its obligations.").  28 U.S.C. § 516.  *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988) quoted in *Maine*, 140 S. Ct. at 1334 (Alito, J. dissenting).

7. Did the Court of Federal Claims error when it opined under R.C.F.C. 12(h)(3) before it received the United States-President-Promisor-Defendant's answer to the complaint, which based on the President's demonstration would not have challenged the breach of contract claim (i.e. "efficient breach"), and much prior to the expiration of the sixty (60)-day time requirement under R.C.F.C. 12(a)(1)(A) causing prejudice to me and not consistent with the Federal Circuit's opinion in *Wood-Ivey Systems Corp. v. United States*, 4 F.3d 961, 965 (Fed. Cir. 1993)?[1]  Appxs. 45 (President Biden communication, para. LXXXVI), 42 (breach, para. LXXIV) & 45 (if not Appx 42, then breach, para. LXXXIII), 38-9 (ratification by President Trump, para. LVI), and 45 (President Biden unnecessary re-ratification, based on my request via www.whitehouse.gov, para. LXXII).  28 U.S.C. § 516.  *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541 (Fed. Cir. 1996) ("A trial court's ruling on its own jurisdiction is a question of law which we review *de novo*.").  *Cienega*

---

1. *Wood-Ivey*, 4 F.3d at 965 ("A court may not change a jurisdictional time period because the statute grants the court no power to act over the matter.  This type of time period is mandatory and immutable.").

*Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (Whether a contract

exists is a mixed question of law and fact) quoted in *California Federal Bank v. United*

*States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001) (includes review for clear error).[2]

Respectfully submitted,

/s/ Raj Patel

T.E., T.E. Raj K. Patel (Pro Se)
6850 East 21st Street
Indianapolis, IN 46219
Marion County
317-450-6651 (cell)
rajp2010@gmail.com
www.rajpatel.live

Dated: March 8, 2022

---

2. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009), *Maine Community Health Options v. United States*, 590 U.S. ___ (2020), 140 S. Ct. 1308, 1328 (2020), *United States v. Mitchell*, 463 U.S. 206, 217-19 (1983), *Lopez v. United States*, No. 21-1166 (Fed. Cl. Jan. 21, 2022), *Massie v. United States*, 166 F.3d 1184, 1189-90 (Fed. Cir. 1999), *McAbee Construction v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996), *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) (specific claim construction is not necessary; general terms are fine).

**PETITION FOR REHEARING EN BANC**

A petition that an appeal be reheard en banc must contain one or both of the following statements of, and separately signed by, counsel at the beginning:

Based on my professional judgment, I believe the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedent(s) of this court: (cite specific decisions).

1.  By engaging in a frivolity inquiry for the Tucker Act, 28 U.S.C. § 1491(a), -complementing United States-Presidential-express-not-written-and-memorialized-contract-in-fact-at-hand, did the Court of Federal Claims and the Federal Circuit in Order & Op., ECF No. 31 violate *Fischer v. United States*, 402 F.3d 1167, 1172 (*en banc*) which limits frivolity inquires to Tucker Act-complementing statutes and regulations?  *Denton v. Hernandez*, 504 U.S. 25, 32-3 (1992).  *Oswalt v. United States*, 41 Fed. Appx. 471, 472-73 (Fed. Cir. 2002).

2.  By dismissing the Tucker Act, 28 U.S.C. § 1491(a), -complementing United States-Presidential-express-not-written-and-memorialized-contract-in-fact-at-hand for lack of jurisdiction, under R.C.F.C. 12(h)(3), did the Court of Federal Claims clearly error, under *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667-69 (Fed. Cir. 1965) which states that a Tucker Act-contract-claim can only be dismissed pursuant to R.C.F.C. 12(b)(6), for "failure to state a claim upon which relief can be granted," and not for "want of jurisdiction," and effectually was prejudicially to me under the Fifth Amendment of the United States Constitution? *Ralston*, 340 F.2d at 667-69 & 672.  Dkt. 10 & Order & Op., ECF 31.  R.C.F.C. 8(e).

3.  Did the Federal Circuit violate the federal common law presumption of validness of civil contracts when it affirmed the Court of Federal Claims' order, which did not construe a Tucker Act, 28 U.S.C. § 1491(a), -complementing not-written-but-memorialized-contract-in-fact because both courts incorrectly thought that I had

pleaded a Tucker Act, 28 U.S.C. § 1491(a), -complementing statute or regulation? *Compare* Order & Op., ECF No. 31 *with* Dkts. 10 (Order) & 1 (Compl.).  *United States v. Mitchell*, 463 U.S. 206, 226 (1983) (referring to language of the Restatement), Rest. (2d) Contracts §§ 90, 139(2), & 178, cmt. b., & R.C.F.C. 8(e).  *See Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364-65 (Fed. Cir. Apr. 16, 2021) (clarifying language).  *United States v. Navajo Nation*, 556 U.S. 287 (2009).

4.  Did the Federal Circuit violate its four(4)-part intra-Court jurisdictional split, which is uninterested to the amount of breach liability, when it did not apply any of the rules from *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) citing *United States v. Winstar Corp.*, 518 U.S. 839 (1996) and *Smith v. United States*, 709 F.3d 1114, 1115 (Fed. Cir. 2013), *cert. denied*, 571 U.S. 945 (2013) (federal common law presumptions are sufficient to give notice to the Federal Government that the contract will be money mandating, as money is the default remedy for contract breach, and no further inquiry is needed to a claim of breach of Tucker Act complementing contract),[3] *Brashear v. United States*, No. 2018-2405 at 3 (Fed. Cir. Jun. 10, 2019) ("reasonably amenable" to the reading that Tucker Act-complementing contract mandates a right of recovery in damages against the Government")[4], *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (in addition to the presumptions of the civil contracts, a court is to ask whether the Federal Government "contemplat[ed]" money damages from

---

3. *But see Maine*, 140 S. Ct. at 1315 & 1328 (Sotomayor, J., majority opinion) (implicitly supporting the *Holmes/Smith/Fisher* (*en banc*) rule).

4. *But see Maine*, 140 S. Ct. at 1333 (Alito, J., dissenting) (for non-statute claims, such as, here, for the contract-at-hand, in order to for the C.F.C. or the Federal Circuit to apply the "reasonably amenable" test, the applying court(s) should give a "reasoned explanation of the basis for the test" in its opinion, otherwise the presumptions that civil governmental contracts are generally always fairly interpretable as being money mandating from the Federal Government is enough and thus a court need not inquire further).

the Tucker Act-substantive source of law of contract), and *Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015) quoting *Higbie v. United States*, 113 Fed. Cl. 358, 364 (2013) (a Tucker Act-complementing contract that is "remotely monetary" is fairly presumed to be money mandating; fairness inquiry is only proper if, unlike here, "breach of contract could be entirely non-monetary.")?

5. Are the precedents of *Navajo*, 556 U.S. at 290, along with the precedents of *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 465-479 (2003) and *Mitchell II*, 463 U.S. at 226, immaterial and invalidly misappropriated and misapplied to the breach of Tucker Act contract claim because the precedents apply only to Tucker Act, 28 U.S.C. § 1491(a), claims originating in statutes and regulations, and the precedents of *Balt. & Ohio R. Co. v. United States*, 261 U.S. 592 (1923) or the 4-part-intra-jurisdictional cases above (*Holmes*, *Brashear*, *San*, and *Higbie*) probably applied? *See also Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996).  *Fraunhofer-Gesellschaft Zur Förderung Der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1382 (Fed. Cir. 2019).

6. Was Plaintiff-Appellant (*pro se*) unconstitutionally prejudiced of his procedural and substantive Fifth Amendment Due Process rights when this Federal Circuit allowed for the filing of ECF 16 and ECF 21, which advocated for United States-Senior Judge Loren A. Smith's opinion at Dkt. 10 instead of the United States-President-Promisor-Defendant-Appellee's, who is also the Head of the United States Federal Government and the "chief constitutional officer," per *Motions Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) and *Marbury v. Madison*, 5 U.S. (1

Cranch) 137, 166 (1803)[5], and opined in support of ECF 16 and ECF 21 in ECF 31? *Cf.* ECFs 16, 21, & 31 citing *Joshua v. United States*, 17 F.3d 378 (Fed. Cir. 1994) (thus, position of United States not clear). 28 U.S.C. § 516. *United States v. Arthrex, Inc.*, 594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 at 23 (2021) (Roberts, C.J., opinion) ("[T]he President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people."). Doctrine of Comity & Privileges and Immunities Cl., U.S. const. art. IV, § 2, cl. 1.

7.  Because President Biden's opinion on ensuring payment from the unlimitedly funded treasury by relying on the federal common law presumptions of vaildness and enforceability of breach of Tucker Act contracts claims and Senior Judge Smith's opinion which forcefully prevents the transfer of money are in conflict, did the Federal Circuit error in allowing Mr. Kiepura's, opposing counsel's, unfaithfully representation of the United States before the Federal Circuit and prejudiced the Plaintiff-Appellant by not arguing the precedential opinion of the United States, which is the United States-President's. *Ex parte Bakelite Corp.*, 279 U.S. 438, 451-52 (1929) (the C.F.C. is a not-willed rubber-stamp court to oversee Congress' pursue powers under the execution of the Executive Branch). *Marbury*, 5 U.S. at 166 (1803). *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1335 (2020) (Alito, J., dissenting) (judicial caution in Tucker Act claims required). Federalist No. 78.

---

5. *Marbury*, 5 U.S. at 166 ("This officer…is to conform precisely to the will of the president. He is the mere organ by whom that will is communicated. The acts of such an [inferior] officer, as an officer, can never be examinable by the courts.").

8.  Does the R.C.F.C. 8(e), Restatement (Second) Contract §§ 1-5, 90 & 139(2), and *Mitchell II*, 463 U.S. at 226, require C.F.C. to find a contract-in-fact under the Tucker Act, 28 U.S.C. § 1491(a), even if the contract-at-hand was based on a promise or agreement made between the United States-President-Federal Government-Promisor, a sophisticated party, and Appellant (*pro se*), me? *California Federal Bank v. United States*, 245 F.3d 1342 (Fed. Cir. 2001). *Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631, 632 & 640 (2005) (this technicality is not something that relieves the Federal Government from fair-inference and liability). *Oswalt*, 41 Fed. Appx. at 472-73.

9.  By not honoring the federal common law presumptions of Tucker Act claims of validness did the Court of Federal Claims violate *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) breach of contract claim comes "armed with presumptions" language? *Oswalt*, 41 Fed. Appx. at 472-73.

Respectfully submitted,

/s/ Raj Patel
T.E., T.E. Raj K. Patel (Pro Se)
6850 East 21st Street
Indianapolis, IN 46219
Marion County
317-450-6651 (cell)
rajp2010@gmail.com
www.rajpatel.live

Dated: March 8, 2022

## **POINTS OF LAWS & FACTS OVERLOOKED OR MISAPPREHENDED**

I.    The points of law or fact the filer believes the court has overlooked or misapprehended as required under Federal Rule of Appellate Procedure 40(a)(2);

II.   The petition must state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended and must argue in support of the petition. Oral argument is not permitted.

III.  **Questions of Facts:**

    A. Did Plaintiff-Appellant (pro se) plead enough facts to show that the United States breached the United States-Presidential-express-not-written-and-memorialized-contract-in-fact-at-hand giving rise to jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)?  *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (Whether a contract exists is a mixed question of law and fact) quoted in *California Federal Bank v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001) (includes review for clear error). Appxs. 39, 42, & 45.

    B. Did Plaintiff-Appellant (pro se) plead enough facts to show that the Tucker Act, 28 U.S.C. § 1491(a), -complementing United States-Presidential-express-not-written-and-memorialized-contract-in-fact-at-hand was duly formed in light of the surrounding circumstances.  *Balt. & Ohio R. Co. v. United States*, 261 U.S. 592, 597 (1923) cited in ECF-15, *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996) ("The circumstances surrounding the contracting are only relevant to the extent that they help us deduce what the parties to the contract agreed to in fact."), & *Fraunhofer-Gesellschaft Zur*

*Förderung Der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1382 (Fed. Cir. 2019).  *See also* ECF No. 30.  *See* Compl., Dkt. 1.

C.  Did Plaintiff-Appellant (pro se) plead enough facts to show that the case-at-hand <u>is not</u> rooted in statute or regulation which complement the Tucker Act, 28 U.S.C. § 1491(a), <u>but is</u> rooted in a contract?  *Contra.* Order & Op., ECF No. 31. *Cienega*, 194 F.3d at 1239 quoted in *California*, 245 F.3d at 1346.  Appxs. 39, 42, & 45.

D.  Even if Plaintiff-Appellant did not fully prove the breach of the United States-Presidential-express-not-written-and-memorialized-contract-in-fact-at-hand, did the C.F.C. error or abuse its discretion by not granting trial or order sufficiency of contract claim based on the federal common law presumptions of civil contract and give the procedural rubber stamp to transfer money?  *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319-20 (Fed. Cir. 1997).  *Boaz Hous. Auth. v. United States,* No. 2019-2325, 994 F.3d 1359 (Fed. Cir. Apr. 16, 2021).  *Crow*, No. 2017-2340, Dkt. 26 citing *Kawa*, 77 Fed. Cl. at 304 n. 4 & *Oswalt v. United States*, 41 Fed. Appx. 471, 472-73 (Fed. Cir. 2002).  28 U.S.C. § 453.

VI.  **Question of Law**:

A.  Did Senior Judge Loren A. Smith of the C.F.C. abuse his discretion when his honor conducted a frivolity inquiry, inconsistent with *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) *(en banc)*, on the United States-Presidential-express-not-written-and-memorialized-contract-in-fact-at-hand?  *Denton v. Hernandez*, 504 U.S. 25, 32-3 (1992).  *See also Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

B.  Did the Court of Federal Claims violate Plaintiff-Appellant's Fifth Amend-
    ment Due Process rights when it opined under R.C.F.C. 12(h)(3) rather
    than R.C.F.C. 12(b)(6), upon a motion submitted by United States-Defend-
    ant-Appellee, inconsistent with *Ralston Steel Corp. v. United States*, 340 F.2d
    663, 667-69 & 672 (Fed. Cir. 1965), *cert. denied*, 381 U.S. 590 (1965) which
    further supports the federal common law presumptions of validness and
    enforceability of contracts of which breached give rise to liability?

C.  Did Senior Judge Loren A. Smith of the Court of Federal Claims conduct
    the analysis for the United States-Presidential-express-not-written-and-
    memorialized-contract-in-fact-at-hand without error or abuse of discre-
    tion, under the Tucker Act, 28 U.S.C. § 1491(a), "formula[ic]" and "ru-
    bric"-like interpretation method, and did the Federal Circuit error or
    abuse its discretion by affirming the C.F.C. at Dkt. 10?  *Maine Cmty. Health
    Options v. United States*, 590 U.S. ___, 140 S. Ct. 1308, 1315 & 1328 (2020).
    ECF No. 31.

D.  If a sufficient contract and breach of contract has been pleaded, totaling
    $3.76B, which is not disputed by United States-President-Promisor-De-
    fendant-Appellee, then must the C.F.C. gives its rubber stamp to transfer
    monies from the treasury to the Appellant-Plaintiff in his personal capac-
    ity?

    1.  Did Senior Judge Smith violate his oath of office when his honor
        opined under R.C.F.C. 12(h)(3) and without the United States-Mr.
        Kiepura having to perform his necessary statutory duties, on behalf
        of the United States-President-Promisor-Defendant-Appellee, to
        challenges the federal common law presumptions of validness and

enforceability of Tucker Act-contract-at-hand or agree with the presumptions and prior to R.C.F.C. 12(a)(1)(A) sixty(60)-day time requirement expiring? 28 U.S.C. §§ 453 & 516. *Wood-Ivey Systems Corp. v. United States*, 4 F.3d 961 (Fed. Cir. 1993) and *Arctic Corner, Inc. v. United States,* 845 F.2d 999, 1000 (Fed. Cir. 1988).

2.  If so, is de novo review and/or a writ of mandamus, 28 U.S.C. § 1651(a), to the C.F.C.-Senior Judge Smith, to aid in the Federal Circuit's jurisdiction or enforce the Supreme Court's obligatory rules and duties on the judicial functions of the Article I court, appropriate? *Cienega*, 194 F.3d at 1239 (Whether a contract exists is a mixed question of law and fact).

3.  Can a valid & enforceable contract-in-fact, as contracts work under the theory of self-determination/Liberty/Privileges, formed by the directly by the United States-President, while working under both explicit Congressional approval via the Tucker Act, 28 U.S.C. § 1491(a), and/or 3 U.S.C. § 301 *et seq.* and the President's constitutional powers, rights and duties, be found "factually frivolous" by a United States-court of law, while being consistent with the norms of judicial review set by the Supreme Court and Federal Circuit? *See* Dkt. 10. *Compare* Dkt. 10 *with* ECF No. 31. *See* ECF No 16 (counselor for the Appellee arguing the unrepresentative perspective of United States-CFC-Judge Smith over representative perspective of United States-President; a Judge's use of personal or political invalidates judicial opinion on judicial review). *Youngstown Sheet & Tube Co.* v. *Sawyer*, 349 U.S. 579, 635-55 & 646 (1952). *Fisher v. United*

*States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) (frivolity inquiry is limited to statutes or regulations). *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) (strong presumption that civil contracts are valid). *Samish Indian Nation v. United States*, 419 F.3d 1355, 1363 (Fed. Cir. 2005) (self-determination allowed via contracts).

E. Did the Federal Circuit in ECF No. 31 misapprehend the law of *United States v. Navajo*, 556 U.S. 287 (2009) factors, invalidly require misapplication of its factors to the contract-at-hand-at-hand (verbal)? *See Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011) (The Supreme Court not require inquiry "money mandate" for contract-in-fact.). *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364-65 (Fed. Cir. Apr. 16, 2021).

F. May the United States-C.F.C. *sua sponte* move to dismiss a Tucker Act, 28 U.S.C. § 1491(a), -complementing-contract entered into directly by United States-President or United States-Head of Agency or must the United States-C.F.C. let the presumptions of validness prevail, unless the United States-President, or through the United States-President's representative, overcome the presumptions clearly and convincingly? 28 U.S.C. § 516.

G. Are *Holmes* at 1314 (court does not have to inquiry about the fairly can interpret to mandate compensation by the government), *Brasher* at 3 ("reasonably amenable"), *San* at 959 ("comtemplat[ed]"), and *Higbie* at 993 ("remotely monetary") in an intra-court jurisdictional split? *Boaz Hous. Auth. v. United States,* 994 F.3d 1359 (Fed. Cir. Apr. 16, 2021).

VII. Should the Federal Circuit have denied United States-Appellee's Motion for Summary Affirmance at ECF No. 16 because the position of the United States not

"clear," because United States-Judge Smith and United States-President Biden are in conflict, which is inconsistent with the conditional applicability of *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994)?  ECF Nos. 21 & 31. 28 U.S.C. § 516.

A. Once it received United States-Appellee's Motion for Summary Affirmance at ECF No. 16, should the Federal Circuit have ordered United States-Mr. Kiepura to argue United States-President's viewpoint, as the President was the Promisor and the "chief constitutional officer," rather than United States-Judge Smith's opinion, which violates the separation of powers, in order to ensure that the "interests" of the United States and the Federal Government are constitutionally represented and so that Plaintiff-Appellant has a fair, due appeal and litigation process, per *Marbury* at 166 and *Arthrex* at 23?  28 U.S.C. § 516.  *Motions Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803)[6], and opined in support of ECF 16 and ECF 21 in ECF 31? *Cf.* ECFs 16, 21, & 31 citing *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994). *United States v. Arthrex, Inc.*, 594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 at 23 (2021) (Roberts, C.J., opinion) ("[T]he President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people.").  Doctrine of Comity & Privileges and Immunities Cl., U.S. const. art. IV, § 2, cl. 1.

VIII. Did the Court of Federal Claims abuse its discretion or made a clear error and unconstitutionally intervene in the United States-Presidential affairs, including of

---

6. *Marbury*, 5 U.S. at 166 ("This officer…is to conform precisely to the will of the president. He is the mere organ by whom that will is communicated. The acts of such an [inferior] officer, as an officer, can never be examinable by the courts.").

efficient breach, when it did not allow the United States-President to agree to the federal common law presumptions of the Tucker Act-contract-at-hand or let the United States-President attempt to overcome the respective presumptions by a clear and convincing standard and effectually prejudice Plaintiff-Appellant's, my, constitutional Due Process rights?  U.S. const. amend. V.

## <u>RELATED CASES</u>

**FEDERAL CASES**

1. *Patel v. Trump Corp.*, No. 20-1513 (U.S. June 14, 2021), *rehearing denied* (U.S. Aug. 2, 2021).

2. *Doe v. Trump Corp.*, No. 20-1706 (2d Cir. Oct. 9, 2020).

3. *Doe et al. v. The Trump Corp. et al.*, No. 1:18-cv-9936-LGS (S.D.N.Y. May 26, 2020), Dkt. 272.

4. *Patel v. United States*, No. 2022-1131 (Fed. Cir. 202_).

5. *T.E., T.E. Raj K. Patel v. United States*, No. 1:21-cv-2004-LAS (Fed. Cl. Nov. 5, 2021).

6. *Patel v. Biden et al.*, No. 22-cv-394-UNA (D.D.C. 202_) (pet. for mandamus § 1391).

7. *Patel v. F.B.I. et al.*, No. 1:18-cv-3441-RLY-DML (S.D.I.N. Nov. 13, 2018).

8. *Patel v. F.B.I. et al.*, No. 1:18-cv-3442-WTL-DML (S.D.I.N. Nov. 13, 2018).

9. *Patel v. F.B.I. et al.*, No. 1:18-cv-3443-TWP-MJD (S.D.I.N. Nov. 13, 2018).

10. *Patel v. Trump et al.*, No. 1:20-cv-454-SEB-DML (S.D.I.N. Feb. 19, 2020).

11. *Patel v. Trump et al.*, No. 1:20-cv-758-RLY-MJD (S.D.I.N. Apr. 14, 2020).

12. *Trump v. Vance, Jr. et al.*, No. 1:19-cv-8694-VM (S.D.N.Y. July 9, 2020), Dkt. 45.

13. *Patel v. Patel et al.*, No. 20-2713 (7th Cir. Jan. 21, 2021).

14. *Patel v. Patel et al.*, No. 1:20-cv-1772-TWP-MPB (Sept. 1, 2020).

15. *Carroll v. Trump*, No. 1:20-cv-7311-LAK (S.D.N.Y. Oct. 28, 2020), Dkt. 36.

16. *Patel v. Martinez et al.*, No. 3:21-cv-241 RLM-JPK (N.D.I.N. Apr. 8, 2021).

17. *Patel v. The President of the United States Joe Biden et al.*, No. 2:21-cv-01345-APG-EJY (D. Nev. Aug. 9, 2021).

18. *Patel v. United States*, No. 1:21-cv-22729-BB (S.D. Fla. Aug. 12, 2021).

xxxvii

**19.** *Patel v. United States et al.*, No. 1:21-cv-2219-JMS-TAB (S.D.I.N. Aug. 20, 2021).

**20.** *Patel v. United States et al.*, No. 1:21-cv-2263-UNA (D.D.C. Sept. 8, 2021).

**21.** *Patel v. United States et al.*, No. 2:21-cv-4160-NKL (W.D. Mo. Sept. 13, 2021).

**22.** *Patel v. United States et al.*, No. 2:21-cv-16029-SDW-CLW (D.N.J. Sept. 20, 2021).

**23.** *Patel v. The United States et al.*, No. 1:21-cv-6553-LTS (S.D.N.Y. Sept. 20, 2021).

**24.** *Patel v. The United States et al.*, No. 1:21-cv-2250-RLY-MG (S.D.I.N. Sept. 21, 2021).

**25.** *Patel v. United States et al.*, No. 1:21-cv-11429-LTS (D. Mass. Sept. 24, 2021).

**26.** *Patel v. Biden et al.*, No. 21-5155 (D.C. Cir. Sept. 27, 2021).

   **27.** *In Re Raj K. Patel*, No. 21-5153 (D.C. Cir. Aug. 6, 2021).

      **28.**  *Patel v. Biden et al.*, No. 1:21-cv-1076-TSC (D.D.C. July 2, 2021).

**29.** *The Excellent Raj Patel v. The United States et al.*, No. 1:21-cv-3335-MLB (N.D. Ga. Oct. 5, 2021).

**30.** *The Excellent Raj Patel v. The United States et al.*, No. 1:21-cv-3376-MLB (N.D. Ga. Oct. 5, 2021).

**31.** *Patel v. United States et al.*, No. 3:21-cv-628-RLM-APR (N.D.I.N. Oct. 7, 2021).

## STATE CASE

**32.** *Patel v. Patel*, No. 32D05-1808-PO-000372 (Ind. Super. Ct. Aug. 21, 2018).

## <u>STATEMENT OF THE CASE</u>

**Reversal of Order & Op. at ECF No. 31 is merited based on** *Holmes v. United States*, **657 F.3d 1303, 1314 (Fed. Cir. 2011) and other independent public policy considerations, including effectuated efficient breach[7] of the United States-Presidential-express-not-written-contract-in-fact-at-hand,** and I, Pro Se Plaintiff-Appellant, should be given the compensation in the form of money, as agreed with the President of the United States **for $3.76B.**[8] *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364-65 (Fed. Cir. Apr. 16, 2021). *But cf.* Federalist 78 (unlike the Congress and President, judges "no direction either of the strength or of the wealth of the society; and can take no active resolution whatever"). *Kawa v. United States*, No. 06-0448C at 12-13 (Fed. Cl. June 28, 2007). *Leaf Invenergy Co. v. Invenergy Renewables LLC,* No. 308, 2018 at 31 (Del. May. 2, 2019). *Nama Holdings, LLC v. Related WMC LLC*, C.A. No. 7934-VCL (Del. Ch. Nov. 17, 2014).

**The case-at-hand rises from a substantive source of law of a contract-in-fact** which creates the necessary substantive rights to complement the jurisdiction-only-creating Tucker Act, 28 U.S.C. § 1491(a), and the case-at-hand does not rise from a substantive source of law statute or regulations. *Contra.* Order & Op., ECF No. 31. *Contra.* Dkt. 10. *Boaz*, 994 F.3d at 1364-65. **Therefore, this Federal Circuit is mistaken in stating that I have pled a Tucker Act, 28 U.S.C. § 1491(a), claim rooted in a complementing statue or regulation.** *Compare* ECF No. 31 *with* Dkt. 1 & Order, Dkt. 10. *Kawa*, No. 06-0448C at 12-13. *Fisher v. United States*, 402 F.3d 1167, 1172 (*en banc*) (frivolity inquiry is limited to statutes or regulations…a court is to stop its inquiry whether a substantive source of

---

7. *See e.g., Nama Holdings, LLC v. Related WMC LLC*, C.A. No. 7934-VCL (Del. Ch. Nov. 17, 2014).

8. *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (a branch of government can change course of event irrespective of existing governmental contracts, i.e. the Executive Privilege of the President, but these constitutionally "*per se*" efficient breaches of these contracts almost always mandate the Federal Government to give money damages).

law of contract "can fairly be interpreted as mandating compensation by the Federal Government").

Contrary to Order & Op. at ECF No. 31, *Boaz*, 994 F.3d at 1364-65 (Fed. Cir. Apr. 2021) explains that only "for claims founded upon the Constitution, a statute, or a regulation, 'a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Compare* Order & Op. at ECF No. 31 *with Boaz*, 994 F.3d at 1364-65 (Fed. Cir. Apr. 16, 2021). "But for claims founded upon a contract, '**there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement**.'…This presumption normally satisfies, like for the case-at-hand, the money-mandating requirement for Tucker Act [, 28 U.S.C. § 1491(a),] jurisdiction, '**with no further inquiry being necessary**.'…**The right to money damages is…fairly implied."** *Boaz*, 994 F.3d at 1364-65 (Fed. Cir. Apr. 16, 2021). *See also Fisher* (*en banc*) at 1172. **The United States-Defendant-Appellee has not overcome this federal common law presumption** because simply it has not contested the contract-at-hand in the Court of Federal Claims or the Federal Circuit or failed to show why a contract does not exist by the standard of clear and convincing. *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667-69 & 672 (Fed. Cir. 1965), *cert. denied*, 381 U.S. 590 (1965). R.C.F.C. 8(e). **Therefore, Judge Loren A. Smith errored by not giving the Article I Court of Law's "rubber stamp" to allow a transfer $3,760,000,000 from the federal treasury for the money compensation owed to me by the Federal Government to me.** *Ex parte Bakelite Corp.*, 279 U.S. 438, 451-52 (1929). *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1331 (2020).

Here, the Court of Claims and the Court of Appeals for the Federal Circuit have sufficient jurisdiction even though the claims in the case-at-hand are rooted only from

the contract-at-hand.  *Contra*. Order & Op., ECF No. 31.  *Contra*. Dkt. 10. *Kawa*, No. 06-0448C at 12-13.

The Supreme Court, on limited writs of certiorari, has only given fairness factors to Tucker Act, 28 U.S.C. § 1491(a), claims rooted in complementing statutes and regulations. *Navajo* (U.S. 2009), *Mitchell* (U.S. 1983), & *White* (U.S. 2003). *Cf.* ECF No. 31.

**Holmes (Fed. Cir. 2011) and *Boaz* (Fed. Cir. Apr. 16, 2021) are the applicable precedents** for the case- and contract-at-hand **rather than *Navajo* (U.S. 2009)** because **Holmes is more logically on point than *Navajo***, which discusses a distinct sources of substantive law.  *Cf.* Order & Op., ECF No. 31.  *See also Fisher* (*en banc*) at 1172.  Further, according to the Federal Circuit, both the United States Supreme Court and itself have both recognized these necessary "distinguish[ments]."  *Boaz*, 994 F.3d at 1364 (Fed. Cir. Apr. 16, 2021) citing *Holmes* (Fed. Cir. 2011), 657 F.3d at 1313-14 (summarizing cases).  *See also Fisher* (*en banc*) at 1172.

Nevertheless, Senior Judge Smith errored or abused his honor's discretion for being not consistent in the **four-(4)-part intra-jurisdictional-split**, or their inter-section, set by the judicial hierarchy:[9] (first) under *Holmes*, the presumptions satisfy the fairness requirement that the Federal Government can be mandated to pay money compensation with no further inquiry, *see also Fisher* (*en banc*) at 1172; (second) under *Brashear*, the contract is "reasonably amenable" to the reading that it mandates a right of recovery in damages against the Federal Government; (third) under *San*, the Federal Government "contemplat[ed]" money damages; (fourth) under *Higbie*, since the contract-at-hand is "remotely monetary" thus it is fairly presumed to be money mandating.  And, neither stare decisis nor vertical precedent were honored by the C.F.C. or the Federal Circuit, causing

---

9. *Cf. San* at 960-61 (holding interpretation of contract as error rather than abuse of discretion because the C.F.C. did not violate the Tucker Act-contract presumptions.).

noticeable prejudice to me, the Plaintiff-Appellant; clearly misconstruing the contract-at-hand both a blatant and flagrant disregard of duty and of its relationship with this Federal Circuit. Dkt. 10 & ECF No. 31.

Nonetheless, as the contract was formed directly by the President-Chief Executive of the United States Federal Government **public policy balancing tests, principles of constitutional law, and principles of law,** require the contract-at-hand be fairly interpreted to mandate compensation from the Federal Government in the form of money damages. *See* Rest. (2d) §§ 90, 139(2) & 178, cmt b. For instance, the court should not support the President, who has his own branch in the Federal Government and who is also the Commander-in-Chief, Head of State, Head of Government, and the Chief Executive, in escaping liability by using the Tucker Act, possibly through judicially enlarged requirements of pleading a contracts claim in Order & Op. at ECF No. 31, as a shield; the court should also should not use WILL to get involved in political affairs between the incumbents of Congress and the President, i.e Members of Congress are using political clout to cause the President to breach the contract-at-hand, and apply only its judgement; and the court should consider what impact Order & Op. at ECF No. 31 as precedent would have current Federal Government contracts, whether made by the U.S.-President-Chief Executive or not, and the changes of chances Order & Op. at ECF No. 31 as precedent would have on the Federal Government successfully forming future contracts. Interestingly, Order & Op. at ECF No. 31 as precedent would state that the Federal Government, through the President, can escape responsibility even though Presidents from both major political parties have treated it as a contract necessary to execute their duties; **in other words, Order & Op. at ECF No. 31 as precedent would functionally nullify the Tucker Act, 28 U.S.C. § 1491(a), constitutional waiver of sovereign immunity**, which has been upheld by the Supreme Court in *Navajo*, *Mitchell*, and *White*, and which exceeds

the **powers of judicial review and separation of powers**.  In addition, for matters of public policy, introducing Order & Op. at ECF No. 31 as precedent will only have a negative impact on the contracting state, including but not limited to constitutional law as contrarian theory and settlements under civil rights law, and will **unintentionally and consequentially** reduce the powers, and duties of other political, business, commercial, quasi-governmental, and socially-significant institutions chief executives, such as CEOs, Presidents, Mayors, Town Managers, whom will not be able to make binding agreements for their governments and entities or will allow them to escape contracts liability from millions of future claims or will be forced to breach even when they would act to **efficient breach** to reduce social waste and make social gains.  Mead & Warren.  Lastly but not conclusively, as a matter of public policy, Order & Op. at ECF No. 31 as precedent could unintentionally be used to slow down entrepreneurs, entrepreneurship, and other innovative professions and industries, some which have appellate rights before this Federal Circuit, and slow down the flow of money and Commerce.  *Winstar* at 885.  *But cf.* Federalist 78.

Order & Op. at ECF No. 31 as precedent probably will shape public policy by negatively impacting **Head of Government to subdivision relationships, risking the President's role in the United Nations Security Council, how other heads of states and heads of government might behave in contracts through the world, judicial enlargement of the Vested Powers and the Military Powers outside of war time, and contracts with evidence from new state-of-the-art technologies, the burdens of proof and presumptions regime of constitutional law, plea agreements, and even immigration sponsorships, and the politics of the child.**

**Public policy balancing tests and principles of law would require that a contract is to be found even if there is only a specific, narrow promise, goodwill or supervisory,**

**or agreement**[10] directly from the former or incumbent President of the Federal Government while unequivocally using the colors and resources of the United States Federal Government, like at the case-at-hand. *California Federal Bank v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001) citing Restatement. *See* **Rest. (2d) §§ 1-5, 90, 139(2), 178, cmt b., 367** (supervisory promise) & Indian Contract Act, 1872. Therefore, in the contemporary, the distinguishments amongst promises, agreements, and contracts are merely to determine the legal characterization of the issue-in-a-case and the remedy the court of law may give, but all promises, agreements, and contracts may be money-mandating, as a **third party would reasonably believe** and the **Federal Government may not use this technicality to escape liability**. *Mitchell II* at 217 quoting *Eastport* at 1007 cited in *Testan* at 398. R2dK § 5. R2dK §§ 5, 18, 19, 19, cmt. c. *Cf.* Indian Contract Act, 1872 at Add. I (only when a court of law determines that an agreement is enforceable does the agreement become a contract); & *Cherokee* at 632 & 640. Thus, the modern contracting state allows for greater self-determination, consistent with the Liberty to exercise the Privilege of contracting including for individualistic and subjective passions, and ECF No. 31 as precedent is repugnant to this jurisprudence. *See* 42 U.S.C. § 1981(a) & *Smaish* at 1363. **The R2dK and federal-common-law are mandatory authority for contracts interpretation, in the embracing jurisdiction of this Federal Circuit.** *Mitchell* at 226. R2dK § 313 (gov't contracts). R2dK §§ 1-5, 10, 75, 78-81, & 200-203. *See* Appx. 77-79 (here, factors are sufficiently mustered). *Langan* at 6. *See* Appx. 38-9.

Besides, the United States-President-Promisor was acting with explicit Congressional approval when making the Tucker Act-complementing-contract-at-hand; **judicial**

---

10. **Whether a contract exists is a mixed question of law and fact.** *Cienega* at 1239 in *California* at 1346 (includes review for clear error). **The Federal Circuits reviews the trial court's legal conclusions independently and its findings of fact for clear error**. *Glendale* at 1379. **Contract interpretation is a question of law, which we review de novo**. *Cienega* at 1239 citing *Winstar* at 1540.

**review cannot deem a part of the Constitution or part of the function or strategy or tactic of another branch of Government as being "factually frivolous" or "clearly baseless,"** especially when the contract-at-hand is supplemental to or mirrors the pre-existing Constitutional duties of the President and also the executive Heads of departments. *White* & *Navajo*. *Ralston*, 340 F.2d at 667-69 & 672. Federalist 78; *Denton* at 33; and *Fisher* (*en banc*) at 1172. *Cf.* Dkt. 10 & ECF 31. **Hence, the presumptions too mean that a Tucker Act-Presidential-contract-claim cannot be "factually frivolous" or "clearly baseless" or "meritless."** *Contra*. Dkt. 10 & ECF 31. *Fisher* (*en banc*) at 1172. *United States v. Arthrex, Inc.*, 594 U.S. ___, 141, No. 19-1434 at 23 (2021). *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166. Due Process Cl., U.S. const. amend. V.

Hitherto, the **position of the United States is unclear** because the United States-President-Promisor-Defendant-Appellee, who demonstrated reliance on R.C.F.C. 12(a)(1)(A)'s sixty (60)-day time limit, and the United States-C.F.C.-Senior Judge Loren A. Smith, who sua sponte before the expiration of time for an answer to a complaint issued an opinion calling the Presidential contract "factually frivolous." *Fisher* (*en banc*) at 1172 & *Denton* at 33. *Ralston*, 340 F.2d at 667-69 & 672. *But see* Federalist No. 78. Surprisingly, this Federal Circuit, probably because Mr. Keipura strongly, although incorrectly, in ECF Nos. 16 & 21, alluded that the United States-President-Promisor agreed with United States-C.F.C.-Judge Smith's opinion at Dkt. 10, called the contract-at-hand "clearly baseless." *Fisher* (*en banc*) at 1172. *Ralston*, 340 F.2d at 667-69 & 672. **Therefore, the Federal Circuit errored when it granted summary affirmation and continue briefing.** *Cf. Joshua*, 17 F.3d 378, 378-80 (Fed. Cir. 1994) (only when one side has a clear position is summary affirmation allowed).

**Nevertheless, I was prejudiced in this United States-Federal Circuit when the United States-Mr. Keipura submitted a Motion for Summary Affirmance arguing to**

further United States-C.F.C.-Senior Judge Smith's procedurally invalid opinion and not arguing the substantive viewpoints of the United States-President-Promisor-Defendant-Appellee, "the chief constitutional officer," while also concurrently taking away the United States-Federal-Government-President's concurrent representation owed to me in these proceedings as my elected representative before the United States-Federal Circuit. Due Process Cl., U.S. const. amend. V; *Joshua*, 17 F.3d at 378-80; and *Motions*, 437 F.3d at 1366-69. **The Federal Circuit incautiously errored in granting Mr. Keipura's Motion for Summary Affirmance at ECF No. 31.[11]** 28 U.S.C. § 516. 3 U.S.C. §§ 301-03. U.S. const. art. II, §§ 1-8. Federalist No. 80. **The Federal interests were mal-administered because of this clear error or abuse of discretion.** *Maine* at 1333-35.

Next, misapplying the misapprehended Supreme Court factors for Tucker Act claims originating from statutes or regulations, similar to the United States-Federal Circuit in ECF 31, favorably and **unambiguously finds a meeting of the minds for the contract-at-hand between me and the United States-Federal-Government-President-Promisor**, and, thus, because no further inquiry is necessary for the Tucker Act-contract-at-hand claim, the Supreme Court factors and the federal-common-law strongly favors transferring monies of $3.76B (and counting) from the United States-Federal treasury to me in my personal capacity. *Navajo*, *Mitchell II*, and *White*. Succinctly put, the Federal Government can mandate money because the Federal Government exercise comprehensive control, the Restatement (Second) of the Law of Contracts supports it along with the federal common law, there is "trust" in our relationship (*see* Aitken), deter future Federal

---

11. The problems with standing for me is that the presumptions of my contract-at-hand were injudiciously and incautiously opined overcome without the opposing side's, the United States-President-Promisor-Defendant-Appellee's, neither the R.C.F.C. 12(a)(1)(A)-sixty(60)-days answer to my complaint nor demonstrating such an argument nor having to argue against the presumptions under R.C.F.C. 12(b)(1) or (6), e.g. per se constitutionally efficient breach doctrine.

promisors for breaching lesser-powered or lesser-purposed contracts, the contract-at-hand supplements the duties of the United States Constitution, "mirrors language" of existing duties, claimant has a loss of earning power, and because different facets of the United States show a **"firm desire"** for the claimant to retain the benefits: C.I.A., First Ladies, President by not challenging the presumptions as efficient breach, Congress by unlimitedly funding the contract-at-hand, and the Judiciary by setting the presumptions. *Slattery*, 635 F.3d at 1321 (*en banc*) & *Winstar*, 64 F.3d at 1542 (*en banc*), *cert. granted*, 518 U.S. at 885. C.F.C. Judge Smith errored by not allowing the transfer of money from the federal treasury and maladministered these Federal interests. *Maine*, 140 S. Ct. at 1332 & 1333-35.

Overall, the separation of powers and **stare decisis is threatened with inconsistent precedent** if this court does not overturn Order & Op. at ECF No. 31 and affirm *Holmes* (Fed. Cir. 2011), 657 F.3d at 1313-14. *Id.* cited in *Boaz* (Fed. Cir. Apr. 16, 2021) (summarizing cases). *Fisher* (en banc) at 1172 ("clearly baseless" and "factual frivolity" inquires are limited to statutes and regulation and are not a part of contract-based claims under the Tucker Act). *See also Denton* at 32-3. *Ralston*, 340 F.2d at 667-69 & 672. Therefore, Order & Op. at **ECF No. 31 should be reversed** and the United States-Defendant-Appellee could either accept the federal common law presumptions of fairness, vaildness, and enforceability applicable to the Tucker Act-complementing contract-at-hand, which would also be efficient breach, and immediately move to resolve the case or continuing briefing with intent to challenge the presumptions clear or convincingly. *Arthrex*, No. 19-1434 at 23. *Marbury*, 5 U.S. at 166.

## **ARGUMENT**

Including after claim construction[1], I have neither in this docket nor in the docket below pleaded a Tucker Act, 28 U.S.C. §1491(a)("Tucker Act"), claim complemented by a statute or regulation. *Contra*.Order&Op.,ECF-31. Dkt.1. Therefore, this petition mainly focuses on a Tucker Act claim complemented by the breach of a U.S.-Presidential-not-written-express-and-memorialized-contract-in-fact-at-hand between the U.S.-President-Promisor, the-Defendant-Appellee who could have also effectuated efficient breach, and I, the-Plaintiff-Appellant(pro se). Appxs. 39 (re-ratification), 42 (breach), & 45 (response). *Cities* at451& *Hercules* at423. *Nama*. *Cf*.Order&Op.,ECF-31&Dkt.-10 at1,para.1 citing R.Ct.Fed.Cl.12(h)(3). *See*Add. at IV(42:§1981(a)). *Kilopass*,No.13-1193at11. Langford at 45("Federal Circuit's contract interpretation jurisprudence substantially parallels its claim construction law."). *Erickson* at94, *Forshey* at1357,& *Maine* at1318,n.3(28:§2517).

<u>*Holmes* at 1314(Fed. Cir. 2011)(logically on point),[2] like *Smith* at 1115-16(Fed. Cir. 2013), *cert. denied*, 571 U.S. 945(2013),[3] rather than *Navajo*(U.S. 2009) contains the proper applicable precedent because the money-mandating substantive source of law is a contract rather than another Federal statute or regulation.</u> *Contra*.Order,ECF-31 at2,para.1.

A. **By law of the Federal Circuit and Supreme Court, the presumptions of fairness for the U.S.-Presidential-contract-at-hand are cautiously enough for a Tucker Act, 28 U.S.C. § 1491(a), contract-based claim to be fairly interpreted in money mandating compensation from the Federal Government, and the C.F.C. should follow one (1) of the four (4) intra-Federal Circuit-court splits.**

"In our view, when referencing the money-mandating inquiry for Tucker Act jurisdiction, [28:§1491(a)], the cases logically put to one side contract-based claims. To begin with, [n]ormally contracts do not contain provisions specifying the basis for the award of

---

1. *Fraunhofer-Gesellschaft* at1375-76.
2. *See-infra*,Add. atII.
3. *See-also Boaz* at1364 &Tbl. of Auths.("clarifying language cases.").

damages in case of breach [of contractual duty][4]....[I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement…."damages are always the default remedy for breach of contract…Thus, when a breach of contract claim is brought in the [C.F.C.] under the Tucker Act, the plaintiff **comes armed with the presumption**[5] that money damages are available, so that normally no further inquiry is required…Put another way, in a contract case, the money-mandating requirement for Tucker Act juris-diction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes* at1314(internal-quo-tations-removed).   That is, "[t]he right to money damages is…fairly implied." *Boaz* at1365.[6]   As a rule, generally all contracts with the United States from the onset of for-mation are strongly presumed to be fairly money mandating, and when a contract is con-structed from or into a promise or agreement, as it may permissively happen here, man-dating money damages are still fairly presumed.   R2dK§§1-5.   The presumptions cau-tiously make analysis of a Tucker Act-contract claim "formula[ic]" as if on a "rubric" and indifferent to the amount of breach liability.   *Maine* at1315&1328.   *Cf.Cherokee* at631-33; *Samish* at1363-64 *&Greenlee* at878.   Specific claim construction is not necessary. *Infra*,p.6.

---

4. "Whether a contract creates a duty is a legal question of contract interpretation and thus freely reviewable by this court." *San* at959-60.

5. Since all breach of Tucker Act contract claims "come armed" with the presumption of fairly implied money damages, the "come armed" necessities that all Tucker Act contracts pleaded are also valid and enforceable, including because the presumptions, as *infra*, respect the separations of powers and un-necessary disclosure of information. *Holmes* at1314. *ButCf. Brooks* at631(courts have a presumption to pro-ceed cautiously of Tucker Act claims originating from statutes and regulations, unlike for contracts claims). Thus, the presumptions mean that a Tucker Act-Presidential-contract-claim cannot be "factually frivolous" or "clearly baseless" or "meritless." *Contra*.Dkt.-10 &ECF-31.

6. *See Boaz* at1365("We have recognized…government). *Higbie* at993(Even "[w]here relief for breach of contract could be entirely non-monetary…the agreement[ ] could fairly be interpreted as contem-plating monetary damages in the event of breach.").

The presumptions for Tucker Act contracts-in-fact help respect the separations of powers, because the contracts formed with the United States is almost always from the President or the executive and helps respect their executive privilege and swords as they use unique tactics in executing their job; protects plaintiffs from unjustifiable uses of the Political Question Doctrine while respecting political caution; prevents creating additional politics which might be detrimental to the rule of law; helps Congress exercise checks and balances and pay the liability of the United States proficiently; allow "purse matters" to be handled in its branch; review to this branch of government allows for judgment of the phenomenon of the both "purse matters" and "sword matters" while allowing the members and officers of political branch to focus on much at-large matters; help protect individuals and not sophisticated persons against the Federal Government, including not limited to efficient breaches, effectual efficient breaches, and "higher-power," interfering contracts[7]; ensure Due Process; and helps the judiciary constrain unintended FORCE or WILL and cautiously use judgement only when conducting judicial review for matters of law only, especially since the United States is like, here, represented by the President or head of agency. *Hercules* at423.  *Comm.* at186 &*Id.*quoting*Zivotofsky* at1432. *See*Federalist78; *Marbury*; *see*5:§701(a)(2).  If the U.S.-President-Promisor wants to "back out," the United States must challenge the presumptions of vaildness and enforceability of governmental contracts clearly and convincingly. *Cherokee* at633 &*Minesen* at1334 quoting*Slattery* at1320-21.

My research shows that there might be at least a three-(3) or four-(4)-part intranal-jurisdictional split within the Federal Circuit, and my contract-at-hand is enough under all four splits.

---

7. Bond.

- First, as in the aforementioned, when a substantive source of law which is a contract complements the Tucker Act, a court stops its inquiry whether a substantive source of law of contract "can fairly be interpreted as mandating compensation by the Federal Government" and relies on the Federal common law presumptions of contracts. *Holmes* at1314 citing *Fisher*(*en banc*). *Boaz. Contra.*ECF-31 &Dkt.-10. In fact, here, the stopped its fairness inquiry because I plead a Tucker Act-complementing contract and the presumptions of validness and fairness should prevail. *Id.*

- Second, under *Brashear*, whether the contract is "reasonably amenable to the reading that it mandates a right of recovery in damages against the Government…Moreover, [a court] generally interpret[s] the pleadings of a pro se plaintiff liberally [is to be carried along with the reasonable amenable inquiry]."[8] *Brashear* at3. Appxs.19,21,22(written records at the White House; money by age 30, September 2022, prior to breach),&77-80. Here, to back out, the U.S.-Promisor must show clearly and convincingly that the contract is not reasonably amenable to the recovery money damages from the Federal Government, which the U.S.-Appellee-President-Promisor have not attempted (nor were likely to attempt, *see infra*). *But-see Maine* at1333(Alito, J.,dissenting)(for non-statute claims, such as, here, for the contract-at-hand, in order to for the C.F.C. or the Federal Circuit to apply the "reasonably amenable" test, the applying court(s) should give a "reasoned explanation of the basis for the test" in its opinion, otherwise the presumptions that civil governmental contracts are

---

8. *See White* at472-73(For Tucker Act-complementing statutes…"[i]t is enough...that a statute…be reasonably amenable").

4

generally always fairly interpretable as being money mandating from the Federal Government is enough and thus a court need not inquire further).*See-also Samish* at1364.

- Third, under *San,* in addition to the presumptions of the civil contracts, a court is to ask whether the Federal Government "contemplat[ed]" money damages from the Tucker Act-substantive source of law of contract. *San* at959. Appxs.19,21,& 77-80. Here, the U.S.-President-Promisor must show it did not contemplate damages clearly and convincingly which the Appellee has not even attempted(i.e. entirely nonmonetary contract for employment transfer after settlement). Dkt.10.

- Fourth, under *Higbie,* a Tucker Act-complementing contract that is "remotely monetary" is fairly presumed to be money mandating, which is especially the standard in C.F.C. and "remotely" would be an understatement for the contract-breach-at-hand. *Higbie* at993 quoting*Higbie,*113Fed.Cl.at364. *Higbie* also holds that a fairness inquiry is only proper if, unlike here, "breach of contract could be entirely non-monetary." *Id.*at993.

All four(4) jurisdictional splits' inquiries are unconcerned to the dollar-amount of the liability. *Minesen* at1334 quoting*Slattery*(*en banc*)at1320-21. Accordingly, the rules of *Holmes*, *Brashear*, *San*, and *Higbie* on the interpreting court indicate those inquires favor the presumptions of fairness. *Cherokee* at633; *see-generally Maine* at1335(Alito, J.,dissenting). Thus, Tucker Act scheme could be a way to escape political liability (politics for Tucker Act are like the duties to enforce agreement to the United States Constitution) if not efficient breach. *Youngstown* at646(Act of Congress should not allow President to escape responsibilities of executive power).

Next, even if the contract is construed as a promise or an agreement rather than a contract, contract law construes promises, including goodwill and supervisory, and agreements as contracts. *California*. R2dK§§1-5&367. *Mitchell* at217&226 quoting*Eastport* at1007&1008,n.7 cited in *Testan* at398. R2dK§§5&313. *Cienega* at1239(Whether a contract exists is a mixed question of law and fact) quoted in *California* at1346(includes review for clear error); & *Cherokee* at632&640(this technicality is not something that relieves the Federal Government from fair-inference and liability). Specific claim construction is not necessary. *Navajo* at290,*Maine* at1328,*Mitchell* at217-19,*Kilopass* at11,&*Lopez*. *Massie* at1189-90& *McAbee* at1435.

*Vacate ECF 31, Reverse Dkt. 10, & remand with instructions for constituent opinion.*

**B. Like here, a U.S.-presidential-contract cannot be "clearly baseless" or "factually frivolous," per Federal Circuit ruling, when it is directly formed with the U.S.-President as Promisor, because the U.S.-C.F.C. has limited judicial discretion before its abuse in reviewing Tucker Act, 28 U.S.C. § 1491(a), -contract-in-fact claims which carry the strong presumptions of validness & fairness which assists judicial caution, and the U.S.-C.F.C. errored when it erroneously and unconstitutionally-prejudicially released a prejudicial judgement prior to the R.C.F.C. 12(a)(1)(a)-sixty(60)-day deadline of submitting an answer from the U.S.-President-Promisor-Defendant-Appellee and responses and replies to all initial filings from me to the answer in the litigation before opining as the Tucker Act Federal-common-law presumptions restrict R.C.F.C. 12(h)(3)'s applicability. R.C.F.C. 12(a)(1)(a). U.S.const.amend.V. *Fisher*(en banc).**

The C.F.C. dismissed my complaint and the Tucker Act-Presidential-contract claim <u>not because</u> it did not find a lawfully-formed-not written contract <u>but because</u> it unconstitutionally and prejudicially thought the lawfully-formed-not-written-contract-at-hand was "factually frivolous," especially because the U.S.-President-Promisor-Appellee did not oppose its liability pleaded [*sic*]. Dkts. 1(compl.)& 10(dismissing complaint *sua sponte* under R.Ct.Fed.Cl.12(h)(3) rather than waiting the additional 30 days, per

R.C.F.C.12(a)(1)(A), for a motion from Mr. Kiepura for R.C.F.C.12(b)(1)/(6) motion)[9]. *See*Dkt. 1-2(lie detector test conducted by retired former Indianapolis Metropolitan Police officer showing that the contract-at-hand exists, while I retain many duplicate evidence which was also not added to these court filings because the presumptions make it need-less to introduction until the U.S.-President-Promisor overcomes the respective contract-at-hand presumptions). *Butcf.*Langford at 45("In contract interpretation, the [Federal Cir-cuit] rarely finds any issue of underlying fact that need be resolved."). 28:§§516-18. If anything, Judge Smith is replying on past judicial cautiousness to politick this outcome for this Presidential-Federal-Government-contract. *Samish* at1363(contracts are to allow for self-determination).

First, it is illogical and forbidden by the Supreme Court to deem something that exists, either "judicially noticeable facts" or "known," as "frivolous" (or "clearly base-less"), and severably, illogical rulings or effectually illogical rulings constitute an abuse of discretion. *Rabkin* at977; *Denton* at 33(limiting discretion to things which the judiciary, including the same court, has said there are not "judicially noticeable facts" available); *but cf.* ECF-30; *Fisher*(*en banc*) at 1173(limiting frivolity inquiry discussion to statutes and regulations only); & *contra.*ECF-31("clearly baseless"). Here, as interpreted, Judge Smith's ruling would not change and is insurmountable even if additional evidence was submitted to the C.F.C. which include the White House correspondences with my social security number(*see-e.g.,*Appxs.22,30,&39), if notarized statements, or if Declarations, 28:§1746, by and from Presidents G. W. Bush, Obama, Trump, and incumbent Biden were submitted, either by me or the opposing counsel, recognizing the not-written-contract-at-

---

9. *Compare Balt.* at597 cited in ECF-15 *with Hercules* at427("The circumstances surrounding the contracting are only relevant to the extent that they help us deduce what the parties to the contract agreed to in fact.") *and Fraunhofer-Gesellschaft* at1382.

hand and its breach with fair liability of $3.76B in money; Judge Smith's ruling would not change if President Biden, in a press conference or under oath in Congress testified to validity and enforceability of this contract by its actuality.  Dkt.10; *see*Appx.45.  Even an earmarked appropriation for the contract-at-hand – Congress specifically waiting for its-subordinate's C.F.C.'s rubber stamp to allow me, the claimant, to receive money transfer from the treasury – for this contract would not change Judge Smith's ruling.  *Slattery* at1320-21[10] &Federalist78. *ExparteBakelite* at451-52(Article I courts are rubbers-stamp courts.).

Yet, the presumptions in the Federal Circuit, as applied here and as supervised by Circuit Justice Roberts, the Chief Justice, has anticipated such an issue: the presumptions create proficiency and do not require the President or other heads of agency to show up to a court of law for proceedings *in personam*, as such a requirement would prejudice non-claimants and the Heads' other Constitutional commitments, some of which are now on inter-galactic-commerce-based schedules (*see*51:§§20102, 20302, &50702), constituting a "uniquely federal interest;" and, requiring needless physical presence of the U.S.-President-Promisor-Appellee or an inferior head would be too systematically stressful and would prejudice not only the executive but also the Congressional oversight powers, the separation of powers, and the constructed efficiency of the C.F.C. technocracy.  *See Inre-RiverbedTech* at14,n.20;  *Marbury*;  Federalist78.  *Maine* at1334;  28:§453;  & U.S.const.art.IV,§1.  *Compare* Dkt.-10 *with* ECFs.16&31;Appx.22.  *Youngstown* at635-55,

---

10. In the alternative, Judge Smith could have taken an activist approach and issued a Rule Nisi, 28:§1651(b), which might serve as a judicially cautioned reminder from the U.S.-C.F.C. to the U.S.-President-Promisor-Defendant-Appellees of separation of powers and to overcome the strong presumptions by the deadline in R.C.F.C.12(a)(1)(A) or a favorable ruling to the Plaintiff-Appellant (*pro se*), me, will be ordered at the $3.76B in money from the Purse.  3:§303 & 28:§§516&519.

preamble; Federalist78(opinion carries FORCE as rubber stamp to allow transfer from the treasury will not be allowed); A*rthrex*;*Marbury*;&28:§1651.

Nonetheless, here, the C.F.C. has implied that it has successfully identified a contract, as my complaint was enough, based on judicial noticeable facts (even though in its invalid ruling the C.F.C. ignored its acknowledgement of the contract-at-hand). Dkts. 1,7&9; *Denton* at33. U.S.const.amend.V.

If this Federal Circuit holds that the President of the United States, who is also the-Head-of-State, the-Head-of-Government, and the-Chief-Executive (a party with actual authority) cannot fairly give notice to the Federal Government that a breach of contract will lead to damages, then there are dire public policy and public interest effects on the contracts/agreements/promises the Federal Government might make or have through the President (courts would only know about Presidential-Tucker Act contracts once there is a law suit, subject to veil rules); the rights of the Tucker Act-Presidential-contract claimants, almost all of whom are American citizens; against the more-sophisticated U.S.-Federal-Government, on the roles of military, political, and quasi-governmental chief executives and their powers and duties – and of other socially-significant organizations – and on the powers and duties of business, commercial, and corporate – and entrepreneurship. *See*R2dK§§364-65,90,139(2),178 &178,cmt.b(balancing of interests); *Youngstown* at 635-55(Jackson, J.concurring)(President not acting contrary to Congressional acts); *Id.* at646; *Maine* at 1315,1318,1323,1331,&1333(Tucker Act valid even when Congress recently refuses to earmark or earmark entirely); & Mead &Warren at290. The precedent of this case will unintentionally and consequential re-shape contracts law. An unfavorable ruling towards the Plaintiff-Appellant, me, is actually an unfavorable ruling towards the United States and opens up Pandora's Box to create a new form of tyranny for contracts.

While I have not been able to find a Tucker Act complementing substantive law of contract deemed "factually frivolous," the Federal Circuit in *Kilopass* at11, a case discussing sanctioning attorneys for filing patent claims which they know are factually frivolous, explained tests of factually frivolous claims in a complaint under "subjective bad faith" or "objectively baseless," by a standard of clear and convincing.[11] Unlike in patent claims, in Tucker Act-contracts claims, the separations of powers and judicial review is always imminently material, and, particularly, in contracts claims with the Federal Government, like here, not all facts of the contract or breach-at-hand need to be pleaded because of the pre-existing strong presumptions of vaildness and enforceability of Tucker Act-contract claims submitted to both the C.F.C. and this Federal Circuit; the respective contracts claim presumptions can be overcome by arguing that the contract claim is factually frivolous by "subjective bad faith"(i.e. a plaintiff lied about any possibility of formation of a contract, agreement, or promise or even its negotiation) or "objectively baseless"(i.e. Plaintiff will not be able to overcome U.S.-Defendant-President-Promisor's argument that a meeting of the minds did not form)under the clear and convincing standard(and for pro litigants which must also be liberally construed in favor of plaintiff). *Kilopass* at11 & Langford at45; *see-also Kawa,*No.06-448C at12-13& *Reynolds* at748 & *Ullman* at941**.** If it was not convinced, the C.F.C. errored / abused its discretion by not granting trial or not letting the initial litigation filings continue to determine the merits of the contract-at-hand when it dismissed the complaint *sua sponte* before the expiration of the R.C.F.C.12(a)(1)(A)-sixty(60)-days to avoid prejudice (Due Process) to me.[12] *Cf.*Dkt.-10. *Crow,*No.2017-2340,

---

11. *Total*(preponderance of evidence for the sufficiency of a Tucker Act-complementing-contract complaint and jurisdiction because a "contract must only be pleaded, not ultimately proven," which may also serve "both as a basis for jurisdiction and as a basis for recovery"…favorable to plaintiff, per *Kawa*).

12. Addendum at p.V &X-XI; ***Compare** Wood-Ivey* at965 *with Arctic* at1000.   ***Compare Fed.R.Civ.P.12(h)(3)** with **R.C.F.C.12(h)(3)**.*

Dkt.26 citing *Kawa*,77Fed.Cl.at304n.4 & *Oswalt* at472-73. *James* at1541("A trial court's rul-ing on its own jurisdiction is a question of law which we review *de novo*."). *Boaz* at1364-65 & R2dK§§33(2),33(2),cmt.b.,90,139(2),346,&207. *Infra* Addendum,p.XXV-XXVI(*Ralston* at667). *Wood-Ivey* at965.

Next, unlike in some cases, here, it not a logical fallacy or legally inappropriate to rely exclusively on the authority of presumptions of civil contracts, especially when the U.S.-President-Promisor-Appellee is involved because the **presumptions mind effectu-ated efficient breaches and sensitive contracts** and help prevent needless information disclosure amongst branches or to the public, and by not faithfully discharging the pre-sumptions, Judge Smith created the risk for his honor's court to run afoul to the limits of judicial review bordered by executive privilege—here, Congress has given explicit ap-proval to the President to use the Tucker Act-contract-clause for an unlimited amount of money needed to faithfully discharge the President's vested powers and duties. *Maine* at1318,n.3(discussing unlimited-payment, 28:§2517); 3:§301-303;& *Youngstown* at646; *Maine* at 1318,1323,1331,&1333. *Slattery* at 1320-21&*Clinton* at 704(documents sensitive to work product of the U.S.-President); *Maine* at1331("…The Government should honor its obligations.");Federalist80;&U.S.const.art.IV,§2,cl.1. Nonetheless, U.S.-C.F.C.-Judge-Smith could have adhered to the federal-common-law and support the civil-contracts presumptions, under Due Process similar to what Due Process requires of judges and prosecutors in criminal cases, and judicial caution requires **judiciforming** the initial pro-ceedings to an inquisitorial method, thereby substituting the adversarial default, to en-sure that U.S.-C.F.C.-Judge-Smith has all the facts his honor needs to prevent both

prejudice and the maladministration of justice and to effectuate Due Process through judgement.[13] *Olson*. *People*. R.C.F.C.8(e).

Hence, because of the argument hitherto, the position of the U.S. was not clear, and the U.S.-Mr.Kiepura was unfaithful and undutiful in submitting a motion for summary affirmance, especially one that is in conflict with the U.S.-President-Promisor's position. *Motions* at1366-69(U.S.-President is "chief constitutional officer"). *Cf.*ECFs 16,21,&31 citing *Joshua*(position of U.S. not clear).

REVERSE & REMAND WITH INSTRUCTIONS FOR CONSTITUENT OPINION.

**C.  In Order & Opinion, ECF 31,** *Navajo* **is a misapprehended and misapplied Supreme Court rule to the Tucker Act, 28 U.S.C. § 1491(a), -complementing-case-and-contract-at-hand because** *Navajo* **and its preceding and subsequent rulings are understood and explicitly applied only to Tucker Act, 28 U.S.C. § 1491(a), claims rooted in statutes and regulations.**

*Navajo*'s factors are inapplicable to the valid-and-enforceable-not-written-express-contract-at-hand-and-memorialized, as the federal-common-law presumptions for civil governmental contracts, including those complementing the Tucker Act, implies, and as the Tucker Act itself dictates. *See*Addendum atXIV-XVI. *Contra*.ECF-31. *See-also Rite-Hite* at1547. Overall, the misapplied the misapprehended Supreme Court factors for Tucker Act claims unambiguously find a meeting of the minds for the contract-at-hand between me and the U.S.-Federal-Government-President-Promisor, and, thus, because no

---

13. *Fraunhofer-Gesellschaft* at 1382("[T]here is unanimity [among courts] that the surrounding circumstances may be considered when an ambiguity [in a contract] does exist.").*Cf.*Dkt.10.
    What sounds like "product of delusion or fantasy" is not legally a product of delusion of fantasy, i.e. promisee has to dress up as a little green man. *Denton* at33. While it might be fantastic to end up as one of the richest Americans, .00265% of the total United States wealth or less, there is nothing "fantastic" about living through unlikeable pain of Weapon S and dropping out of law school. There is no difference between a Tucker Act claimant and a prisoner of war who both end up receiving similar monetary compensation; fairness inquiry is apathetic to the subsequent inquiry of remedies. Dkt.-10 &ECF-31. *Denton* might also be un-Duly prejudicial to government-President contracts because only the Federal Government is faced with unique federal interest to blur the lines between "fantasy," science fiction, and "reality," such as the NASA Act and making the Union "more Prefect." Both the C.F.C. and the Federal Circuit have observably applied *Denton* to prejudicially prevent me from the "fantastic realm of infinite [Federal] liability" because the amount of breach in the contract-at-hand is "reasonably foreseeable," which is a subsequent analysis to whether money damages are mandating. *Hercules* at 195.

12

further inquiry is necessary for the Tucker Act-contract-at-hand claim, the Supreme Court factors and the federal-common-law strongly favors transferring monies of $3.76B(and counting) from the U.S.-Federal treasury to me in my personal capacity.

Then, here, hypothetically, the complaint "can be interpreted as mandating compensation by the Federal Government" in the form of money damages because

- [1](Factors 1N,2M,3M, &1W) comprehensive control in "almost all aspects" and decisionmaking, *see San* at959-60;

- [2](Factors 9M) the respective Restatement, the R2dK(1981), which is also embedded within the federal-common-law, *in passim;*

- [3](Factors 6M &8M) "trust" relationship, *see*Aitken;

- [4](Factors 2W) both contextual and textualist interpretations of contract give "fair inference" the contract is money mandating;

- [5](Factors 2W,6N,1N, &7N) "deter"; "supplement"; "mirrors language"; Preserving Fair Play, expanding and enforcing the "purpose" along with other federal interests and duties, which is an essential function of judicial review and judicial caution too, *see*U.S.const.pmbl. &art.IV,§2,cl.1;

- [6](Factors 7M &5M) there is an "loss of income…[or]…earning power;"

- [7](Factor 5M) there is a loss of time in recovery; and,

- [8](Factor 4M) the U.S.-President-Federal-Government-Promisor showed a "firm desire" that I, the claimant-Plaintiff, "retain benefits" with money damages of the contract-at-hand until Weapon S had done its visible and aesthetically damages on me, which created a political and policy crisis, including for

  - the U.S.-Federal-Government-**C.I.A.**, *see*ECF-30;

- o the U.S.-Federal-Government-President-**First Ladies** whose works and policies have focused on courtiering, aesthetics, health and wellness, mental health, cyber-bullying (e.g. combating lawless battery via contemporary weapons), gender, race, identity, and the human and civil rights and are trustees of the National Cultural Center of the J.F.K. Center of Performing Arts, *see*T.N. Patel at600; *Ass'n* at904-05; 3:§105(e) &301-03, Trustees:Kennedy Center,&20:§76h;

- o the U.S.-Federal-Government-**Supreme-Court**; **rule of** *Winstar* at 885; by **setting the nearly insurmountable Tucker Act contract presumptions of validness, fairness, and money mandating in favor of Claimant-Promisee-Plaintiff-Appellant**;

- o the U.S.-**President-Head-of-State-Head-of-Federal-Government; by the very nature of efficient breach**;

- o the U.S.-**Congress'**-Enacted-Tucker Act; unlimitedly funded Federal treasury; and,

- o the U.S.-**Framers-of-the-Constitution** have shown a firm desire by **instituting judicial caution and judicial review** to help maintain the rule of law and the Federal interests, including of fairness. Addendum,*Ralston* at667.

*REVERSE & RE-START BRIEFING.*

## **RELIEF SOUGHT**

1. Remedies aforementioned in small caps.

2. Judgement as a matter of law for $3,800,000,000.*Cf.*R.C.F.C.50.

3. Poll. Fed.R.App.P.35(f).

4. Reverse ECF-31&Dkt.10.*See Patel,*No.22-cv-394(D.D.C. 202_).

5. Transfer control of my Weapon S to me in my official capacity as the Excellent of a political subdivision, *See*Addendum atXLI-XLIV(*Alden* at706,713-16,&756 and President Washington Farewell Address).Federalist80-81.U.S.const.art.III.

6. Remedies listed in Compl.,Dkt.-1at67-69.

7. Other remedies this court thinks proper.28:§§1651&1653.

Respectfully submitted,

/s/ Raj K. Patel
Raj K. Patel (*Pro se*)
6850 East 21st Street
Indianapolis, IN 46219
317-450-6651 (cell)
rajp2010@gmail.com

Former J.D. Candidate, Notre Dame L. Sch.
President/Student Body President, Student Gov't Ass'n of Emory U., Inc. 2013-2014
Student Body President, Brownsburg Cmty. Sch. Corp./President, Brownsburg High Sch. Student Gov't 2009-2010
Rep. from the Notre Dame L. Sch. Student B. Ass'n to the Ind. St. B. Ass'n 2017
Deputy Regional Director, Young Democrats of Am.-High Sch. Caucus 2008-2009
Co-Founder & Vice Chair, Ind. High Sch. Democrats 2009-2010
Vice President of Fin. (Indep.), Oxford C. Republicans of Emory U., Inc. 2011-2012
Officer, Brownsburg High Sch. Best Buddies 2008-2010

Dated: March 8, 2022

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

the filing has been prepared using a proportionally-spaced typeface and includes <u>3,900</u> words.

Respectfully submitted,

/s/ Raj Patel
T.E., T.E. Raj K. Patel (Pro Se)
6850 East 21st Street
Indianapolis, IN 46219
Marion County
317-450-6651 (cell)
rajp2010@gmail.com
www.rajpatel.live

Dated: March 8, 2022

## <u>ADDENDUM FOR RULES, LAWS, STATUTES & CASES</u>

**[1] The Tucker Act, 28 U.S.C. § 1491(a):**

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded…upon any express or implied contract with the United States…

**[2] Indian Contract Act, 1872 (Sept. 1, 1872) (British Empire from 1612-1947) (member of the Commonwealth of Nations, 1947-present):**

> **Preliminary, § 2 - Interpretation-clause.**—In this Act the following words and expressions are used in the following senses, unless a contrary intention appears from the context:— —In this Act the following words and expressions are used in the following senses, unless a contrary intention appears from the context:—
>
> **(a)** When one person signifies to another his willingness to do or to abstain from doing anything, with a view to obtaining the assent of that other to such act or abstinence, he is said to make a proposal;…
>
> **(b)** When the person to whom the proposal is made signifies his assent thereto, the proposal is said to be accepted. A proposal, when accepted, becomes a promise;…
>
> **(e)** Every promise and every set of promises, forming the consideration for each other, is an agreement;…
>
> **(h)** An agreement enforceable by law is a contract;…
>
> **Chapter I, § 9 - Promises, express and implied.**—In so far as the proposal or acceptance of any promise is made in words, the promise is said to be express. In so far as such proposal or acceptance is made otherwise than in words, the promise is said to be implied. —In so far as the proposal or acceptance of any promise is made in words, the promise is said to be express. In so far as such proposal or acceptance is made otherwise than in words, the promise is said to be implied."…
>
> **Chapter II, § 10 - What agreements are contracts.**—All agreements are contracts if they are made by the free consent of parties competent to contract, for a lawful consideration and with a lawful object, and are not hereby expressly declared to be void. —All agreements are contracts if they are made by the free consent of parties competent to contract, for a lawful consideration and with a lawful object,

and are not hereby expressly declared to be void." Nothing herein contained shall affect any law in force in 1[India], and not hereby expressly repealed, by which any contract is required to be made in writing or in the presence of witnesses, or any law relating to the registration of documents.

[A promise is embedded within an agreement; an agreement is embedded within a contract; a promise is embedded with a contract; all promises are agreements; and an agreement can become a contract *only if* a court of law deems it enforceable; agreements lie in wait to reveal if they are contracts].

**[3]** *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011):

> In our view, when referencing the money-mandating inquiry for Tucker Act jurisdiction, the cases logically put to one side contract-based claims. To begin with, "[n]ormally contracts do not contain provisions specifying the basis for the award of damages in case of breach...."[I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), "damages are always the default remedy for breach of contract." *Id.* at 885 (plurality opinion) (citing, e.g., Restatement (Second) of Contracts § 346, cmt. a (1981)). <u>Thus, when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required.</u> We view this presumption as forming the likely basis for the disparate discussion of claims arising under the Constitution, a statute, or a regulation and those stemming from a contract. <u>Put another way, in a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary.</u> [Thus, limiting judicial review.] (underline added).

**[4]** *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (*en banc*): "a recovery against the Government requires a substantive right created by some money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."

**[5]** *Boaz Hous. Auth. v. United States*, No. 2019-2325, 994 F.3d 1359, 1364-65 (Fed. Cir. Apr. 16, 2021) (internal citations removed):

> Under the Tucker Act, the Claims Court has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act is only a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 881 (Fed. Cir. 2018). A plaintiff must therefore identify a separate source of substantive law that creates the right to money damages. *Id*. In the parlance of Tucker Act cases, that source must be "money-mandating." *Lummi*, 870 F.3d at 1317.
>
> In their discussions of the money-mandating requirement, the Supreme Court and this court have <u>distinguished between</u> claims based on the Constitution, a statute, or a regulation and claims based on a contract. *See Holmes v. United States*, 657 F.3d 1303, 1313–14 (Fed. Cir. 2011) (summarizing cases). For claims founded upon the Constitution, a statute, or a regulation, "a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). <u>But for claims founded upon a contract, "there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Holmes*, 657 F.3d at 1314 (quoting *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001)). This presumption normally satisfies the money-mandating requirement for Tucker Act jurisdiction, "with no further inquiry being necessary." *Id*. [This presumption normally satisfies, like for the case-at-hand, the money-mandating requirement for Tucker Act [, 28 U.S.C. § 1491(a),] jurisdiction, with no further inquiry being necessary…The right to money damages is…fairly implied."</u>].

**[6] 42 U.S.C. §§ 1981** *et seq.* –

> **(a) Statement of equal rights**
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> **(b)"Make and enforce contracts" defined**
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment**
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

**[7]** *State v. States Colorado*, 574 U.S. 445, 483 (2015):

> In any event, 39 opines that disgorgement should be available only <u>when a party deliberately breaches a contract. This makes sense. If disgorgement is an antidote for "efficient breach," then it need only be administered when "conscious advantage-taking" and "opportunistic calculation" are present.</u> But as noted above, the Master expressly found that no deliberate breach occurred. Report 130. The Masters reliance on 39 was accordingly misplaced.

**[8]** *Leaf Invenergy Co. v. Invenergy Renewables LLC*, No. 308, 2018 at 31 (Del. May. 2, 2019):

> Efficient breach is a concept that recognizes that "properly calculated expectation damages increase economic efficiency by giving the other party an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach." <u>In other words, efficient breach is based on the idea that a party might find it economically worthwhile to breach a contract because that breach yields economic benefits that exceed the value of the damages it must pay to the non-breaching party.</u>

**[9]** *Nama Holdings, LLC v. Related WMC LLC*, C.A. No. 7934-VCL (Del. Ch. Nov. 17, 2014):

> <u>Efficient breach increases societal wealth by enabling parties to exit from inefficient contracts and transfer assets or services to a higher valued use.</u> If the non-breaching party could use tortious interference with contract to impose greater tort-based liability on a parent corporation than a breach of contract claim would support, the parent corporation would be less inclined to cause its subsidiary to breach efficiently, thereby reducing societal wealth.

**[10]** *Hawkins v. United States*, No. 19-1672C (Fed. Cl. Sep. 30, 2021):

> But for such a theory to pose a matter within our jurisdiction, the plaintiff must identify a money-mandating obligation on the part of the federal government, rooted in a contract or law. *See United States v. Mitchell*, 463 U.S. 206, 215-18 (1983); *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013). The only substantive statutes that Mrs.

Hawkins has added to her allegations in this proceeding were a criminal statute concerning civil rights, 18 U.S.C. § 242; a criminal statute concerning housing discrimination, 42 U.S.C. § 3631; and a civil rights statute which authorizes civil enforcement by the Attorney General, 34 U.S.C. § 12601 (formerly 42 U.S.C. § 14141).

**[11]** *Arnold v. United States*, No. 21-1393 (Fed. Cl. Sep. 22, 2021):

> However, "[t]he Tucker Act does not, of itself, create a substantive right enforceable against the United States . . . ." *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013). Rather, to state a claim within this Court's jurisdiction, "the plaintiff must identify a separate contract, regulation, statute, or constitutional provision that provides for money damages against the United States." *Id.*

**[12]** *Ibrahim v. United States*, 20-1396 T (Fed. Cl. Aug. 31, 2021):

> The Tucker Act, though, "does not, of itself, create a substantive right enforceable against the United States…" *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013) (citing *Ferreiro v. United States*, 501 F.3d 1349, 1351 (Fed. Cir. 2007)). Rather, to establish jurisdiction in this Court, "the plaintiff must identify a separate contract, regulation, statute, or constitutional provision that provides for money damages against the United States." *Id.*

**[13] 51 U.S.C. § 20302 - Vision for space exploration:**

> (a) In General.— The Administrator shall establish a program to develop a sustained human presence in cis-lunar space or on the Moon, including a robust precursor program, to promote exploration, science, commerce, and United States preeminence in space, and as a stepping-stone to future exploration of Mars and other destinations. The Administrator is further authorized to develop and conduct appropriate international collaborations in pursuit of these goals.

**[14]** *Compare Wood-Ivey* at 965 ("A court may not change a jurisdictional time period because the statute grants the court no power to act over the matter.  This type of time period is mandatory and immutable.") *with Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed. Cir. 1988).  *Compare* **Fed. R. Civ. P. 12(h)(3)** (district courts generally do not have cases with strong presumptions of vaildness so may rule before an answer from the opposing side without prejudice) *with* **R.C.F.C.12(h)(3)** (judgement for the expiration of an answer is prejudicial to plaintiff because of strong presumption; in fact, C.F.C. must cautiously order an answer as plaintiffs carry the strong federal-common-law presumption of vaildness and enforceability for Tucker Act contracts; Due Process-procedural and Due Process-substantive).

## I. CONTENTS OF LAW FROM THE FED. CIR.'S ORDER & OP. AT ECF 31.

- **ECF 31 at 2, para. 1:**

> We agree with the government that the merits of the parties' positions as stated in the opening brief and motions papers are so clear as to warrant summary affirmance. *See Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994). The Tucker Act, 28 U.S.C. § 1491, limits the Court of Federal Claims' jurisdiction to claims for money damages against the United States based on [1] <u>sources of substantive law</u> that "can [2] <u>fairly be interpreted</u> as [3] <u>mandating compensation</u> [3 or 4] <u>by the Federal Government</u>." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (citation and internal quotation marks omitted). The Court of Federal Claims correctly concluded that Mr. Patel's allegations <u>were baseless</u> and [thus]…it lacked jurisdiction over any of his claims. *Id.* (underline added).

*See also Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) cited in *California* at 1346.

- ***Chancellor*** at 899 (privity of contract required in order to recovery).

- ***Forshey v. Principi***, 284 F.3d 1335, 1357 (Fed. Cir. 2005) (when "a party appeared pro se before" the C.F.C., the Federal Circuit "may appropriately be less stringent in requiring that the issue have been raised explicitly below.").

- ***Higbie v. United States***, 778 F.3d 990, 993 (Fed. Cir. 2015) (when contract is entirely non-monetary).

- _____ ("Nonetheless, the inquiry is apathetic to dollar amount the Federal Government will owe if a Plaintiff proves a substantive source of law that mandates compensation in the form of money damages."; responsibility v. liability).

## A. Substantive Source of Law.

- Substantive law includes the law of contracts. Rest. (2d) Contracts § 1. ***Drake***, No. 2018-2135 & ***Kawa***, No. 06-448C at 12-13.

- ***Mass***. at 1372.  The Federal Circuit review "contracts interpretation," which are conclusions of law, "de novo."

- ***Jan's Helicopter Serv., Inc. v. FAA***, 525 F.3d 1299, 1309 (Fed. Cir. 2008):

> In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a non-frivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source. There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits. A contrary rule would seriously undermine Congress's decision to vest the Court of Federal Claims with exclusive jurisdiction over claims against the United States seeking money damages exceeding $10,000 and founded on the Constitution or a federal statute. Claims erroneously filed in the district courts could only be transferred to the Court of Federal Claims once the district court had examined the merits to ascertain whether the claim was frivolous or substantial, a task which Congress entrusted exclusively (in the first instance) to a court specially created for that purpose.

- ***Total Med. Mgmt., Inc. v. United States***, 104 F.3d 1314, 1319-20 (Fed. Cir. 1997):

> Although the government argues that jurisdiction is lacking because there was no enforceable contract, the law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven…There is no question that TMM pleaded the existence of a valid contract here. The proper question, despite the government's label, is one of the merits: whether TMM failed to state a claim upon which relief can be granted. *Id.*

> The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract…In addition, government contracts must comply with statutorily sanctioned regulations.…A contract which is "plainly illegal" is a nullity and void ab initio…A contract is "plainly illegal" when made contrary to statute or regulation either because of some action or statement by the contractor, or when the contractor is on "direct notice that the procedures being followed were violative of such requirements…"

> Here, the existence of the negotiated, signed MOUs evidences offer and acceptance. There was also consideration in the mutuality of obligation: TMM is to provide discounted health care services; the Army is to provide support staff and free space in the military hospital. The Contract Disputes Act defines a contracting officer as: any person who, by appointment in accordance with applicable

regulations, has the <u>authority</u> to enter into and administer contracts and make determinations and findings with respect thereto. The term also includes the authorized representative of the contracting officer, acting within the limits of his authority.

<u>The general rule is that, to be binding, a contract must be "sufficiently definite to permit determination of breach and remedies."</u> *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed. Cir. 1992). Here, the government has not made a convincing argument that the MOUs are so indefinite as to preclude determination of breach and remedies. To the contrary, the obligations of the parties are clear: TMM is to provide discounted medical services; the hospital is to provide free space and support staff and to encourage dependents to use TMM's services. <u>The CHAMPUS regulatory scheme provides payment details. The determination of damages or specific performance would flow naturally from a breach of these duties.</u>

Since the MOUs were void ab initio [being in conflict with Civilian Health and Medical Program of the Uniformed Services Act (1994)], TMM failed to state a claim upon which relief can be granted. We therefore reverse and remand with instructions to dismiss for failure to state a claim.

REVERSED AND REMANDED. (underline added).

**B. Fairly…to Mandate Compensation.**

- *Mitchell,* 463 U.S. 206 (1983) states that Restatement (Second) of the Law of Contracts (1981) is mandatory authority in factoring whether a contract is favor. R2dK §§ 208 & 205 (Many Federal Circuit decisions do not focus much on whether a contract is "fair" or "fairly," especially because contracts theory has its own defenses of fairness, such as "unconscionability" and "good faith and fair dealing.").

- **Federalist 78**: "The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment."

- *Fischer*, 402 F.3d at 1172-73 (en banc) (Tucker Act The Tucker Act, 28 U.S.C. § 1491(a), which prohibits the United States from claiming sovereign immunity after a breach of contract.).

- ***Boaz Hous. Auth. v. United States***, No. 2019-2325, 994 F.3d 1359, 1364-65 (Fed. Cir. Apr. 16, 2021) (internal citations removed):

  > [for claims founded upon a substantive source of law as contract], "<u>there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement</u>…<u>This presumption normally satisfies, like for the case-at-hand, the money-mandating requirement for Tucker Act [, 28 U.S.C. § 1491(a),] jurisdiction, with no further inquiry being necessary</u>…<u>The right to money damages is</u>…<u>fairly implied</u>."

## 1. Fair

- Gregory C. Sisk, J.D., "Online Symposium: The Federal Circuit's 2020 Rulings Reviewing Decisions of the Court of Federal Claims in Tucker Act Cases," FedCircuitBlog, March 31, 2021, https://fedcircuitblog.com/2021/03/31/online-symposium-the-federal-circuits-2020-rulings-reviewing-decisions-of-the-court-of-federal-claims-in-tucker-act-cases/. (Since a different statute other than the Tucker Act, 28 U.S.C. § 1491(a), is not involved, the proper precedent is *Smith* at 1114-16 rather than *Navajo* at 290 because Smith applies when substantive source of law is a contract. *Contra.* ECF 32 at 2, para. 1. Nonetheless, although a bit invalidly misappropriated and misapplied, the fairness test applicable to money-mandating statues or regulations can be applied to contracts when they are the money-mandating sources of law.).

### i.    Consent to be Sued-Waiver of Sovereign Immunity.

- Tucker Act, 28 U.S.C. § 1491(a).

- *Fischer*, 402 F.3d at 1172-73 (*en banc*).

- *Compare Wood-Ivey Systems Corp. v. United States*, 4 F.3d 961 (Fed. Cir. 1993) *with Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed. Cir. 1988):

> The government states that although Congress authorized the Claims Court to prescribe its rules of procedure, 28 U.S.C. § 2503(b), these rules were not required to be transmitted to Congress, as are the Federal Rules of Civil Procedure, 28 U.S.C. § 2074(a). Thus the government concludes that the Claims Court rules of procedure are inapplicable. Claims Court Rule 6(a) was enacted in accordance "with the authorization of Congress to promulgate rules of procedure. It is an official rule on which the court and the public must rely. Congress did not require return of the Claims Court Rules to Congress for review and ratification. For the government now to argue that absent such ratification this Rule cannot apply as it is written is an unwarranted disruption, after ten years of Claims Court existence, and indeed an improper intrusion into the constitutional balance.

> As an initial point, it must be noted that statutory time periods (whether applicable between private litigants or respecting a claim against the government) fall into two categories, one being a jurisdictional limitation on the court itself, the other being only a statute of limitations, i.e., a provision for repose of stale claims which is not jurisdictional between private litigants. *See Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 354, 103 S.Ct. 2392, 2398, 76 L.Ed.2d 628 (1983); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394, 102 S.Ct. 1127, 1133, 71 L.Ed.2d 234 (1982). Examples of a jurisdictional time limit would be a statute which provides that all claims of a class or type must be brought by a specified date, *Killip v. Office of Personnel Management*, 991 F.2d 1564 (Fed.Cir.1993), and 28 U.S.C. § 2107 (1988), <u>which mandates that no appeal brings an action to an appellate court unless filed within 30 days of entry of the appealed judgment, order or decree. A court may not change a jurisdictional time period because the statute grants the court no power to act over the matter. This type of time period is mandatory and immutable.</u> *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 315-16, 108 S.Ct. 2405, 2407-08, 101 L.Ed.2d 285 (1988);…

> Meeting the terms for the waiver of sovereign immunity is and remains a jurisdictional requirement in any suit against the government. The *Irwin* court cited with approval *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), which at that point expressly holds that "the terms of [the sovereign's] consent to be sued in any court defines that court's jurisdiction to entertain the suit." (Emphasis added.) Nothing in *Irwin* discards the principle that a litigant's failure to satisfy the conditions for suit against the sovereign is a defect relating to the subject matter jurisdiction of the court. "Subject matter" jurisdiction is a broad term

as used in the Federal Rules, e.g., Fed. R. Civ. P. 12(h)(3), and includes not only the fact of being a CDA claim but also the terms and conditions respecting the government's consent to suit on such claim. *Rivera v. United States*, 924 F.2d 948, 951 (9th Cir.1991); *Irving v. United States*, 909 F.2d 598, 600 (1st Cir.1990); *Dawson v. United States*, 894 F.2d 70, 71 (3d Cir.1990); *Baird v. United States*, 653 F.2d 437, 440 (10th Cir.1981), cert. denied, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). Sovereign consent is as much a part of "subject matter" jurisdiction as the requirement for a "case or controversy." *Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691, 699-700, 7 L.Ed.2d 663 (1962). But even if "subject matter" jurisdiction were rejected as the term covering the requirement of consent to suit, semantic preferences cannot convert such consent to a nonjurisdictional requirement.

The difference in holding an issue to be jurisdictional or nonjurisdictional is not a technical quibble. The consequences are far reaching. A court's lack of jurisdiction over a case may be considered at any time, even for the first time on appeal, and can be raised sua sponte by the court. ***Arctic Corner, Inc. v. United States***, 845 F.2d 999, 1000 (Fed.Cir.1988). Further, parties cannot overcome the lack of jurisdiction by stipulation, waiver or estoppel. *California v. LaRue*, 409 U.S. 109, 113 n. 3, 93 S.Ct. 390, 394 n. 3, 34 L.Ed.2d 342 (1972); *Amco Constr. Co. v. Mississippi State Bldg. Comm'n*, 602 F.2d 730, 733 (5th Cir.1979).

A congressionally imposed limitation on the sovereign's consent to suit is not merely a defense to the merits of a claim. To so hold would make waiver of sovereign immunity itself subject to waiver by reason of action or nonaction of government litigators….

## ii.     Fair Notice.

- ***Eastport S.S. Corp. v. United States***, 178 Ct. Cl. 599, 607, 372 F.2d 1002, 1009 (Fed. Cir. 1967):

> The claim must, of course, be for money. Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes — those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury…In the second group, where no such payment has been made, the allegation must be that the particular provision of law [contract] relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum. (underline added).

- ***See Mitchell II, 462 U.S. at 217-219*** quoting ***Eastport***, 372 F.2d at 1007 cited in ***Testan***, 424 U.S. at 398:

> "[A] court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. <u>In undertaking this inquiry,…[A] court need not find consent to suit in any express or implied contract with the United States</u>… whether source of substantive law [of contract] can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained…<u>The Tucker Act itself provides the necessary consent.</u>" *Mitchell II* at 218 (internal citations and quotes omitted).

- ***Boaz***, No. 2019-2325, 994 F.3d 1359 at 1364-65:

> "The right to money damages is…fairly implied" by the "presumption" set by for civil contracts-in-fact complementing The Tucker Act, 28 U.S.C. § 1491(a), especially because the Federal Government is always more sophisticated entity.

- ***Rite-Hite Corp. v. Kelley Co., Inc.***, 56 F.3d 1538, 1547 (Fed. Cir. 1995):

> The substantive source of law of contracts can be general terms rather than specific terms. *Rite-Hite* at 1547. *Contra*. ECF 31.

   ***See also Ralston Steel Corp. v. United States***, 340 F.2d 663 (Fed. Cir. 1965), *cert. denied*, 381 U.S. 590 (1965).

- ***Harrison v. United States***, No. 14-705C (Fed. Cl. Mar. 19, 2015), p. 19-20 *citing* ***Russell Corp. v. United States***, 210 Ct. Cl. 596, 606, 537 F.2d 474, 481 (1976), *cert. denied*, 429 U.S. 1073 (1977) ("For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established.").

- ***Hercules Inc. v. United States***, 24 F.3d 188, 195 (Fed. Cir. 1994) ("it is axiomatic that…damages [arising from contract breaches] are limited to those that were reasonably foreseeable at the time the parties formed the contract.").

- ***Cherokee Nation of Oklahoma v. Leavitt***, 543 U.S. 631, 632-633 (2005):

> [The Government] does not deny that it promised, but failed, to pay the costs;…and that as long as Congress has appropriated sufficient legally unrestricted funds to pay contracts, as it did here, the Government normally cannot back out of a promise to pay on grounds of insufficient appropriations. <u>Thus, in order to show that its promises were not legally binding, the Government must show</u>

something special about the promises at issue [, by challenging the presumptions of vaildness]. It fails to do so here. *Id.* at 632.

[In other words, when there is no provisio to limit the liability of the Federal Government,] "Congress appropriated adequate un-restricted funds," [through The Tucker Act, 28 U.S.C. § 1491(a).]

*See Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892) ("A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects").

- *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*).

    hold that the source of funding of an agency's activities or for payment of its judgments is not a limitation on Tucker Act jurisdiction.

- *Minesen Co. v. McHugh*, 671 F.3d 1332, 1334 (Fed. Cir. 2012) *quoting Slattery*, 635 F.3d at 1320-21:

    The government's argument runs afoul of this court's recent *en banc* decision in *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011). We held in *Slattery* that "the source of funding of an agency's activities or for payment of its judgments is not a limitation on Tucker Act jurisdiction." *Id.* at 1320. Thus, contracts…presumptively fall within the Tucker Act's waiver of sovereign immunity, and "exceptions require an unambiguous statement by Congress." *Id.* at 1320–21. (underline added)

### iii.    Supreme Court Factors – Primary Authority – *Navajo, Mitchell,* & *White*.

**First**, in ***United States v. Navajo Nation***, 556 U.S. 287, 287-302 (2009), the Supreme

Court gave the following factors:

- [Factor 1N] the source of law "need not *explicitly* provide that the right or duty it creates is enforceable though a suit for damages,"

- [Factor 2N] the source of law "imposes any concrete substantive obligations, fiduciary or otherwise, on the [Federal] Government,

- [Factor 3N] the source of law's "purpose,"

- [Factor 4N] source of law gives the Federal Government a "comprehensive managerial role…with enumerated specific factors to

guide…decisionmaking,"

- [Factor 5N] whether higher law supersedes or forbids the source of substantive law which creates these rights, i.e. if the contract or statute or regulation is in the domain set up by a higher law,

- [Factor 6N] whether the source of law "mirror[s]…language" of a law which the Federal Government is already bound by,

- [Factor 7N] whether the source of law is "*supplemental* authority" for another law, and

- [Factor 8N] liability premised on more than control alone. *Navajo*, 556 U.S. at 287-302.

**Second**, *see generally* **United States v. Mitchell**, 463 U.S. 206, 217-228 (1983), although some of these *Mitchell* factors might be superseded by *Navajo* (2009), the Supreme Court ruled the following:

- [Factor 1M] money damages would "further purpose" of the substantive source of law,

- [Factor 2M] the source of law must give the Federal Government control in "almost all aspects,"

- [Factor 3M] whether the Government has a need for "daily supervision" in performance of contract,

- [Factor 4M] the Government has expressed a "firm desire" in outcome that claimant retain benefits,

- [Factor 5M] "how many years" it will before claimant will be "natur[ally] restored" from breach,

- [Factor 6M] trust vested in the Federal Government, including from common-law elements,

- [Factor 7M] claimant's loss of income or earning power, (8) relationship with trust or fiduciary duty, and

- [Factor 9M] language from the appropriate Restatement. *Mitchell*, 463 U.S. at 217-228.

**Third**, in *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 465-79 (2003), the Supreme Court opined the following:

- [Factor 1W] if the substantive source of law gives "full responsibility" to the Federal Government rather than the "'bare' or minimum level," then the source of law is fairly money mandating,

- [Factor 2W] only a "fair inference," not an explicit provision for each possible is required, and

- [Factor 3W] whether "absen[t] a retrospective damages remedy, there would be little to deter federal officials from violating their trust duties."

- *Minesen Co. v. McHugh*, 671 F.3d 1332, 1334 & 1336-8 (Fed. Cir. 2012) *quoting Slattery*, 635 F.3d at 1320-21 (Notably, all Supreme Court fairness factors are apathetic to the amount that will be owed if the substantive source of law can fairly be interpreted as mandating compensation by the Federal Government in the form on money.) *But see Holmes* at 1314.

### iv.    Elements of Breach of Contract.

- *Vargas* at 232 citing also *San* at 959 (The Tucker Act, 28 U.S.C. § 1491(a), necessary inquiry is whether the Federal Government "contemplat[ed]" that money compensation damages would follow from breach of contract and money and was also easily shown in the contract.).

- *Contra.* The Indian Tucker Act, 28 U.S.C. § 1505 (The Tucker Act, 28 U.S.C. § 1491(a) "wants to ensure that liquidated and unliquidated damages are not "sounding in tort.").

- "Breach of Contract Complaint Federal Court," Upcounsel, Retrieved Feb. 13, 2022, https://www.upcounsel.com/breach-of-contract-complaint-federal-court:

- o Nonetheless, generally, there are four (4) elements of a breach of contract claim:

  - ▪ "[1] There must be a valid contract.

  - ▪ [2] The party bringing the suit performed its obligations.

  - ▪ [3] The party bringing the suit complained to the opposing party that they failed to honor their obligations.

  - ▪ [4] The contract breach resulted in damages for the plaintiff, which may be listed in the complaint."

- **San** at 959 (Fed. Cir. 1989):

  - o "To recover for breach of contract, a party must allege and establish:

    - ▪ (1) a valid contract between the parties,

    - ▪ (2) an obligation or duty arising out of the contract,

    - ▪ (3) a breach of that duty, and

    - ▪ (4) damages caused by the breach.") (C.F.C. reversed and re-manded because the Federal Government "contemplat[ed]" that compensation damages would follow from breach of contract and the type of compensation damages (i.e. specific damages) was also easily shown in the contract.).

### v.    Promises & The Restatement of Law (Second) of Contracts (1981).

- **R2dK § 346, cmt. b (1981)**

  - o "It is common knowledge that "[a] breach of contract by a party against whom it is enforceable always gives rise to a claim for damages." **San** at 959.

- **R2dK §§ 344, cmt. a**

XVI

- o "Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract."

- o *Id.* **at § 344** (expectation, reliance, & restitution interests).

- **R2dK § 33(2)**

  - o "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."

- **R2dK § 33(2), cmt. b**

  - o "The test is not certainty as to what the parties were to do nor as to the exact amount of damages due to the plaintiff." & 364.

- **R2dK § 207**

  - o "In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred."

- **R2dK § 207, cmt. a**

  - o "The rule preferring an interpretation which favors an interest of the public applies only to agreements which affect a public interest. It is a rule of legal effect as well as interpretation, and rests more on considerations of public policy than on the probable intention of the parties…government contracts are likely to be construed against the government as the drafting party."

  - o R2dK §§ 207, cmt. a, 345, 90, 139(2), 178, & 362, cmt. b, & 378.

- *See generally California* **citing R2dK §§ 344(a) & 347**

- o "Promises, including but not limited to "supervisory promise" or a "good-will promise" constitute valid and enforceable contracts under The Tucker Act, 28 U.S.C. § 1491(a), "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.").

- o *California Federal Bank v. United States,* 245 F.3d 1342, 1349-50 (Fed. Cir. 2001) citing *Locke v. United States,* 283 F.2d 521, 524 (Ct. Cl. 1960).

- o *See generally California* citing Rest. (2d) Contracts §§ 344(a) & 347.

- **R2dK § 345**

  - o "The judicial remedies available for the protection of the interests stated in [Rest. (2d) Contracts] § 344 include a judgment or order (a) awarding a sum of money due under the contract or as damages."

- **R2dK § 364**

  - o unfairness inquiry limited to specific performance and injunction, not amount of money mandated.

- **R2dK § 378** (claimant may elect remedy).

- **R2dK §§ 33-34, 90, 139(2), 178, & 362, cmt. b.**

  - o "Insecurity of terms or contract does not devast a court of jurisdiction."

### vi.    Judicial Review & Executive Privilege & Congressional Oversight.

- *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (Under the United States Constitution, an Article III court or other quasi-judicial functions of the United States-Federal Government are limited to "judicial review.").

- **Federalist No. 78**:

Whoever attentively considers the different departments of power must perceive, that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

…[the judiciary] can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks.…For I agree, that "there is no liberty, if the power of judging be not separated from the legislative and executive powers."…notwithstanding a nominal and apparent separation; that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches; and that as nothing can contribute so much to its firmness and independence as permanency in office, this quality may therefore be justly regarded as an indispensable ingredient in its constitution, and, in a great measure, as the citadel of the public justice and the public security.

The complete independence of the courts of justice is peculiarly essential in a limited Constitution.…Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

…As this doctrine is of great importance in all the American constitutions, a brief discussion of the ground on which it rests cannot be unacceptable.

There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the Constitution, can be valid. To deny this, would be to affirm, that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid….

XIX

It can be of no weight to say that the courts, on the pretense of a repugnancy, may substitute their own pleasure to the constitutional intentions of the legislature. This might as well happen in the case of two contradictory statutes; or it might as well happen in every adjudication upon any single statute. The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body. The observation, if it prove any thing, would prove that there ought to be no judges distinct from that body…

To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them;…

- *Ex parte Bakelite Corp.*, 279 U.S. 438, 451-52 ("To further show the separation of powers amongst Congress, the President, and the Judiciary, the Supreme Court has stated that Article I courts, such as the C.F.C., are mainly secretarial and have a rubber-stamp role in the Federal Government."). *Kawa*, No. 06-448C at 12-13.

- *Youngstown Sheet & Tube Co. v. Sawyer*, 349 U.S. 579, 635-55 (1952) (Jackson, J. concurring) (President not acting contrary to Congressional acts) &

  - *Id.* at 646 (Act of Congress should not allow President to escape responsibilities of executive power.).

- *Kawa v. United States*, No. 06-448C (Fed. Cl. June 28, 2007), pp. 12-13 (*cf.* Judicial review is most helpful for implied contract-in-fact, not explicit contract-in-fact…contra. Contracts-in-law could even necessitate judicial review.).

## 2. Substantive Law to Mandate Compensation.

- *Drake v. United States*, No. 2018-2135 (Fed. Cir. Nov. 13, 2019) ("To be cognizable, a claim under the Tucker Act must be for money damages against the United States…a plaintiff must identity a separate contract, regulation, statute, or

constitutional provision granting such a substantive right" to mandate compensation of money damages) quoted in *United States v. Testan*, 424 U.S. 392, 398 (1976).

- *Ferreiro* at 1351 & *Fisher* at 1172 (discussion limited to constitution, statute, and regulations, and does not include discussion for source of law as contract); *see also Myles* at No. 2021-1758 quoting *Smith* at 1116; & *see supra*, n. 1.

- *Kawa*, No. 06-448C at 12-13 (An express or implied contract with the Government may serve "both as a basis for jurisdiction and as a basis for recovery on the favorable to the plaintiff." ).

- *Holmes* at 1314 (a contract, when it serves as the substantive source of law to complement The Tucker Act, 28 U.S.C. § 1491(a) has a strong presumption that it can fairly be interpreted as mandating compensation by the Federal Government.).

- *Fischer v. United States*, 402 F.3d 1167, 1172 (en banc) (frivolity inquiry is limited to statutes or regulations…a court is to stop its inquiry whether a substantive source of law of contract "can fairly be interpreted as mandating compensation by the Federal Government,"). under *Holmes* at 1303 & 1314 relying on *Fisher* (en banc).

- *Brashear v. United States*, No. 2018-2405, p. 3 (Fed. Cir. Jun. 10, 2019) ("For a source of substantive law [, including but not limited to a contract,] to be money-mandating, it be 'reasonably amenable to the reading that it mandates a right of recovery in damages' against the Government…Moreover, we generally interpret the pleadings of a pro se plaintiff liberally. *See Durr v. Nicholson*, 400 F.3d 1375, 1380 (Fed. Cir. 2005).") citing *White*, 537 U.S. at 473. *See also Fischer* (en banc) at 1174 ("reasonably amenable" standard applies to statutes).

- *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005) (Where the substantive law is "reasonably amenable" to an interpretation "that it mandates a

right of recovery in damages," claims arising under that law lie within the trial

court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a) or Indian Tucker Act.).

- *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) under the Federal Government can "contemplat[e]" or "contemplat[ed] damages would follow from a breach, the substantive source of law is money-mandating; the Federal Government must show that they did not.

**C. Does a Contract (a promise or agreement which is enough to be a contract) exist?**

- **R2dK § 313** (government contracts).

- *Mitchell* **at 226** – R2dK is mandatory authority for contracts interpretation, in this embracing Federal Circuit.

- **R2DK §§ 1 (contract), 2 (promise), & 3 (agreement)** (In the contemporary, the distinguishments amongst promises, agreements, and contracts are merely to determine the legal characterization of the issue in a case; there is no legal distinction of whether money damages will be given or fairly interpreted as being mandated, but only that courts of law are less likely to give specific performance or injunctions as a remedy for agreements and promises.). *Mitchell II* at 217 quoting *Eastport* at 1007 cited in *Testan*, 424 U.S. at 398.

- **42 U.S.C. § 1981** (Thus, the modern contracting state is freer and allows for greater self-determination, not inconsistent with the Liberty to exercise the Privilege of contracting).

- **Indian Contract Act, 1872** (For instance, the consideration in a contract is oftentimes analogous to an agreement as both parties will likely benefit, and the performance of the parties' manifests mutual intentionality to be bound by some promise (a vague

word, embracing promise, agreement, and contract). Rest. (2d) Contracts §§ 1-3, 10, 75, 78-81, & 200-203.

- **R2dK §§ 5, 18, 19, 19, cmt. c.** (the promisor and promisee fairly allow a third-party to reasonable believe that a meeting of the minds has formed, which is enough for there for be a valid and enforceable contract).

- *Langan v. United States*, No. 2020-1057, p. 6 (Fed. Cir. May. 6, 2020) (ratification by an officer or Head with actual authority is fine).

- *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (citation omitted) in *California* at 1346 (includes review standard of clear effort) ("Whether a contract exists is a mixed question of law and fact…Contract interpretation is a question of law, which we review de novo") (citing *Winstar II*, 64 F.3d at 1540).

- *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001) ("The Federal Circuits reviews the trial court's legal conclusions independently and its findings of fact for clear error.").

- *Kilopass*, No. 13-1193 at 11 ("As the *Eastport* decision recognized, the substantive source of law may grant the claimant a right to recover damages either "expressly or by implication," including after claim construction"). *Mitchell II* at 217.

- *Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1318, n. 3, 1327-38 (2020) (Sotomayor, J., opinion):

> n. 3 - For a meritorious claim brought within the Tucker Act's 6-year statute of limitations, 28 U.S.C. § 2501, federal law generally requires that the "final judgment rendered by the United States Court of Federal Claims against the United States ... be paid out of any general appropriation therefor." § 2517(a). The Judgment Fund is a permanent and indefinite appropriation for "[n]ecessary amounts ... to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by

law when ... payment is not otherwise provided for." 31 U.S.C. § 1304(a)(1)….

The Tucker Act, however, does not create "substantive rights." *Navajo Nation*, 556 U.S. at 290, 129 S.Ct. 1547. A plaintiff relying on the Tucker Act must premise her damages action on "other sources of law," like "statutes or contracts." *Ibid*. For that reason, "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *Mitchell*, 463 U.S. at 216, 103 S.Ct. 2961. Nor will every "failure to perform an obligation ... creat[e] a right to monetary relief" against the Government.  *United States v. Bormes*, 568 U.S. 6, 16, 133 S.Ct. 12, 184 L.Ed.2d 317 (2012).

To determine whether a statutory claim falls within the Tucker Act's immunity waiver, we typically employ a "fair interpretation" test. A statute creates a "right capable of grounding a claim within the waiver of sovereign immunity if, but only if, 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (quoting *Mitchell*, 463 U.S. at 217, 103 S.Ct. 2961 ); *see also Navajo Nation*, 556 U.S. at 290, 129 S.Ct. 1547 ("The other source of law need not explicitly provide that the right or duty it creates is enforceable through a suit for damages"). Satisfying this rubric is generally both necessary and sufficient to permit a Tucker Act suit for damages in the Court of Federal Claims. *White Mountain Apache*, 537 U.S. at 472–473, 123 S.Ct. 1126.

- *Id.*, 140 S. Ct. at 1333 & 1335 (Alito, J., dissenting):

The Court concludes that it is proper for us to recognize a right of action to collect damages from the United States under any statute that " 'can fairly be interpreted as mandating compensation.' *Ante*, at 1328. The Court is correct that prior cases have set out this test, but as the Court acknowledges, we have "[r]arely" had to determine whether it was met. *See ante*, at 1328 – 1329. And we have certainly never inferred such a right in a case even remotely like these.

Nor has any prior case provided a reasoned explanation of the basis for the test. In *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Court simply lifted the language in question from an opinion of the old United States Court of Claims before holding that the test was not met in the case at hand. *Id.*, at 400–402, 96 S.Ct. 948 (citing *Eastport S. S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967) ). The Court of Claims opinion, in turn, did not explain the origin or basis for this test. *See id.*, at 607, 372 F.2d at 1009. And not only have later cases parroted this language, they have expanded it. In *United States v. White*

*Mountain Apache Tribe*, 537 U.S. 465, 473, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (emphasis added), the Court wrote that "[i]t is enough ... that a statute ... be reasonably amenable to the reading that it mandates a right of recovery in damages."

Despite the uncertain foundation of this test, our post-*Testan* decisions have simply taken it as a given. I would not continue that practice. Before holding that this test requires the payment of billions of dollars that Congress has pointedly refused to appropriate, we ought to be sure that there is a reasonable basis for this test. And that is questionable…

At that time, federal courts often applied general common law. But since *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the federal courts have lacked this power. Yet the "money-mandating" test that the Court applies today, *ante*, at 1328–1329, and n. 13, bears a disquieting resemblance to the sort of test that a common-law court might use in deciding whether to create a new cause of action. To be sure, some of the claims asserted under the Tucker Act, most notably contract claims, are governed by the new federal common law that applies in limited areas involving " 'uniquely federal interests.' " *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); *see also Testan*, 424 U.S. at 400, 96 S.Ct. 948. And the recognition of an implied right to recover on such claims is thus easy to reconcile with the post-Erie regime. There may also be some sharply defined categories of claims that may be properly asserted simply as a matter of precedent. But the exercise of common-law power in cases like the ones now before us is a different matter…. but our recent cases have held that even there, we should exercise "great caution" before recognizing any new claims not created by statute, ...There is every reason to believe that a similar caution should guide cases under the Tucker Act—especially when billions of dollars of federal funds are at stake. The money-mandating test that the Court applies here is in stark tension with this precedent.

## D. Jurisdiction of the C.F.C.

*See supra*, Substantive Law to Mandate Compensations. 42 U.S.C. §§1981(a)-c). (general right to recover from breach of contracts for non-whites). *See* Dkt. 10 & ECF31.
  **Ralston Steel Corp. v. United States**, 340 F.2d 663, 667 (Fed. Cir. 1965), *cert. denied*, 381 U.S. 590 (1965):

It is "well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for [lack] of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for [lack] of jurisdiction." *Bell v. Hood, supra*, 327

> U.S. at 682, 66 S.Ct. at 776. "Unsuccessful as well as successful suits may be brought" upon a federal act or regulation. *The Fair v. Kohler Die, supra*, 33 S.Ct. at 411….[contract was not breached thus failure to state claim upon which can be granted]. (underline added).

- *Kawa*, No. 06-448C at pp. 12-13 (An express or implied contract with the Government may serve "both as a basis for jurisdiction and as a basis for recovery on the favorable to the plaintiff." ). *Hercules*, 24 F.3d 188 (Fed. Cir. 1994), cert. granted, 516 U.S. at 423 (jurisdiction on contract-in-fact only, not implied-in-law) and *Cities* at 451 ("Although we do not have jurisdiction of contracts implied in law, it is well established that we have jurisdiction of contracts implied in fact.").

- *Crow Creek Sioux Tribe v. United States*, No. 2017-2340 (Fed. Cir. Oct. 19, 2018), Dkt. 26 citing *Kawa v. United States*, 77 Fed. Cl. 294, 304 n. 4 (2007) & *Oswalt v. United States*, 41 Fed. Appx. 471, 472-73 (Fed. Cir. 2002) (When "the resolution of jurisdiction [via contract] is intertwined with the merits [of a contract]…the decision on jurisdiction should await a determination on the merits, either by the court on summary judgment motion or by the trier of fact.). *Cf.* Dkt. 10.

- *United States v. Owens*, 789 F.2d 750, 753 (9th Cir. 1986) (contextually accessed), *rev'd on other grounds*, 484 U.S. 554 (1988) quoted in *United States v. Mateo-Mendez*, 215 F.3d 1039, 1042 (9th Cir. 2000) ("When a mixed question of law and fact is presented, the standard of review turns on whether factual matters or legal matters predominate.").

- *People v. Davis*, 142 Misc. 2d 881, 895-897 (N.Y. Sup. Ct. 1988) quoting *United States v. Bagley*, 473 U.S. 667, 675 (1983):

> Before turning to the explanations themselves, it is necessary to explain my decision to hear the explanations both in camera and *ex parte*. The People argued that this *ex parte* procedure unfairly prevented them from responding to the specific explanations offered by the defense. While I recognize that *ex parte* procedures are the disafavored exception to the general rule of adversarial proceedings

(*United States v Bagley,* 473 U.S. 667, 675; *United States v Thompson,* 827 F.2d 1254, 1257 [9th Cir 1987]), I note that *Batson v Kentucky* ( 476 U.S. 79, 99-100, n 24, supra) expressly refrained from formulating procedures to implement its holding, and at least one Federal appellate court has held that the *Batson* inquiry may be made *ex parte.* (*United States v Davis,* 809 F.2d 1194, 1200-1202 [6th Cir 1987], *cert denied* 483 U.S. 1008, [1987]; *see also, State v Jackson,* 322 N.C. 251, 368 S.E.2d 838 [defendant has no right to examine prosecutor on Batson-required explanations of peremptory challenges].) Moreover, the one Federal Circuit holding that a prosecutor could not give Batson explanations ex parte did so because, in its view, the defendant's constitutional right to due process required that he be present. (*United States v Thompson,* 827 F.2d, *supra,* at 1257-1258.) There was no suggestion that that court would require the presence of the prosecutor when explanations are ordered from the defense. Furthermore, an *ex parte* proceeding may be necessary to protect the defendant's Sixth Amendment right to effective assistance of counsel. Otherwise, in offering their explanations for peremptorily challenged jurors, defense counsel might be required to expose their legitimate jury selection strategies to the People. And, in so doing, in an appropriate case, this could provide the prosecution with an unfair advantage. Since it was not possible to determine in advance if this would have occurred, I took the defense explanations of their peremptory challenges ex parte and in camera. Now that jury selection has long been completed, and since the explanations offered do not reveal a jury selection strategy and since they also expressly did not reveal any privileged attorney-client communications, there is now no impediment to unsealing and discussing the proffered explanations….

According to *Batson* (supra), a prima facie showing of purposeful discrimination in the exercise of peremptory challenges may be rebutted only by "a neutral explanation related to the particular case to be tried." (476 US, *supra,* at 98.) While this explanation need not rise to the level of a cause challenge, it must be "`clear and reasonably specific'" and explain the "`legitimate reasons'" for the peremptory challenges. (*Supra,* at 98, n 20.) Thus, the court concluded that a prosecutor who exercised peremptory challenges to exclude blacks from the jury "may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race * * *. Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or "affirm[ing] [his] good faith in * * * individual selections". (476 US, *supra,* at 97-98.) Furthermore, the court recognized that this procedure required the trial court to act in a fact-finding capacity by assessing the credibility of the attorneys advancing the purportedly racially neutral explanations.

- ***United States v. Bagley***, 473 U.S. 667, 675 (1983) quoted in ***People v. Davis***, 142 Misc. 2d 881, 895-897 (N.Y. Sup. Ct. 1988):

> A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." The evidence suppressed in *Brady* would have been admissible only on the issue of punishment and not on the issue of guilt, and therefore could have affected only *Brady*'s sentence and not his conviction. Accordingly, the Court affirmed the lower court's restriction of *Brady*'s new trial to the issue of punishment. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.[6] Thus, the prosecutor is not required to deliver his entire file to defense counsel,[7] but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial:

>> "For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose. . . . "

>> . . . But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." 427 U.S., at 108.

> 6. By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). *See Brady v. Maryland*, 373 U.S., at 87-88.

> 7. *See United States v. Agurs*, 427 U.S. 97, 106, 111 (1976); *Moore v. Illinois*, 408 U.S. 786, 795 (1972). *See also California v. Trombetta*, 467 U.S. 479, 488, n. 8 (1984). An interpretation of *Brady* to create a broad, constitutionally required right of discovery "would entirely alter the character and balance of our present systems of criminal justice." *Giles v. Maryland*, 386 U.S. 66, 117 (1967) (dissenting opinion). Furthermore, a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible

burden on the prosecutor and would undermine the interest in the finality of judgments.

## II. OMISSIONS IN THE FED. CIR.'S OP. AT ECF 31.

- **28:§453** (italics added) - An Article I court under Congress is sworn to duties to "administer justice without respects to persons."

- ***See generally Ex parte Bakelite*** at 451-52 (Art. I courts serve a secretarial or rubber-stamp role). *Fisher* at 1172-73.

- ***Denton***, 504 U.S. at 33 (limiting discretion; "strange, but true; for truth is always strange, Stranger than fiction."):

    "A complaint . . . is frivolous where it lacks and arguable basis either in law or fact." *Neitze v. Williams*, 490 U.S. 319, 325 (1989). Put another way, an action is frivolous when either "(1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (quoting *Neitze*, 491 U.S. at 327).

- ***In re Flynn***, 973 F.3d 74, 89 n. 7 (D.C. Cir. 2020) (Henderson, J. dissenting):

    This fundamental separation of powers between the Judiciary and the Executive is well recognized in our sister circuits as well. *See, e.g.,...In re United States*, 791 F.3d 945, 958 (9th Cir. 2015) ("[I]nterference ... risks ... intruding upon the traditional prerogatives of the political branches. Courts should not risk becoming monitors of the wisdom and soundness of Executive action.") (cleaned up); *In re United States*, 503 F.3d 638, 641 (7th Cir. 2007)…("Judges in the United States resolve the parties' disputes rather than initiate their own factual inquiries on issues that the parties have not contested; that's a major difference between adversarial and inquisitorial systems."); *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) ("How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate."); *id.* ("… [Judges'] temptation [to intrude] must be resisted in order to maintain separation between executive and judicial roles" and because "an inquisitorial role [is] inappropriate to the Judicial Branch.").

- ***Carr v. Saul***, 593 U.S. __, 141 S. Ct. 1352, 1358 (2021) (Sotomayor, J., opinion):

    Where claimants are not expected to develop certain issues in ALJ proceedings, it is generally inappropriate to treat those issues as

forfeited. *See id.*, at 109, 120 S.Ct. 2080 ("[C]ourts require administrative issue exhaustion 'as a general rule' because it is usually 'appropriate under [an agency's] practice' for 'contestants in an adversary proceeding' before it to develop fully all issues there" (*quoting L.A. Tucker Truck Lines*, 344 U.S., at 36–37, 73 S.Ct. 67)).

- *Id.*, 593 U.S. __, 141 S. Ct. at 1363 (2021) (Thomas, J., concurring in part):

  This decidedly pro- claimant, inquisitorial process is quite unlike an adversarial suit in which parties are expected to identify, argue, and preserve all issues.

- *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 334 (2006):

  Procedural default rules generally take on greater importance in an adversary system than in the sort of magistrate-directed, inquisitorial legal system characteristic of many of the other Convention signatories…

- *Biestek v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1158 (2019) (Sotomayor, J. dissenting):

  But a Social Security proceeding is "inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *see* 20 CFR §§ 404.900(b), 416.1400(b). The ALJ acts as "an examiner charged with developing the facts," *Richardson v. Perales*, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and has a duty to "develop the arguments both for and against granting benefits,"

- *See* **Langford at 45** ("The Federal Circuit's contract interpretation jurisprudence substantially parallels its claim construction law.") (In contract interpretation, the [Federal Circuit] rarely finds any issue of underlying fact that need be resolved.).

- *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1353, 1357 & 1360 (2018) (Gorsuch, J. opinion):

  Sometimes, though, bad patents slip through. Maybe the invention wasn't novel, or maybe it was obvious all along, and the patent owner shouldn't enjoy the special privileges it has received. To remedy these sorts of problems, Congress has long permitted parties to challenge the validity of patent claims in federal court. See §§ 282(b)(2)– (3). More recently, Congress has supplemented litigation with various administrative remedies….Once instituted, though, an ex parte reexamination follows essentially the same inquisitorial process between patent owner and examiner as the initial Patent Office examination. § 305. Later, Congress supplemented ex parte reexamination with inter partes reexamination. Inter partes

reexamination (since repealed) provided a slightly more adversarial process, allowing a third party challenger to submit comments throughout the proceeding. § 314(b)(2) (2006 ed.) (repealed). But otherwise it too followed a more or less inquisitorial course led by the Patent Office. § 314(a). Apparently unsatisfied with this approach, in 2011 Congress repealed inter partes reexamination and replaced it with inter partes review….

The new inter partes review regime looks a good deal more like civil litigation…

At the end of the proceeding, § 318(a) categorically commands the Board to address in its final written decision "any patent claim challenged by the petitioner." In all these ways, the statute tells us that the petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion….

He notes that, when addressing whether to institute review at the beginning of the litigation, § 314(a) says he must focus on the claims found "in the petition"; but when addressing what claims the Board must address at the end of the litigation, § 318(a) says it must resolve the claims challenged "by the petitioner." According to the Director, this (slight) linguistic discrepancy means the claims the Board must address in its final decision are not necessarily the same as those identified in the petition. And the only possible explanation for this arrangement, the Director submits, is that he must enjoy the (admittedly implicit) power to institute an inter partes review that covers fewer than all of the claims challenged in the petition….

Because everything in the statute before us confirms that SAS is entitled to a final written decision addressing all of the claims it has challenged and nothing suggests we lack the power to say so, the judgment of the Federal Circuit is reversed and the case is remanded for further proceedings consistent with this opinion.

- **Sims v. Apfel**, 530 U.S. 103, 110-11 (2000) (Thomas, J. opinion):

    Social Security <u>proceedings are inquisitorial rather than adversarial</u>. It is the <u>ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits</u>…

## A. Omission of ECF 15 in Order & Op. at ECF 31.

- *See infra*, ____.    ECF-31; concerning prejudice to me. **Illogical to ignore of surrounding facts. *Balt.* & ____.** *Rabkin* at 977 (citation and internal quotation marks omitted) relying on *General* at 136.

- ***United States v. Owens***, 789 F.2d 750, 753 (9th Cir. 1986) (contextually accessed), *rev'd on other grounds*, 484 U.S. 554 (1988) quoted in *United States v. Mateo-Mendez*, 215 F.3d 1039, 1042 (9th Cir. 2000) (When a mixed question of law and fact is presented, the standard of review turns on whether factual matters or legal matters predominate.).

- ***Crow Creek Sioux Tribe v. United States***, No. 2017-2340 (Fed. Cir. Oct. 19, 2018), Dkt. 26 citing *Kawa v. United States*, 77 Fed. Cl. 294, 304 n. 4 (2007) & *Oswalt v. United States*, 41 Fed. Appx. 471, 472-73 (Fed. Cir. 2002) (When "the resolution of jurisdiction [via contract] is intertwined with the merits [of a contract]…the decision on jurisdiction should await a determination on the merits, either by the court on summary judgment motion or by the trier of fact.). *Cf.* Dkt. 10.

- ***United States v. Arthrex, Inc.***, 594 U.S. ___, 141 S. Ct. 1970, No. 19-1434 at 12-20, 23 (2021) (Roberts, C.J., opinion):

> The parties are left with neither an impartial decision by a panel of experts nor a transparent decision for which a politically accountable officer must take responsibility. And the public can only wonder "on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." The Federalist No. 70, at 476 (A. Hamilton)…
>
> Review outside Article II—here, an appeal to the Federal Circuit—cannot provide the necessary supervision. While the duties of APJs "partake of a Judiciary quality as well as Executive," <u>APJs are still exercising executive power and must remain "dependent upon the President."</u> 1 Annals of Cong., at 611–612 (J. Madison); *see Oil States*, 584 U. S., at ___ (slip op., at 8). <u>The activities of executive officers may "take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they must be exercises of—the 'executive Power,'" for which the President is ultimately responsible.</u> *Arlington v. FCC*, 569 U. S. 290, 305, n. 4 (2013) (quoting Art. II, §1, cl. 1)…
>
> Given the insulation of PTAB decisions from any executive review, the President can neither oversee the PTAB himself nor "attribute the Board's failings to those whom he can oversee." Free Enterprise Fund, 561 U. S., at 496. APJs accordingly exercise power that conflicts with the design of the Appointments Clause "to preserve political accountability." *Edmond*, 520 U. S., at 663…

The principal dissent dutifully undertakes to apply the governing test from *Edmond*, *see* post, at 5–10 (opinion of THOMAS, J.), but its heart is plainly not in it. For example, the dissent rejects any distinction between "inferior-officer power" and "principal-officer power," post, at 12, but *Edmond* calls for exactly that: <u>an appraisal of how much power an officer exercises free from control by a superior</u>. The dissent pigeonholes this consideration as the sole province of the Vesting Clause, post, at 14–15, but *Edmond* recognized the Appointments Clause as a <u>"significant structural safeguard[ ]" that "preserve[s] political accountability" through direction and supervision of subordinates—in other words, through a chain of command</u>. 520 U. S., at 659, 663. The dissent would have the Court focus on the location of an officer in the agency "organizational chart," post, at 1, but as we explained in *Edmond*, "[i]t is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude," 520 U. S., at 662–663. The dissent stresses that "at least two levels of authority" separate the President from PTAB decisions, post, at 1, but the unchecked exercise of executive power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem. Conspicuously absent from the dissent is any concern for the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed." *Myers v. United States*, 272 U. S. 52, 135 (1926). The other dissent charges that the Court's opinion has "no foundation" in past decisions. Post, at 5 (opinion of BREYER, J.). Of course, we have a different view on the proper application of *Edmond* in this dispute. As for other past decisions, it is the dissent that expressly grounds its analysis in dissenting opinions from *Free Enterprise Fund* and *Seila Law*, while frankly acknowledging that the Court's opinions in those cases support the principles that guide us here. Post, at 5–7…

    <u>History reinforces the conclusion that the unreviewable executive power exercised by APJs is incompatible with their status as inferior officers.</u> Since the founding, principal officers have directed the decisions of inferior officers on matters of law as well as policy. Hamilton articulated the principle of constitutional accountability underlying such supervision in a 1792 Treasury circular. Writing as Secretary of the Treasury to the customs officials under his charge, he warned that any deviations from his instructions "would be subversive of uniformity in the execution of the laws." 3 Works of Alexander Hamilton 557 (J. Hamilton ed. 1850). <u>"The power to superintend," he explained, "must imply a right to judge and direct,"</u> thereby ensuring that <u>"the responsibility for a wrong construction rests with the head of the department, when it proceeds from him."</u> *Id.*, at 559… [*cf.*, here, proceeds from the President directly]

    When it comes to the patent system in particular, adjudication has followed the traditional rule that a principal officer, if not the President himself, makes the final decision on how to exercise executive power. Recall that officers in President Washington's Cabinet

formed the first Patent Board in 1790. 1 Stat. 109–110. The initial determination of patentability was then relegated to the courts in 1793, but when the Executive Branch reassumed authority in 1836, it was the Commissioner of Patents—appointed by the President with the advice and consent of the Senate— who exercised control over the issuance of a patent. 5 Stat. 117, 119. The patent system, for nearly the next hundred years, remained accountable to the President through the Commissioner, who directed the work of his subordinates by, for example, hearing appeals from decisions by examiners-in-chief, the forebears of today's APJs. 12 Stat. 246– 247…

In a case that presents a conflict between the Constitution and a statute, we give "full effect" to the Constitution and to whatever portions of the statute are "not repugnant" to the Constitution, effectively severing the unconstitutional portion of the statute. *Bank of Hamilton v. Lessee of Dudley*, 2 Pet. 492, 526, 7 L.Ed. 496 (1829) (Marshall, C. J.). This principle explains our "normal rule that partial, rather than facial, invalidation is the required course." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)…

We hold that the unreviewable authority wielded by APJs during inter partes review is incompatible with their appointment by the Secretary to an inferior office.  But both formulations describe the same constitutional violation: Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in the proceeding before us…

[T]he President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people.

- *See also United States v. Arthrex, Inc.*, 594 U.S. ___, 141 S. Ct. 1970, 1988, No. 19-1434

at 3-4 (Gorsuch, J., concurring in part & dissenting in part):

By definition, an "'inferior officer' . . . has a superior." *Edmond v. United States*, 520 U. S. 651, 662 (1997). To be an "inferior" officer, then, one must be both "subordinate to a[n] officer in the Executive Branch" and "under the direct control of the President" through a "chain of command." *Morrison*, 487 U. S., at 720–721 (Scalia, J., dissenting). In this way, the "text and structure of the Appointments Clause" require a "reference to hierarchy." Calabresi & Lawson, The Unitary Executive, Jurisdiction Stripping, and the Hamdan Opinions: A Textualist Response to Justice Scalia, 107 Colum. L. Rev. 1002, 1018–1020 (2007). Only such an understanding preserves, as Madison described it, the "chain of dependence," where "the lowest officers, the middle grade, and the highest"—each and every one—"will depend, as they ought, on the President." 1 Annals of Cong. 499 (Madison). And where the President, in turn, depends "on the community," so that "[t]he chain of dependence" finally "terminates in

the supreme body, namely, in the people." Ibid. I agree with the Court, too, that the statutory regime before us breaks this chain of dependence….

After the three-member panel issues its decision, a party may seek rehearing from another three-member panel. *Ibid.* But only a PTAB panel—and no other official within the Executive Branch—may grant rehearing. Ibid. If that fails, a losing party's only recourse is to seek judicial review in the Court of Appeals for the Federal Circuit, which reviews the PTAB's factual findings under the deferential substantial evidence standard of review. *See* §319; *Oil States*, 584 U. S., at ___ (slip op., at 4). Under this statutory arrangement, APJs are executive officers accountable to no one else in the Executive Branch. A panel of bureaucrats wields unreviewable power to take vested property rights. This design may hold its advantages for some. Often enough, the Director of the Patent and Trademark Office and the President may be happy to wash their hands of these decisions. <u>But by breaking the chain of dependence, the statutory scheme denies individuals the right to be subjected only to lawful exercises of executive power that can ultimately be controlled by a President accountable to "the supreme body, namely, . . . the people."</u>

- *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 ("This officer…is to conform precisely to the will of the president. He is the mere organ by whom that will is communicated. The acts of such an [inferior] officer, as an officer, can never be examinable by the courts.").

- *Joshua v. United States*, 17 F.3d 378, 378-380 (Fed. Cir. 1994):

This matter brings before us the question of the appropriate standard for summary disposition of an appeal, when there has not yet been full briefing of the merits, and no oral argument has been held or allowed. We must then apply that standard to the circumstances of the case before us. The United States moves for summary affirmance of the Court of Federal Claims' June 3, 1993 order dismissing Roynell Joshua's complaint for lack of jurisdiction. Joshua argues that the United States' motion is improper and requests that sanctions be imposed.

Joshua filed a complaint in the Court of Federal Claims seeking $36 billion in damages resulting from the dismissal of his case by the United States District Court for the Western District of Louisiana. On June 3, 1993, the Court of Federal Claims issued an order stating:

Plaintiff forwarded a complaint in the above-styled action that was received by the court on June 1, 1993. Plaintiff seeks damages and costs, and various

forms of specific performance, allegedly arising out of a civil action brought by plaintiff and others in the United States District Court for the Western District of Louisiana. The Clerk of the Court and a Judge are also named defendants. Plaintiff appears pro se and the claim included a petition to proceed in forma pauperis. The petition to proceed in forma pauperis is granted, the complaint is filed, and dismissed, sua sponte, with prejudice for reasons set forth below.

…The court's actions allegedly violated several provisions of Title 18, the criminal code, and deprived plaintiff of his Constitutional rights under the Fifth Amendment to due process and equal protection of law. The criminal acts complained of include conspiracy, fraud, perjury, and malfeasance in office.

<u>Plaintiff misconstrues the jurisdiction of this court. This is a court of specific civil jurisdiction, defined by 28 U.S.C. § 1491, et. seq.,</u> and requires a money mandating act to confirm jurisdiction. The court has no jurisdiction to adjudicate any claims whatsoever under the federal criminal code and the due process and equal protection clauses of the Fifth Amendment do not provide for the payment of monies, even if there were a violation. Plaintiff has [not] identified a money mandating provision of law, and the court is aware of none that could possibly provide jurisdictional support for any of his claims. The court does not have jurisdiction, in the circumstances of this case, to provide any of the relief requested. *See* 28 U.S.C. § 1491 et. seq. <u>Accordingly, the complaint is dismissed</u>. No costs.

We hold that summary disposition is appropriate, inter alia, when the position of one party is so clearly correct as a matter of law that no substantial question regarding the outcome of the appeal exists. *See, e.g., Groendyke*, 406 F.2d at 1162. In the present case, it is clear that Joshua's complaint did not identify any substantive right, founded upon either a money mandating statute or the Constitution, which might form the basis for his claim. Further, to the extent that Joshua is seeking it, the Court of Federal Claims does not have jurisdiction to review the decisions of district courts or the clerks of district courts relating to proceedings before those courts.

## 1. Declaration, 28 U.S.C. § 1746, as Expert Op.

- *See* **28 U.S.C. § 1746**; ECF 15 & 30; & R.C.F.C. 8. Federalist 78 (protect separation of powers).

- **28 U.S.C. § 1746** (italics added) ("Congress has enacted that "[w]herever, under any law of the United States or under any rule [R.C.F.C. 8]…made pursuant to law, *any matter* is required or permitted to be supported evidenced, established, or proved by the sworn declaration, verification, certificate, [short and plain] statement, oath, or affidavit, in writing of the person making the same…, such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration,…in writing of such person which is subscribed by him, as true under penalty of perjury.").

- ***Rodriguez v. Match.com***, 290 Fed. Appx. 6 (9th Cir. 2008) ("The Court of Appeals of the Ninth circuit ruled that the lower court abused it discretion when it did not review and permit a compliant Declaration under 28 U.S.C. Section 1746, irrespective of the logical effect it may have on the case if suddenly introduced."). *See* ECF No. 27.

## 2. Back Drop of the Offer & Acceptance.

- "Expert panel: Havana Syndrome Most Likely Caused By Directed Energy," *MSNBC News*, https://www.nbcnews.com/politics/national-security/havana-syndrome-symptoms-small-group-likely-caused-directed-energy-say-rcna14584. February 2, 2022. *See* ECF 30.

- ***Corfield*** (a list of duties, including Protecting each citizen from the whole).

- ***In Re Neagle***, 135 U.S. 1 at 2 & 98-99 (Act of Congress not required for judges when upholding the Privileges & Immunities Clause). Federalist 78. Rdk2 §§ 19 & 202.

- ***Lujan v. Defenders of Wildlife***, 504 U.S. 555, 560-61 & 579.

  i. **Omissions of C.I.A. Findings as to Technology-Weapon, Analogous to or the Same as Weapon S, which Causes the Havana Syndrome.**

- *Denton* at 32 (limiting discretion).

- Federalist 78 (judiciary may not access wealth of society). *But see* ECF 30 & Dkt. 10.

## III. PRIVILEGES AND/OR IMMUNITIES CLAUSES.

- *See supra*, Statement of Counsel (*pro se*). *See generally* Compl., Dkt. 1.

### A. Natural-Born Citizen.

- **Federalist 80** ("The Privileges and/or Immunities Clause is why the American people have chosen to have a national constitutional government; faithfulness to this Clause defines the National Character and 'the basis of the union.'"). U.S. const. art. IV, § 2, cl. 1. & amend. XIV, § 1, cl. 2.

- *See* **Vermeule, Adrian** (veil rules do not apply to federal judges but do to the executive).

- *See also Arthrex*, No. 19-1434 at p. 23 (Roberts, C.J., The Constitutional hierarchy requires "the exercise of executive power [to remain] accountable to the people.") ("executive power" includes power to communicate, recognize, correct, constrain, incapacitate, touch, contract, assault, kill, defend, enforce, etc.).

- **U.S. const. art. IV, § 2, cl. 1** - "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

- *Corfield*, 6 F. Cas. 546, 4 Wash.C.C. 371, No. 3230 (C.C.E.D. Pa. 1823) (Washington, J.) (Privileges include to receive the "Protection of the Federal Government" and Liberty to enter into contracts). ***See also Marbury*** at 163.

- **U.S. const. amend. XIV, § 1, cl. 2** - "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

- ***In Re Neagle* at 2 & 98-99** - An Act of Congress is not required to discharge duties of the Privileges and/or Immunities Clauses, either for the President or the judiciary.

- **Federalist 78** - Congress can "prescribes the rules by which the duties and rights of every citizen [including court judges] are to be regulated…[the judiciary]…regarded as an indispensable ingredient in…[the]…constitution…as the citadel of the public justice and the public security."

- **28 U.S.C. § 453** - For instance, Congress has bound each judge to "administer justice *without respect to persons*, and do *equal right to the poor and to the rich*, and…*faithfully* and impartially discharge and perform all the duties incumbent upon…[each judge]…under the Constitution and laws of the United States." 28 U.S.C. § 453.

- *Logan* **at 295** (The Federal Government "commands obedience" to its laws through the Privileges and Immunities Clause (and to certain Privileges and Immunities through the Full Faith and Credit Clause).

- *Twining* **at 97-99** (Nonetheless, the Privileges and Immunities Clause gives each United States citizen "the right to inform the United States authorities of violation of its laws.").

- *In Re Quarles* **at 535-37** lists *each* individual citizen's Privileges, including from "lawless violence" and states that each judge and the judiciary has the "correlative duty" to Protect *each* individual citizen as they pursue Privileges.

- *See generally* **18 U.S.C. §§ 241** *et seq.*

- *See also Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 71, & 77-79 (1873). When enforcing the Privileges and Immunities, the Federal Government has supremacy in protecting each citizen and need not involve State executives or other governments. *In Re Quarles* at 536-37 & *Harris* at 638 & 643-44.

- *See also* **U.S. const. art. VI, § 1 referring to the Decl. of Independence (1776), the Treaty of Paris (1783), & Paris Peace Treaty – Congressional Proclamation of Jan. 14,**

**1784 -** The Privileges and Immunities Clause duties on the Federal Government are foundational and fundamental and oath-bound. 3 U.S.C. § 301-303 & U.S. const. art. II, § 1, cls. 1 & 8.

- *See* **3 U.S.C. §§ 301-303** ( "Like in the contemporary, when an inferior officer is not established by Congress, the President of the United States who is also the Head of State, Head of Government, and Chief Executive is directly responsible to oversee the enforcement of the Privileges and Immunities Clause."). *Arthrex*, No. 19-1434 at p. 23.

- **Thomas Jefferson said to Samuel Kercheval**, also known as H. Tompkinson (Privileges and Immunities Clause forbids the use of psychological weapons).

- **28 U.S.C. §§ 516 *et seq*.** (United States has "interest").

**B. Privileges and/or Immunities as Applied within the Executive Branch.**

- *See supra*, Statement of Counsel. *Nixon* at 683 (no person or no project/experiment is above the law, the Federalist Project/Experiment) & *Fitzgerald* at 731 (immunity limited to official acts). *Cf.* Amend. XIII.

- The United States Attorney General and Mr. Kiepura are logically constitutionally less Privileged and Immune than the President of the United States, in relation to each individual citizen of the United States who is styled "The Excellent."

- Framers and Amenders of the United States Constitution put the codified Privileges and Immunities expressly twice in the United States Constitution to show that the Privileges and Immunities Clause conceals the Natural State/Order. Federalist 80 & U.S. const. amend. XIV.

- The Privileges and Immunities Clause allows each of My Excellency, my styles in my official capacity, to develop and bare weapons, much like it does for the Excellents (foreign affairs) and the Honorable of the United States and the Sister States. Upon an

attack on one of My Excellency, I or the respective courts may  institute a transfer of power, including weapons, instruments, and other technologies, for further use under the United States Constitution. Federalist 80.

- ***Alden v. Maine***, 527 U.S. 706, 713-16 & 756 (1999):

> Although the Constitution establishes a National Government with broad, often plenary authority over matters within its recognized competence, the founding document "specifically recognizes the States as sovereign entities." *Seminole Tribe of Fla. v. Florida*, supra, at 71, n. 15; accord, *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991) ("[T]he States entered the federal system with their sovereignty intact"). Various textual provisions of the Constitution assume the States' continued existence and active participation in the fundamental processes of governance. *See Printz v. United States*, 521 U.S. 898, 919 (1997) (citing Art. III, § 2; Art. IV, §§ 2-4; Art. V). The limited and enumerated powers granted to the Legislative, Executive, and Judicial Branches of the National Government, moreover, underscore the vital role reserved to the States by the constitutional design, *see*, e.g., Art. I, § 8; Art. II, §§ 2-3; Art. III, § 2. Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment, which, like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of  the national power.  The Amendment confirms the promise implicit in the original document: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Amdt. 10; *see also Printz, supra*, at 919; *New York v. United States*, 505 U.S. 144, 156-159, 177 (1992).

> The federal system established by our Constitution preserves the sovereign status of the States in two ways. First, it reserves to them a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status. The States "form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere." The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison).

> Second, even as to matters within the competence of the National Government, the constitutional design secures the founding generation's rejection of "the concept of a central government that would act upon and through the States" in favor of "a system in which the State and Federal Governments would exercise concurrent authority over the people — who were, in Hamilton's words, `the

only proper objects of government.'" Printz, supra, at 919-920 (quoting The Federalist No. 15, at 109); accord, New York, *supra*, at 166 ("The Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States"). In this the founders achieved a deliberate departure from the Articles of Confederation: Experience under the Articles had "exploded on all hands" the "practicality of making laws, with coercive sanctions, for the States as political bodies." 2 Records of the Federal Convention of 1787, p. 9 (M. Farrand ed. 1911) (J. Madison); accord, The Federalist No. 20, at 138 (J. Madison A. Hamilton); James Iredell: Some Objections to the Constitution Answeered, reprinted in 3 Annals of America 249 (1976)

The States thus retain "a residuary and inviolable sovereignty." The Federalist No. 39, at 245. They are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty.

The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity. When the Constitution was ratified, it was well established in English law that the Crown could not be sued without consent in its own courts. *See Chisholm v. Georgia*, 2 Dall. 419, 437-446 (1793) (Iredell, J., dissenting) (surveying English practice); *cf. Nevada v. Hall*, 440 U.S. 410, 414 (1979) ("The immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity"). In reciting the prerogatives of the Crown, Blackstone — whose works constituted the preeminent authority on English law for the founding generation — underscored the close and necessary relationship understood to exist between sovereignty and immunity from suit:…

Although the American people had rejected other aspects of English political theory, the doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified. *See Chisholm*, *supra*, at 434-435 (Iredell, J., dissenting) ("I believe there is no doubt that neither in the State now in question, nor in any other in the union, any particular Legislative mode, authorizing a compulsory suit for the recovery of money against a State, was in being either when the Constitution was adopted, or at the time the judicial act was passed"); *Hans v. Louisiana*, 134 U.S. 1, 16 (1890) ("The suability of a State, without its consent, was a thing unknown to the law. This has been so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted"). The ratification debates, furthermore, underscored the importance of the States' sovereign immunity to the American people. Grave concerns were raised by the provisions of Article III, which extended the federal judicial power to

controversies between States and citizens of other States or foreign nations. As we have explained:

> "Unquestionably the doctrine of sovereign immunity was a matter of importance in the early days of independence. Many of the States were heavily indebted as a result of the Revolutionary War. They were vitally interested in the question whether the creation of a new federal sovereign, with courts of its own, would automatically subject them, like lower English lords, to suits in the courts of the `higher' sovereign." *Hall, supra*, at 418 (footnote omitted).

The leading advocates of the Constitution assured the people in no uncertain terms that the Constitution would not strip the States of sovereign immunity. One assurance was contained in The Federalist No. 81, written by Alexander Hamilton:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal. . . [T]here is no color to pretend that the State governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident that it could not be done without waging war against the contracting State; and to ascribe to the federal courts, by mere implication, and in destruction of a preexisting right of the State governments, a power which would involve such a consequence, would be altogether forced and unwarrantable." *Id.*, at 487-488 (emphasis in original).

- **President George Washington (September 19, 1796: Farewell Address)**:

Respect for its authority, compliance with its laws, acquiescence in its measures, are duties enjoined by the fundamental maxims of true liberty. <u>The basis of our political systems is the right of the people to make and to alter their constitutions of government. But the constitution which at any time exists till changed by an explicit and authentic act of the whole people is sacredly obligatory upon all.</u> The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government.

All obstructions to the execution of the laws, all combinations and associations, under whatever plausible character, with the real design to direct, control, counteract, or awe the regular deliberation and action of the constituted authorities, are destructive of this fundamental principle and of fatal tendency. <u>They serve to organize faction; to give it an artificial and extraordinary force; to put in the place of the delegated will of the nation the will of a party,</u> often a small but artful and enterprising minority of the community, and, according to the alternate triumphs of different parties, to snake the public administration the mirror of the ill-concerted and incongruous projects of faction rather than the organ of consistent and wholesome plans, digested by common counsels and modified by mutual interests.

<u>However combinations or associations of the above description may now and then answer popular ends, they are likely in the course of time and things to become potent engines by which cunning, ambitious, and unprincipled men will be enabled to subvert the power of the people, and to usurp for themselves the reins of government, destroying. afterwards the very engines which have lifted them to unjust dominion.</u>

Toward the preservation of your Government and the permanency of your present happy state, it is requisite not only that you steadily discountenance irregular oppositions to its acknowledged authority, but also that you resist with care the spirit of innovation upon its principles, however specious the pretexts. One method of assault may be to effect in the forms of the Constitution alterations which will impair the energy of the system, and thus to undermine what can not be directly overthrown…

…and remember especially that for the efficient management of your common interests in a country so extensive as ours a government of as much vigor as is consistent with the perfect security of liberty is indispensable. <u>Liberty itself will find in such a government, with powers properly distributed and adjusted, its surest guardian.</u>

**LexisNexis®**

## *Restat 2d of Contracts, § Scope*

*Restatement of the Law, Contracts 2d - Official Text >  Chapter 1- Meaning of Terms*

# Introductory Note

A persistent source of difficulty in the law of contracts is the fact that words often have different meanings to the speaker and to the hearer.  Most words are commonly used in more than one sense, and the words used in this Restatement are no exception.  It is arguable that the difficulty is increased rather than diminished by an attempt to give a word a single definition and to use it only as defined.  But where usage varies widely, definition makes it possible to avoid circumlocution in the statement of rules and to hold ambiguity to a minimum.

In the Restatement, an effort has been made to use only words with connotations familiar to the legal profession, and not to use two or more words to express the same legal concept.  Where a word frequently used has a variety of distinct meanings, one meaning has been selected and indicated by definition.  But it is obviously impossible to capture in a definition an entire complex institution such as "contract" or "promise." The operative facts necessary or sufficient to create legal relations and the legal relations created by those facts will appear with greater fullness in the succeeding chapters

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



<u>*Restat 2d of Contracts, § 1*</u>

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 1- Meaning of Terms*

# § 1 Contract Defined

**A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.**

COMMENTS & ILLUSTRATIONS

Comment:

*a. Other meanings.* The word "contract" is often used with meanings different from that given here.  It is sometimes used as a synonym for "agreement" or "bargain." It may refer to legally ineffective agreements, or to wholly executed transactions such as conveyances; it may refer indifferently to the acts of the parties, to a document which evidences those acts, or to the resulting legal relations.  In a statute the word may be given still other meanings by context or explicit definition.  As is indicated in the Introductory Note to the Restatement of this Subject, definition in terms of "promise" excludes wholly executed transactions in which no promises are made; such a definition also excludes analogous obligations imposed by law rather than by virtue of a promise.

*b. Act and resulting legal relations.* As the term is used in the Restatement of this Subject, "contract," like "promise," denotes the act or acts of promising.  But, unlike the term "promise," "contract" applies only to those acts which have legal effect as stated in the definition given.  Thus the word "contract" is commonly and quite properly also used to refer to the resulting legal obligation, or to the entire resulting complex of legal relations. Compare Uniform Commercial Code § 1-201(11), defining "contract" in terms of "the total legal obligation which results from the parties' agreement."

*c. Set of promises.* A contract may consist of a single promise by one person to another, or of mutual promises by two persons to one another; or there may be, indeed, any number of persons or any number of promises.  One person may make several promises to one person or to several persons, or several persons may join in making promises to one or more persons.  To constitute a "set," promises need not be made simultaneously; it is enough that several promises are regarded by the parties as constituting a single contract,

or are so related in subject matter and performance that they may be considered and enforced together by a court.

*d. Operative acts other than promise*. The definition does not attempt to state what acts are essential to create a legal duty to perform a promise. In many situations other acts in addition to the making of a promise are essential, and the formation of the contract is not completed until those acts take place. For example, an act may be done as the consideration for a contract (see § 71), and may be essential to the creation of a legal duty to perform the promise (see § 17). Similarly, delivery is required for the formation of a contract under seal (see § 95). Such acts are not part of the promise, and are not specifically included in the brief definition of contract adopted here.

*e. Remedies*. The legal remedies available when a promise is broken are of various kinds. Direct remedies of damages, restitution and specific performance are the subject of Chapter 16. Whether or not such direct remedies are available, the law may recognize the existence of legal duty in some other way such as recognizing or denying a right, privilege or power created or terminated by the promise.

Illustration:

1. A orally agrees to sell land to B; B orally agrees to buy the land and pays $ 1000 to A. The agreement is unenforceable under the Statute of Frauds. B's right to restitution of the $ 1000, however, is governed by the same rules as if the agreement were enforceable. B has a right to recover the $ 1000 paid if A refuses to convey the land, but not if A is ready and willing to convey. See § 140 and the provisions on restitution in § 375. By virtue of this indirect recognition of the duty to convey, the agreement is a contract.

*f. Varieties of contracts*. The term contract is generic. As commonly used, and as here defined, it includes varieties described as voidable, unenforceable, formal, informal, express, implied (see Comment *a* to § 4), unilateral, bilateral. In these varieties neither the operative acts of the parties nor the resulting relations are identical.

*g. "Binding promise."* A promise which is a contract is said to be "binding." As the term "contract" is defined, a statement that a promise is binding does not necessarily mean that any particular remedy is available in the event of breach, or indeed that any remedy is available. Because of the limitations inherent in stating or illustrating rules for the legal relations resulting from promises, it frequently becomes necessary to indicate that a legal duty to perform arises from the facts stated, assuming the absence of other facts. In order to avoid the connotation that the duty stated exists under all circumstances, the word "binding" or a statement that the promisor is "bound" is used to indicate that the duty arises if the promisor has full capacity, if there is no

illegality or fraud in the transaction, if the duty has not been discharged, and if there are no other similar facts which would defeat the prima facie duty which is stated.

### REPORTER'S NOTES

This Section carries forward former § 1.  See 1 Williston, Contracts § 1 (3d ed. 1957); 1 Corbin, Contracts § 3 (1963).  For other important discussions of what contracts are, see Gilmore, The Death of Contract (1974); Friedman, Contract Law in America: A Social and Economic Case Study (1965); Symposium, The Relevance of Contract Theory, 1967 Wis. L. Rev. 303; Macauley, Contract Law and Contract Research, 20 J. Legal Ed. 452 (1968); Farnsworth, The Past of Promise: An Historical Introduction to Contract, 69 Colum. L. Rev. 576 (1969); Macneil, The Many Futures of Contract, 47 So. Cal. L. Rev. 691 (1974); Macneil, Restatement, Second, of Contracts and Presentation, 60 Va. L. Rev. 589 (1974); Atiyah, Contracts, Promises and the Law of Obligations, 94 L. Q. Rev. 193 (1978); see also Leff, Contract as Thing, 19 Amer. U. L. Rev. 131 (1970).

*Comments a and b.*  For a concise discussion of what constitutes a contract, how it can be created and its relation to tort actions for fraud, see *Steinberg v. Chicago Medical School, 69 Ill.2d 320, 371 N.E.2d 634 (1977)*.

*Comment e.*  Illustration 1 is new.

*Comment f.*  Section 12 of the original Restatement defined unilateral and bilateral contracts.  It has not been carried forward because of doubt as to the utility of the distinction, often treated as fundamental, between the two types.  As defined in the original Restatement, "unilateral contract" included three quite different types of transaction: (1) the promise which does not contemplate a bargain, such as the promise under seal to make a gift, (2) certain option contracts, such as the option under seal (see §§ 25, 45), and (3) the bargain completed on one side, such as the loan which is to be repaid.  This grouping of unlike transactions was productive of confusion.

Moreover, as to bargains, the distinction tends to suggest, erroneously, that the obligation to repay a loan is somehow different if the actual delivery of the money was preceded by an advance commitment from the obligation resulting from a simultaneous loan and commitment.  It also causes confusion in cases where performance is complete on one side except for an incidental or collateral promise, as where an offer to buy goods is accepted by shipment and a warranty is implied.  Finally, the effect of the distinction has been to exaggerate the importance of the type of bargain in which one party begins performance without making any commitment, as in the classic classroom case of the promise to pay a reward for climbing a flagpole.

The principal value of the distinction has been the emphasis it has given to the fact that a promise is often binding on the promisor even though the promisee is not bound by any promise. This value is retained in § 25 on option contracts. But the terms unilateral and bilateral are generally avoided in this Restatement.

## Cross Reference

ALR Annotations:

What constitutes a contract for sale under uniform commercial code § 2-314. *78 A.L.R.3d 696*.

Digest System Key Numbers:

Contracts 1

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute



*Restat 2d of Contracts, § 2*

*Restatement of the Law, Contracts 2d - Official Text >  Chapter 1- Meaning of Terms*

# § 2 Promise; Promisor; Promisee; Beneficiary

(1)  A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.

(2)  The person manifesting the intention is the promisor.

(3)  The person to whom the manifestation is addressed is the promisee.

(4)  Where performance will benefit a person other than the promisee, that person is a beneficiary.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Acts and resulting relations.* "Promise" as used in the Restatement of this Subject denotes the act of the promisor.  If by virtue of other operative facts there is a legal duty to perform, the promise is a contract; but the word "promise" is not limited to acts having legal effect.  Like "contract," however, the word "promise" is commonly and quite properly also used to refer to the complex of human relations which results from the promisor's words or acts of assurance, including the justified expectations of the promisee and any moral or legal duty which arises to make good the assurance by performance.  The performance may be specified either in terms describing the action of the promisor or in terms of the result which that action or inaction is to bring about.

*b. Manifestation of intention.* Many contract disputes arise because different people attach different meanings to the same words and conduct.  The phrase "manifestation of intention" adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention.  A promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct.  Rules governing cases where the promisee could

reasonably draw more than one inference as to the promisor's intention are stated in connection with the acceptance of offers (see §§ 19 and 20), and the scope of contractual obligations (see §§ 201, 219).

c. *Promise of action by third person; guaranty*. Words are often used which in terms promise action or inaction by a third person, or which promise a result obtainable only by such action. Such words are commonly understood as a promise of conduct by the promisor which will be sufficient to bring about the action or inaction or result, or to answer for harm caused by failure. An example is a guaranty that a third person will perform his promise. Such words constitute a promise as here defined only if they justify a promisee in an expectation of some action or inaction on the part of the promisor.

d. *Promise of event beyond human control; warranty*. Words which in terms promise that an event not within human control will occur may be interpreted to include a promise to answer for harm caused by the failure of the event to occur. An example is a warranty of an existing or past fact, such as a warranty that a horse is sound, or that a ship arrived in a foreign port some days previously. Such promises are often made when the parties are ignorant of the actual facts regarding which they bargain, and may be dealt with as if the warrantor could cause the fact to be as he asserted. It is then immaterial that the actual condition of affairs may be irrevocably fixed before the promise is made.

Words of warranty, like other conduct, must be interpreted in the light of the circumstances and the reasonable expectations of the parties. In an insurance contract, a "warranty" by the insured is usually not a promise at all; it may be merely a representation of fact, or, more commonly, the fact warranted is a condition of the insurer's duty to pay (see § 225(3)). In the sale of goods, on the other hand, a similar warranty normally also includes a promise to answer for damages (see Uniform Commercial Code § 2-715).

**Illustrations:**

1. A, the builder of a house, or the inventor of the material used in part of its construction, says to B, the owner of the house, "I warrant that this house will never burn down." This includes a promise to pay for harm if the house should burn down.

2. A, by a charter-party, undertakes that the "good ship Dove," having sailed from Marseilles a week ago for New York, shall take on a cargo for B on her arrival in New York. The statement of the quality of the ship and the statement of her time of sailing from Marseilles include promises to pay for harm if the statement is untrue.

e. *Illusory promises; mere statements of intention*. Words of promise which by their terms make performance entirely optional with the "promisor" whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory

promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance.

On the other hand, a promise may be made even though no duty of performance can arise unless some event occurs (see §§ 224, 225(1)). Such a conditional promise is no less a promise because there is small likelihood that any duty of performance will arise, as in the case of a promise to insure against fire a thoroughly fireproof building. There may be a promise in such a case even though the duty to perform depends on a state of mind of the promisor other than his own unfettered wish (see § 228), or on an event within the promisor's control.

**Illustration:**

3. A says to B, "I will employ you for a year at a salary of $ 5,000 if I go into business." This is a promise, even though it is wholly optional with A to go into business or not.

*f. Opinions and predictions.* A promise must be distinguished from a statement of opinion or a mere prediction of future events. The distinction is not usually difficult in the case of an informal gratuitous opinion, since there is often no manifestation of intention to act or refrain from acting or to bring about a result, no expectation of performance and no consideration. The problem is frequently presented, however, whether words of a seller of goods amount to a warranty. Under Uniform Commercial Code § 2-313(2) a statement purporting to be merely the seller's opinion does not create a warranty, but the buyer's reliance on the seller's skill and judgment may create an implied warranty that the goods are fit for a particular purpose under Uniform Commercial Code § 2-315. In any case where an expert opinion is paid for, there is likely to be an implied promise that the expert will act with reasonable care and skill.

A promise often refers to future events which are predicted or assumed rather than promised. Thus a promise to render personal service at a particular future time commonly rests on an assumption that the promisor will be alive and well at that time; a promise to paint a building may similarly rest on an assumption that the building will be in existence. Such cases are the subject of Chapter 11. The promisor may of course promise to answer for harm caused by the failure of the future event to occur; if he does not, such a failure may discharge any duty of performance.

**Illustration:**

4. A, on seeing a house of thoroughly fireproof construction, says to B, the owner, "This house will never burn down." This is not a promise but merely an opinion or prediction. If A had been paid for his opinion as an

Restat 2d of Contracts, § 2

expert, there might be an implied promise that he would employ reasonable care and skill in forming and giving his opinion.

*g. Promisee and beneficiary.* The word promisee is used repeatedly in discussion of the law of contracts, and it cannot be avoided here. In common usage the promisee is the person to whom the promise is made; as promise is defined here, the promisee might be the person to whom the manifestation of the promisor's intention is communicated. In many situations, however, a promise is complete and binding before the communication is received (see, for example, §§ 63 and 104(1)). To cover such cases, the promisee is defined here as the addressee. As to agents or purported agents of the addressee, see § 52 Comment *c.*

In the usual situation the promisee also bears other relations to the promisor, and the word promisee is sometimes used to refer to one or more of those relations. Thus, in the simple case of a loan of money, the lender is not only the addressee of the promise but also the person to whom performance is to be rendered, the person who will receive economic benefit, the person who furnished the consideration, and the person to whom the legal duty of the promisor runs. As the word promisee is here defined, none of these relations is essential.

Contractual rights of persons not parties to the contract are the subject of Chapter 14. The promisor and promisee are the "parties" to a promise; a third person who will benefit from performance is a "beneficiary." A beneficiary may or may not have a legal right to performance; like "promisee", the term is neutral with respect to right and duties. A person who is entitled under the terms of a letter of credit to draw or demand payment is commonly called a beneficiary, but such a person is ordinarily a promisee under the present definition. See Uniform Commercial Code § 5-103.

### REPORTER'S NOTES

This Section substitutes the concept of a "manifestation of intention to act . . ." for the phrase used in former § 2(1): "an undertaking . . . that something shall happen. . . ." The older definition did not identify the essential characteristics of an undertaking. See Gardner, An Inquiry Into the Principles of Contracts, 46 Harv. L. Rev. 1, 5 (1932). The present definition of promise is based on 1 Corbin, Contracts § 13 (1963 & Supp. 1980). See also 1 id. § 15; 1 Williston, Contracts § 1A (3d ed. 1957). The definitions of "promisor," "promise" and "beneficiary" are new. Compare Gardner, Massachusetts Annotations, Restatement of Contracts, Chapter 6, at 64 (1935).

*Comment a.* See *Coffman Industries, Inc. v. Gorman-Taber Co., 521 S.W.2d 763 (Mo. Ct. App. 1975)*; Farnsworth, The Past of Promise: An Historical Introduction to Contract, 69 Colum. L. Rev. 576 (1969).

*Comment d.* This Comment is based on former § 2(2). Illustrations 1 and 2 are based on Illustrations 2 and 3 to former § 2.

*Comment e.* See [Pappas v. Bever, 219 N.W.2d 720 (Iowa 1974)](). Illustration 3 is based on Illustration 4 to former § 2.

*Comment f.* Illustration 4 is based on Illustration 1 to former § 2. More stringent liability for opinions and predictions may be created by statutes and administrative rules governing such areas as securities regulation, unfair trade practices and deceptive advertising. See also §§ 159-73 on misrepresentation, especially §§ 168-71.

## Cross Reference

Digest System Key Numbers:

Contracts 15, 187

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 3*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 1- Meaning of Terms*

# § 3 Agreement Defined; Bargain Defined

An agreement is a manifestation of mutual assent on the part of two or more persons.   A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances.

### COMMENTS & ILLUSTRATIONS

Comment:

*a.  Agreement distinguished from bargain.*  Agreement has in some respects a wider meaning than contract, bargain or promise.  On the other hand, there are contracts which do not require agreement.  See, e.g., §§ 82-90, 94, 104.  The word "agreement" contains no implication that legal consequences are or are not produced.  It applies to transactions executed on one or both sides, and also to those that are wholly executory.  The word contains no implication of mental agreement.  Such agreement usually but not always exists where the parties manifest assent to a transaction.

*b.  Manifestation of assent.*  Manifestation of assent may be made by words or by any other conduct (see § 19).  Even silence in some circumstances is such a manifestation (see § 69).  Compare the definition of "agreement" in Uniform Commercial Code § 1-201(3).

*c. Bargain distinguished from agreement.*  Bargain has a narrower meaning than agreement, since it is applicable only to a particular class of agreements.  It includes agreements which are not contracts, such as transactions where one party makes a promise and the other gives something in exchange which is not consideration, or transactions where what would otherwise be a contract is invalidated by illegality.  As here defined, it includes completely executed transactions, such as exchanges of goods (barters) or of services, or sales where goods have been transferred and the price paid for them, although such transactions are not within the scope of this Restatement unless a promise is made.

*d.  Offer.*  A bargain is ordinarily made by an offer by one party and an acceptance by the other party or parties, the offer specifying the two subjects of exchange to which the offeror is manifesting assent (see §§ 22 and 24).

*e. Contract distinguished from bargain.* A contract is not necessarily a bargain. Thus, a promise to make a gift, if made under seal, may be a contract (see § 95), but it is not a bargain. Other contracts which are not bargains are the subject of §§ 82-94. Such contracts do not require manifestations of mutual assent in the form of offer and acceptance.

REPORTER'S NOTES

This Section is based on former §§ 3 and 4. See 1 Williston, Contracts §§ 2, 2A (3d ed. 1957); 1 Corbin, Contracts §§ 9-10 (1963).

*Comment a.* On the difference between an agreement and a contract, see *Corbit v. J. I. Case Co., 70 Wash.2d 522, 424 P.2d 290 (1967),* quoting from the similar Comment *a* to former § 3; *Gaskins v. Blue Cross-Blue Shield of South Carolina, 271 S.C. 101, 245 S.E.2d 598 (1978).*

*Comment b.* See *Kabil Devs. Corp. v. Mignot, 279 Or. 151, 566 P.2d 505 (1977),* discussing the admissibility of testimony about a person's state of mind as evidence of his manifestation of assent; see also *Gaskins v. Blue Cross-Blue Shield of South Carolina, supra,* regarding inference of assent from parties' acts.

*Comment c.* In ordinary usage, "bargain" includes executed transactions. 1 Williston, Contracts § 2A (3d ed. 1957); 1 Corbin, Contracts § 10 (1963).

# Cross Reference

ALR Annotations:

What constitutes a contract for sale under uniform commercial code § 2-314. *78 A.L.R.3d 696.*

Digest System Key Numbers:

Contracts 15, 25

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 4*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 1- Meaning of Terms*

# § 4 How a Promise May Be Made

A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Express and implied contracts.* Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance. See Uniform Commercial Code § 1-201(3), defining "agreement."

Illustrations:

1. A telephones to his grocer, "Send me a ten-pound bag of flour." The grocer sends it. A has thereby promised to pay the grocer's current price therefor.

2. A, on passing a market, where he has an account, sees a box of apples marked "25 cts. each." A picks up an apple, holds it up so that a clerk of the establishment sees the act. The clerk nods, and A passes on. A has promised to pay twenty-five cents for the apple.

*b. Quasi-contracts.* Implied contracts are different from quasi-contracts, although in some cases the line between the two is indistinct. See Comment *a* to § 19. Quasi-contracts have often been called implied contracts or contracts implied in law; but, unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice. Such obligations were ordinarily enforced at common law in the same form of action (assumpsit) that was appropriate to true contracts, and some confusion with reference to the nature of quasi-contracts has been caused thereby. They are dealt with in the Restatement of Restitution. See also §§ 141, 158, 197-99, 272, 370-77.

Restat 2d of Contracts, § 4

Illustration:

3. A's wife, B, separates from A for justifiable cause, and, in order to secure necessary clothing and supplies, buys them from C and charges their cost to A. A is bound to pay for them, though he has directed C not to furnish his wife with such supplies; but A's duty is quasi-contractual, not contractual. See Restatement of Restitution § 113.

## REPORTER'S NOTES

This Section is derived from former § 5, but is substantially reworded. See 1 Williston, Contracts §§ 3-3A (3d ed. 1957); 1 Corbin, Contracts §§ 18-19 (1963 & Supp. 1980).

*Comment a.* A major source of confusion in this area is the use of the term "implied in fact" for actual but nonverbal contracts inferred from facts such as the parties' conduct. See Reporter's Note to § 19. Compare *Arizona Bd. of Regents v. Arizona York Refrig. Co., 115 Ariz. 338, 565 P.2d 518 (1977)*; *Bloomgarden v. Coyer, 479 F.2d 201 (D.C. Cir. 1973)*; *Kabil Devs. Corp. v. Mignot, 279 Or. 151, 566 P.2d 505 (1977)*. Illustrations 1 and 2 are based on Illustrations 1 and 2 to former § 5. The provision of § 69(2) is not an exception to the requirements of this Section, but a statement of an obligation that does not rest on a manifestation of intention.

*Comment b.* As opposed to the inferred from fact ("implied in fact") contract, the "implied in law" quasi-contract is no contract at all, but a form of the remedy of restitution. On the difference, see *Bloomgarden v. Coyer, 479 F.2d 201 (D.C. Cir. 1973)*; *Continental Forest Prods. v. Chandler Supply Co., 95 Idaho 739, 518 P.2d 1201 (1974)*; *United States ex rel. J. C. Schaefer Elec., Inc. v. O. Frank Heinz Constr. Co., 300 F. Supp. 396 (S.D. Ill. 1969)*. Illustration 3 is based on Illustration 3 to former § 5; compare *Compbell v. Tennessee Valley Auth., 421 F.2d 293 (5th Cir. 1969)*, 1970 Duke L. J. 573; *Paschall's, Inc. v. Dozier, 219 Tenn. 45, 407 S.W.2d 150 (1966)*.

## Cross Reference

ALR Annotations:

Reward for disproving commercial claim. *96 A.L.R.3d 907*.

Digest System Key Numbers:

Contracts 16

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 5*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 1- Meaning of Terms*

# § 5 Terms of Promise, Agreement, or Contract

(1)  A term of a promise or agreement is that portion of the intention or assent manifested which relates to a particular matter.

(2)  A term of a contract is that portion of the legal relations resulting from the promise or set of promises which relates to a particular matter, whether or not the parties manifest an intention to create those relations.

COMMENTS & ILLUSTRATIONS

Comment:

*a.  Agreed terms*.  The terms of a promise or agreement are those expressed in the language of the parties or implied in fact from other conduct.  Both language and conduct are to be understood in the light of the circumstances, including course of dealing or usage of trade or course of performance.  See Comment *a* to § 4. If a promise is binding, a term of the promise becomes a term of the contract unless it is rendered inoperative by some rule of law.

*b.  Contract terms supplied by law*.  Much contract law consists of rules which may be varied by agreement of the parties.  Such rules are sometimes stated in terms of presumed intention, and they may be thought of as implied terms of an agreement.  They often rest, however, on considerations of public policy rather than on manifestation of the intention of the parties.  In the Restatement of this Subject, such rules are stated in terms of the operative facts which make them applicable.

*c.  Statutory contract terms*. Statutes providing for contract terms vary in the extent to which they follow the terminology used here, and in the extent to which they permit variation by agreement.  Under Uniform Commercial Code § 1-102(3), for example, the effect of provisions of the Code may be freely varied by agreement, with limited exceptions; at the other extreme are statutes or administrative regulations prescribing standard forms of such documents as insurance policies or bills of lading. Transactions entered into under

statutes providing either optional or required terms commonly contain promises within the present definition, but they may also produce obligations which do not rest upon any manifestation of the intention of the obligor.

Such statutory obligations are beyond the scope of the Restatement of this Subject.   The statutes are sometimes written in terms of presumed intention, and they are sometimes properly interpreted as imposing the same legal consequences as if one of the parties to a contract had made a promise in the prescribed terms.   If so, rules stated here may be applicable.

**Illustration:**

1.   A contracts to sell B a described automobile.   Both parties sign a printed contract form on which the description is typed and which contains the printed words, "Seller hereby excludes all warranties, express or implied." Under Uniform Commercial Code § 2-316 the quoted words do not exclude an implied warranty of merchantability, and under § 2-314 A warrants that the automobile is fit to drive.   Under § 2-714 the warranty has the effect of a promise to pay for harm if the warranty is broken.

### REPORTER'S NOTES

This Section is new.  See 1 Williston, Contracts §§ 1, 1A, 2 (3d ed. 1957); 1 Corbin, Contracts §§ 3, 9, 13 (1963 & Supp. 1980).

*Comments a and b*.  The choice of terms is primarily a power of the parties to a contract.   Nonetheless, their freedom of choice is increasingly circumscribed by rules of law.   A term may be unenforceable because it offends public policy, § 178; or because it is unconscionable, § 208.   It generally will be interpreted against the draftsman, § 206, and in a manner favoring the public, § 207.   In some circumstances terms in standardized agreements will not be enforced despite the adhering party's manifestation of assent, Comment *c* to § 211; and affirmative relief such as injunction and specific performance may be denied because terms are unfair even though the terms would be enforced in an action for damages, § 364.

*Comment c*.  As to statutory contract terms see Kessler, Contracts of Adhesion -- Some Thoughts about Freedom of Contract, 43 Colum. L. Rev. 629 (1943); Lenhoff, Optional Terms (Jus Dispositivum) and Required Terms (Jus Cogens) in the Law of Contracts, 45 Mich. L. Rev. 39 (1946). As to bills of lading, see 10 Williston, Contracts § 1078 (3d ed. 1957).   The Federal Trade Commission has promulgated Trade Regulation Rules requiring that many consumer contracts contain specified terms giving consumers rights or forbidding the waiver of those rights.   See, e.g., *16 C.F.R. § 433.1*-.3 (1975) (preserving consumers' claims and defenses against holders in due course or assignees); *16 C.F.R. § 429.1 (1974)* (giving buyers in door-to-door transactions three days to rescind the contract).  Illustration 1 is new.

Restat 2d of Contracts, § 5

## Cross Reference

Digest System Key Numbers:

Contracts 16, 189

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 10*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 2- Formation of Contracts -- Parties and Capacity*

## § 10 Multiple Promisors and Promisees of the Same Performance

**(1)  Where there are more promisors than one in a contract, some or all of them may promise the same performance, whether or not there are also promises of separate performances.**

**(2)  Where there are more promisees than one in a contract, a promise may be made to some or all of them as a unit, whether or not the same or another performance is separately promised to one or more of them.**

COMMENTS & ILLUSTRATIONS

Comment:

*a.  Procedural limitations at common law.*  Historically it was said that there could be only two sides to an action at law, that of the plaintiff and that of the defendant.  There might be more than one person on each side, but it was necessary that all the parties joined as plaintiffs assert a common right and that all the persons joined as defendants be charged with a common duty.  In equity, however, there has never been a requirement that the parties to a suit must consist of merely two units, one seeking to enforce a right against the other.  On the contrary, any number of parties having diverse and conflicting legal relations could be dealt with under equity procedure; and the same thing is true where under modern statutes or rules of court legal and equitable procedures have been merged in a single form of action.  The extent to which remnants of common-law procedure survive in the United States is beyond the scope of the Restatement of this Subject.

*b.  Multiple promises; suretyship.*  As a matter of substantive law, an indefinite number of persons may contract with one another, and there may be three or more individuals or groups, each with distinct rights and duties.  Promises may be made by individuals or by groups acting together, and they may be made to individuals or to groups acting together.

Rules governing multiple promises of the same performance are stated in Chapter 13.  Where promises of the same performance are made by two or more promisors, there is necessarily a relation of suretyship among the promisors.  Thus, if there are two promisors, either one is the principal obligor and the other his surety, or each is a principal obligor as to a part and a surety as to the balance.  Rules of suretyship are stated in the Restatement of Security; in general they are beyond the scope of the Restatement of this Subject.

**Illustration:**

1.  A promises to convey a tract of land to his three sons, B, C and D.  In return B and C promise to build and maintain a home for A; D promises to live with A and to support and care for him; B, C and D promise that A will receive $ 200 a year.  As to the home, B is the principal obligor for his share and C for his; B is C's surety for C's share and C is B's surety for B's share.  Similarly, as to the $ 200, each is principal as to a third and surety for each of the others.  D alone is bound to furnish care and support.

### REPORTER'S NOTES

This Section is derived from former § 16, but the terminology "joint," "several," and "joint and several" is avoided because of its obsolete connotations.  See 4 Corbin, Contracts §§ 923-42 (1951 & Supp. 1980); cf. 2 Williston, Contracts § 336 (3d ed. 1959).  The terms are used in Chapter 13 of the Restatement of this Subject, particularly §§ 289, 290, 294 and 296-300, but attention should be given to the Introductory and Statutory Notes to Chapter 13.

*Comment a.*  Procedural problems at common law are discussed at length in 4 Corbin, Contracts §§ 925, 928-37 (1951 & Supp. 1980); on modern statutory changes, see 2 Williston, Contracts §§ 336-36A, 344A (3d ed. 1959), and the Statutory Note to Chapter 13.

*Comment b.*  In Corbin's words, "the question whether two or more promisors have promised a single undivided performance, or have each promised a limited and separate performance, is wholly a problem of interpretation."  4 Corbin, Contracts § 926 at 704 (1951).  Interpretation of multiple promises is discussed in 4 id. §§ 926-27, and in §§ 288, 297 and 301 of this Restatement.  Illustration 1 is based on 4 Corbin, Contracts § 938 (1951), citing *Krbel v. Krbel, 84 Neb. 160, 120 N.W. 935 (1909)*.

## Cross Reference

Digest System Key Numbers:

Contracts 12, 177

Restat 2d of Contracts, § 10

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 18*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 3- Formation of Contracts -- Mutual Assent > Topic 2- Manifestation of Assent in General*

# § 18 Manifestation of Mutual Assent

Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance.

### COMMENTS & ILLUSTRATIONS

Comment:

*a. Manifestation of assent.* Assent to the formation of an informal contract is operative only to the extent that it is manifested. Compare § 3 and Comment *b* to § 2. As to the manifestation of assent by conduct other than words, see §§ 4 and 19. Rules for cases where one party could reasonably draw more than one inference as to the intention of another are stated in the following sections, in connection with the scope of contractual obligations (see §§ 201, 219), and in connection with mistake (see § 151-58).

*b. Assent by promise or performance.* Where a bargain has been fully performed on one side, there is commonly no need to determine the moment of making of the contract or whether the performing party made a promise before he performed. Those issues ordinarily become important only when a dispute arises at an earlier stage. In the typical case such a dispute involves an exchange of promises before any performance takes place; there is an offer containing a promise and made binding by an acceptance containing a return promise. Section 50. The beginning or tender of performance may operate as such a return promise under § 63. In less common cases, acceptance may be made by a performance under § 54, and the beginning of performance may have an intermediate effect of making the offer irrevocable under § 45.

*c. Sham or jest.* Where all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously, there is no such manifestation of assent to the exchange as is required by this Section. In some cases the setting makes it clear that there is no contract, as where a business transaction is simulated on a stage during a dramatic performance. In other cases, there may be doubt as to

whether there is a joke, or one of the parties may take the joke seriously.  If one party is deceived and has no reason to know of the joke the law takes the joker at his word.  Even if the deceived party had reason to know of the joke, there may be a claim for fraud or unjust enrichment by virtue of the promise made.  Where the parties to a sham transaction intend to deceive third parties, considerations of public policy may sometimes preclude a defense of sham.  Cf. Illustration 1 to § 21.

### REPORTER'S NOTES

This Section is new; compare former § 20.  See 1 Williston, Contracts § 22 (3d ed. 1957); 1 Corbin, Contracts § 107 (1963 & Supp. 1980).  The requirement of a voluntary act is dealt with in § 19.  The effect of a manifestation of assent when the party does not in fact assent is stated in §§ 19, 20, and subsequent sections.  Intention to be or not to be legally bound is the subject of § 21.

# Cross Reference

ALR Annotations:

What constitutes a contract for sale under uniform commercial code § 2-314.  *78 A.L.R.3d 696*.

Validity and construction of preincorporation agreement between promoters as to future employment.  *66 A.L.R.3d 1138*.

Variance between offer and acceptance in regard to title as affecting consummation of contract for sale of real property.  *16 A.L.R.3d 1424*.

Person who signs contract but is not named in body thereof as party to contract and liable thereunder.  *94 A.L.R.2d 691*.

Validity, construction, and effect of contract between grower of vegetable or fruit crops, and purchasing processor, packer, or canner.  *87 A.L.R.2d 732*.

What constitutes acceptance or ratification of, or acquiescence in, services rendered by attorney so as to raise implied promise to pay reasonable value thereof.  *78 A.L.R.2d 318*.

Conditions printed on confirmation slips as binding on customers of stock or commodity broker.  *71 A.L.R.2d 1089*.

Admissibility of oral evidence to show that a writing was a sham agreement not intended to create legal relations.  *71 A.L.R.2d 382*.

Restat 2d of Contracts, § 18

Comment Note. -- Mutuality of remedy as essential to granting of specific performance. *22 A.L.R.2d 508*.

Digest System Key Numbers:

Contracts 14, 15

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 19*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 3- Formation of Contracts -- Mutual Assent  >  Topic 2- Manifestation of Assent in General*

## § 19 Conduct as Manifestation of Assent

(1)  The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.

(2)  The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.

(3)  The conduct of a party may manifest assent even though he does not in fact assent.  In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Conduct other than words.*  Words are not the only medium of expression.  Conduct may often convey as clearly as words a promise or an assent to a proposed promise.  See Comment *a* to § 4 and Illustrations. Where no particular requirement of form is made by the law a condition of the validity or enforceability of a contract, there is no distinction in the effect of the promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others.  Purely negative conduct is sometimes, though not usually, a sufficient manifestation of assent.  See § 69.

Like words, non-verbal conduct often has different meanings to different people.  Indeed, the meaning of conduct not used as a conventional symbol is more uncertain and more dependent on its setting than are words.  A wide variety of elements of the total situation may be relevant to the interpretation of such conduct. The problem is illustrated in cases of claims against a decedent's estate for services rendered.  In such cases the line between a contractual claim based on agreement and a quasi-contractual claim based on unjust

Restat 2d of Contracts, § 19

enrichment is often indistinct; on either basis a major question may be whether the services were rendered gratuitously, and the circumstances are often critical.

**Illustration:**

1.  A lives in B's home and renders services to B over a period of years, and after B's death claims the value of the services.  By statute A is incompetent to testify to transactions with B, and there is no evidence of a verbal promise.  Among the factors relevant to a determination whether the services were gratuitous are the following: a request by B that A render the services, the relation between A and B, the value of the services to B, the alternatives foregone and hardship suffered by A, the financial circumstances of the parties, the relation between B and his legatees or distributees, and their connection with A's services.

*b.  "Reason to know."*  A person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist.  A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference.  There is also reason to know if the inference would be thatthere is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.

Reason to know is to be distinguished from knowledge and from "should know." Knowledge means conscious belief in the truth of a fact; reason to know need not be conscious.  "Should know" imports a duty to others to ascertain facts; thewords " reason to know" are used both where the actor has a duty to another and where he would not be acting adequately in the protection of his own interests were he not acting with reference to the facts which he has reason to know.  See Restatement, Second, Agency § 9; Restatement, Second, Torts § 12; Uniform Commercial Code § 1-201(25).

*c. Responsibility for unintended appearance of assent.*  A "manifestation" of assent is not a mere appearance; the party must in some way be responsible for the appearance.  There must be conduct and a conscious will to engage in that conduct.  Thus, when a party is used as a mere mechanical instrument, his apparent assent does not affect his contractual relations.  See the rules on duress in §§ 174-77.  This is true even though the other party reasonably believes that the assent is genuine.

Similarly, even though the intentional conduct of a party creates an appearance of assent on his part, he is not responsible for that appearance unless he knows or has reason to know that his conduct may cause the other party to understand that he assents.  In effect there must be either intentional or negligent creation of an appearance of assent.  Compare § 20 and the rules on mistake, misrepresentation, duress and undue influence

Raj Patel

in Chapters 6 and 7. The other party must also manifest assent, but no further change of position on his part is necessary to the formation of a bargain. Change of position may of course be relevant to the existence of a power of avoidance, but the law must take account of the fact that in a society largely founded on credit bargains will be relied on in subtle ways, difficult or incapable of proof.

**Illustrations:**

2. A offers to sell B his library at a stated price, forgetting that his favorite Shakespeare, which he did not intend to sell, is in the library. B accepts the offer. There is a contract including the Shakespeare, unless B knows or has reason to know of A's temporary forgetfulness. Whether the contract is voidable for mistake depends on the rules stated in Chapter 6.

3. A writes an offer to B, which he encloses in an envelope, addresses and stamps. Shortly afterwards, he decides not to send the offer, but by mistake he deposits it in the mail. It is delivered to B, who accepts the offer. There is a contract unless B knows or has reason to know of A's error. Whether the contract is voidable for mistake is governed by the rules stated in Chapter 6.

*d. Voidable manifestations distinguished.* Actual mental assent is not essential to the formation of an informal contract enforceable as a bargain. This is made clear by the definitions of "bargain" and "agreement" in terms of "manifestation" of mutual assent. See §§ 3, 17, 18; compare Comment *b* to § 2. But the fact that apparent assent is not genuine may have legal significance in rendering the contract voidable or unenforceable for mistake, misrepresentation, duress, or undue influence. See Chapters 6 and 7. In such cases it is often necessary to inquire whether the power of avoidance has been exercised with sufficient promptness, or whether the other party has so changed his position that avoidance would be inequitable. Where there is no manifestation of mutual assent, on the other hand, the contractual relations of the parties are not affected, and such inquiries are unnecessary.

## REPORTER'S NOTES

Subsection (1) is based on former § 21. Subsections (2) and (3) are new but are derived in part from former § 20 and Comment *a* thereto. See generally, 1 Williston, Contracts §§ 21-23, (3d ed. 1957); 1 Corbin, Contracts § 62 at n.35 (1963).

*Comment a.* The distinctions between an actual agreement inferred from the parties' conduct and a quasi-contract implied as a matter of law to avoid unjust enrichment are nicely made in *Baltimore & O. R.R. v. United States, 261 U.S. 592 (1923)*; and *Bailey v. West, 105 R.I. 61, 249 A.2d 414 (1969)*. See also Comment *b* to § 4. Much confusion could be avoided if "imply" were not used when "infer" is meant. Corbin makes this point in his

chapter entitled "Interpretation -- The Process Called Implication," 3 Corbin, Contracts, ch. 25 and §§ 534 and 561 (1960 & Supp. 1980); see also 1 Williston, Contracts § 36A (3d ed. 1957); but even Corbin and Williston use the familiar term "implied in fact" for actual contracts inferred from facts.  Perhaps it is too late to abandon so common a term, but its use blurs an important distinction.  For an example, see *Steva v. Steva, 332 S.W.2d 924 (Mo. 1960)*.

The issue of assent partly by conduct and partly by words may come up when negotiations are inconclusive, but the parties continue to deal with one another.  See, e.g., *Thomson v. United States, 357 F.2d 683 (Ct. Cl. 1966)*; and § 22, Comment *b*.  On inference of assent from conduct, see 1 Williston, Contracts §§ 22A, 36 and 36A (3d ed. 1957); 3 Corbin, Contracts § 566 (1960).

As to disputes over family services, and Illustration 1, see Havighurst, Services in the Home -- A Study of Contract Concepts in Domestic Relations, 41 Yale L.J. 386 (1932). See also *Marvin v. Marvin, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106 (1976)*; Kay & Amyx, Marvin v. Marvin: Preserving the Options, 65 Calif. L. Rev. 937 (1977); Bruch, Property Rights of DeFacto Spouses Including Thoughts on Homemakers' Services, 10 Fam. L.Q. 101 (1976); Weitzman, Legal Regulation of Marriage: Tradition and Change, 62 Calif. L. Rev. 1169 (1974).

*Comment b.*  See 1 Williston, Contracts § 35 (3d ed. 1957); 1 Corbin, Contracts § 106 (1963 & Supp. 1980); cf. 3 id. §§ 534-35 (1960 & Supp. 1980).   See also *Swanson v. Holmquist, 13 Wash. App. 939, 539 P.2d 104 (1975)*.

*Comment c.*  See Whittier, The Restatement of Contracts and Mutual Assent, 17 Calif. L. Rev. 441, 442 (1929); 1 Williston, Contracts §§ 35, 66-67A, 94-95A (3d ed. 1957); 1 Corbin, Contracts §§ 103-04 (1963 & Supp. 1980), 3 id. § 599 (1960 & Supp. 1980); cf.  *In re Estate of Lyman, 7 Wash. App. 945, 503 P.2d 1127 (1972)*, aff'd on opinion below, *82 Wash. 2d 693, 512 P.2d 1093 (1973)*. Illustration 2 is based on Illustration 1 to former § 20.  Illustration 3 is based on Illustration 4 to former § 20. Cf. *Sulzbach v. Town of Jefferson, 83 S.D. 156, 155 N.W.2d 921 (1968)*. In both Illustration 2 and Illustration 3, the clauses beginning "unless B knows" are added in light of Subsection (2) of § 20.

*Comment d.*  See 1 Williston, Contracts § 20 (3d ed. 1957); 1 Corbin, Contracts §§ 106-07 (1963 & Supp. 1980), 3 id. §§ 597-98 (1960 & Supp. 1980).  Cf.  *Oliver v. Henley, 21 S.W.2d 576, 578 (Tex. Civ. App. 1929)*.

# Cross Reference

Restat 2d of Contracts, § 19

ALR Annotations:

Knowledge of reward as condition of right thereto. *86 A.L.R.3d 1142*.

Construction and application of agreement by medical or social work student to work in particular position or at particular location in exchange for financial aid in meeting costs of education. *83 A.L.R.3d 1273*.

Master and servant: Regular payment of bonus to employee, without express contract to do so, as raising implication of contract for bonus. *66 A.L.R.3d 1075*.

What constitutes acceptance or ratification of, or acquiescence in, services rendered by attorney so as to raise implied promise to pay reasonable value thereof. *78 A.L.R.2d 318*.

Digest System Key Numbers:

Contracts 14, 15, 22

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document

Raj Patel



*Restat 2d of Contracts, § 31*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 3- Formation of Contracts -- Mutual Assent  >  Topic 3- Making of Offers*

## § 31 Offer Proposing a Single Contract or a Number of Contracts

An offer may propose the formation of a single contract by a single acceptance or the formation of a number of contracts by successive acceptances from time to time.

### COMMENTS & ILLUSTRATIONS

Comment:

*a. Separate contracts.* An offer may request several acts or promises as the indivisible exchange for the promise or promises in the offer, or it may request a series of contracts to be made from time to time. Whether several promises create several contracts or are all part of one contract is determined by principles of interpretation stated in Chapter 9.

*b. Continuing guaranty.* A standard example of a divisible offer is the continuing guaranty, the promise to guarantee performance of such obligations of a specified type as a third party may incur to the offeree from time to time. An offer of suretyship may be directed to one offeree or to many offerees; it may contemplate a single extension of credit by the offeree or many; it may or may not be expressly limited in time or amount. See Restatement of Security §§ 82-88. Where there is a continuing guaranty as to future loans or sales to be made by the offeree and each loan or sale furnishes the sole consideration for the corresponding part of the guaranty, the guaranty is oftencharacterized as an offer for a series of separate contracts.

This characterization, if sound, means that the offer is revocable and revoked by death (see §§ 47, 48), and that a separate acceptance is required for each contract (see § 50 et seq.). Often, however, the characterization is unsound. Thus, where the rule of § 54 is inapplicable because the offer requests a notification, although communication of acceptance is required, a single notice of intention to act is ordinarily sufficient. Again, where the guaranty is under seal or is supported by a consideration, it is more than a mere offer. Even in such cases guaranties are commonly revocable not only where a power of revocation is

Restat 2d of Contracts, § 31

expressly reserved or fairly implied but also in circumstances where there is no manifested intention to reserve such a power.

Whether the case is one of divisible offer or of reserved power, the power of revocation is reinforced by the considerations underlying limitation of the recovery of damages for avoidable harm and denial of specific performance where return performance is not well secured (see §§ 350, 363). Even if there is no absolute power of revocation, as where a substantial consideration is given at the outset, those considerations may limit relief, once notice of revocation is given, to obligations incurred before the promisee has had a reasonable opportunity to prevent further obligations from arising or to secure a substitute surety. In many States statutes give particular types of sureties a right to apply to the court for relief from future obligations.

*c. Sale of goods.* The standing offer for the sale or purchase of goods furnishes another example of the divisible offer. Continuing arrangements for the sale of goods may provide terms for contracts made under them even though there is no offer until particular goods are ordered or actually delivered. See Illustration 4 to § 21. Or there may be a divisible standing offer which can be separately accepted with respect to each lot of goods by either a promise or a performance. See Comment *c* to § 32. Or the continuing arrangement may itself be a binding contract, as in the case of an output or requirements contract. See § 77.

**Illustrations:**

1. A offers B, a railway company, such quantities of certain goods as B's storekeeper may order from time to time during the next twelve months. In the absence of a revocation, each order of B's storekeeper during that period creates a separate contract for the quantity ordered.

2. A offers B to sell and deliver to him during the following year any quantity of goods between 4000 and 6000 pounds in amount, acceptance to specify the total quantity. B must within a reasonable time specify a particular amount of not less than 4000 pounds and not more than 6000 pounds in order to create a contract; and there can be but one acceptance and one contract.

3. A offers B to sell him in monthly installments the coal which B may require in his business during the next six months, not exceeding one hundred tons in any one month. B has an established manufacturing business which has used an average of 75 tons of coal a month for several years. The offer is one for a single contract under which B promises not to buy coal elsewhere during the six months unless he has excess requirements.

**REPORTER'S NOTES**

This Section was former § 30.  See 1 Williston, Contracts § 58 (3d ed. 1957); 1 Corbin, Contracts §§ 38, 76 (1963).

*Comment b.* As to notice of acceptance of a continuing guaranty, see Campbell, The Notice Due to a Guarantor, 35 Mich. L. Rev. 529 (1937); 1 Williston, Contracts §§ 69A, 69AA (3d ed. 1957); Note, 16 L.R.A. (N.S.) 353 (1908). As to revocation of such a guaranty, see 10 Williston, Contracts § 1253 (3d ed. 1967); Simpson, Suretyship §§ 22-24 (1950); Stearns, Suretyship § 4.20 (5th ed. 1951); 2 Durfee, Cases on Security 667-77 (1953); Annots., 42 A.L.R. 926 (1926) (revocation by death), 81 A.L.R. 790 (1932) (revocability).  A continuing guaranty was held enforceable despite the offeror's adjudication of incompetency in *Swift & Co. v. Smigel, 115 N.J. Super. 391, 279 A.2d 895 (1971)*, aff'd, *60 N.J. 348, 289 A.2d 793 (1972)*. See also §§ 13, 15, 48.

A continuing guaranty under seal was revoked by death despite noncompliance with a notice provision in *Jordan v. Dobbins, 122 Mass. 168, 23 Am. Rep. 305 (1877)*. *American Chain Co. v. Arrow Grip Mfg. Co., 134 Misc. 321, 235 N.Y.S. 228 (Sup. Ct. 1929)*, reached the same result despite nominal consideration.  A continuing guaranty under seal was held revocable by a living guarantor in *Jeudevine v. Rose, 36 Mich. 54 (1877)*. As to relief limited to the reasonable reliance of the offeree, see *United States ex rel.  Wilhelm v. Chain, 300 U.S. 31 (1937)*; *Lawrence v. American Sur. Co., 263 Mich. 586, 249 N.W. 3, 264 Mich. 516, 250 N.W. 295 (1933)*; *Ricketson v. Lizotte, 90 Vt. 386, 98 A. 801 (1916)*; cf. Fuller & Perdue, The Reliance Interest in Contract Damages: II, 46 Yale L.J. 373, 410-17 (1937). As to statutes permitting sureties to apply for judicial relief, see Annots., 118 A.L.R. 1261 (1939), 150 A.L.R. 485 (1944).

*Comment c.* As to output and requirement contracts, see Havighurst & Berman, Requirement and Output Contracts, 27 Ill. L. Rev. 1 (1932); Corbin, The Effect of Options on Consideration, 34 Yale L.J. 571 (1925). As to "open-end" or "master-type" contracts and "basic agreements" used by the United States Government, see Title 41 of the C.F.R.; Cohen, Public Construction Contracts and the Law § 9.3 (1961).

## Cross Reference

ALR Annotations:

Construction of provision in real-estate mortgage, land contract, or other security instrument for release of separate parcels of land as payments are made.  *41 A.L.R.3d 7*.

Restat 2d of Contracts, § 31

Validity, construction, and effect of contract between grower of vegetable or fruit crops, and purchasing processor, packer, or canner. _87 A.L.R.2d 732_.

Digest System Key Numbers:

Contracts 16

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 33*

*Restatement of the Law, Contracts 2d - Official Text >   Chapter 3- Formation of Contracts -- Mutual Assent >   Topic 3- Making of Offers*

# § 33 Certainty

(1)  Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2)  The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3)  The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Certainty of terms.* It is sometimes said that the agreement must be capable of being given an exact meaning and that all the performances to be rendered must be certain.  Such statements may be appropriate in determining whether a manifestation of intention is intended to be understood as an offer.  But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.  In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.

An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties.  Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary.  See § 5, defining "term." Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract.  If the essential terms are so uncertain that there is no basis for deciding whether the agreement

Restat 2d of Contracts, § 33

has been kept or broken, there is no contract. But even in such cases partial performance or other action in reliance on the agreement may reinforce it under § 34.

*b. Certainty in basis for remedy.* The rule stated in Subsection (2) reflects the fundamental policy that contracts should be made by the parties, not by the courts, and hence that remedies for breach of contract must have a basis in the agreement of the parties. Where the parties have intended to make a contract and there is a reasonably certain basis for granting a remedy, the same policy supports the granting of the remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due to the plaintiff; uncertainty may preclude one remedy without affecting another. See Uniform Commercial Code § 2-204(3) and Comment.

Thus the degree of certainty required may be affected by the dispute which arises and by the remedy sought. Courts decide the disputes before them, not other hypothetical disputes which might have arisen. It is less likely that a reasonably certain term will be supplied by construction as to a matter which has been the subject of controversy between the parties than as to one which is raised only as an afterthought. In some cases greater definiteness may be required for specific performance than for an award of damages; in others the impossibility of accurate assessment of damages may furnish a reason for specific relief. Partial relief may sometimes be granted when uncertainty prevents full-scale enforcement through normal remedies. See §§ 357-62.

**Illustrations:**

1. A agrees to sell and B to buy goods for $ 2,000, $ 1,000 in cash and the "balance on installment terms over a period of two years," with a provision for liquidated damages. If it is found that both parties manifested an intent to conclude a binding agreement, the indefiniteness of the quoted language does not prevent the award of the liquidated damages.

2. A agrees to sell and B to buy a specific tract of land for $ 10,000, $ 4,000 in cash and $ 6,000 on mortgage. A agrees to obtain the mortgage loan for B or, if unable to do so, to lend B the amount, but the terms of loan are not stated, although both parties manifest an intent to conclude a binding agreement. The contract is too indefinite to support a decree of specific performance against B, but B may obtain such a decree if he offers to pay the full price in cash.

*c. Preliminary negotiations.* The rule stated in Subsection (3) is a particular application of the rule stated in § 26 on preliminary negotiations. Incompleteness of terms is one of the principal reasons why advertisements and price quotations are ordinarily not interpreted as offers. Similarly, if the parties to negotiations for sale

manifest an intention not to be bound until the price is fixed or agreed, the law gives effect to that intention. Uniform Commercial Code § 2-305(4). The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement. See Uniform Commercial Code § 2-204 and Comment.

*d. Uncertain time of performance.* Valid contracts are often made which do not specify the time for performance. Where the contract calls for a single performance such as the rendering of a service or the delivery of goods, the time for performance is a "reasonable time." Compare § 41 on the time for accepting an offer; see Uniform Commercial Code §§ 1-204, 2-309(1). Payment is due when the service is completed or the goods received. Uniform Commercial Code § 2-310. When the contract calls for successive performances but is indefinite in duration, it is commonly terminable by either party, with or without a requirement of reasonable notice. Uniform Commercial Code §§ 2-309(2), (3).

**Illustrations:**

3. A and B promise that certain performances shall be mutually rendered by them "immediately" or "at once," or "promptly," or "as soon as possible," or "in about one month." All these promises are sufficiently definite to form contracts.

4. A promises B to sell certain goods to him, and B promises to pay a specified price therefor. No time of performance is fixed. The time for delivery and payment is a reasonable time. Uniform Commercial Code §§ 2-309(1), 2-310(a). What is a reasonable time depends on the nature, purpose and circumstances of the action to be taken. Uniform Commercial Code § 1-204(2).

5. A offers to employ B for a stated compensation as long as B is able to do specified work, or as long as a specified business is carried on, and B accepts the terms offered. The length of the engagement is sufficiently definite for the formation of a contract.

6. A promises B to serve B as chauffeur, and B promises to pay him $ 100 a month. Nothing further is stated as to the duration of the employment. There is at once a contract for one month's service. At the end of the first month, in the absence of revocation, there is a contract for a second month. But circumstances may show that such an agreement merely specifies the rate of compensation for an employment at will.

*e. Indefinite price.* Where the parties manifest an intention not to be bound unless the amount of money to be paid by one of them is fixed or agreed and it is not fixed or agreed there is no contract. Uniform Commercial Code § 2-305(4). Where they intend to conclude a contract for the sale of goods, however, and the price is not settled, the price is a reasonable price at the time of delivery if (a) nothing is said as to price, or (b) the price is left to be agreed by the parties and they fail to agree, or (c) the price is to be fixed in terms of some agreed

market or other standard as set or recorded by a third person or agency and it is not so set or recorded. Uniform Commercial Code § 2-305(1). Or one party may be given power to fix the price within limits set by agreement or custom or good faith. Similar principles apply to contracts for the rendition of service. But substantial damages cannot be recovered unless they can be estimated with reasonable certainty (§ 352), and if the contract is entirely executory and specific performance is not an appropriate remedy, relief may be limited to the recovery of benefits conferred and specific expense incurred in reliance on the contract.

**Illustrations:**

7. A promises to sell and B to buy goods "at cost plus a nice profit." The quoted words strongly indicate that the parties have not yet concluded a bargain.

8. A promises to do a specified piece of work and B promises to pay a price to be thereafter mutually agreed. The provision for future agreement as to price strongly indicates that the parties do not intend to be bound. If they manifest an intent to be bound, the price is a reasonable price at the time for doing the work.

*f. Other indefinite terms.* Promises may be indefinite in other aspects than time and price. The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable. Even when the parties intend to enter into a contract, uncertainty may be so great as to frustrate their intention. Thus a promise by A to give B employment, even though consideration is paid for it, does not provide a basis for any remedy if neither the character of the employment nor the compensation therefor is stated. In such cases the consideration paid, or its value, can be recovered. Restatement of Restitution §§ 15, 40, 47, 53.

**Illustrations:**

9. A promises B to execute a conveyance in fee or a lease for a year of specified land and B promises to make specified payments therefor. Although the terms of leases and conveyances vary, the promises are interpreted as providing for documents in the form in common local use, and are sufficiently definite to form contracts.

10. A promises to sell and B to buy all goods of a certain character which B shall need in his business during the ensuing year. The quantity to be sold is sufficiently definite to provide a basis for remedy, since the promises are interpreted to refer to B's actual good-faith requirements. Uniform Commercial Code § 2-306.

11. A promises B to construct a building according to stated plans and specifications, and B promises A to pay $ 30,000 therefor. It is also provided that the character of the window fastenings shall be subject to further agreement of the parties. Unless a contrary intention is manifested, the indefiniteness of the agreement with reference to this matter will not prevent the formation of a contract.

12.  A and B have a settlement of accounts, and A promises to pay B a stated balance, "errors and omissions excepted." A's promise is reasonably certain in the absence of a showing of error or omission, but it may be corrected on such a showing.

### REPORTER'S NOTES

This Section carries forward former § 32, but is completely reformulated.  See 1 Williston, Contracts §§ 37-48 (3d ed. 1957); 1 Corbin, Contracts §§ 95-100 (1963 & Supp. 1980).

*Comment b.*  On basis for remedy as the measure of certainty, see *Yoder v. Rock Island Bank, 47 Ill. App.3d 486, 5 Ill. Dec. 755, 362 N.E.2d 68 (1977)*, citing Subsection (2) in Tentative Draft.  Illustration 1 repudiates the reasoning of G. Scammell & Nephew v. Ouston, [1941] 1 A.C. 251.  Compare the remedies awarded in *Howard v. Beavers, 128 Colo. 541, 264 P.2d 858 (1953)*; *Hedges v. Hurd, 47 Wash.2d 683, 289 P.2d 706 (1955)*; *Bentzen v. H. N. Ranch, Inc., 78 Wyo. 158, 320 P.2d 440 (1958)*. Illustration 2 is based on *Blanton v. Williams, 209 Ga. 16, 70 S.E.2d 461 (1952)*. As to the denial of specific performance on the ground of indefiniteness, see 5A Corbin, Contracts § 1174 (1964); Annot., 49 A.L.R. 1464 (1927).

*Comment c.*  See, e.g., *Interstate Indus. v. Barclay Indus., 540 F.2d 868 (7th Cir. 1976)*; Reporter's Note to § 26.

*Comment d.*  Illustration 3 is based on Illustration 5 to former § 32.  Illustration 4 is based on Illustration 4 to former § 32, revised in light of the Uniform Commercial Code; see also *Tanenbaum Textile Co. v. Sidran, 423 S.W.2d 635 (Tex. Civ. App. 1968)*, ref. n.r.e., involving an alleged offer governing a salesman's commissions. Illustration 5 is based on Illustration 3 to former § 32.  Illustration 6 is based on Illustration 2 to former § 32; see also *San Francisco Brewing Corp. v. Bowman, 52 Cal.2d 607, 343 P.2d 1 (1959)*.

*Comment e.*  See Prosser, Open Price in Contracts for the Sale of Goods, *16 Minn. L. Rev. 733 (1932)*. Illustration 7 is based on Illustration 6 to former § 32.  Illustration 8 is based on Illustration 10 to former § 32; see *Lucey v. Hero Int'l Corp., 361 Mass. 569, 281 N.E.2d 266 (1972)*.

*Comment f.*  Illustration 9 is based on Illustration 7 to former § 32.  Illustration 10 is based on Illustration 12 to former § 32, with the reference to the Uniform Commercial Code added.  Illustration 11 is based on Illustration 11 to former § 32; see, in different factual contexts, *Southern Fire & Cas. Co. v. Teal, 287 F. Supp. 617 (D.S.C. 1968)*, aff'd, *406 F.2d 1330 (4th Cir. 1969)*; *Page & Wirtz Constr. Co. v. Van Doren Bri-Tico Co., 432 S.W.2d 731 (Tex. Civ. App. 1968)*, ref. n.r.e.  Illustration 12 is based on *McKay v. Overton, 65 Tex. 82 (1885)*; cf. *McCue v. Hope, 97 Kan. 85, 154 P. 216 (1916)*.

Restat 2d of Contracts, § 33

# Cross Reference

ALR Annotations:

Requirements as to certainty and completeness of terms of lease in agreement to lease. *85 A.L.R.3d 414*.

Validity of option to purchase realty as affected by indefiniteness of term provided for exercise. *31 A.L.R.3d 522*.

Specific Performance: Requisite definiteness of provision in contract for sale or lease of land, that vendor or landlord will subordinate his interest to permit other party to obtain financing. *26 A.L.R.3d 855*.

Digest System Key Numbers:

Contracts 9

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Raj Patel



*Restat 2d of Contracts, § 34*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 3- Formation of Contracts -- Mutual Assent > Topic 3- Making of Offers*

## § 34 Certainty and Choice of Terms; Effect of Performance or Reliance

(1)  The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance.

(2)  Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.

(3)  Action in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed.

### COMMENTS & ILLUSTRATIONS

Comment:

*a.  Choice in the course of performance*.  A bargain may be concluded which leaves a choice of terms to be made by one party or the other.  If the agreement is otherwise sufficiently definite to be a contract, it is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties.  Uniform Commercial Code § 2-311(1).  The more important the choice is, the more it is likely that the parties do not intend to be bound until the choice is made.  But even on such matters as subject matter and price, one party is often given a wide choice.  If the parties intend to make a contract and there is a reasonably certain basis for granting an appropriate remedy, such alternative terms do not invalidate the contract.  See § 33.  Often a basis for remedy can be found in the rule of Comment *b* to § 362, permitting a remedy in accordance with the alternative chosen or in accordance with the alternative that will result in the smallest recovery.  In other cases the failure of one party to choose may shift the right to choose to the other party or to an arbitrator or to the court.

Illustrations:

1.  A promises B to give him any one of a number of specified things which A shall choose, and B promises A to pay a specified price.  The agreement is sufficiently definite to be a contract.  A method is provided for determining what A is to give; though what he gives is subject to his choice, he must give some one of the things specified.

2.  A agrees to sell and B to buy 50,000 pounds of white worsted yarn on a basis which enables the parties to compute 48 prices for 48 styles and sizes.  The agreement is sufficiently definite to be a contract.  Unless otherwise agreed specifications relating to assortment of the goods are at the buyer's option, but if B does not make a seasonable specification, A may proceed to perform in any reasonable manner.  Uniform Commercial Code § 2-311.

*b. Unlimited choice; good faith and fair dealing.*  If one party to an agreement is given an unlimited choice, that party may not be a promisor (see Comment *e* to § 2), and the contract may fail for want of consideration.  See § 79.  The other party's promise may be unconscionable and may be wholly or partly illegal.  Compare §§ 178, 208; see Uniform Commercial Code § 2-302.  These difficulties are commonly avoided, however, by the fact that the choice granted is limited.  Just as the power of selection may be given not only by explicit agreement but also by course of dealing or usage of trade or course of performance under the particular agreement or by other implication from circumstances, so limits on the power may be either express or implied.  Often the choice made must be reasonable in the circumstances.  See § 228; Uniform Commercial Code §§ 2-306, 2-311(1).  And in any event discretionary power granted by a commercial contract must be exercised in good faith and in accordance with fair dealing.  Uniform Commercial Code §§ 1-203, 2-103(1)(b).  A price to be fixed by a seller or buyer of goods, for example, means a price for him to fix in good faith.  Uniform Commercial Code § 2-305(2).

**Illustration:**

3.  A promises B to do specified work or to transfer certain goods or land and B promises A to make specified payments if the work or property is satisfactory to B in specified respects.  These promises are sufficiently definite to form contracts, since B's duty depends not on his mere whim but on his exercise of an honest judgment, or in some cases of a reasonable judgment.  See § 228.

*c. Subsequent conduct removing uncertainty.*  Indefiniteness may prevent enforcement of a contract in two different ways: it may mean that a manifestation of intention is not intended to be understood as an offer; or, even though the parties intended to enter into a contract, there may be no sufficient basis for giving an appropriate remedy.  See § 33.  Subsequent conduct of one or both parties may remove either obstacle or

both.  Preliminary manifestations may propose terms which are incorporated in a subsequent offer and become part of a contract.  See Comment *f* to § 26.  The contract may then be thought of as concluded only at the time of the acceptance of the subsequent offer.  Or part performance may give meaning to indefinite terms of an agreement, or may have the effect of eliminating indefinite alternatives by waiver or modification.  Uniform Commercial Code § 2-208.  In such cases a bargain may be concluded, but it may be impossible to identify offer or acceptance or to determine the moment of formation.  See § 22(2).  The obstacle of indefiniteness may nevertheless be removed.

*d.  Reliance and appropriate remedies.*  The need for a particular remedy may sometimes become apparent as a result of part performance or other action in reliance on an indefinite agreement, even though the original uncertainty remains.  The appropriate remedy may be non-contractual.  Thus benefits conferred on the other party under an agreement void for indefiniteness may ordinarily be recovered.  Restatement of Restitution §§ 15, 40, 47, 53.  In some such cases the measure of benefit may appropriately be the value of the plaintiff's performance rather than the economic benefit to the defendant.  See Restatement of Restitution § 155 and Caveat; compare § 370 of this Restatement.  Where one party has suffered loss because of his reliance on such an agreement, the other party may be subject to liability in tort.  See Restatement, Second, Torts § 323, and Caveat; Restatement, Second, Agency § 378.

In many cases, however, reliance makes appropriate a contractual remedy.  Thus the agreement may be treated as divisible and recovery for benefits conferred may then be permitted at the promised rate.  An express or implied promise may be found to reimburse expenses incurred pursuant to the indefinite agreement.  In some cases partial or full enforcement through an award of damages for breach of contract or a decree of specific performance may become appropriate.  See § 90.  As to detrimental reliance not consisting of the performance of the agreement, compare Comment *a* to § 129.

**Illustrations:**

4.  A says to B: "I will employ you for some time at $ 10 a day." An acceptance by B either orally or in writing will not create a contract.  But if B serves one or more days with A's assent A is bound to pay $ 10 for each day's service.

5.  A agrees to sell and B to buy a specific house and lot for $ 10,000, mortgage terms to be agreed.  At B's request, reinforced by a threat not to perform, A makes certain alterations in the house, which add nothing to its value.  B then repudiates the agreement without reference to mortgage terms.  A may recover the cost of the alterations.  See § 349.

6.  A leases land to B for three years, giving B an option to buy the land for $ 10,000 "on terms to be agreed on." B occupies the land for three years, making extensive improvements, and seeks to exercise the option, offering to pay "either in cash or upon such terms as A may impose." B may obtain a decree of specific performance.  See Illustration 2 to § 362.

### REPORTER'S NOTES

Subsections (1) and (3) are new.  Subsection (2) is based on former § 33 and Comment *c* to former § 32.  See 1 Williston, Contracts §§ 43-49 (3d ed. 1957); 1 Corbin, Contracts §§ 98-102 (1963 & Supp. 1980); Fuller & Perdue, The Reliance Interest in Contract Damages: II, 46 Yale L.J. 373, 394-96 (1937).

*Comment a*.  Illustration 1 is based on Illustration 8 to former § 32; see also § 79.  Illustration 2 is based on *William Whitman & Co. v. Namquit Worsted Co., 206 F. 549 (D.R.I. 1913)*, aff'd, *221 F. 49 (1st Cir. 1915)*; for conflicting decisions see Annot., 106 A.L.R. 1284 (1937).

*Comment b*.  See *California Lettuce Growers, Inc. v. Union Sugar Co., 45 Cal.2d 474, 289 P.2d 785 (1955)*, and *Annot., 49 A.L.R.2d 508 (1956)*; Prosser, Open Price in Contracts for the Sale of Goods, *16 Minn. L. Rev. 733 (1932)*. Illustration 3 is based on Illustration 9 to former § 32.  For the application of Illustration 3 to the sale of land, see *Mattei v. Hopper, 51 Cal.2d 119, 330 P.2d 625 (1958)*.

*Comment c*.  On subsequent conduct, see *Yoder v. Rock Island Bank, 47 Ill. App.3d 486, 5 Ill. Dec. 755, 362 N.E.2d 68 (1977)*, citing this Comment in Tentative Draft; *Maryland Supreme Corp. v. Blake Co., 279 Md. 531, 369 A.2d 1017 (1977)*; *Tanenbaum Textile Co. v. Sidran, 423 S.W.2d 635 (Tex. Civ. App. 1968)*.

*Comment d*.  Illustration 4 is based on Illustration 1 to former § 33.  Illustration 5 is based on *Kearns v. Andree, 107 Conn. 181, 139 A. 695 (1928)*; see Annot., 59 A.L.R. 604 (1929); Costigan, Implied in Fact Contracts and Mutual Assent, 33 Harv. L. Rev. 376 (1920); Note, 44 Harv. L. Rev. 623 (1931). Illustration 6 is based on *Morris v. Ballard, 16 F.2d 175 (D.C. Cir. 1926)*; see 5A Corbin, Contracts § 1174 (1964).

## Cross Reference

Digest System Key Numbers:

Contracts 9

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 50*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 3- Formation of Contracts -- Mutual Assent > Topic 5- Acceptance of Offers*

## § 50 Acceptance of Offer Defined; Acceptance by Performance; Acceptance by Promise

(1)  Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.

(2)  Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a performance which operates as a return promise.

(3)  Acceptance by a promise requires that the offeree complete every act essential to the making of the promise.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Mode of acceptance.*  The acceptance must manifest assent to the same bargain proposed by the offer, and must also comply with the terms of the offer as to the identity of the offeree and the mode of manifesting acceptance.  Offers commonly invite acceptance in any reasonable manner, but a particular mode of acceptance may be required.  See § 30.  In case of doubt, the offeree may choose to accept either by promising or by rendering the requested performance.  See § 32.

*b. Acceptance by performance.* Where the offer requires acceptance by performance and does not invite a return promise, as in the ordinary case of an offer of a reward, a contract can be created only by the offeree's performance.  See Comment *b* to § 32.  In such cases the act requested and performed as consideration for the offeror's promise ordinarily also constitutes acceptance; under § 45 the beginning of performance or the tender of part performance of what is requested may both indicate assent and furnish consideration for an option contract.  In some other cases the offeree may choose to create a contract either by making a promise

or by rendering or tendering performance; in most such cases the beginning of performance or a tender of part performance operates as a promise to render complete performance. See §§ 32, 62. Mere preparation to perform, however, is not acceptance, although in some cases preparation may make the offeror's promise binding under § 87(2).

**Illustrations:**

1. A, who is about to leave on a month's vacation, tells B that A will pay B $ 50 if B will paint A's porch while A is away. B says he may not have time, and A says B may decide after A leaves. If B begins the painting, there is an acceptance by performance which operates as a promise to complete the job. See §§ 32, 62.

2. In Illustration 1, B also expresses doubt whether he will be able to finish the job, and it is agreed that B may quit at any time but will be paid only if he finishes the job during A's vacation. If B begins the painting, there is an acceptance by performance creating an option contract. See § 45.

*c. Acceptance by promise.* The typical contract consists of mutual promises and is formed by an acceptance constituting a return promise by the offeree. A promissory acceptance may be explicitly required by the offer, or may be the only type of acceptance which is reasonable under the circumstances, or the offeree may choose to accept by promise an offer which invites acceptance either by promise or by performance. See §§ 30, 32. The promise may be made in words or other symbols of assent, or it may be implied from conduct, other than acts of performance, provided only that it is in a form invited or required by the offer. An act of performance may also operate as a return promise, but the acceptance in such a case is treated as an acceptance by performance rather than an acceptance by promise; thus the requirement of notification is governed by § 54 rather than by § 56. As appears from § 63, acceptance by promise may be effective when a written promise is started on its way, but the offeree must complete the acts necessary on his part to constitute a promise by him. Similarly, in cases where communication to the offeror is unnecessary under § 69, the acts constituting the promise must be complete.

**Illustrations:**

3. A sends to B plans for a summer cottage to be built on A's land in a remote wilderness area, and writes, "If you will undertake to build a cottage in accordance with the enclosed plans, I will pay you $ 5,000." B cannot accept by beginning or completing performance, since A's letter calls for acceptance by promise. See § 58.

4. A mails a written order to B, offering to buy on specified terms a machine of a type which B regularly sells from stock. The order provides, "Ship at once." B immediately mails a letter of acceptance. This is an acceptance by promise, even though under § 32 B might have accepted by performance.

5.   A gives an order to B Company's traveling salesman which provides, "This proposal becomes a contract without further notification when approval by an executive officer of B Company is noted hereon at its home office." The notation of approval is an acceptance by promise.   See §§ 56, 69 as to the requirement of notification.

   **REPORTER'S NOTES**

This Section is based on former § 52.  The exception for cases covered by former § 63 is omitted, since the rule of former § 63 is abandoned.  See Reporter's Note to § 62; 1 Williston, Contracts §§ 65, 78A (3d ed. 1957); 1 Corbin, Contracts §§ 63, 70 (1963 & Supp. 1980).   See generally Murray, Contracts §§ 44-57 (2d rev. ed. 1974); Calamari & Perillo, Contracts §§ 2-15 to -28 (2d ed. 1977); Braucher, Offer and Acceptance in the Second Restatement, 74 Yale L.J. 302 (1964).

*Comments b and c.*  Illustrations 1, 2 and 3 are based on Fuller, Basic Contract Law 215-17 (1947).  As to Illustration 2, compare *Sigrist v. Century 21 Corp., 519 P.2d 362 (Colo. App. 1974)* ("substantial" performance constitutes acceptance); and *Bowlerama of Texas v. Miyakawa, 449 S.W.2d 357 (Tex. Civ. App. 1970)* (terms of offer govern details of acceptance by performance).  As to Illustration 4, see Uniform Commercial Code § 2-206(1)(b) and Comment 2.  Illustration 5 is based on *International Filter Co. v. Conroe Gin, Ice & Light Co., 277 S.W. 631 (Tex. Comm. App. 1925)*; compare *Empire Mach. Co. v. Litton Business Tel. Sys., 115 Ariz. 568, 566 P.2d 1044 (1977)*.

# Cross Reference

ALR Annotations:

Recovery for services rendered by persons living in apparent relation of husband and wife without express agreement for compensation.  *94 A.L.R.3d 552*.

Knowledge of reward as condition of right thereto.  *86 A.L.R.3d 1142*.

Advertisement addressed to public relating to sale or purchase of goods at specified price as an offer the acceptance of which will consummate a contract.  *43 A.L.R.3d 1102*.

Private rights and remedies growing out of prize-winning contests.  *87 A.L.R.2d 649*.

What constitutes acceptance or ratification of, or acquiescence in, services rendered by attorney so as to raise implied promise to pay reasonable value thereof.  *78 A.L.R.2d 318*.

Oral acceptance of written offer by party sought to be charged as satisfying statute of frauds.  *30 A.L.R.2d 972*.

Restat 2d of Contracts, § 50

Digest System Key Numbers:

Contracts 22

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 75*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 4- Formation of Contracts --*
*Consideration > Topic 1- The Requirement of Consideration*

## § 75 Exchange of Promise for Promise

**Except as stated in §§ 76 and 77, a promise which is bargained for is consideration if, but only if, the promised performance would be consideration.**

### COMMENTS & ILLUSTRATIONS

Comment:

*a. The executory exchange.* In modern times the enforcement of bargains is not limited to those partly completed, but is extended to the wholly executory exchange in which promise is exchanged for promise. In such a case the element of unjust enrichment is not present; the element of reliance, if present at all, is less tangible and direct than in the case of the half-completed exchange. The promise is enforced by virtue of the fact of bargain, without more. Since the principle that bargains are binding is widely understood and is reinforced in many situations by custom and convention, the fact of bargain also tends to satisfy the cautionary and channeling functions of form. Compare Comments *b* and *c* to § 72. Evidentiary safeguards, however, are largely left to the Statute of Frauds rather than to the requirement of consideration. See Chapter 5.

*b. Promise and performance.* The principle of this Section is that, in determining whether there is consideration, one's word is as good as one's deed but no better. More detailed rules are stated in §§ 76-78 for cases in which the application of this principle has produced problems. Certain cases which have sometimes been thought to be exceptions to the principle are commented upon below.

*c. Performance of legal duty and settlement of claims.* A promise to perform a legal duty is not consideration for a return promise unless performance would be. Similarly, a promise to surrender a claim or defense or to forbear from asserting it is consideration only if performance would be. Thus a promise of such performance may raise the same questions as the performance would: Is the duty owed to the maker of the return promise? Is the claim or defense known to be invalid? See §§ 73, 74.

**Illustrations:**

1.  A promises to pay a debt to B, or to perform an existing contractual duty to B, or to perform his duty as a public official.  The legal duty is neither doubtful nor the subject of honest dispute, but A would not have fulfilled the duty but for B's return promise.  A's promise is not consideration for B's return promise.  Compare § 73.

2.  A promises B to surrender or to forbear suit upon a claim either against B or against C.  A knows the claim is invalid.  A's promise is not consideration for a return promise by B.  Compare § 74.

*d. "Void" promises*. The value of a promise does not necessarily depend upon the availability of a legal remedy for breach, and bargains are often made in consideration of promises which are voidable or unenforceable.  Such a promise may be consideration for a return promise.  See § 78.  But it is sometimes suggested that a promise is not consideration if it is not binding, or if it is "void." The examples used commonly involve total lack of capacity to contract (see §§ 12, 13), indefinite promises (see §§ 33-34), promises lacking consideration, or promises unenforceable as against public policy (see Chapter 8).  Such cases are not exceptions to the rule stated in this Section.  In some of them there is no promise within the definition in § 2, in others the return promise would not be binding whether the consideration consisted of a promise or of performance, in some the invalidity of the return promise rests on other policies than those embodied in the requirement of consideration.

**Illustrations:**

3.  While A's property is under guardianship by reason of an adjudication of mental illness, A makes an agreement with B in which B makes a promise.  B's promise is not a contract, whether the consideration consists of a promise by A or performance by A.  Compare § 13; Restatement of Restitution § 139.

4.  A promises to forbear suit against B in exchange for B's promise to pay a liquidated and undisputed debt to A.  A's promise is not binding because B's promise is not consideration under § 73, but A's promise is nevertheless consideration for B's.  Moreover, B's promise would be enforceable without consideration under § 82.  On either basis, B's promise is conditional on A's forbearance and can be enforced only if the condition is met.

5.  A, a married man, and B, an unmarried woman, make mutual promises to marry.  B neither knows nor has reason to know that A is married.  B's promise is consideration and B may recover damages from A for breach of his promise though B would have a defense to a similar action by A.  See § 180.

6.  A promises B $ 100 in return for B's promise to cut timber on land upon which A is a trespasser.  B neither knows nor has reason to know that A is not privileged to cut the timber.  B's promise is consideration and B may

recover damages from A for breach of his promise though B would have a defense to a similar action by A. See Illustration 2 to § 180.

### REPORTER'S NOTES

This Section consolidates subjectmatter found in former §§ 77, 78, 80 and 84(e).  See 1 Williston, Contracts §§ 103, 106, 123 (3d ed. 1957); 1 Corbin, Contracts §§ 142-47 (1963 & Supp. 1980).

*Comment c.*  Illustrations 1 and 2 are based on Illustrations 1 and 2 to former § 78.

*Comment d.*  Illustration 3 is based on Illustration 2 to former § 80.  Illustration 4, contrary to Illustration 4 to former § 80, adopts the result but not the reasoning of *Hay v. Fortier, 116 Me. 455, 102 A. 294 (1917)*, following the reasoning of *Ward v. Goodrich, 34 Colo. 369, 82 P. 701 (1905)*. Illustrations 5 and 6 are Illustrations 5 and 6 to former § 80.

## Cross Reference

Digest System Key Numbers:

Contracts 56

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Raj Patel



*Restatement of the Law, Contracts 2d - Official Text > Chapter 4- Formation of Contracts -- Consideration > Topic 1- The Requirement of Consideration*

## § 78 Voidable and Unenforceable Promises

**The fact that a rule of law renders a promise voidable or unenforceable does not prevent it from being consideration.**

**COMMENTS & ILLUSTRATIONS**

Comment:

*a. Rationale.* The value of a promise depends on its terms and on the probability that it will be performed. The value is not necessarily affected adversely by the fact that no legal remedy will be available in the event of breach; the probability of performance may be greater for a voidable or unenforceable promise, or even for a promise which is not binding or is against public policy, than for the judgment or decree of a court. In general the law of contracts leaves to the parties the valuation of a promise in the formation of a bargain. See § 79. The fact that no legal remedy is available for breach of a promise does not prevent it from being a part of a bargain or remove the bargain from the scope of the general principle that bargains are enforceable. See §§ 17, 71. As to "void" promises, see Comment *d* to § 75.

*b. Voidable promises.* A contract may be voidable by one party by reason of his incapacity or mistake, or by reason of the fraud, breach or other fault of the other party. See § 7. In many such cases a reservation of a similar power by the terms of the agreement would mean that he had made no promise or that his promise was not consideration for a return promise. See § 77. But where the power of avoidance is given by the law to protect one party from actual or possible imposition, he often regards himself as bound in conscience if not in law. He may in some circumstance lose the power by ratification without consideration. See § 85. Until the power is exercised, it does not prevent enforcement of a return promise.

Illustration:

1.  A makes a promise in exchange for a return promise by B.  The fact that the contract is voidable by A because of his own infancy or because of B's fraud does not prevent A's promise from being consideration for B's promise.

*c. Unenforceable promises.*  A promise may be unenforceable by reason of lack of consideration or public policy, or because of a statute relating to remedies, such as the Statute of Frauds, or because of the traditional immunity of the sovereign from suit.  See § 8.  In such cases a return promise may or may not be unenforceable on the same or other grounds.  But the fact that a promise is unenforceable does not mean that the return promise lacks consideration.  See Illustrations 4-6 to § 75.

**Illustrations:**

2.  A makes a promise in exchange for a return promise by B.  The fact that A's promise is unenforceable under the local Statute of Frauds does not prevent it from being consideration for B's promise.

3.  A makes a promise in exchange for a promise by B, a foreign government not subject to suit.  The fact that B's promise is unenforceable does not prevent it from being consideration for A's promise.

REPORTER'S NOTES

This Section consolidates subject matter found in former §§ 80 and 84(e).  The principle stated in former § 80 is abandoned, since former § 84(e) deprived it of effect.  See 1 Williston, Contracts §§ 103, 105 (3d ed. 1957); 1 Corbin, Contracts §§ 146-47 (1963 & Supp. 1980).

*Comment a*.  For a holding contrary to the rule of this Section, see *In re Johnson's Estate, 74 Misc.2d 788, 346 N.Y.S.2d 283 (Surr. Ct. 1973)*.

*Comment b*.  Illustration 1 was Illustration 6 to former § 84.

*Comment c*.  Courts sometimes speak loosely of contracts as involving illegal or immoral "consideration." See, e.g., *Rehak v. Mathis, 239 Ga. 541, 238 S.E.2d 81 (1977)*. Compare *Dick v. Dick, 167 Conn. 210, 355 A.2d 110 (1974)*. See Comment *a* to § 71.  Illustrations 2 and 3 are revised from Illustrations 7 and 8 to former § 84.

## Cross Reference

ALR Annotations:

Establishment of "family" relationship to raise presumption that services were rendered gratuitously, as between persons living in same household but not related by blood or affinity.  *92 A.L.R.3d 726*.

Restat 2d of Contracts, § 78

Failure of artisan or construction contractor to procure occupational or business license or permit as affecting validity or enforceability of contract. *82 A.L.R.2d 1429*.

Recovery, on theory of quasi contract, unjust enrichment, or restitution, of money paid in reliance upon unenforceable promise to accept a bill of exchange or draft. *81 A.L.R.2d 587*.

Digest System Key Numbers:

Contracts 57, 81

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 79*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 4- Formation of Contracts --*
*Consideration  >  Topic 1- The Requirement of Consideration*

## § 79 Adequacy of Consideration; Mutuality of Obligation

**If the requirement of consideration is met, there is no additional requirement of**

**(a)  a gain, advantage, or benefit to the promisor or a loss, disadvantage, or detriment to the promisee; or**

**(b)  equivalence in the values exchanged; or**

**(c)  "mutuality of obligation."**

COMMENTS & ILLUSTRATIONS

Comment:

*a. Rationale.* In such typical bargains as the ordinary sale of goods each party gives up something of economic value, and the values exchanged are often roughly or exactly equivalent by standards independent of the particular bargain.  Quite often promise is exchanged for promise, and the promised performances are sometimes divisible into matching parts.  See § 31.  Hence it has sometimes been said that consideration must consist of a "benefit to the promisor" or a "detriment to the promisee"; it has frequently been claimed that there was no consideration because the economic value given in exchange was much less than that of the promise or the promised performance; "mutuality of obligation" has been said to be essential to a contract.  But experience has shown that these are not essential elements of a bargain or of an enforceable contract, and they are negated as requirements by the rules stated in §§ 71-78.  This Section makes that negation explicit.

*b. Benefit and detriment.*  Historically, the common law action of debt was said to require a *quid pro quo*, and that requirement may have led to statements that consideration must be a benefit to the promisor.  But contracts were enforced in the common-law action of assumpsit without any such requirement; in actions of assumpsit the emphasis was rather on the harm to the promisee, and detrimental reliance on a promise may

still be the basis of contractual relief.  See § 90.  But reliance is not essential to the formation of a bargain, and remedies for breach have longbeen given in cases of exchange of promise for promise where neither party has begun to perform.  Today when it is said that consideration must involve a detriment to the promisee, the supposed requirement is often qualified by a statement that a "legal detriment" is sufficient even though there is no economic detriment or other actual loss.  It is more realistic to say simply that there is no requirement of detriment.

**Illustrations:**

1.  A contracts to sell property to B.  As a favor to B, who is C's friend, and in consideration of A's performance of the contract, C guarantees that B will pay the agreed price.  A's performance is consideration for C's promise.  See § 73.

2.  A has executed a document in the form of a guaranty which imposes no obligation on A and has no value.  B's surrender of the document to A, if bargained for, is consideration for a promise by A to pay $ 10,000.  Compare § 74.

*c. Exchange of unequal values.*  To the extent that the apportionment of productive energy and product in the economy are left to private action, the parties to transactions are free to fix their own valuations.  The resolution of disputes often requires a determination of value in the more general sense of market value, and such values are commonly fixed as an approximation based on a multitude of private valuations.  But in many situations there is no reliable external standard of value, or the general standard is inappropriate to the precise circumstances of the parties.  Valuation is left to private action in part because the parties are thought to be better able than others to evaluate the circumstances of particular transactions.  In any event, they are not ordinarily bound to follow the valuations of others.

Ordinarily, therefore, courts do not inquire into the adequacy of consideration.  This is particularly so when one or both of the values exchanged are uncertain or difficult to measure.  But it is also applied even when it is clear that the transaction is a mixture of bargain and gift.  See Comment *c* to § 71.  Gross inadequacy of consideration may be relevant to issues of capacity, fraud and the like, but the requirement of consideration is not a safeguard against imprudent and improvident contracts except in cases where it appears that there is no bargain in fact.

**Illustrations:**

3.  A borrows $ 300 from B to enable A to begin litigation to recover a gold mine through litigation, and promises to repay $ 10,000 when he recovers the mine.  The loan is consideration for the promise.

4.  A is pregnant with the illegitimate child of B, a wealthy man.  A promises to give the child A's surname and B's given name, and B promises to provide for the support and education of the child and to set up a trust of securities to provide the child with a minimum net income of $ 100 per week until he reaches the age of 21. The naming of the child is consideration for B's promise.

*d. Pretended exchange*. Disparity in value, with or without other circumstances, sometimes indicates that the purported consideration was not in fact bargained for but was a mere formality or pretense.  Such a sham or "nominal" consideration does not satisfy the requirement of § 71.  Promises are enforced in such cases, if at all, either as promises binding without consideration under §§ 82-94 or as promises binding by virtue of their formal characteristics under § 6.  See, for example, §§ 95-109 on contracts under seal.

**Illustrations:**

5.  In consideration of one cent received, A promises to pay $ 600 in three yearly installments of $ 200 each. The one cent is merely nominal and is not consideration for A's promise.

6.  A dies leaving no assets and owing $ 4000 to the B bank.  C, A's widow, promises to pay the debt, and B promises to make no claim against A's estate.  Without some further showing, B's promise is a mere formality and is not consideration for C's promise.

*e. Effects of gross inadequacy*. Although the requirement of consideration may be met despite a great difference in the values exchanged, gross inadequacy of consideration may be relevant in the application of other rules.  Inadequacy "such as shocks the conscience" is often said to be a "badge of fraud," justifying a denial of specific performance.  See § 364(1)(c).  Inadequacy may also help to justify rescission or cancellation on the ground of lack of capacity (see §§ 15, 16), mistake, misrepresentation, duress or undue influence (see Chapters 6 and 7).  Unequal bargains are also limited by the statutory law of usury, by regulation of the rates of public utilities and some other enterprises, and by special rules developed for the sale of an expectation of inheritance, for contractual penalties and forfeitures (see §§ 229, 356), and for agreements between secured lender and borrower (see Restatement of Security § 55, Uniform Commercial Code § 9-501).

*f. Mutuality*. The word "mutuality," though often used in connection with the law of Contracts, has no definite meaning.  "Mutual assent" as one element of a bargain is the subject of Topic 2 of this Chapter.  "Mutuality of remedy" is dealt with in Comment *c* to § 363.  Clause (c) of this Section negates any supposed requirement of "mutuality of obligation." Such a requirement has sometimes been asserted in the form, "Both parties must be bound or neither is bound." That statement is obviously erroneous as applied to an exchange of promise for performance; it is equally inapplicable to contracts governed by §§ 82-94 and to contracts enforceable by virtue

Restat 2d of Contracts, § 79

of their formal characteristics under § 6. Even in the ordinary case of the exchange of promise for promise, § 78 makes it clear that voidable and unenforceable promises may beconsideration. The only requirement of "mutuality of obligation" even in cases of mutual promises is that stated in §§ 76-77.

### REPORTER'S NOTES

Clauses (a) and (b) are revised from former § 81. Clause (c) is new. See 1 Williston, Contracts §§ 99-104A, 115-15C (3d ed. 1957); 1 Corbin, Contracts §§ 116-23, 127-31, 1A id. § 152 (1963 & Supp. 1980).

Comment b. See *Collins v. Parsons College, 203 N.W.2d 594 (Iowa 1973)*. Illustration 1 is new. Illustration 2 is based on Haigh v. Brooks, 10 Adol. & Ellis 309 (Ex. Ch. 1839).

Comment c. Illustration 3 is based on *Embola v. Tuppela, 127 Wash. 285, 220 P. 789 (1923)*. Illustration 4 is based on *Schumm v. Berg, 37 Cal.2d 174, 231 P.2d 39 (1951)*; see also *Porporato v. Devincenzi, 261 Cal. App.2d 670, 68 Cal. Rptr. 210 (1968)*.

Comment d. Illustration 5 is based on *Schnell v. Nell, 17 Ind. 29, 27 Am. Dec. 453 (1861)*. Illustration 6 is based on *Newman & Snell's State Bank v. Hunter, 243 Mich. 331, 220 N.W. 665, 59 A.L.R. 311 (1928)*.

Comment e. See Dawson, Economic Duress -- An Essay in Perspective, 45 Mich. L. Rev. 253 (1947). Although supported by case law, the statement that "even the slightest consideration is sufficient to support the most onerous obligation," *Kirshner v. Spinella, 73 Misc.2d 962, 343 N.Y.S.2d 298 (Dist. Ct. 1973)*, is oversimplified for the reasons discussed in the Comment. For an example of the use of gross inadequacy of consideration in a context of usury, overreaching and misrepresentation, see *W. T. Grant Co. v. Walsh, 100 N.J. Super. 60, 241 A.2d 46 (Dist. Ct. 1968)* (shopper in store induced to accept a book of scrip redeemable for $ 200 worth of merchandise in return for signing agreement to make payments of $ 10 per month for 24 months regardless whether or when the scrip was used).

Comment f. See Reporter's Note to Comment *a* to § 77, dealing with illusory promises. For an analysis of the relation between the concepts of mutuality of obligation and lack of consideration, see *Collins v. Parsons College, 203 N.W.2d 594 (Iowa 1973)*. An example of the confusion caused by treating mutuality as a separate concept is *First Wisconsin Nat'l Bank v. Oby, 52 Wis.2d 1, 188 N.W.2d 454 (1971)*.

## Cross Reference

ALR Annotations:

Restat 2d of Contracts, § 79

Establishment of "family" relationship to raise presumption that services were rendered gratuitously, as between persons living in same household but not related by blood or affinity. *92 A.L.R.3d 726*.

Sufficiency of consideration for employee stock-option contract. *57 A.L.R.3d 1241*.

Sufficiency of consideration for employee's covenant not to compete, entered into after inception of employment. *51 A.L.R.3d 825*.

Validity of individual employment contract for specific term which contains provision that employee will perform if physically able, if health permits, or the like. *7 A.L.R.3d 898*.

Requisite definiteness of price to be paid in event of exercise of option for purchase of property. *2 A.L.R.3d 701*.

Necessity and sufficiency of allegation, in a suit for specific performance of a contract for the sale of land, as to the adequacy of the consideration or as to the fairness of the contract. *100 A.L.R.2d 551*.

Contractual waiver of after-acquired homestead exemption. *82 A.L.R.2d 982*.

Validity and enforceability of contract which expressly leaves open for future agreement or negotiation the terms of payment for property. *68 A.L.R.2d 1221*.

Digest System Key Numbers:

Contracts 10, 53

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 80*

*Restatement of the Law, Contracts 2d - Official Text* > *Chapter 4- Formation of Contracts --Consideration* > *Topic 1- The Requirement of Consideration*

## § 80 Multiple Exchanges

**(1)  There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone.**

**(2)  The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.**

COMMENTS & ILLUSTRATIONS

Comment:

*a. One consideration for a number of promises.*  Since consideration is not required to be adequate in value (see § 79), two or more promises may be binding even though made for the price of one.  A single performance or return promise may thus furnish consideration for any number of promises.  But if the performance or return promise would not be consideration for a single promise, it is not consideration for that promise as part of a set of promises, or for the other promises in the set.

Illustrations:

1.  A pays B or promises B to pay him $ 5, not then owed by A, in consideration of which B promises A to give him a book and also promises to surrender a letter.  Both of B's promises are supported by consideration.

2.  A pays B or promises B to pay him $ 50 not then owed by A, in exchange for the following promises: a promise by C to dig a well for D, a promise by E to discharge F from a debt of $ 100 owing by F to E.  All the promises are supported by consideration.

*b. Several performances or return promises as consideration.*  In cases within Subsection (2) the promisor has received all he bargained for.  The fact that part of it would not have been consideration standing alone does not make enforcement of the bargain unjust to the promisor or contrary to the public interest.  The effect of

public policy on part of the consideration, however, may invalidate the entire bargain under some circumstances. See §§ 178, 183-85.

**Illustration:**

3.  A owes B $ 5.  B promises to give A a book if A will pay the $ 5 and $ 1 in addition.  A pays the $ 6.  B's promise is binding, although A's payment of the $ 5 which he owed would not of itself have been consideration.

*c. Compositions with creditors.* Composition agreements between a debtor and his creditors illustrate Subsection (2).  The consideration for which each assenting creditor bargains may be any or all of the following: (1) part payment of the sum due him, (2) the promise of each other creditor to forego a portion of his claim, (3) forbearance or promise of forbearance by the debtor to pay the assenting creditors more than equal proportions, (4) the action of the debtor in securing the assent of the other creditors, (5) the part payments made to the other creditors.  The first is not consideration, but each of the others may be consideration.  The last two are seldom bargained for in fact, but (2) and (3) are practically always bargained for by implication if not in so many words.  Still other considerations may be agreed upon in any case.

**Illustration:**

4.  A makes a composition with B, C and D, three of his creditors, whereby each of them promises to accept forty cents on the dollar as full satisfaction, A promising to treat all assenting creditors equally.  A's promise and the promises of the other two creditors are consideration for the promise of each creditor, even though there are other non-assenting creditors.

### REPORTER'S NOTES

Subsection (1) is former § 83 rewritten to reflect the abandonment of the principle stated in former § 80.  Subsection (2) is a revision of former § 84(b).  See 1 Williston, Contracts §§ 134, 137A (3d ed. 1957); 1 Corbin, Contracts §§ 125, 126 (1963 & Supp. 1980).

*Comment a.*  Illustrations 1 and 2 were Illustrations 1 and 2 to former § 83.

*Comment b and c.*  These are revised from Comments *c* and *d* to former § 84.  Illustration 3 was Illustration 2 to former § 84; see *Mitchell v. Lawson, 444 S.W.2d 192 (Tex. Civ. App. 1969)*; compare Illustration 3 to former § 83.  Illustration 4 was Illustration 3 to former § 84.

## Cross Reference

ALR Annotations:

Restat 2d of Contracts, § 80

Construction of provision in real-estate mortgage, land contract, or other security instrument for release of separate parcels of land as payments are made.  *41 A.L.R.3d 7*.

Digest System Key Numbers:

Contracts 50

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 81*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 4- Formation of Contracts --
Consideration  >  Topic 1- The Requirement of Consideration*

# § 81 Consideration as Motive or Inducing Cause

(1)  **The fact that what is bargained for does not of itself induce the making of a promise does not prevent it from being consideration for the promise.**

(2)  **The fact that a promise does not of itself induce a performance or return promise does not prevent the performance or return promise from being consideration for the promise.**

COMMENTS & ILLUSTRATIONS

Comment:

*a. "Bargained for*." Consideration requires that a performance or return promise be "bargained for" in exchange for a promise; this means that the promisor must manifest an intention to induce the performance or return promise and to be induced by it, and that the promisee must manifest an intention to induce the making of the promise and to be induced by it.  See § 71 and Comment *b*.  In most commercial bargains the consideration is the object of the promisor's desire and that desire is a material motive or cause inducing the making of the promise, and the reciprocal desire of the promisee for the making of the promise similarly induces the furnishing of the consideration.

*b. Immateriality of motive or cause*. This Section makes explicit a limitation on the requirement that consideration be bargained for.  Even in the typical commercial bargain, the promisor may have more than one motive, and the person furnishing the consideration need not inquire into the promisor's motives.  Unless both parties know that the purported consideration is mere pretense, it is immaterial that the promisor's desire for the consideration is incidental to other objectives and even that the other party knows this to be so.  Compare § 79 and Illustrations.  Subsection (2) states a similar rule with respect to the motives of the promisee.

REPORTER'S NOTES

This Section covers the subject matter of former § 84(a). Former § 84(b) has been transferred to § 80(2), former § 84(c) and (d) to § 73, former § 84(e) to § 78, and former § 84(f) to §§ 76 and 77.

See 1 Williston, Contracts § 111 (3d ed. 1957); 1 Corbin, Contracts §§ 115-19 (1963).

# Cross Reference

ALR Annotations:

Establishment of "family" relationship to raise presumption that services were rendered gratuitously, as between persons living in same household but not related by blood or affinity. *92 A.L.R.3d 726*.

Digest System Key Numbers:

Contracts 50

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



# Restat 2d of Contracts, § Scope

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 4- Formation of Contracts -- Consideration  >  Topic 2- Contracts Without Consideration*

## Introductory Note

*Bases for enforcement.*  The rules of this Topic are exceptions to the general requirement of a bargain stated in § 17.  The elements in a transaction which justify enforcement of a promise which is not part of a bargain are also often present in bargains.  The principal substantive bases for enforcement are reliance and unjust enrichment.  Also relevant is the extent to which the evidentiary, cautionary, deterrent and channeling functions of formalities are satisfied.  See Comment *c* to § 72.  Additional justification for the enforcement of some promises is found in the fact that they are preliminary steps toward bargain or are otherwise ancillary to the making or performance of a bargain.

*Omitted cases.*  In the absence of bargain, the factors bearing on the enforcement of promises appear in widely varying combinations, and no general principle has emerged which distinguishes the binding promise from the non-binding.  Sections 82-94 state rules for certain cases which have arisen often enough so that rules have crystallized, and §§ 86 and 90 state general principles with respect to the effect of unjust enrichment and reliance, respectively.  In some States, by statute or decision, additional categories of promises are binding without consideration.

*Promises conditional on mutual assent and consideration.*  Sections 82-94 state the circumstances under which certain types of promises are binding.  Where the stated circumstances do not include mutual assent or consideration, those elements are not required by law.  But a promise may be in terms conditional on acceptance or performance or return promise by the promisee, and such a condition is effective.  See § 91.  Where such a condition is met, there may be a transaction enforceable as a bargain; if so, limitations stated in §§ 82-94, relating to enforcement in the absence of bargain, may be inappropriate and inapplicable

**REPORTER'S NOTES**

Restat 2d of Contracts, § Scope

See generally 1A Corbin, Contracts §§ 171-239 (1963 & Supp. 1980); 1 Williston, Contracts §§ 138-204A (3d ed. 1957); Murray, Contracts §§ 91-102 (2d rev. ed. 1974); Calimari & Perillo, Contracts, Chs. 5-6 (2d ed. 1977).   See also Atiyah, Contracts, Promises and the Law of Obligations, 94 L.Q. Rev. 193 (1978); Fuller & Perdue, The Reliance Interest in Contract Damages, 46 Yale L.J. 52 (1936), 46 id. 373 (1937); Posner, Gratuitous Promises in Economics and Law, 6 J. Legal Studies 411 (1977), reprinted in Kronman and Posner, eds., The Economics of Contract Law 46 (1979); Gilmore, The Death of Contract 55-85 (1974); Braucher, Freedom of Contract and the Second Restatement, 78 Yale L.J. 598, 602-07 (1969).

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 90*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 4- Formation of Contracts -- Consideration > Topic 2- Contracts Without Consideration*

## § 90 Promise Reasonably Inducing Action or Forbearance

(1)  A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.

(2)  A charitable subscription or a marriage settlement is binding under Subsection (1) without proof that the promise induced action or forbearance.

### COMMENTS & ILLUSTRATIONS

Comment:

*a. Relation to other rules.*  Obligations and remedies based on reliance are not peculiar to the law of contracts. This Section is often referred to in terms of "promissory estoppel," a phrase suggesting an extension of the doctrine of estoppel.  Estoppel prevents a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation.  See Restatement, Second, Agency § 8B; Restatement, Second, Torts §§ 872, 894.  Reliance is also a significant feature of numerous rules in the law of negligence, deceit and restitution.  See, e.g., Restatement, Second, Agency §§ 354, 378; Restatement, Second, Torts §§ 323, 537; Restatement of Restitution § 55.  In some cases those rules and this Section overlap; in others they provide analogies useful in determining the extent to which enforcement is necessary to avoid injustice.

It is fairly arguable that the enforcement of informal contracts in the action of assumpsit rested historically on justifiable reliance on a promise.  Certainly reliance is one of the main bases for enforcement of the half-completed exchange, and the probability of reliance lends support to the enforcement of the executory exchange.  See Comments to §§ 72, 75.  This Section thus states a basic principle which often renders inquiry

Restat 2d of Contracts, § 90

unnecessary as to the precise scope of the policy of enforcing bargains. Sections 87-89 state particular applications of the same principle to promises ancillary to bargains, and it also applies in a wide variety of non-commercial situations. See, e.g., § 94.

**Illustration:**

1. A, knowing that B is going to college, promises B that A will give him $ 5,000 on completion of his course. B goes to college, and borrows and spends more than $ 5,000 for college expenses. When he has nearly completed his course, A notifies him of an intention to revoke the promise. A's promise is binding and B is entitled to payment on completion of the course without regard to whether his performance was "bargained for" under § 71.

*b. Character of reliance protected.* The principle of this Section is flexible. The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant. Compare Comment to § 72. The force of particular factors varies in different types of cases: thus reliance need not be of substantial character in charitable subscription cases, but must in cases of firm offers and guaranties. Compare Subsection (2) with §§ 87, 88.

**Illustrations:**

2. A promises B not to foreclose, for a specified time, a mortgage which A holds on B's land. B thereafter makes improvements on the land. A's promise is binding and may be enforced by denial of foreclosure before the time has elapsed.

3. A sues B in a municipal cout for damages for personal injuries caused by B's negligence. After the one year statute of limitations has run, B requests A to discontinue the action and start again in the superior cout where the action can be consolidated with other actions against B arising out of the same accident. A does so. B's implied promise that no harm to A will result bars B from asserting the statute of limitations as a defense.

4. A has been employed by B for 40 years. B promises to pay A a pension of $ 200 per month when A retires. A retires and forbears to work elsewhere for several years while B pays the pension. B's promise is binding.

*c. Reliance by third persons.* If a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases rests on the same basis

and depends on the same factors as in cases of reliance by the promisee. Justifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promisee or beneficiary.

**Illustrations:**

5. A holds a mortgage on B's land. To enable B to obtain a loan, A promises B in writing to release part of the land from the mortgage upon payment of a stated sum. As A contemplated, C lends money to B on a second mortgage, relying on A's promise. The promise is binding and may be enforced by C.

6. A executes and delivers a promissory note to B, a bank, to give B a false appearance of assets, deceive the banking authorities, and enable the bank to continue to operate. After several years B fails and is taken over by C, a representative of B's creditors. A's note is enforceable by C.

7. A and B, husband and wife, are tenants by the entirety of a tract of land. They make an oral promise to B's niece C to give her the tract. B, C and C's husband expend money in building a house on the tract and C and her husband take possession and live there for several years until B dies. The expenditures by B and by C's husband are treated like those by C in determining whether justice requires enforcement of the promise against A.

*d. Partial enforcement.* A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate. But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise. See §§ 84, 89; compare Restatement, Second, Torts § 549 on damages for fraud. Unless there is unjust enrichment of the promisor, damages should not put the promisee in a better position than performance of the promise would have put him. See §§ 344, 349. In the case of a promise to make a gift it would rarely be proper to award consequential damages which would place a greater burden on the promisor than performance would have imposed.

**Illustrations:**

8. A applies to B, a distributor of radios manufactured by C, for a "dealer franchise" to sell C's products. Such franchises are revocable at will. B erroneously informs A that C has accepted the application and will soon award the franchise, that A can proceed to employ salesmen and solicit orders, and that A will receive an initial delivery of at least 30 radios. A expends $ 1,150 in preparing to do business, but does not receive the franchise or any radios. B is liable to A for the $ 1,150 but not for the lost profit on 30 radios. Compare Restatement, Second, Agency § 329.

9.  The facts being otherwise as stated in Illustration 8, B gives A the erroneous information deliberately and with C's approval and requires A to buy the assets of a deceased former dealer and thus discharge C's "moral obligation" to the widow.  C is liable to A not only for A's expenses but also for the lost profit on 30 radios.

10.   A, who owns and operates a bakery, desires to go into the grocery business.  He approaches B, a franchisor of supermarkets.  B states to A that for $ 18,000 B will establish A in a store.  B also advises A to move to another town and buy a small grocery to gain experience.  A does so.  Later B advises A to sell the grocery, which A does, taking a capital loss and foregoing expected profits from the summer tourist trade.  B also advises A to sell his bakery to raise capital for the supermarket franchise, saying "Everything is ready to go.  Get your money together and we are set." A sells the bakery taking a capital loss on this sale as well.Still later, B tells A that cconsiderably more than an $ 18,000 investment will be needed, and the negotiations between the parties collapse.  At the point of collapse many details of the proposed agreement between the parties are unresolved.  The assurances from B to A are promises on which B reasonably should have expected A to rely, and A is entitled to his actual losses on the sales of the bakery and grocery and for his moving and temporary living expenses.  Since the proposed agreement was never made, however, A is not entitled to lost profits from the sale of the grocery or to his expectation interest in the proposed franchise from B.

11.  A is about to buy a house on ahill.  Before buying he obtains a promise from B, who owns adjoining land, that B will not build on a particular portion of his lot, where a building would obstruct the view from the house.  A then buys the house in reliance on the promise.  B's promise is binding, but will be specifically enforced only so long as A and his successors do not permanently terminate the use of the view.

12.  A promises to make a gift of a tract of land to B, his son-in-law.  B takes possession and lives on the land for 17 years, making valuable improvements.  A then dispossesses B, and specific performance is denied because the proof of the terms of the promise is not sufficiently clear and definite.  B is entitled to a lien on the land for the value of the improvements, not exceeding their cost.

e. *Gratuitous promises to procure insurance.*  This Section is to be applied with caution to promises to procure insurance.  The appropriate remedy for breach of such a promise makes the promisor an insurer, and thus may result in a liability which is very large in relation to the value of the promised service.  Often the promise is properly to be construed merely as a promise to use reasonable efforts to procure the insurance, and reliance by the promisee may be unjustified or may be justified only for a short time.  Or it may be doubtful whether he did in fact rely.  Such difficulties may be removed if the proof of the promise and the reliance are clear, or if the

promise is made with some formality, or if part performance or a commercial setting or a potential benefit to the promisor provide a substitute for formality.

**Illustrations:**

13.  A, a bank, lends money to B on the security of a mortgage on B's new home.  The mortgage requires B to insure the property.  At the closing of the transaction A promises to arrange for the required insurance, and in reliance on the promise B fails to insure.  Six months later the property, still uninsured, is destroyed by fire.  The promise is binding.

14.  A sells an airplane to B, retaining title to secure payment of the price.  After the closing A promises to keep the airplane covered by insurance until B can obtain insurance.  B could obtain insurance in three days but makes no effort to do so, and the airplane is destroyed after six days.  A is not subject to liability by virtue of the promise.

*f. Charitable subscriptions, marriage settlements, and other gifts*.  One of the functions of the doctrine of consideration is to deny enforcement to a promise to make a gift.  Such a promise is ordinarily enforced by virtue of the promisee's reliance only if his conduct is foreseeable and reasonable and involves a definite and substantial change of position which would not have occurred if the promise had not been made.  In some cases, however, other policies reinforce the promisee's claim.  Thus the promisor might be unjustly enriched if he could reclaim the subject of the promised gift after the promisee has improved it.

Subsection (2) identifies two other classes of cases in which the promisee's claim is similarly reinforced.  American couts have traditionally favored charitable subscriptions and marriage settlements, and have found consideration in many cases where the element of exchange was doubtful or nonexistent.  Where recovery is rested on reliance in such cases, a probability of reliance is enough, and no effort is made to sort out mixed motives or to cconsider whether partial enforcement would be appropriate.

**Illustrations:**

15.  A promises B $ 5000, knowing that B desires thatsum for the purchase of a parcel of land.  Induced thereby, B secures without any payment an option to buy the parcel.  A then tells B that he withdraws his promise.  A's promise is not binding.

16.  A orally promises to give her son B a tract of land to live on.  As A intended, B gives up a homestead elsewhere, takes possession of the land, lives there for a year and makes substantial improvements.  A's promise is binding.

17.  A orally promises to pay B, a university, $ 100,000 in five annual installments for the purposes of its fund-raising campaign then in progress.  The promise is confirmed in writing by A's agent, and two annual installments are paid before A dies.  The continuance of the fund-raising campaign by B is sufficient reliance to make the promise binding on A and his estate.

18.  A and B are engaged to be married.  In anticipation of the marriage A and his father C enter into a formal written agreement by which C promises to leave certain property to A by will.  A's subsequent marriage to B is sufficient reliance to make the promise binding on C and his estate.

### REPORTER'S NOTES

The principal change from former § 90 is the recognition of the possibility of partial enforcement.  See Fuller & Perdue, The Reliance Interest in Contract Damages: 1, 46 Yale L.J. 52, 63-65 (1936); id.: 2, 46 Yale L.J. 373, 401-06 (1937); Shattuck, Gratuitous Promises -- A New Writ?  35 Mich. L. Rev. 908 (1937); 1A Corbin, Contracts § 205 (1963 & Supp. 1980). Partly because of that change, the requirement that the action or forbearance have "a definite and substantial character" is deleted; and provision is added for reliance by beneficiaries.  See Boyer, Promissory Estoppel: Requirements and Limitations of the Doctrine, 98 U. Pa. L. Rev. 459 (1950); 1A Corbin, Contracts § 200 (1963 & Supp. 1980).  Subsection (2) is new.

See, generally, 1 Williston, Contracts §§ 138-40 (3d ed. 1957); 1A Corbin, Contracts §§ 193-209 (1963 & Supp. 1980); Fuller, Consideration and Form, 41 Colum. L. Rev. 799, 810-12, 819 (1941); Boyer, Promissory Estoppel: Principle from Precedents, 50 Mich. L. Rev. 639, 873 (1952); Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343 (1969); *Annots., 115 A.L.R. 152 (1938), 48 A.L.R.2d 1069 (1956).* For a discussion of the creation of former § 90, see Gilmore, The Death of Contract 58-76 (1974).

*Comment a*.  See Seavey, Reliance on Gratuitous Promises or Other Conduct, 64 Harv. L. Rev. 913 (1951). Illustration 1 is based on Illustration 3 to former § 90; cf. *Devecmon v. Shaw, 69 Md. 199, 14 A. 464 (1888)*; *Hamer v. Sidway, 124 N.Y. 538, 27 N.E. 256 (1891)*; compare Illustration 2 to former § 75; Gilmore, supra, at 70-71.

For discussions of the differences between equitable estoppel and promissory estoppel, see *Huhtala v. Travelers Ins. Co., 401 Mich. 118, 257 N.W.2d 640 (1977)*; *Tiffany, Inc. v. W.M.K. Transit Mix, Inc., 16 Ariz. App. 415, 493 P.2d 1220 (1972)*; see also 1A Corbin, Contracts § 204 (1963) on why "reliance" is a more satisfactory term and concept.

Restat 2d of Contracts, § 90

On the meaning of "promise," see § 2 and Comments *a* and *b* to that Section.  Compare *Goodman v. Dicker, 169 F.2d 684 (D.C. Cir. 1948)*; *Division of Labor Law Enforcement v. Transpacific Trans. Co., 69 Cal. App.3d 268, 137 Cal. Rptr. 855 (1977)*; *Tauber v. Jacobson, 293 A.2d 861 (D.C. 1972)*; *Intermar, Inc. v. Atlantic Richfield Co., 364 F. Supp. 82 (E.D. Pa. 1973)*; Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343, 364 (1969).

*Comment b.*  For discussions of the concept of reliance, see, e.g., 1A Corbin, Contracts § 200 (1963); *Corbit v. J. I. Case Co., 70 Wash.2d 522, 424 P.2d 290 (1967)* (relying on the "definite and substantial" language of former § 90); *Crail v. Blakely, 8 Cal.3d 744, 106 Cal. Rptr. 187, 505 P.2d 1027 (1973)*; *In re Johnson's Estate, 74 Misc.2d 788, 364 N.Y.S.2d 283 (Surr. Ct. 1973)*; *R. J. Taggart, Inc. v. Douglas County, 31 Or. App. 1137, 572 P.2d 1050 (1977)*. On the recurring problem of reliance by a contractor on a subcontractor's oral bid, see §§ 25, 87; Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343, 350-74 (1969); *Janke Constr. Co. v. Vulcan Maters. Co., 386 F. Supp. 687 (W.D. Wis. 1974)*, aff'd, *527 F.2d 772 (7th Cir. 1976)*. On franchises, see *Goodman v. Dicker, 169 F.2d 684 (D.C. Cir. 1948)*; *Hoffman v. Red Owl Stores, 26 Wis.2d 683, 133 N.W.2d 267 (1965)*, 51 Cornell L.Q. 351 (1966), 65 Mich. L. Rev. 351 (1966); Henderson, supra, 78 Yale L.J. at 357-65; Calamari & Perillo, Contracts § 6-10 (2d ed. 1977).  On reliance and the Statute of Frauds, see §§ 139, 150.

Illustration 2 is based on Illustration 1 to former § 90.  Illustration 3 is based on *McLearn v. Hill, 276 Mass. 519, 177 N.E. 617 (1931)*. Illustration 4 is based on *Feinberg v. Pfeiffer Co., 322 S.W.2d 163 (Mo. Ct. App. 1959)*; cf. *Ricketts v. Scothorn, 57 Neb. 51, 77 N.W. 365 (1898)*; Illustration 2 to former § 90.  Contrast *Division of Labor Law Enforcement v. Transpacific Trans. Co., 69 Cal. App.3d 268, 137 Cal. Rptr. 855 (1977)*.

*Comment c.*  Illustration 5 is based on *Burgess v. California Mut. Bldg. & Loan Ass'n, 210 Cal. 180, 290 P. 1029 (1930)*; cf. *Spector v. National Cellulose Corp., 181 Misc. 465, 48 N.Y.S.2d 234 (1943)*. Illustration 6 is based on *D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942)*; see Annots., 64 A.L.R. 595 (1929), 95 A.L.R. 534 (1935). Illustration 7 is based on *Roberts-Horsfield v. Gedicks, 94 N.J. Eq. 82, 118 A. 275 (1922)*, aff'd mem., *96 N.J. Eq. 384, 124 A. 925 (Ct. Err. & App. 1924)*.

*Comment d.* See Fuller & Perdue, The Reliance Interest in Contract Damages: 1, 46 Yale L.J. 52, 75-80 (1936), id.: 2, 46 Yale L.J. 373, 401-06 (1937). Illustration 8 is based on *Goodman v. Dicker, 169 F.2d 684 (D.C. Cir. 1948)* (lost profits denied); cf.  *Terre Haute Brewing Co. v. Dugan, 102 F.2d 425 (8th Cir. 1939)*. Illustration 9 is based on *Chrysler Corp. v. Quimby, 51 Del. 254, 144 A.2d 123, 885 (1958)* (lost profits granted). Illustration 10 is based on *Hoffman v. Red Owl Stores, 26 Wis.2d 683, 133 N.W.2d 267 (1965)*, 65 Mich. L.

Rev. 351 (1966); Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343, 363-65 (1969). See also *Janke Constr. Co. v. Vulcan Maters. Co., 386 F. Supp. 687 (W.D. Wis. 1974)*, aff'd, *527 F.2d 772 (7th Cir. 1976)* (applying Hoffman v. Red Owl Stores to a construction bid dispute).  On the measure of damages, see also §§ 347, 349.  Illustration 11 is based on *Miller v. Lawlor, 245 Iowa 1144, 66 N.W.2d 267 (1954)*. Illustration 12 is based on *Kaufman v. Miller, 214 Ill. App. 213 (1919)*; cf.  *Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 165 A.2d 531 (1960)*; see *Annots., 101 A.L.R. 923, 985 (1936), 155 A.L.R. 76 (1945), 24 A.L.R.2d 11 (1952)*.

*Comment e*.  As to the liability of an insurance broker or agent, see *Rayden Eng'r Corp. v. Church, 337 Mass. 652, 151 N.E.2d 57 (1958)*; *Spiegel v. Metropolitan Life Ins. Co., 6 N.Y.2d 91, 188 N.Y.S.2d 486, 160 N.E.2d 40 (1959)*; *Annot., 29 A.L.R.2d 171 (1953)*. Illustration 13 is based on *Graddon v. Knight, 138 Cal. App.2d 577, 292 P.2d 632 (1956)*; see *East Providence Credit Union v. Geremia, 103 R.I. 597, 239 A.2d 725 (1968)*; cf. *Siegel v. Spear & Co., 234 N.Y. 479, 138 N.E. 414 (1923)*; *Lusk-Harbison-Jones, Inc. v. Universal Credit Co., 164 Miss. 693, 145 So. 623 (1933)*. Illustration 14 is based on *Northern Commercial Co. v. United Airmotive, 101 F. Supp. 169 (D. Alaska 1951)*.

*Comment f*. Subsection (2) of this Section, in Tentative Draft, was cited with approval in *Salsbury v. Northwestern Bell Tel. Co., 221 N.W.2d 609 (Iowa 1974)*; see also Calamari & Perillo, Contracts § 6-5 (2d ed. 1977).  Both of these authorities interpret Subsection (2) to treat charitable subscriptions as a sui generis category requiring neither consideration nor reliance, and both approve of this approach.  In contrast, see *Jordan v. Mount Sinai Hosp., 276 So.2d 102 (Dist. Ct. App. 1973)*, aff'd, *290 So.2d 484 (Fla. 1974)*, 26 Baylor L. Rev. 256 (1974). These cases and writers summarize and analyze many different approaches to the problem of charitable subscriptions.  Illustration 15 was Illustration 4 to former § 90.  Illustration 16 is based on *Greiner v. Greiner, 131 Kan. 760, 293 P. 759 (1930)*. Illustration 17 is based on *In re Field's Estate, 11 Misc.2d 427, 172 N.Y.S.2d 740 (1958)*; see Annots., 115 A.L.R. 589 (1938), 151 A.L.R. 1238 (1944). Illustration 18 is based on *Phalen v. United States Trust Co., 186 N.Y. 178, 78 N.E. 943 (1906)*; cf.  *De Cicco v. Schweizer, 221 N.Y. 431, 117 N.E. 807 (1917)*.

## Cross Reference

Digest System Key Numbers:

Estoppel 85

Restat 2d of Contracts, § 90

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



[Restat 2d of Contracts, § 139](#)

*Restatement of the Law, Contracts 2d - Official Text > Chapter 5- The Statute of Frauds > Topic 7-*
*Consequences of Non-Compliance*

## § 139 Enforcement by Virtue of Action in Reliance

(1)  A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach is to be limited as justice requires.

(2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

(a)  the availability and adequacy of other remedies, particularly cancellation and restitution;

(b)  the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c)  the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d)  the reasonableness of the action or forbearance;

(e)  the extent to which the action or forbearance was foreseeable by the promisor.

   COMMENTS & ILLUSTRATIONS

Comment:

*a.  Relation to other rules*.  This Section is complementary to § 90, which dispenses with the requirement of consideration if the same conditions are met, but it also applies to promises supported by consideration.  Like § 90, this Section overlaps in some cases with rules based on estoppel or fraud; it states a basic principle which sometimes renders inquiry unnecessary as to the precise scope of other policies.  Sections 128 and 129 state

particular applications of the same principle to land contracts; §§ 125(3) and 130(2) also rest on it in part.  See also Uniform Commercial Code §§ 2-201(3), 8-319(b).  Where a promise is made without intention to perform, remedies under this Section may be alternative to remedies for fraud.  See Comment *b* to § 313; Restatement, Second, Torts § 530.

*b.  Avoidance of injustice*.  Like § 90 this Section states a flexible principle, but the requirement of consideration is more easily displaced than the requirement of a writing.  The reliance must be foreseeable by the promisor, and enforcement must be necessary to avoid injustice.  Subsection (2) lists some of the relevant factors in applying the latter requirement.  Each factor relates either to the extent to which reliance furnishes a compelling substantive basis for relief in addition to the expectations created by the promise or to the extent to which the circumstances satisfy the evidentiary purpose of the Statute and fulfill any cautionary, deterrent and channeling functions it may serve.

**Illustrations:**

1.  A is lessee of a building for five years at $ 75 per month and has sublet it for three years at $ 100 per month.  A seeks to induce B to purchase the building, and to that end orally promises to assign to B the lease and sublease and to execute a written assignment as soon as B obtains a deed.  B purchases the building in reliance on the promise.  B is entitled to the rentals from the sublease.

2.  A is a pilot with an established airline having rights to continued employment, and could take up to six months leave without prejudice to those rights.  He takes such leave to become general manager of B, a small airline which hopes to expand if a certificate to operate over an important route is granted.  When his six months leave is about to expire, A demands definite employment because of that fact, and B orally agrees to employ A for two years and on the granting of the certificate to give A an increase in salary and a written contract.  In reliance on this agreement A lets his right to return to his prior employer expire.  The certificate is soon granted, but A is discharged in breach of the agreement.  The Statute of Frauds does not prevent recovery of damages by A.

*c.  Particular factors*.  The force of the factors listed varies in different types of cases, and additional factors may affect particular types of contracts.  Thus reliance of the kinds usual in suretyship transactions is not sufficient to justify enforcement of an oral guaranty, where the evidentiary and cautionary functions performed by the statutory formalities are not fulfilled.  See Comment *a* to § 112.  In the case of a contract between prospective spouses made upon consideration of marriage, the policy of the Statute is reinforced by a policy against legal interference in the marriage relation, and reliance incident to the marriage relation does not make the contract

enforceable.  See Comment *d* to § 124.  Where restitution is an unavailable remedy because to grant it would nullify the statutory purpose, a remedy based on reliance will ordinarily also be denied.  See Comment *a* to § 375.

**Illustration:**

3.  A orally promises to pay B a commission for services in negotiating the sale of a business opportunity, and B finds a purchaser to whom A sells the business opportunity.  A statute extends the Statute of Frauds to such promises, and is interpreted to preclude recovery of the reasonable value of such services.  The promise is not made enforceable by B's reliance on it.

*d. Partial enforcement; particular remedies*.  The same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy.  In particular, the remedy of restitution is not ordinarily affected by the Statute of Frauds (see § 375); where restitution is an adequate remedy, other remedies are not made available by the rule stated in this Section.  Again, when specific enforcement is available under the rule stated in § 129, an ordinary action for damages is commonly less satisfactory, and justice then does not require enforcement in such an action.  See Comment *c* to § 129.  In some cases it may be appropriate to measure relief by the extent of the promisee's reliance rather than by the terms of the promise.  See § 90 Comment *e* and Illustrations.

**Illustration:**

4.  A renders services to B under an oral contract within the Statute by which B promises to pay for the services.  On discharge without cause in breach of the contract, A is entitled to the reasonable value of the services, but in the absence of additional circumstances is not entitled to damages for wrongful discharge.

**REPORTER'S NOTES**

This Section is new.  See 3 Williston, Contracts § 533A (3d ed. 1960); 2 Corbin, Contracts § 422A (Supps. 1971 & 1980); id. § 459 (1950 and Supp. 1971); Note, Promissory Estoppel as a Means of Defeating the Statute of Frauds, 44 Fordham L. Rev. 114 (1975) (discussing this Section in Tentative Draft); Edwards, The Statute of Frauds of the Uniform Commercial Code and the Doctrine of Estoppel, 62 Marq. L. Rev. 205, 222-24 (1978); Summers, The Doctrine of Estoppel Applied to the Statute of Frauds, 79 U. Pa. L. Rev. 440 (1931); McNeill, Agreements to Reduce to Writing Contracts Within the Statute of Frauds, 15 Va. L. Rev. 553 (1931); *Annots., 56 A.L.R.3d 1037 (1974), 54 A.L.R.3d 715 (1973), 48 A.L.R.2d 1070, 1079 (1956), 166 A.L.R. 443 (1947), 117 A.L.R. 939 (1938), 115 A.L.R. 152, 158 (1938), 101 A.L.R. 923 (1936), 75 A.L.R. 650 (1931).* But see Note, 66 Mich. L. Rev. 170 (1967).

*Comment a.*  See *Chapman v. Bomann, 381 A.2d 1123 (Me. 1978)*.

*Comment b.*  Courts have shown varying degrees of willingness to set aside the Statute of Frauds to avoid injustice.  See *Janke Constr. Co. v. Vulcan Mater. Co., 386 F. Supp. 687 (W.D. Wis. 1974)*, aff'd, *527 F.2d 772 (7th Cir. 1976)* (discussing several lines of cases and the Tentative Draft of this Section).  Among cases adopting an approach similar to the rule of this Section are *McIntosh v. Murphy, 52 Hawaii 29, 469 P.2d 177 (1970)* (expressly following this Section in Tentative Draft); *Babey v. Lowman, 7 Ohio App.2d 38, 218 N.E.2d 626 (1966)*; and *Crail v. Blakely, 8 Cal.3d 744, 106 Cal. Rptr. 187, 505 P.2d 1027 (1973)* (wife's suicide held sufficient reliance on husband's oral promise not to change a joint will).  In *Walker v. Ireton, 221 Kan. 314, 559 P.2d 340 (1977)*, the court adopted the rule of this Section in Tentative Draft, but found insufficient reliance to require non-application of the Statute of Frauds.  See also *Tanenbaum v. Biscayne Osteopathic Hosp., 190 So.2d 777, 780-82 (Fla. 1966)* (dissenting opinion).

Other courts have permitted reliance to displace the requirement of a writing only in narrowly circumscribed situations, refusing to act unless there has been a misrepresentation that the Statute has been complied with or a failure to carry out a promise to make a memorandum of an oral agreement.  See, e.g., *C. R. Fedrick v. Borg-Warner Corp., 552 F.2d 852 (9th Cir. 1977)*; *Tiffany, Inc. v. W.M.K. Transit Mix, Inc., 16 Ariz. App. 415, 493 P.2d 1220 (1972)*; cf.  *In re Estate of Nelson, 85 Wash.2d 602, 537 P.2d 765 (1975)*. The Texas Supreme Court enforced oral promises to avoid injustice in "Moore" *Burger, Inc. v. Phillips Petrol. Co., 492 S.W.2d 934 (Tex. 1972)*; and *Cooper Petrol. Co. v. LaGloria Oil & Gas Co., 436 S.W.2d 889 (Tex. 1969)*, but later cases have noted that those Texas Supreme Court opinions emphasized broken promises to make subsequent writings, see, e.g., *Boddy v. Gray, 497 S.W.2d 600 (Tex. Civ. App. 1973)*, error ref.; and the Fifth Circuit recently stated that "the Texas courts have made clear that an oral agreement within the statute of frauds will not be enforced except in egregious situations." *Mercer v. C. A. Roberts Co., 570 F.2d 1232, 1237 (5th Cir. 1978)*. Other courts have warned that one putting forth an estoppel argument carries a heavy factual burden.  See, e.g., *Funk v. Anderson-Rooney Operating Co., 423 P.2d 465 (Okl. 1966)* (finding the showing of reliance inadequate); *Special Event Entertainment v. Rockefeller Center, Inc., 458 F. Supp. 72 (S.D.N.Y. 1978)* (upholding an allegation of estoppel against a motion to dismiss).

Still other courts have expressed hostility to any weakening of the Statute of Frauds.  See *Tanenbaum v. Biscayne Osteopathic Hosp., 190 So.2d 777 (Fla. 1966)*; *Dooley v. Lachut, 103 R.I. 21, 234 A.2d 366 (1967)*.

Illustration 1 is based on *Vogel v. Shaw, 42 Wyo. 333, 294 P. 687 (1930)*. Compare *Special Event Entertainment v. Rockefeller Center, Inc., 458 F. Supp. 72 (S.D.N.Y. 1978)*; *Funk v. Anderson-Rooney*

*Operating Co., 423 P.2d 465 (Okla. 1966)*. Illustration 2 is based on *Alaska Airlines, Inc. v. Stephenson, 217 F.2d 295 (9th Cir. 1954)*. See also *McIntosh v. Murphy, 52 Hawaii 29, 469 P.2d 177 (1970)*. Compare *Readmond v. Matsushita Elec. Corp., 355 F. Supp. 1073 (E.D. Pa. 1973)* (discussing California and Texas law); *ITT Cannon Elec., Inc. v. Brady, 141 Ind. App. 506, 230 N.E.2d 114 (1967)* (discussing Indiana and Illinois law). Again, factual determinations, particularly of the extent of reliance, play a major role regardless of how the rule is worded. Cf. *United States v. Consolidated Edison Co., 452 F. Supp. 638, 653 (S.D.N.Y. 1977)*, aff'd as to liability, *580 F.2d 1122 (2d Cir. 1978)*; *Oxley v. Ralston Purina Co., 349 F.2d 328 (6th Cir. 1965)*.

*Comment c.*  Illustration 3 is based on *Minichiello v. Royal Bus. Funds Corp., 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966)*, cert. denied, *389 U.S. 820 (1967)*; *Lee v. St. Joe Paper Co., 371 F.2d 797 (2d Cir.)*, cert. denied, *389 U.S. 821 (1967)*. Compare courts' treatment of other types of oral contracts, e.g., real estate brokerages: *Heyman v. Adeack Realty Co., 102 R.I. 105, 228 A.2d 578 (1967)*; see also *Dooley v. Lachut, 103 R.I. 21, 234 A.2d 366 (1967)*; bids for labor and materials: *Janke Constr. Co. v. Vulcan Mater. Co., 386 F. Supp. 687 (W.D. Wis. 1974)*, aff'd, *527 F.2d 772 (7th Cir. 1976)*; *C. R. Fedrick, Inc. v. Borg-Warner Corp., 552 F.2d 852 (9th Cir. 1977)*; *Tiffany, Inc. v. W.M.K. Transit Mix, Inc., 16 Ariz. App. 415, 493 P.2d 1220 (1972)*; property settlements between spouses: *In re Estate of Nelson, 85 Wash.2d 602, 537 P.2d 765 (1975)*; *Crail v. Blakely, 8 Cal.3d 744, 106 Cal. Rptr. 187, 505 P.2d 1027 (1973)*.

*Comment d.*  As to restitution, see §§ 141, 143.  Illustration 4 is based on *Chevalier v. Lane's, Inc., 147 Tex. 106, 213 S.W.2d 530 (1948)*; *Annot., 6 A.L.R.2d 1053 (1949)*.

## Cross Reference

ALR Annotations:

Construction and application of UCC § 2-201(3)(c) rendering contract of sale enforceable notwithstanding statute of frauds with respect to goods for which payment has been made and accepted or which have been received and accepted.  97 A.L.R.2d 908.

Comment Note. -- Promissory Estoppel as basis for avoidance of statute of frauds.  *56 A.L.R.3d 1037*.

Action by employee in reliance on employment contract which violates statute of frauds as rendering contract enforceable.  *54 A.L.R.3d 715*.

Doctrine of part performance with respect to renewal option in lease not complying with statute of frauds.  *80 A.L.R.2d 425*.

Restat 2d of Contracts, § 139

Statute of frauds: promise by stockholder, officer, or director to pay debt of corporation. *35 A.L.R.2d 906*.

What constitutes part performance sufficient to take agreement in consideration of marriage out of statute of frauds. *30 A.L.R.2d 1419*.

Digest System Key Numbers:

Frauds, Statute of 126, 129

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 178*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 8- Unenforceability on Grounds of Public Policy  >  Topic 1- Unenforceability in General*

## § 178 When a Term Is Unenforceable on Grounds of Public Policy

(1)  A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

(2)  In weighing the interest in the enforcement of a term, account is taken of

(a)  the parties' justified expectations,

(b)  any forfeiture that would result if enforcement were denied, and

(c)  any special public interest in the enforcement of the particular term.

(3)  In weighing a public policy against enforcement of a term, account is taken of

(a)  the strength of that policy as manifested by legislation or judicial decisions,

(b)  the likelihood that a refusal to enforce the term will further that policy,

(c)  the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d)  the directness of the connection between that misconduct and the term.

COMMENTS & ILLUSTRATIONS

Comment:

*a.  Legislation providing for unenforceability.*  Occasionally, on grounds of public policy, legislation provides that specified kinds of promises or other terms are unenforceable.  Whether such legislation is valid and applicable to the particular term in dispute is beyond the scope of this Restatement.  Assuming that it is, the court is bound

Restat 2d of Contracts, § 178

to carry out the legislative mandate with respect to the enforceability of the term. But with respect to such other matters as the enforceability of the rest of the agreement (§§ 183, 184) and the possibility of restitution (Topic 5), a court will be guided by the same rules that apply to other terms unenforceable on grounds of public policy (see Illustration 1), absent contrary provision in the legislation itself (see Illustration 3). The term "legislation" is used here in the broadest sense to include any fixed text enacted by a body with authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them. It also encompasses foreign laws to the extent that they are applicable under conflict of laws rules. See Restatement, Second, Conflict of Laws §§ 202, 203.

Illustrations:

1. A promises to pay B $ 1,000 if the Buckets win their basketball game with the Hoops, and B promises to pay A $ 2,000 if the Hoops win. A state statute makes wagering a crime and provides that a promise such as A's or B's is "void." A's and B's promises are unenforceable on grounds of public policy. Any claims of A or B to restitution for money paid under the agreement are governed by the rules stated in Topic 5. See § 199(b) and Illustrations 4 and 5 to that section.

2. A and B make an agreement by which A agrees to sell and B to buy, at a fixed price per bushel, one thousand bushels of wheat from A at any time that A shall choose during the following month. The state statute that makes wagering a crime does not apply to such an agreement and it does not offend any judicially declared public policy. Enforcement of A's and B's promises is not precluded on grounds of public policy.

3. A borrows $ 10,000 from the B Bank, promising to repay it with interest at the rate of twelve per cent. A state statute that fixes the maximum legal rate of interest on such loans at ten per cent provides that a promise to pay a greater sum is "void" as usurious as to all the promised interest but not as to the principal. A's promise to pay the interest is unenforceable on grounds of public policy. The rule stated in § 184(2) does not make A's promise to pay interest enforceable up to ten per cent because the legislation provides otherwise. Compare Illustration 5 to § 184.

*b. Balancing of interests*. Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability. See § 179. In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude

enforcement.   In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms.   The most common factors in the balancing process are set out in Subsections (2) and (3).   Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term.

*c. Strength of policy*.  The strength of the public policy involved is a critical factor in the balancing process. Even when the policy is one manifested by legislation, it may be too insubstantial to outweigh the interest in the enforcement of the term in question.   See Illustrations 4 and 5.   A court should be particularly alert to this possibility in the case of minor administrative regulations or local ordinances that may not be indicative of the general welfare.   A disparity between a relatively modest criminal sanction provided by the legislature and a much larger forfeiture that will result if enforcement of the promise is refused may suggest that the policy is not substantial enough to justify the refusal.  See Illustration 4.

**Illustrations:**

4.  A and B make an agreement for the sale of goods for $ 10,000, in which A promises to deliver the goods in his own truck at a designated time and place.  A municipal parking ordinance makes unloading of a truck at that time and place an offense punishable by a fine of up to $ 50.  A delivers the goods to B as provided.  Because the public policy manifested by the ordinance is not sufficiently substantial to outweigh the interest in the enforcement of B's promise, enforcement of his promise is not precluded on grounds of public policy.

5.  A promises to employ B and B promises to work for A, all work to be done on weekdays.  The agreement is made on Sunday in violation of a statute that makes the doing of business on Sunday a misdemeanor.  If the court decides that the public policy manifested by the statute is not sufficiently substantial to outweigh the interests in enforcement of A's and B's promises, it will hold that enforcement of their promises is not precluded on grounds of public policy.

*d. Connection with term*.  The extent to which a refusal to enforce a promise or other term on grounds of public policy will further that policy depends not only on the strength of the policy but also on the relation of the term to that policy and to any misconduct involved.  In most cases there is a promise that involves conduct offensive to the policy.  The promise may be one to engage in such conduct.  See Illustration 6.  Or it may be one that tends to induce the other party to engage in such conduct.  This tendency may result from the fact that the promise is made in return for the promisee's engaging in the conduct (see Illustration 7) or in return for the promisee's

return promise to engage in the conduct (see Illustration 8). Or it may result from the fact that the duty to perform the promise is conditional on the promisee's engaging in the conduct (see Illustration 9). In such cases, it is the tendency itself that makes the promise unenforceable, even though the promise does not actually induce the conduct. There are other situations in which the conduct is not itself against public policy, but it is against public policy to promise to engage in such conduct or to attempt to induce it. It is sometimes objectionable to make a commitment to engage in conduct that is not in itself objectionable. This is the case, for example, for a promise to vote in a particular way. See Illustration 10. It is sometimes objectionable to attempt to induce conduct that is not in itself objectionable. This is the case, for example, for a promise made in consideration of the promisee's voting in a particular way. See Illustration 11. This list does not exhaust all of the possible relations between the conduct and the promise that may justify a decision that the promise is unenforceable. But as the relation between the conduct and the promise becomes tenuous, it becomes difficult to justify unenforceability unless serious misconduct is involved. A party will not be barred from enforcing a promise because of misconduct that is so remote or collateral that refusal to enforce the promise will not deter such conduct and enforcement will not amount to an inappropriate use of the judicial process. See Illustrations 15 and 16. However, a new promise to perform an earlier promise that was unenforceable on grounds of public policy is also unenforceable on those grounds unless the circumstances that made the first promise unenforceable no longer exist. The rules stated in §§ 183 and 184 involve special applications of these general principles concerning the relation between the conduct and the promise.

**Illustrations:**

6. A, the owner of a newspaper, promises B that he will publish a statement about C known by A and B to be false and defamatory if B pays him $ 10,000. B pays A $ 10,000. A's promise is one to commit a tort (§ 192) and is unenforceable on grounds of public policy.

7. B promises to pay A, the owner of a newspaper, $ 10,000 if he will publish a statement about C known by A and B to be false and defamatory. A publishes the libel. B's promise is one tending to induce A to commit a tort (§ 192) and is unenforceable on grounds of public policy.

8. A, the owner of a newspaper, promises B that he will publish a statement about C known by A and B to be false and defamatory if B will promise to pay him $ 10,000. B makes the promise. A's promise is one tending to induce A to commit a tort (§ 192). Both promises are unenforceable on grounds of public policy.

9. B promises to convey a tract of land worth $ 11,000 to A, the owner of a newspaper, if A pays B $ 1,000, B's duty to be conditional on A's publishing a statement about C known by A and B to be false and defamatory. A

pays B $ 1,000 and publishes the libel. B's promise is one tending to induce A to commit a tort (§ 192) and is unenforceable on grounds of public policy. Compare § 185.

10. A pays B, a competitor, $ 10,000 for B's promise not to compete with A for a year. Although B's refraining from competition with A would not in itself be improper, B's promise not to compete with A unreasonably restrains B from competition (§ 186) and is unenforceable on grounds of public policy.

11. A promises to pay B, a competitor, $ 10,000 if he will refrain from competing with A for a year. Although B's refraining from competing with A would not in itself be improper, A's promise unreasonably tends to induce B to refrain from competition (§ 186) and is unenforceable on grounds of public policy.

12. A induces B to make an agreement to buy goods on credit from A by bribing B's purchasing agent. A delivers the goods to B. A's bribe tends to induce the agent to violate his fiduciary duty. B's promise to pay the price is unenforceable on grounds of public policy. See § 193.

13. A, who wants to induce B to buy goods from him, promises to pay C $ 1,000 if he will bribe B's purchasing agent to arrange the sale. C does so. C's bribe tends to induce the agent to violate his fiduciary duty. A's promise is unenforceable on grounds of public policy. See § 193.

14. A, who wants to induce B to buy goods from him, promises to pay C $ 1,000 if he arranges the sale. C arranges the sale by bribing B's purchasing agent. C's bribe tends to induce the agent to violate his fiduciary duty. A's promise is unenforceable on grounds of public policy. See § 193.

15. A and B make an agreement for exclusive dealing that is unenforceable because unreasonably in restraint of trade (§ 186). A sells and delivers goods pursuant to the unenforceable agreement to C, who promises to pay the price. Because the relation between C's promise to pay the price and the unreasonable restraint is too remote, enforcement of C's promise is not precluded on grounds of public policy.

16. A and B make a wagering agreement in violation of a statute that makes such agreements "void." When A loses, C pays B at A's request, and A promises C to pay him that amount. Because the relation between A's promise to pay C and the improper wager is too remote, enforcement of A's promise is not precluded on grounds of public policy.

*e. Other factors.* A court will be reluctant to frustrate a party's legitimate expectations unless there is a corresponding benefit to be gained in deterring misconduct or avoiding an inappropriate use of the judicial process. See Illustration 17. The promisee's ignorance or inadvertence, even if it does not bring him within the rule stated in § 180, is one factor in determining the weight to be attached to his expectations. See Illustration 4

to § 181.  To the extent, however, that he engaged in misconduct that was serious or deliberate, his claim to protection of his expectations fails.  The interest in favor of enforcement becomes much stronger after the promisee has relied substantially on those expectations as by preparation or performance.  The court will then take into account any enrichment of the promisor and any forfeiture by the promisee if he should lose his right to the agreed exchange after he has relied substantially on those expectations.  See Comment *b* to § 227.  The possibility of restitution may be significant in this connection.  See Topic 5.  In addition to the interest of the promisee, the court will also weigh any interest that the public or third parties may have in the enforcement of the term in question.  Such an interest may be particularly evident where the policy involved is designed to protect third parties.  See Illustrations 18 and 19.

**Illustrations:**

17.  A agrees to reimburse B for any legal expenses incurred if B will go on C's land in order to test a right of way that is disputed by A and C.  B goes on C's land.  Enforcement of A's promise is not precluded on grounds of public policy, even if it is later determined that B has committed a trespass.  Compare § 192.

18.  A, a trustee under a will, makes an agreement with B in violation of A's fiduciary duty.  If enforcement of A's and B's promises is desirable for the protection of the beneficiaries, it is not precluded on grounds of public policy.  Compare § 193.

19.  A, B, and C, directors of a bank, make notes payable to the bank in order to deceive the bank examiner.  They agree that the notes shall be returned and cancelled after they have served their purpose.  Enforcement of the promises of A, B and C embodied in the notes is not precluded on grounds of public policy.

*f.  Effect on rest of agreement.*  The rules stated in this Section determine only whether a particular promise or other term is unenforceable.  The question of the effect of such a determination on the rest of the agreement is sometimes a complex one.  If there is only one promise in the transaction and it is unenforceable, then the question will not arise.  (As to the divisibility of such a promise, however, see §§ 184, 185).  This is the case for offers that have been accepted by a performance rather than by a promise (§ 53), for promises enforceable because of reliance by the promisee (§ 90), and for promises under seal (§ 95).  Furthermore, even when there is another promise, it too is often unenforceable under the rules stated in this Section.  This is the case, for example, where one party's promise is unenforceable because the promised conduct offends public policy and the other party's return promise is unenforceable because it tends to induce that conduct.  See Illustration 8.  There are, however, situations in which only one party's promise is unenforceable while the other party's return promise is enforceable, as is the case where the promisee of the return promise belongs to the class sought to

Restat 2d of Contracts, § 178

be protected by the policy in question.  See Illustrations 3, 4 and 5 to § 179 and Illustration 5 to § 181.  (That an unenforceable promise may be consideration for a return promise, see § 78.)  Finally, there are circumstances in which the unenforceability of one part of an agreement does not entail the unenforceability of the rest of the agreement, and these are dealt with in §§ 183 and 184.  As to the effect of public policy on conditions, see § 185.

### REPORTER'S NOTES

This Section is based primarily on former §§ 580 and 598, but also incorporates aspects of former §§ 597, 600, 601 and 603.  Those aspects of the rules stated in former §§ 597 and 600 that turned on terms of matters of pleading and proof have been discarded as unnecessarily formal and insufficiently supported by precedent.  See the Introductory Note to this Topic.  See generally, 6A Corbin, Contracts §§ 1373-78, 1510-19, 1525-35 (1962 & Supp. 1980); 14 Williston, Contracts §§ 1628-30 (3d ed. 1972); 15 id. §§ 1748-50A, 1752-74, 1779-83, 1786A-88, 1792; Gellhorn, Contracts and Public Policy, 35 Colum. L. Rev. 679 (1935); Strong, The Enforceability of Illegal Contracts, 12 Hastings L. Rev. 347 (1961); Note, 42 N.D. Law. 46 (1966); Note, 5 UCLA-Alaska L. Rev. 381 (1976).

*Comment a*.  The broad sense in which the term "legislation" is used is comparable to that employed for the term "statute" in Model Penal Code § 1.13(1).  For a discussion of the constitutionality of legislation affecting existing contracts, see *Mazda Motors of America v. Southwestern Motors, 36 N.C.App. 1, 243 S.E.2d 793 (1978)*. Legislation directly affecting contract rights and powers has become widespread in franchising and dealership arrangements.  See, e.g., Automobile Dealers Day in Court Act, *15 U.S.C. § 1221* (1976); North Carolina Motor Vehicle Dealers and Manufacturers Licensing Law, N.C. Gen. Stat. 20-285 (1975); Wisconsin Fair Dealership Law, Wis. Stat. § 135.01 (1961).  Examples of cases applying such statutes to strike down contract terms are *Boatland, Inc. v. Brunswick Corp., 558 F.2d 818 (6th Cir. 1977)*, and *Mazda Motors of America v. Southwestern Motors, supra*.

On the effect of consent decrees before administrative agencies, see *May Department Stores v. First Hartford Corp., 435 F. Supp. 849 (D. Conn. 1977)*.

The reference to the effect of foreign law is based on former § 592; see also *Boatland, Inc. v. Brunswick Corp., supra*. Illustration 1 is suggested by Illustration 1 to former § 520.  Illustration 2 is suggested by Illustration 2 to former § 523.  Illustration 3 is new.

Restat 2d of Contracts, § 178

*Comment b.* Subsection (1) (in Tentative Draft) was approved of and applied in *California Pacific Bank v. Small Business Administration, 557 F.2d 218 (9th Cir. 1977)*. The last sentence of the Tentative Draft of this Comment and the factors set out in Subsection (3) were cited with implicit approval in *Maryland-National Capital Park and Planning Comm'n v. Washington Nat'l Arena, 282 Md. 588, 607, 386 A.2d 1216, 1229 (1978)*, which contains a useful discussion of the balancing of interests. An example of sensitive balancing is *T & T Mfg. Co. v. A. T. Cross Company, 449 F. Supp. 813 (D.R.I. 1978)* (covenant not to sue balanced against trademark infringement; covenant upheld).

*Comment c.* Illustration 4 is suggested by Furmston, The Analysis of Illegal Contracts, 16 U. Toronto L.J. 267, 280 (1966); *Amoco Oil Company v. Toppert, 56 Ill. App.3d 595, 14 Ill. Dec. 595, 371 N.E.2d 1294 (1978)* (citing several examples). Illustration 5 is new, see *Cameron v. Gunstock Acres, 370 Mass. 378, 348 N.E.2d 791 (1976)*.

*Comment d.* The next to the last sentence of this Comment incorporates the rule of former § 590; see also former § 539. Illustrations 6, 7 and 8 are based on Illustration 1 to former § 571. Illustrations 9, 10 and 11 are new. Illustration 12 is based on *Sirkin v. Fourteenth Street Store, 124 A.D. 384, 108 N.Y.S. 830 (1908)*. Illustration 13 is suggested by *Sinnar v. LeRoy, 44 Wash.2d 728, 270 P.2d 800 (1954)*. Illustration 14 is based on *Colyvas v. Red Hand Composition Co., 318 F. Supp. 1376 (S.D.N.Y. 1970)*; *McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960)*. Illustration 15 is based on Illustration 3 to former § 597; *Bruce's Juices v. American Can Co., 330 U.S. 743 (1947)*; *Oppenheimer Indus. v. Firestone, 569 P.2d 334 (Colo. Ct. App. 1977)*. In *Beaver Lake Ass'n v. Beaver Lake Corp., 200 Neb. 685, 264 N.W.2d 871 (1978)*, a bylaw provision giving a real estate developer control of the board of directors of a homeowners' association, though valid initially, was held to have become invalid when used to defeat the quasi-municipal functions of the association and to aid the conflicting private purposes of the developer. Illustration 16 is based on Illustration 2 to former § 597; cf. *Miller v. Radikopf, 394 Mich. 83, 228 N.W.2d 386 (1975)*. But cf. *Manning v. Metal Stamping Corp., 396 F. Supp. 1376 (E.D. Ill. 1975)*, aff'd without opinion, *530 F.2d 980 (7th Cir. 1976)*.

*Comment e.* Illustration 17 is suggested by Furmston, The Analysis of Illegal Contracts, 16 U. Toronto L.J. 267, 283 (1966), citing Winfield on Tort 31 (6th ed. 1954). Illustration 18 is based on Illustration 4 to former § 601. Illustration 19 is based on Illustration 6 to former § 601.

## Cross Reference

ALR Annotations:

Restat 2d of Contracts, § 178

Validity of contract for sale of "good will" of law practice.  *79 A.L.R.3d 1243*.

Failure of vendor to comply with statute or ordinance requiring approval or recording of plat prior to conveyance of property as rendering sale void or voidable.  *77 A.L.R.3d 1058*.

Law of forum against wagering transactions as precluding enforcement of claim based on gambling transactions valid under applicable foreign law.  *71 A.L.R.3d 178*.

Validity and construction of preincorporation agreement between promoters as to future employment.  *66 A.L.R.3d 1138*.

Validity of pyramid distribution plan.  *54 A.L.R.3d 217*.

Liability insurer's unconditional right to cancel policy as affected by considerations of public policy.  *40 A.L.R.3d 1439*.

Validity, construction, and enforcement of business opportunities of "Finder's Fee" contract.  *24 A.L.R.3d 1160*.

Validity, construction, and effect of provision forfeiting or suspending benefits in event of competitive employment as part of retirement or pension plan.  *18 A.L.R.3d 1246*.

Enforceability of warrant of attorney to confess judgment against assignee, guarantor, or other party obligating himself for performance of primary contract.  *5 A.L.R.3d 426*.

Attorney's recovery in quantum meruit for legal services rendered under a contract which is illegal or void as against public policy.  *100 A.L.R.2d 1378*.

Validity and effect of contractual waiver of trial by jury.  *73 A.L.R.2d 1332*.

Right to recover money lent for gambling purposes.  *53 A.L.R.2d 345*.

Validity and effect of agreement controlling the vote of corporate stock.  *45 A.L.R.2d 799*.

Recovery of money or property lost through cheating or fraud in forbidden gambling or game.  *39 A.L.R.2d 1213*.

Enforceability of option to purchase, consideration for which is payment of rentals exceeding rent control law maximum.  *28 A.L.R.2d 1204*.

Contract provisions for deduction of union dues from wages of employees and their payment to union as within statute prohibiting or regulating assignment of future earnings or wages.  *14 A.L.R.2d 177*.

Effect of execution of foreign corporation's contract which, while executory, was unenforceable because of noncompliance with conditions of doing business in state.  *7 A.L.R.2d 256*.

Restat 2d of Contracts, § 178

Application of federal antitrust laws to professional sports. *18 A.L.R.Fed. 489*.

Provisions of franchise agreement as constituting unlawful tying arrangements under federal antitrust laws. *14 A.L.R.Fed. 473*.

Validity or enforceability, under carriage of goods by Sea Act (46 U.S.C. § 1300 et seq.), of clauses in bill of lading or shipping contract as to jurisdiction of foreign courts or applicability of foreign law. *2 A.L.R.Fed. 963*.

Validity, under the Federal Antitrust Laws (*15 U.S.C. § 1 et seq.*), of agreements between employers or employer associations imposing restrictions on employment. *2 A.L.R.Fed. 839*.

Digest System Key Numbers:

Contracts 101 et seq.

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document

Restat 2d of Contracts, § 199

Digest System Key Numbers:

Implied and Constructive Contracts 61

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



# *Restat 2d of Contracts, § Scope*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 9- The Scope of Contractual Obligations*

## Introductory Note

The typical contract is a bargain -- an agreement in which a promise is exchanged for a consideration; in atypical cases a promise is binding because of its formal characteristics, because of reliance by the promisee, or for some other reason. See § 17. The terms of the agreement or promise to a large extent define the obligation created. Certain types of contracts or terms, however, are forbidden or otherwise regulated, and rules of law must fill the gap when the parties have not provided for the situation which arises. Where the parties have adopted a writing as the final expression of all or part of their agreement, interpretation focuses on the writing, and its terms may supersede other manifestations of intention. Whether or not there is a writing, the parties' intention is read in its context, and usages common to the parties are often an important part of the context.

General rules relating to these matters are stated in this chapter. Bargains unenforceable on grounds of public policy, however, are the subject of a separate chapter. See Chapter 8. The scope of a contractual obligation may be determined or affected by the meaning of the promise or agreement (Topic 1), by considerations of fairness and the public interest (Topic 2), by the adoption of a writing (Topic 3), and by usage (Topic 4). Some special rules relating to conditions and their effect on the scope of contractual obligations are stated at the end of this Chapter (Topic 5).

This Chapter analyzes the process of interpreting and applying agreements, stating separately rules with respect to various aspects of the process. Such a separate statement may convey an erroneous impression of the psychological reality of the judicial process in which many elements are typically combined in a single ruling. Nevertheless, where evidence of an oral term is excluded in an action based on a written agreement with simply the imprecise explanation that "the writing speaks for itself," the ruling, when analyzed, may sum up the following determinations: the contract was integrated (§ 209); the integration was complete (§ 210); the oral term is

inconsistent with the written agreement, is within its scope, does not bear on its interpretation, and would not naturally be omitted from the writing (§§ 213-16)

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 200*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations*
*>  Topic 1- The Meaning of Agreements*

## § 200 Interpretation of Promise or Agreement

**Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning.**

### COMMENTS & ILLUSTRATIONS

Comment:

*a.  Formation of contract.*  Questions of interpretation arise in determining whether there is a contract as well as in determining rights and duties under a contract.  Chapter 3 states rules applicable in determining whether the parties have manifested the mutual assent necessary to a contract enforceable as a bargain.  The rules stated in the present Topic overlap with those rules, but also apply where the making of a contract is not disputed.

*b.  Manifestation of intention.*  As is made clear in Chapter 3, particularly §§ 17-20, the intention of a party that is relevant to formation of a contract is the intention manifested by him rather than any different undisclosed intention.  The definitions of "promise," "agreement," and "term" in §§ 2, 3 and 5 also refer to "manifestation of intention." It follows that the meaning of the words or other conduct of a party is not necessarily the meaning he expects or understands.  He is not bound by a meaning unless he has reason to know of it, but the expectation and understanding of the other party must also be taken into account.  See § 201.

*c.  Interpretation and legal operation.*  Interpretation is not a determination of the legal effect of words or other conduct.  Properly interpreted, an agreement may not be enforceable as a contract, or a term such as a promise to pay a penalty may be denied legal effect, or it may have a legal effect different from that agreed upon, as in a case of employment at less than a statutory minimum wage.

### REPORTER'S NOTES

Former § 226 is rephrased to make it clear that "interpretation" relates to meaning and to avoid confusion with the ascertainment of legal operation or effect, sometimes called "construction." See 4 Williston, Contracts §§

600-02 (3d ed. 1961); 3 Corbin, Contracts §§ 532-35 (1960 & Supp. 1980); compare the definitions of "agreement" and "contract" in Uniform Commercial Code § 1-201(3) and (11).  This accords with Comment *c* to former § 226.

*Comment c.* Supporting the distinctions made between interpretation and construction are Patterson, The Interpretation and Construction of Contracts, 64 Colum. L. Rev. 833 (1964); and *Wahlenmaier v. American Quasar Petroleum Co., 517 S.W.2d 390 (Tex. Civ. App. 1974)*, ref. n.r.e.; but see Note, 57 Iowa L. Rev. 215, 215 n.1 (1971).

## Cross Reference

ALR Annotations:

Modern status as to duration of employment where contract specifies no terms but fixes daily or longer compensation.  *93 A.L.R.3d 659*.

Validity and construction of "No Damage" clause with respect to delay in building or construction contract.  *74 A.L.R.3d 187*.

Landlord and tenant: What amounts to "sale" of property for purposes of provision giving tenant right of first refusal if landlord desires to sell.  *70 A.L.R.3d 203*.

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member.  *66 A.L.R.3d 1018*.

Validity and construction of provision (Escalator Clause) in land contract or mortgage that rate of interest payable shall increase if legal rate is raised.  *60 A.L.R.3d 473*.

Who is "employee" under employee stock-option plan or contract.  *57 A.L.R.3d 787*.

Construction and operation of "optional agreement-flat payment" land contract under which optionee has right to take title when periodic payments (otherwise to be treated as rent) equal agreed price.  *55 A.L.R.3d 159*.

Meaning of terms "city," "town," or the like as employed in restrictive covenants not to compete.  *45 A.L.R.3d 1339*.

Construction and effect of affirmative provision in contract of sale by which purchaser agrees to take article "as is," in the condition in which it is, or equivalent term.  *24 A.L.R.3d 465*.

Restat 2d of Contracts, § 200

Conclusiveness of determination of third party whose approval is provided for by contract for sale of goods. *7 A.L.R.3d 555*.

What 12-month period constitutes "year" or "calendar year" as used in public enactment, contract, or other written instrument. *5 A.L.R.3d 584*.

Construction and effect of provision in contract for sale of realty by which purchaser agrees to take property "as is" or in the condition in which it is. *97 A.L.R.2d 849*.

Implied obligation of purchaser or lessee to conduct search for, or to develop or work premises for, minerals other than oil and gas. *76 A.L.R.2d 721*.

"Escalator" price adjustment clauses. *63 A.L.R.2d 1337*.

Construction and effect of contract for sale of commodity or goods wherein quantity is described as "about" or "more or less" than an amount specified. *58 A.L.R.2d 377*.

What constitutes "accounts receivable" under contract selling, assigning, pledging, or reserving such items. *41 A.L.R.2d 1395*.

Meaning of term "radius" employed in contract, statute, or ordinance as descriptive of area, location, or distance. *10 A.L.R.2d 605*.

Digest System Key Numbers:

Contracts 143 et seq.

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



## Restat 2d of Contracts, § 201

*Restatement of the Law, Contracts 2d - Official Text > Chapter 9- The Scope of Contractual Obligations > Topic 1- The Meaning of Agreements*

# § 201 Whose Meaning Prevails

(1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

COMMENTS & ILLUSTRATIONS

Comment:

*a. The meaning of words.* Words are used as conventional symbols of mental states, with standardized meanings based on habitual or customary practice. Unless a different intention is shown, language is interpreted in accordance with its generally prevailing meaning. See § 202(3). Usages of varying degrees of generality are recorded in dictionaries, but there are substantial differences between English and American usages and between usages in different parts of the United States. Differences of usage also exist in various localities and in different social, economic, religious and ethnic groups. All these usages change over time, and

persons engaged in transactions with each other often develop temporary usages peculiar to themselves. Moreover, most words are commonly used in more than one sense.

*b. The problem of context.* Uncertainties in the meaning of words are ordinarily greatly reduced by the context in which they are used. The same is true of other conventional symbols, and the meaning of conduct not used as a conventional symbol is even more dependent on its setting. But the context of words and other conduct is seldom exactly the same for two different people, since connotations depend on the entire past experience and the attitudes and expectations of the person whose understanding is in question. In general, the context relevant to interpretation of a bargain is the context common to both parties. More precisely, the question of meaning in cases of misunderstanding depends on an inquiry into what each party knew or had reason to know, as stated in Subsections (2) and (3). See § 20 and Illustrations. Ordinarily a party has reason to know of meanings in general usage.

*c. Mutual understanding.* Subsection (1) makes it clear that the primary search is for a common meaning of the parties, not a meaning imposed on them by the law. To the extent that a mutual understanding is displaced by government regulation, the resulting obligation does not rest on "interpretation" in the sense used here. The objective of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding: "the courts do not make a contract for the parties." Ordinarily, therefore, the mutual understanding of the parties prevails even where the contractual term has been defined differently by statute or administrative regulation. But parties who used a standardized term in an unusual sense obviously run the risk that their agreement will be misinterpreted in litigation.

**Illustrations:**

1. A and B agree that A will sell goods to B "f.o.b." the place of destination. Prior correspondence shows that the price has been adjusted on the assumption that B's insurance policies will cover the goods during shipment. Notwithstanding the normal meaning of the "f.o.b." term declared in Uniform Commercial Code § 2-319, it may be found that the parties have "otherwise agreed" under that section and that B bears the risk in transit.

2. A signs a negotiable promissory note payable to B's order, and C signs his name on the back without more. Under Uniform Commercial Code § 3-402, C's signature is an indorsement, and evidence of a contrary understanding is not admissible except for the purpose of reformation of the instrument. This conclusion does not rest on interpretation of the writing.

3. A agrees to sell beer to B at a specified price per barrel. At the time of the agreement both parties and others in their trade use as standard barrels wooden barrels which originally hold 31 gallons and hold less as

Restat 2d of Contracts, § 201

they continue in use.  A statute defines a barrel as 31 1/2 gallons.  The statute does not prevent interpretation of the agreement as referring to the barrels in use.

*d. Misunderstanding*.  Subsection (2) follows the terminology of § 20, referring to the understanding of each party as the meaning "attached" by him to a term of a promise or agreement.  Where the rules stated in Subsections (1) and (2) do not apply, neither party is bound by the understanding of the other.  The result may be an entire failure of agreement or a failure to agree as to a term.  There may be a binding contract despite failure to agree as to a term, if the term is not essential or if it can be supplied.  See § 204.  In some cases a party can waive the misunderstanding and enforce the contract in accordance with the understanding of the other party.

**Illustrations:**

4.  A agrees to sell and B to buy a quantity of eviscerated "chicken." A tenders "stewing chicken" or "fowl"; B rejects on the ground that the contract calls for "broilers" or "fryers." Each party makes a claim for damages against the other.  It is found that each acted in good faith and that neither had reason to know of the difference in meaning.  Both claims fail.

5.  A orders goods from B, using A's standard form.  B acknowledges the order, using his own standard form. Each form provides that no terms are agreed to except those on the form and that the other party agrees to the form.  One form contains an arbitration clause; the other does not.  The goods are delivered and paid for.  Later a dispute arises as to their quality.  There is no agreement to arbitrate the dispute.

**REPORTER'S NOTES**

The Section covers matters treated in former §§ 227, 230-34.  The rules are entirely rewritten to follow the terminology in new § 20 on the effect of misunderstanding.  See 4 Williston, Contracts §§ 603-14 (3d ed. 1961); 3 Corbin, Contracts §§ 535-44 (1960 & Supp. 1980).  Compare former § 233(a) and (b).

*Comment a*.  See Farnsworth, "Meaning" in the Law of Contracts, 76 Yale L.J. 939 (1967) and authorities cited therein; *Della Ratta, Inc. v. American Better Comm. Devs., 38 Md. App. 119, 380 A.2d 627 (1977)*.

*Comment b*.  Holmes wrote: "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner, 245 U.S. 418, 425 (1918)*. On a party's knowledge and reason to know the meaning attached to a term by the other party, see *Perry and Wallis, Inc. v. United States, 192 Ct. Cl. 310, 427 F.2d 722 (1970)*; *Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770 (3d Cir. 1972)*.

Restat 2d of Contracts, § 201

*Comment c.* This replaces former § 234.  Illustration 1 is new; cf. *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co., 147 F.2d 399 (2d Cir.)*, cert. denied, *325 U.S. 861 (1945)*.  Illustration 2 follows the official Comment to Uniform Commercial Code § 3-402; compare Illustration 3 to former § 234.  Illustration 3 is based on *Harvard Brewing Co. v. Killian, 222 Mass. 13, 109 N.E. 649 (1915)*; compare *Wahlenmaier v. American Quasar Petroleum Co., 517 S.W.2d 390 (Tex. Civ. App. 1974)*, ref. n.r.e.

*Comment d.*  Illustration 4 is based on *Frigaliment Importing Co. v. B.N.S. Internat'l Sales Corp., 190 F. Supp. 116 (S.D.N.Y. 1960)*; see 3 Corbin, Contracts, § 543B (Supp. 1964).  Illustration 5 is based on *In re Doughboy Indus., Inc. (Pantasote Co.), 17 A.D.2d 216, 233 N.Y.S.2d 488 (1962)*.

# Cross Reference

ALR Annotations:

Modern status as to duration of employment where contract specifies no term but fixes daily or longer compensation.  *93 A.L.R.3d 659*.

Doctrine of unconscionability as applied to insurance contracts.  *86 A.L.R.3d 862*.

Validity and construction of contract between hospital and physician providing for exclusive medical services.  *74 A.L.R.3d 1268*.

Validity and construction of "No Damage" clause with respect to delay in building or construction contract.  *74 A.L.R.3d 187*.

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member.  *66 A.L.R.3d 1018*.

Validity, construction, and effect of clause in franchise contract prohibiting transfer of franchise or contract.  *59 A.L.R.3d 244*.

Construction and effect of provision in contract for sale of realty by which purchaser agrees to take property "as is" or in the condition in which it is.  *97 A.L.R.2d 849*.

Digest System Key Numbers:

Contracts 147

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 202*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations*
*>  Topic 1- The Meaning of Agreements*

## § 202 Rules in Aid of Interpretation

(1)  Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

(2)  A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

(3)  Unless a different intention is manifested,

(a)  where language has a generally prevailing meaning, it is interpreted in accordance with that meaning;

(b)  technical terms and words of art are given their technical meaning when used in a transaction within their technical field.

(4)  Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

(5)  Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Scope of special rules.* The rules in this Section are applicable to all manifestations of intention and all transactions.  The rules are general in character, and serve merely as guides in the process of interpretation.

Restat 2d of Contracts, § 202

They do not depend upon any determination that there is an ambiguity, but are used in determining what meanings are reasonably possible as well as in choosing among possible meanings.

*b. Circumstances*.  The meaning of words and other symbols commonly depends on their context; the meaning of other conduct is even more dependent on the circumstances.  In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position they occupied at the time the contract was made.  When the parties have adopted a writing as a final expression of their agreement, interpretation is directed to the meaning of that writing in the light of the circumstances.  See §§ 209, 212.  The circumstances for this purpose include the entire situation, as it appeared to the parties, and in appropriate cases may include facts known to one party of which the other had reason to know.  See § 201.

Illustrations:

1.  A contracts with B to do concrete work on a bridge, to be paid for according to "the number of square yards of concrete surface included in the bridge deck." An estimate included in the proposal for bids and an estimate submitted by A to B after award are shown to have been based on the top surface only, not including the side and bottom surfaces.  On a finding that this was the mutual understanding, the contract is to be sointerpreted.

2.  In a written agreement between A and B it is stated that B owns half of the stock of C Company, that "A has rendered valuable services to C Company for which B desires to compensate A in the sum of $ 25,000 payable in the manner hereinafter set forth," and that B will pay A "one-half of all money received from C Company, such as dividends, or profits until A has been paid the said amount of $ 25,000." It is shown that the written agreement was executed after the services were rendered, that there was no prior explicit understanding that A would be compensated, and that before signing the written agreement A and B orally agreed that the $ 25,000 was to be a "bonus out of B's profit," "double or nothing," "a gamble." The written agreement is to be interpreted in accordance with the oral agreement.

*c. Principal purpose*.  The purposes of the parties to a contract are not always identical; particularly in business transactions, the parties often have divergent or even conflicting interests.  But up to a point they commonly join in a common purpose of attaining a specific factual or legal result which each regards as necessary to the attainment of his ultimate purposes.  Moreover, one party may know or have reason to know the purpose of the other and thus that his meaning is one consistent with that purpose.  Determination that the parties have a principal purpose in common requires interpretation, but if such a purpose is disclosed further interpretation is guided by it.  Even language which is otherwise explicit may be read with a modification needed to make it consistent with such a purpose.

**Illustrations:**

3.   A promises B as follows: "In consideration of your supplying my nephew C with china and earthenware during the coming year, I guarantee the payment of any bills you may draw on him on account thereof to the amount of $ 200." C is engaged in the business of selling such goods.   B sells C $ 2,000 of china during the year and draws bills for their price in varying amounts.   C pays $ 1,000 and then defaults.   A's promise is to be interpreted as a continuing undertaking, not limited to the first $ 200 of purchases.

4.   A agrees with his divorced wife B and C, trustee, to pay to C $ 1,200 each year for the benefit of D, the 10-year-old son of A and B, until D enters college, and to pay $ 2,200 each year for the period of D's higher education but not more than four years.   At age 19 D completes high school and is inducted into the army. Upon a finding that the main purpose of the agreement is to provide for D's maintenance and education, the agreement is to be interpreted as not requiring payments during D's military service.

*d. Interpretation of the whole.*   Meaning is inevitably dependent on context.   A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.   A longer writing similarly affects the paragraph, other related writings affect the particular writing, and the circumstances affect the whole. Where the whole can be read to give significance to each part, that reading is preferred; if such a reading would be unreasonable, a choice must be made.   See § 203.   To fit the immediate verbal context or the more remote total context particular words or punctuation may be disregarded or supplied; clerical or grammatical errors may be corrected; singular may be treated as plural or plural as singular.

**Illustrations:**

5.   A written agreement between A and B for the exchange of real estate provides that A and B will each pay a $ 200 commission to C, a broker, "upon the signing of this agreement by both parties hereto." The last sentence of the agreement states, "The commission being due and payable upon the transfer of the properties." It is shown that A refused to sign the agreement until the last sentence was added.   The agreement is to be interpreted to make the commission due only when both the signing and the transfer take place.

6.   A agrees to appoint B exclusive distributor in a specified area for a new product to be manufactured by A, and B agrees to use his best efforts to promote sale of the product.   The written agreement includes an initial retail price list and a provision that A will sell to B at the lowest price and highest discount it gives to any distributor.   Whether the parties intend to be bound before any other distributor is appointed or any price fixed is a question of the meaning of the entire agreement in its context.   If they do, the agreement has the effect of an agreement to sell at a reasonable price at the time for delivery.   See Uniform Commercial Code § 2-305.

7.   A contracts in writing to build a house for B according to specifications, and C, a surety company, guarantees A's performance.  After completion and acceptance the house and its contents are damaged by hot water because of defective work by the plumbing and heating subcontractor.  In determining the responsibility of A and C, the contract, specifications and surety bond are to be read together.

*e. General usage.*  In the United States the English language is used far more often in a sense which would be generally understood throughout the country than in a sense peculiar to some locality or group.  In the absence of some contrary indication, therefore, English words are read as having the meaning given them by general usage, if there is one.  This rule is a rule of interpretation in the absence of contrary evidence, not a rule excluding contrary evidence.  It may also yield to internal indications such as inconsistency, absurdity, or departure from normal grammar, punctuation, or word order.

**Illustrations:**

8.   A issues to B a fire insurance policy covering lumber stored in "sheds." In the absence of contrary indication, lumber in the basement of a two-story warehouse is not covered.

9.   A leases restaurant premises to B.  The lease provides that A will pay for electricity and that B will "pay for gas or fuel used in the preparation of food." In the absence of contrary indication, "fuel" should be read not to include electricity.

*f. Technical terms.*  Parties to an agreement often use the vocabulary of a particular place, vocation or trade, in which new words are coined and common words are assigned new meanings.  But technical terms are often misused, and it may be shown that a technical word or phrase was used in a non-technical sense.  Moreover, the same word may have a variety of technical and other meanings.  "Mules" may mean animals, shoes or machines; a "ram" may mean an animal or a hydraulic ram; "zebra" may refer to a mammal, a butterfly, a lizard, a fish, a type of plant, tree or wood, or merely to the letter "Z".

**Illustrations:**

10.   The facts being otherwise as stated in Illustration 9, there is a local usage in the restaurant trade that "fuel" includes electricity used in cooking.  In the absence of contrary indication, "fuel" may be read in accordance with the usage.  But a provision in the lease that if B installs a new electric range he will also install a special meter and pay for electricity used by the range would show that the parties did not adopt the local usage.

11.   A contract for the sale of horsemeat scraps calls for "minimum 50% protein." As both parties know, by a usage of the business in which they are engaged, 49.5 per cent is treated as the equivalent of 50 per cent.  The contract is to be interpreted in accordance with the usage.

*g. Course of performance.* The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning. But such "practical construction" is not conclusive of meaning. Conduct must be weighed in the light of the terms of the agreement and their possible meanings. Where it is unreasonable to interpret the contract in accordance with the course of performance, the conduct of the parties may be evidence of an agreed modification or of a waiver by one party. See Uniform Commercial Code § 2-208. Or there may be simply a mistake which should be corrected. The rule of Subsection (4) does not apply to action on a single occasion or to action of one party only; in such cases the conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning, but self-serving conduct is not entitled to weight.

**Illustrations:**

12. A discloses to B a secret formula for an antiseptic liquid and B agrees to pay monthly royalties based on amounts sold. Fifty years later the formula has been published in medical journals. After continuing to pay for 25 years more, B contends that the duty to pay royalties ended when the formula ceased to be secret. B's conduct strongly negates the contention.

13. Several railroads agree in writing to share working expenses and taxes of X, another railroad, on a "wheelage basis." For several years they pay shares in proportion to their stock ownership in the other railroad. Then all but one agree that they have been mistaken and that future payments will be made on a basis of use of X's physical properties. Stock ownership is so plainly unrelated to any possible meaning of "wheelage" that the course of performance does not support an interpretation of "wheelage basis" as requiring payments in proportion to stock ownership.

*h. Preference for consistency.* Subsection (5) states a rule fairly implied in Subsections (1) and (2); words and conduct are interpreted in the light of the circumstances, and writings are interpreted as a whole. A meaning consistent with all the circumstances is preferred to a meaning which requires that part of the context be disregarded. But the parties may have agreed to displace normal meanings, may have modified a prior understanding, or may have agreed to confusing or self-contradictory terms. They may even have entirely failed to agree, though each thought there was an agreement. See §§ 20, 201.

### REPORTER'S NOTES

Former § 228 is replaced by new § 209. This Section is former § 235, rearranged to put the most general rules first, plus former § 236(a) and (b). Subsection (4), formerly § 235(e), is revised to use the terminology of Uniform Commercial Code § 2-208. See 4 Williston, Contracts §§ 618-19, 628-30 (3d ed. 1961); 3 Corbin,

Contracts §§ 542-45, 549, 552, 555, 558 (1960 & Supp. 1980); Patterson, The Interpretation and Construction of Contracts, 64 Colum. L. Rev. 833 (1964).

*Comment b.* Illustration 1 is based on *Berke Moore Co. v. Phoenix Bridge Co., 98 N.H. 261, 98 A.2d 150 (1953)*. Illustration 2 is based on *Hood v. Gordy Homes, Inc., 267 F.2d 882 (4th Cir. 1959)*.

*Comment c.* Cases seeking to ascertain the parties' purpose as an aid to interpretation include *Crestview Bowl, Inc. v. Womer Constr. Co., 225 Kan. 335, 592 P.2d 74 (1979)*; *Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969)*; and *Graziano v. Tortora Agency, Inc., 78 Misc.2d 1094, 359 N.Y.S.2d 489 (Civ. Ct. 1974)*. Illustration 3 was substantially Illustration 2 to former § 236. Illustration 4 is based on *Spaulding v. Morse, 322 Mass. 149, 76 N.E.2d 137 (1947)*.

*Comment d.* For discussions of interpretation of the whole, see *Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1130 n.31 (3d Cir. 1969)*; *Elliott Leases Cars, Inc. v. Quigley, 118 R.I. 321, 373 A.2d 810 (1977)*; *Castellano v. State, 43 N.Y.2d 909, 403 N.Y.S.2d 724, 374 N.E.2d 618 (1978)*. In the last two cases, both the majority and dissenting opinions deserve attention on this point. Illustration 5 is based on *Mealey v. Kanealy, 226 Iowa 1266, 286 N.W. 500 (1939)*; see Annot., 131 A.L.R. 955 (1941). Illustration 6 is based on *Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379, 55 A.2d 250 (Ct. Err. & App. 1947)*. Illustration 7 is based on *Paisner v. Renaud, 102 N.H. 27, 149 A.2d 867 (1959)*.

*Comment e.* Illustration 8 is based on *Easton v. Washington County Ins. Co., 391 Pa. 28, 137 A.2d 332 (1957)*. Illustration 9 is based on *John F. Davis Co. v. Shepard Co., 71 R.I. 499, 47 A.2d 635 (1946)*. See also *Wahlenmaier v. American Quasar Petroleum Co., 517 S.W.2d 390 (Tex. Civ. App. 1974)*, ref. n.r.e.

*Comment f.* Illustration 10 is based on *John F. Davis Co. v. Shepard Co., 71 R.I. 499, 47 A.2d 635 (1946)*. Illustration 11 is based on *Hurst v. W. J. Lake & Co., 141 Or. 306, 16 P.2d 627 (1932)*. See also *Robin v. Sun Oil Co., 548 F.2d 554, 558 (5th Cir. 1977)*, involving the interpretation of a settlement agreement: "Counsel in this case were competent maritime lawyers. They knew the difference between liability and negligence. They knew how to use other words if they chose to do so."

*Comment g.* See Note, Evaluating the Conduct of Successors in the Interpretation of Contract Terms: Practical Construction and Judicial Method, 57 Iowa L. Rev. 215 (1971). Illustration 12 is based on *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc., 178 F. Supp. 655 (S.D.N.Y. 1959)*, aff'd, *280 F.2d 197 (2d Cir. 1960)*. Illustration 13 is based on *In re Chicago & E.I. Ry., 94 F.2d 296 (7th Cir. 1938)*.

*Comment h.* Compare *Elliott Leases Cars, Inc. v. Quigley, 118 R.I. 321, 373 A.2d 810 (1977)* with *Western Oil Fields, Inc. v. Pennzoil United, Inc., 421 F.2d 387 (5th Cir. 1970)*.

Restat 2d of Contracts, § 202

## Cross Reference

ALR Annotations:

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member. *66 A.L.R.3d 1018*.

Validity, construction, and effect of real-estate brokers' multiple-listing agreement. *45 A.L.R.3d 190*.

Effect of provision in real-estate option or land sale contract making the contract subject to zoning or rezoning of the property. *76 A.L.R.2d 1195*.

Time specified in real-estate contract for giving notice of exercise of option to purchase as of essence. *72 A.L.R.2d 1127*.

Validity, construction, and effect of land sale contract providing that title must be satisfactory to purchaser. *47 A.L.R.2d 455*.

Digest System Key Numbers:

Contracts 143(4), 143.5, 147, 152, 169, 170

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document

Raj Patel



# [Restat 2d of Contracts, § 203](#)

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations > Topic 1- The Meaning of Agreements*

## § 203 Standards of Preference in Interpretation

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

(a)  an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;

(b)  express terms are given greater weight than course of performance, course of dealing, and usage of trade, course of performance is given greater weight than course of dealing or usage of trade, and course of dealing is given greater weight than usage of trade;

(c)  specific terms and exact terms are given greater weight than general language;

(d)  separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Scope.* The rules of this Section are applicable to all manifestations of intention and all transactions. They apply only in choosing among reasonable interpretations. They do not override evidence of the meaning of the parties, but aid in determining meaning or prescribe legal effect when meaning is in doubt.

*b. Superfluous terms.* Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous. The parties may of course agree to supersede prior manifestations of intention; indeed, this is the normal effect of an integrated agreement. See § 213. But, particularly in cases of integrated agreements, terms are rarely agreed to without reason. Where an integrated agreement has been negotiated

Restat 2d of Contracts, § 203

with care and in detail and has been expertly drafted for the particular transaction, an interpretation is very strongly negated if it would render some provisions superfluous.  On the other hand, a standard form may include provisions appropriate only to some of the transactions in which the form is to be used; or the form may be used for an inappropriate transaction.  Even agreements tailored to particular transactions sometimes include overlapping or redundant or meaningless provisions.

The preference for an interpretation which gives meaning to every part of an agreement does not mean that every part is assumed to have legal consequences.  Parties commonly direct their attention to performance rather than breach, and it is enough that each provision has meaning to them as a guide to performance.  Stipulations against particular legal consequences are not uncommon.  Thus it is not unusual to define the intended performance with precision and then to provide for tolerances within which variation is permitted.  See Uniform Commercial Code § 2-508(2).

c.  *Unreasonable and unlawful terms*.  In the absence of contrary indication, it is assumed that each term of an agreement has a reasonable rather than an unreasonable meaning, and that the agreement is intended to be lawful rather than unconscionable, fraudulent or otherwise illegal.  But parties are free to make agreements which seem unreasonable to others, and circumstances may show that even an agreement innocent on its face has an illegal purpose.  The search is for the manifested intention of the parties.  If a term or a contract is unconscionable or otherwise against public policy, it should be dealt with directly rather than by spurious interpretation.  See § 208 and Uniform Commercial Code § 2-302 and Comment.

**Illustration:**

1.  A licenses B to manufacture pipes under A's patents, and B agrees to pay "a royalty of 50 cents per 1,000 feet for an output of 5,000,000 or less feet per year, and for an output of over 5,000,000 feet per year at the rate of 30 cents per thousand feet." The 50 cent rate is payable on the first 5,000,000 feet, the 30 cent rate only on the excess.  The more literal reading is unreasonable, since it would involve a smaller payment for 6,000,000 feet than for 4,000,000 feet.

d.  *Priority of express terms*.  Just as parties to agreements often depart from general usage as to the meaning of words or other conduct, so they may depart from a usage of trade.  Similarly, they may change a pattern established by their own prior course of dealing.  Their meaning in such cases is ordinarily to be ascertained as a fact; no penalty is attached by the law of contracts to their failure to conform to the usages of others or to their own prior usage.  Course of performance may establish meaning, or it may show mistake or oversight or

modification or waiver.   See § 202.   The priorities stated in Subsection (b) are those stated in Uniform Commercial Code §§ 1-205 and 2-208, rephrased to fit the different context of the Restatement.

*e. General and specific terms.* People commonly use general language without a clear consciousness of its full scope and without awareness that an exception should be made.   Attention and understanding are likely to be in better focus when language is specific or exact, and in case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language.   If the specific or exact can be read as an exception or qualification of the general, both are given some effect, in accordance with the rule stated in Subsection (a).   Compare Uniform Commercial Code § 2-317.   But the rule yields to manifestation of a contrary intention.

*f. Superseded standard terms.* The rule stated in Subsection (d) has frequent application in cases of standardized documents.   Printed forms are often misused, and there may be a question whether the parties manifested assent to a printed term on a writing.   A printed provision that is clearly part of an integrated contract is normally to be interpreted as consistent with other terms, but in cases of inconsistency a handwritten or typewritten term inserted in connection with the particular transaction ordinarily prevails.   Similarly, a typewritten term may be superseded by drawing a line through it, modified by interlineation, or controlled by an inconsistent handwritten insertion in another part of the agreement.   It is sometimes said generally that handwritten terms control typewritten and printed terms, and typewritten control printed.   See Uniform Commercial Code § 3-118(b); compare § 2-316(1) (disclaimer of express warranty), § 3-110(3) (instrument payable both to order and to bearer).   But the rule yields to manifestation of a contrary intention.

**Illustrations:**

2.   A, an agent of C, authorized to make contracts for C, writes a letter to B beginning "We offer," and stating a proposal in detailed and clear language, signed "C by A, Agent." At the bottom of the office stationery which A uses for the offer there is printed "All contracts and orders taken are subject to the approval of the executive office." A portion of the letter is typed over a portion of this printing.   A jury's finding that the printed words were not part of the letter and that it is therefore an offer will not be set aside.

3.   A charter party contains the printed provision "vessel to have turn in loading." There is written below this, "vessel to be loaded promptly." The printed and written provisions are given the consistent meaning that the vessel shall take its turn in loading, though this involves considerable delay, but when its turn arrives, the vessel shall be loaded promptly.

4.  A's agent B draws checks on the C bank, imprinting the amounts with perforations made by a checkwriting machine.  The amounts are also handwritten in figures.  In case of conflict, since the perforated amounts are more difficult to alter, they control the handwritten figures.  See Uniform Commercial Code § 3-118(b), (c).

### REPORTER'S NOTES

This Section is based on former § 236, but former Subsections (a) and (b) are transferred to § 202 and former Subsections (d) and (f) to §§ 206 and 207.  The other Subsections are rearranged.  Subsection (b) is new; it conforms to Uniform Commercial Code §§ 1-205, 2-208.  See 4 Williston, Contracts §§ 615-26 (3d ed. 1961); 3 Corbin, Contracts §§ 546-52, 559 (1960 & Supp. 1980); Patterson, The Interpretation and Construction of Contracts, 64 Colum. L. Rev. 833 (1964).

*Comment b*.  See *Intertherm, Inc. v. Coronet Imperial Corp., 558 S.W.2d 344, 351-52 (Mo. Ct. App. 1977)*.

*Comment c*.  Many courts have said that the construction process should seek a reading that leads to a reasonable result.  See, e.g., *Crestview Bowl, Inc. v. Womer Constr. Co., 225 Kan. 335, 592 P.2d 74 (1979)*; *Goddard v. South Bay Union High School Dist., 79 Cal. App.3d 98, 144 Cal. Rptr. 701 (1978)*; *Intertherm, Inc. v. Coronet Imperial Corp., supra.* Nonetheless, the real question is one of the intentions of the parties.  See *Perry and Wallis, Inc. v. United States, 192 Ct. Cl. 310, 427 F.2d 722 (1970)*; *Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969)*; compare the majority and dissenting opinions in *Pokorny v. Pecsok, 50 Ohio St.2d 260, 364 N.E.2d 241 (1977)* (dissent citing this Section in Tentative Draft).  Illustration 1 is based on Illustration 1 to former § 236.

*Comment d*.  For an example of express terms prevailing over custom of the trade, see *Citizens Nat'l Bank v. L. L. Glascock, Inc., 243 So.2d 67 (Miss. 1971)*.

*Comment e*.  On the general standard that specific clauses should prevail over general ones, see *Western Oil Fields, Inc. v. Pennzoil United, Inc., 421 F.2d 387 (5th Cir. 1970)*.  That this standard must yield when inappropriate under the particular circumstances, see *Elliott Leases Cars, Inc. v. Quigley, 118 R.I. 321, 373 A.2d 810 (1977)*; contrast the reading of the dissenting opinion in that case, which cites § 202 and this Section in Tentative Draft.

*Comment f*.  See *Roylex, Inc. v. Avco Commun. Devs., Inc., 559 S.W.2d 833 (Tex. Civ. App. 1977)*, which finds the general rule that handwriting prevails over typewriting inapplicable under the circumstances shown by testimony.  Illustrations 2 and 3 were Illustrations 4 and 5 to former § 236.  Illustration 4 is based on *United States Fidelity & Guar. Co. v. First Nat'l Bank, 244 S.C. 436, 137 S.E.2d 582 (1964)*.

Restat 2d of Contracts, § 203

## Cross Reference

ALR Annotations:

Validity, construction, and effect of land sale contract providing that title must be satisfactory to purchaser. *47 A.L.R.2d 455*.

Digest System Key Numbers:

Contracts 152, 154, 156, 163

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Raj Patel



*Restat 2d of Contracts, § 204*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations*
*>  Topic 1- The Meaning of Agreements*

## § 204 Supplying an Omitted Essential Term

When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

**COMMENTS & ILLUSTRATIONS**

Comment:

*a. Scope; relation to other rules.* This Section states a principle governing the legal effect of a binding agreement.  The supplying of an omitted term is not technically interpretation, but the two are closely related; courts often speak of an "implied" term.  In many common situations the principle has been elaborated in more detailed rules, applicable unless otherwise agreed.  See the rules on the effect of failure of performance stated in §§ 231-49 and the rules on impossibility and frustration stated in Chapter 11, and compare §§ 158 and 272, regarding the supplying of terms in cases of mistake and impracticability or frustration.  A similar principle is often applicable in determining whether the terms of an agreement are sufficiently certain to constitute a contract.  See §§ 33, 34.  In both situations the supplying of an omitted term may resemble or overlap interpretation (see § 200) or the effect given to usage (see §§ 219-23).

*b. How omission occurs.* The parties to an agreement may entirely fail to foresee the situation which later arises and gives rise to a dispute; they then have no expectations with respect to that situation, and a search for their meaning with respect to it is fruitless.  Or they may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse.

Restat 2d of Contracts, § 204

*c. Interpretation and omission.* Interpretation may be necessary to determine that the parties have not agreed with respect to a particular term, but the supplying of an omitted term is not within the definition of interpretation in § 200. Where there is tacit agreement or a common tacit assumption or where a term can be supplied by logical deduction from agreed terms and the circumstances, interpretation may be enough. But interpretation may result in the conclusion that there was in fact no agreement on a particular point, and that conclusion should be accepted even though the omitted term could be supplied by giving agreed language a meaning different from the meaning or meanings given it by the parties.

*d. Supplying a term.* The process of supplying an omitted term has sometimes been disguised as a literal or a purposive reading of contract language directed to a situation other than the situation that arises. Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process. Thus where a contract calls for a single performance such as the rendering of a service or the delivery of goods, the parties are most unlikely to agree explicitly that performance will be rendered within a "reasonable time;" but if no time is specified, a term calling for performance within a reasonable time is supplied. See Uniform Commercial Code §§ 1-204, 2-309(1). Similarly, where there is a contract for the sale of goods but nothing is said as to price the price is a reasonable price at the time for delivery. See Uniform Commercial Code § 2-305.

*e. Effect of the parol evidence rule.* The fact that an essential term is omitted may indicate that the agreement is not integrated or that there is partial rather than complete integration. In such cases the omitted term may be supplied by prior negotiations or a prior agreement. See § 216. But omission of a term does not show conclusively that integration was not complete and a completely integrated agreement, if binding, discharges prior agreements within its scope. See § 213. Where there is complete integration and interpretation of the writing discloses a failure to agree on an essential term, evidence of prior negotiations or agreements is not admissible to supply the omitted term, but such evidence may be admissible, if relevant, on the question of what is reasonable in the circumstances.

**Illustration:**

1. A and his wife convey their ranch to A's sister and her husband, reserving an option to repurchase. The parties agree orally that the property will be kept in the family, but the deed says nothing as to assignment of

the option.  If the deed is found to be a partial integration, the oral agreement is effective to show that the option is not assignable.  If the deed is found to be a complete integration, the oral agreement is discharged and the option is assignable.

### REPORTER'S NOTES

This Section is new.  See 3 Corbin, Contracts §§ 561-72A (1960 & Supp. 1980); 4 Williston, Contracts §§ 600-610B, 614-15, 640 (3d ed. 1961); Farnsworth, Disputes Over Omissions in Contracts, 68 Colum. L. Rev. 860 (1968).

*Comment a.*  For a discussion of the duty of good faith and fair dealing, see § 205.  For its relation to the court's power to supply omitted terms, and application of these concepts to different parts ofa contract with differing results, see *Snyder v. Howard Johnson's Motor Lodges, Inc., 412 F. Supp. 724 (S.D. Ill. 1976)*. In *Chemetron Corp. v. McLouth Steel Corp., 522 F.2d 469 (7th Cir. 1975)*, the court, from the ungrammatical language of a provision, concluded that the draftsman had inadvertently omitted either "and" or "or." Compare § 158.

*Comment d.*  Examples of courts adding a reasonable time requirement to contracts silent on the point include *Haines v. City of New York, 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820 (1977)* (long-term maintenance of a sewer system; cites this Section in Tentative Draft); and *Houston County v. Leo L. Landauer & Assoc., 424 S.W.2d 458 (Tex. Civ. App. 1968)*, ref. n.r.e. (time for performance under a contract).  In *Southern Bell Tel. & Tel. Co. v. Florida E. Coast Ry. Co., 399 F.2d 854 (5th Cir. 1968)*, 47 N.C. L. Rev. 710 (1969), a power to place telephone and telegraph lines over and under railroad tracks, duration of which was unspecified, was held subject to termination upon reasonable notice.  The power had already been in existence for more than fifty years.  As to a court's power to find an omitted term limiting restrictive employment agreements to a reasonable time or area, compare *Toch v. Eric Schuster Corp., 490 S.W.2d 618 (Tex. Civ. App. 1972)*, ref. n.r.e., with *Haines v. City of New York, supra* (dictum).  In *Snyder v. Howard Johnson's Motor Lodges, Inc., supra*, the court refused to find an implied covenant not to compete, but found an implied covenant that a restaurant would be operated in a manner consistent with others operated by the defendants.  For an example of a court refusing to supply an allegedly omitted term, see *Hinckley v. Bechtel Corp., 41 Cal. App.3d 206, 116 Cal. Rptr. 33 (1974)*.

*Comment e.*  On the interplay with the parol evidence rule see *Snyder v. Howard Johnson's Motor Lodges, Inc., supra*. Illustration 1 is based on *Masterson v. Sine, 68 Cal.2d 222, 65 Cal. Rptr. 545, 436 P.2d 561 (1968)*.

## Cross Reference

ALR Annotations:

Admissibility of extrinsic evidence to identify person or persons intended to be designated by the name in which a contract is made.  *80 A.L.R.2d 1137*.

Implied obligation of purchaser or lessee to conduct search for, or to develop or work premises for, minerals other than oil and gas.  *76 A.L.R.2d 721*.

Sale of business or of real estate upon which business is conducted as transferring good will by implication, in absence of covenant not to compete.  *65 A.L.R.2d 502*.

Effect of failure of contract for sale or exchange of real estate to specify time for giving of possession.  *56 A.L.R.2d 1272*.

Place, in absence of written provision in sales contract, where cash consideration for goods purchased is payable.  *49 A.L.R.2d 1350*.

Implied covenant in lease for business purposes, that lessor will not compete in business activity for conducting of which lessee leased the premises.  *22 A.L.R.2d 1466*.

Digest System Key Numbers:

Contracts 152

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document

Raj Patel



*Restat 2d of Contracts, § 205*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations  >  Topic 2- Considerations of Fairness and the Public Interest*

## § 205 Duty of Good Faith and Fair Dealing

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

### COMMENTS & ILLUSTRATIONS

Comment:

*a.  Meanings of "good faith."*  Good faith is defined in Uniform Commercial Code § 1-201(19) as "honesty in fact in the conduct or transaction concerned." "In the case of a merchant" Uniform Commercial Code § 2-103(1)(b) provides that good faith means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context.  Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.  The appropriate remedy for a breach of the duty of good faith also varies with the circumstances.

*b.  Good faith purchase.*  In many situations a good faith purchaser of property for value can acquire better rights in the property than his transferor had.  See, e.g., § 342.  In this context "good faith" focuses on the honesty of the purchaser, as distinguished from his care or negligence.  Particularly in the law of negotiable instruments inquiry may be limited to "good faith" under what has been called "the rule of the pure heart and the empty head." When diligence or inquiry is a condition of the purchaser's right, it is said that good faith is not enough.  This focus on honesty is appropriate to cases of good faith purchase; it is less so in cases of good faith performance.

*c. Good faith in negotiation.* This Section, like Uniform Commercial Code § 1-203, does not deal with good faith in the formation of a contract. Bad faith in negotiation, although not within the scope of this Section, may be subject to sanctions. Particular forms of bad faith in bargaining are the subjects of rules as to capacity to contract, mutual assent and consideration and of rules as to invalidating causes such as fraud and duress. See, for example, §§ 90 and 208. Moreover, remedies for bad faith in the absence of agreement are found in the law of torts or restitution. For examples of a statutory duty to bargain in good faith, see, e.g., National Labor Relations Act § 8(d) and the federal Truth in Lending Act. In cases of negotiation for modification of an existing contractual relationship, the rule stated in this Section may overlap with more specific rules requiring negotiation in good faith. See §§ 73, 89; Uniform Commercial Code § 2-209 and Comment.

*d. Good faith performance.* Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, butthe following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

**Illustrations:**

1. A, an oil dealer, borrows $ 100,000 from B, a supplier, and agrees to buy all his requirements of certain oil products from B on stated terms until the debt is repaid. Before the debt is repaid, A makes a new arrangement with C, a competitor of B. Under the new arrangement A's business is conducted by a corporation formed and owned by A and C and managed by A, and the corporation buys all its oil products from C. The new arrangement may be found to be a subterfuge or evasion and a breach of contract by A.

2. A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, the rent to be a percentage of B's gross receipts. During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket. Unless such action was contemplated or is otherwise justified, there is a breach of contract by A.

3. A Insurance Company insures B against legal liability for certain bodily injuries to third persons, with a limit of liability of $ 10,000 for an accident to any one person. The policy provides that A will defend any suit covered by it but may settle. C sues B on a claim covered by the policy and offers to settle for $ 9,500. A refuses to settle on the ground that the amount is excessive, and judgment is rendered against B for $ 20,000

after a trial defended by A.  A then refuses to appeal, and offers to pay $ 10,000 only if B satisfies the judgment, impairing B's opportunity to negotiate for settlement.  B prosecutes an appeal, reasonably expending $ 7,500, and obtains dismissal of the claim.  A has failed to deal fairly and in good faith with B and is liable for B's appeal expense.

4.  A and B contract that A will perform certain demolition work for B and pay B a specified sum for materials salvaged, the contract not to "become effective until" certain insurance policies "are in full force and effect."  A makes a good faith effort to obtain the insurance, but financial difficulty arising from injury to an employee of A on another job prevents A from obtaining them.  A's duty to perform is discharged.

5.  B submits and A accepts a bid to supply approximately 4000 tons of trap rock for an airport at a unit price.  The parties execute a standard form of "Invitation, Bid, and Acceptance (Short Form Contract)" supplied by A, including typed terms "to be delivered to project as required," "delivery to start immediately," "cancellation by A may be effected at any time."  Good faith requires that A order and accept the rock within a reasonable time unless A has given B notice of intent to cancel.

6.  A contracts to perform services for B for such compensation "as you, in your sole judgment, may decide is reasonable."  After A has performed the services, B refuses to make any determination of the value of the services.  A is entitled to their value as determined by a court.

7.  A suffers a loss of property covered by an insurance policy issued by B, and submits to B notice and proof of loss.  The notice and proof fail to comply with requirements of the policy as to form and detail.  B does not point out the defects, but remains silent and evasive, telling A broadly toperfect his claim.  The defects do not bar recovery on the policy.

*e.  Good faith in enforcement*.  The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses.  See, e.g., §§ 73, 89.  The obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts.  It also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason.  See Uniform Commercial Code § 2-209, Comment 2.  Other types of violation have been recognized in judicial decisions: harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract.  For a statutory duty of good faith in termination, see the federal Automobile Dealer's Day in Court Act, *15 U.S.C. §§ 1221-25* (1976).

**Illustrations:**

8.  A contracts to sell and ship goods to B on credit.  The contract provides that, if B's credit or financial responsibility becomes impaired or unsatisfactory to A, A may demand cash or security before making shipment and may cancel if the demand is not met.  A may properly demand cash or security only if he honestly believes, with reason, that the prospect of payment is impaired.

9.  A contracts to sell and ship goods to B.  On arrival B rejects the goods on the erroneous ground that delivery was late.  B is thereafter precluded from asserting other unstated grounds then known to him which A could have cured if stated seasonably.

### REPORTER'S NOTES

This Section is new.  See Farnsworth, Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code, 30 U. Chi. L. Rev. 666 (1963); Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195 (1968); 3A Corbin, Contracts §§ 654A-I (Supp. 1980).  As to the development of "good faith" in German law, see Dawson, The Oracles of the Law 461-502 (1968).

For an important discussion of the concept, see *Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977)*, applying it to an employment contract terminable at will.  In *VTR, Inc. v. Goodyear Tire & Rubber Co., 303 F. Supp. 773 (S.D.N.Y. 1969)*, it was held that particular conduct that would have been barred by the duty of good faith could be expressly consented to in the contract.  Some of the limits of the duty are discussed in *Sessions, Inc. v. Morton, 491 F.2d 854 (9th Cir. 1974)*; see also *Commercial Contractors, Inc. v. United States F. & G. Co., 524 F.2d 944 (5th Cir. 1975)* (discussing good faith, custom of trade and a general contractor's lack of duty to help a subcontractor keep his work force intact when another subcontractor offers higher wages).

*Comment b.*  See Gilmore, The Commercial Doctrine of Good Faith Purchase, 63 Yale L. J. 1057 (1954).

*Comment c.*  See Kessler & Fine, Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study, 77 Harv. L. Rev. 401 (1964); Cox, The Duty to Bargain in Good Faith, 71 Harv. L. Rev. 1401 (1958); Summers, Collective Agreements and the Law of Contracts, 78 Yale L.J. 525 (1969).

*Comment d.*  Illustration 1 is based on *Western Oil & Fuel Co. v. Kemp, 245 F.2d 633 (8th Cir. 1957)*; cf. *Fort Wayne Corrugated Paper Co.v. Anchor Hocking Glass Corp., 130 F.2d 471 (3d Cir. 1942)*; Uniform Commercial Code § 2-306(1).  Illustration 2 is based on *Daitch Crystal Dairies, Inc. v. Neisloss, 8 A.D.2d 965, 190 N.Y.S.2d 737 (1959)*, aff'd mem., *8 N.Y.2d 723, 201 N.Y.S.2d 101, 167 N.E.2d 643 (1960)*; *Carter v. Adler, 138 Cal.*

Raj Patel

Restat 2d of Contracts, § 205

App.2d 63, 291 P.2d 111 (1955); see Annots., 170 A.L.R. 1113 (1947), 38 A.L.R.2d 1113 (1954); cf. Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 200 A.2d 166 (1964) (good faith of lessee); Uniform Commercial Code § 2-306(2) (obligation to use best efforts in cases of exclusive dealing in goods); Bloor v. Falstaff Brewing Corp., 601 F.2d 609 (2d Cir. 1979) (discussion of scope of "best efforts"); Riess v. Murchison, 503 F.2d 999 (9th Cir. 1974), cert. denied, 420 U.S. 993 (1975) (buyers of land required by implied obligation of good faith to produce, save and sell water on which sellers' adjoining lands were dependant); Center Garment Co. v. United Refrig. Co., 369 Mass. 633, 341 N.E.2d 669 (1976) (franchisor required to make at least some effort to find supplies for franchisee when previous source was cut off).  Compare Sessions, Inc. v. Morton, 491 F.2d 854 (9th Cir. 1974) (no implied obligation on lessors to agree to dedicate significant portion of land to public use even though dedication might be necessary to permit lessee to develop land).  Illustration 3 is based on Brassil v. Maryland Cas. Co., 210 N.Y. 235, 104 N.E. 622 (1914); see Annot., 69 A.L.R.2d 690 (1960); cf. Annot., 40 A.L.R.2d 168 (1955) (insurer's duty to settle); Keeton, Ancillary Rights of the Insured Against His Liability Insurer, 13 Vand. L. Rev. 837 (1960); Spindle v. Travelers Ins. Cos., 66 Cal. App.3d 951, 136 Cal. Rptr. 404 (1977), discussed below in connection with Comment e.  Illustration 4 is based on Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 912 (8th Cir. 1964). Illustration 5 is based on Sylvan Crest Sand & Gravel Co. v. United States, 150 F.2d 642 (2d Cir. 1945); cf. Uniform Commercial Code § 2-309(3).  Illustration 6 is based on Pillois v. Billingsley, 179 F.2d 205 (2d Cir. 1950); see also In re Estate of Hollingsworth, 88 Wash.2d 322, 560 P.2d 348 (1977); cf. California Lettuce Growers, Inc. v. Union Sugar Co., 45 Cal.2d 474, 484, 289 P.2d 785, 791 (1955) (power to fix price of goods); Uniform Commercial Code § 2-305(2) (same).  Illustration 7 is based on Johnson v. Scottish Union Ins. Co., 160 Tenn. 152, 22 S.W.2d 362 (1962); cf. Uniform Commercial Code § 2-311 (cooperation in sale of goods).

Comment e.  See Kessler & Brenner, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135 (1957). Several courts have found that an express power to terminate a contract at will was modified by a duty of good faith.  See, e.g., Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977) (salesman's employment contract); Spindle v. Travelers Ins. Cos., 66 Cal. App.3d 951, 136 Cal. Rptr. 404 (1977), 26 Drake L. Rev. 883 (1976-77) (termination of physician's malpractice insurance allegedly as part of scheme to intimidate the profession to accept higher premiums; court analogized from the insurer's duty to settle claims in good faith, see Illustration 3, supra); L'Orange v. Medical Protective Co., 394 F.2d 57 (6th Cir. 1968) (termination of dentist's malpractice insurance as retaliation because he testified against other dentist insured by same carrier); Shell Oil Co. v. Marinello, 63 N.J. 402, 307 A.2d 598 (1973), cert. denied, 415 U.S.

*920 (1974)* (termination of service station franchise; court reasoned both from dominant position of franchisor and from Legislature's enactment of franchising statute not applicable to particular transaction).  Illustration 8 is based on *James B.  Berry's Sons Co. v. Monark Gasoline & Oil Co., 32 F.2d 74 (8th Cir. 1929)*; cf. Uniform Commercial Code §§ 1-208, 2-609.  Illustration 9 is based on *Fielding v. Robertson, 141 Va. 123, 126 S.E. 231 (1925)*; cf. § 248; Uniform Commercial Code § 2-605(1)(a).

## Cross Reference

ALR Annotations:

Modern status as to duration of employment where contract specifies no term but fixes daily or longer compensation.  *93 A.L.R.3d 659*.

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member.  *66 A.L.R.3d 1018*.

Who is "employee" under employee stock-option plan or contract.  *57 A.L.R.3d 787*.

Validity and construction of restrictive covenant not to compete ancillary to franchise agreement.  *50 A.L.R.3d 746*.

"Unconscionability" as ground for refusing enforcement of contract for sale of goods or agreement collateral thereto.  *18 A.L.R.3d 1305*.

Necessity and sufficiency of allegation, in a suit for specific performance of a contract for the sale of land, as to the adequacy of the consideration or as to the fairness of the contract.  *100 A.L.R.2d 551*.

Construction and effect of agreement relating to salary of partners.  *66 A.L.R.2d 1023*.

"Escalator" price adjustment clauses.  *63 A.L.R.2d 1337*.

Validity and effect of agreement controlling the vote of corporate stock.  *45 A.L.R.2d 799*.

Validity, construction and effect of contract, option, or provision for repurchase by vendor.  *44 A.L.R.2d 342*.

Contract by seller of business not to compete as affecting his lease of other property in restricted area to one who he knows will compete with purchaser.  *14 A.L.R.2d 1333*.

Digest System Key Numbers:

Contracts 168

Restatement of the Law, Second, Contracts

Restat 2d of Contracts, § 205

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 206*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations > Topic 2- Considerations of Fairness and the Public Interest*

## § 206 Interpretation Against the Draftsman

In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.

### COMMENTS & ILLUSTRATIONS

Comment:

*a. Rationale*. Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party. The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases. It is in strictness a rule of legal effect, sometimes called construction, as well as interpretation: its operation depends on the positions of the parties as they appear in litigation, and sometimes the result is hard to distinguish from a denial of effect to an unconscionable clause.

*b. Compulsory contract or term*. The rule that language is interpreted against the party who chose it has no direct application to cases where the language is prescribed by law, as is sometimes true with respect to insurance policies, bills of lading and other standardized documents. In some cases, however, the statute or regulation adopts language which was previously used without compulsion and was interpreted against the drafting party, and there is normally no intention to change the established meaning. Moreover, insurers are more likely than insureds to participate in drafting prescribed forms and to review them carefully before putting them into use.

Restat 2d of Contracts, § 206

**REPORTER'S NOTES**

This Section carries forward the substance of former § 236(d).  See 3 Corbin, Contracts § 559 (1960 & Supp. 1980); 4 Williston, Contracts § 621 (3d ed. 1961).

*Comment a*.  On the general rule, see, e.g., *Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1206-07 (2d Cir. 1970)*, quoting from this Comment in Tentative Draft; *Goddard v. South Bay Union High School Dist., 79 Cal. App.3d 98, 144 Cal. Rptr. 701 (1978)*; *Pappas v. Bever, 219 N.W.2d 720 (Iowa 1974)*. That it has less force when the other party has taken an active role in the drafting process, or is particularly knowledgeable, see *Centennial Ent., Inc. v. Mansfield Dev. Co., 568 P.2d 50 (Colo. 1977)*; *Crestview Bowl, Inc. v. Womer Constr. Co., 225 Kan. 335, 592 P.2d 74 (1979)*; *Graziano v. Tortora Agency, Inc., 78 Misc.2d 1094, 359 N.Y.S.2d 489 (Civ. Ct. 1974)*. As the text of the Section makes clear, the rule does not apply if the non-drafting party's interpretation is unreasonable.  See *Intertherm, Inc. v. Coronet Imp. Corp., 558 S.W.2d 344 (Mo. Ct. App. 1977)*, quoting from this Comment in Tentative Draft; *Perry and Wallis, Inc. v. United States, 192 Ct. Cl. 310, 427 F.2d 722 (1970)*. Nonetheless, one may doubt that the rule is "the last one to be resorted to, and never to be applied except when other rules of interpretation fail," *Quad Constr., Inc. v. Wm. A. Smith Contr. Co., 534 F.2d 1391 (10th Cir. 1976)*, quoting (in a diversity case) from *Patterson v. Gage, 11 Colo. 50, 16 P. 560 (1888)*.

*Comment b*.  The substance of this Comment was contained in former § 236(d) as a qualification of the general rule concerning terms prescribed by law.

## Cross Reference

ALR Annotations:

Modern status as to duration of employment where contract specifies no term but fixes daily or longer compensation.  *93 A.L.R.3d 659*.

Doctrine of unconscionability as applied to insurance contracts.  *86 A.L.R.3d 862*.

Validity and construction of "No Damage" clause with respect to delay in building or construction contract.  *74 A.L.R.3d 187*.

Landlord and tenant: What amounts to "sale" of property for purposes of provision giving tenant right of first refusal if landlord desires to sell.  *70 A.L.R.3d 203*.

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member.  *66 A.L.R.3d 1018*.

Restat 2d of Contracts, § 206

Validity, construction, and effect of clause in franchise contract prohibiting transfer of franchise or contract. *59 A.L.R.3d 244*.

Who is "employee" under employee stock-option plan or contract. *57 A.L.R.3d 787*.

Validity and construction of restrictive covenant not to compete ancillary to franchise agreement. *50 A.L.R.3d 746*.

Digest System Key Numbers:

Contracts 155

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 207*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 9- The Scope of Contractual Obligations*
*>  Topic 2- Considerations of Fairness and the Public Interest*

## § 207 Interpretation Favoring the Public

In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.

### COMMENTS & ILLUSTRATIONS

Comment:

*a. Scope.* The rule preferring an interpretation which favors an interest of the public applies only to agreements which affect a public interest.  It is a rule of legal effect as well as interpretation, and rests more on considerations of public policy than on the probable intention of the parties.  It has often been relied on to justify narrow construction of a grant of a public franchise or an agreement for a tax exemption.  In general, it does not prefer the interest of a governmental agency as a party to a contract; government contracts are likely to be construed against the government as the drafting party.

Illustration:

1.  A is employed by B as an inventor.  In an agreement settling their disputes on termination of the employment, A promises to assign to B all A's rights in a pending patent application and all improvements on the invention covered.  Thereafter A makes an invention and applies for a patent, and B claims it as an improvement.  The public interest in encouraging invention supports an interpretation of the agreement excluding future improvements unless future improvements were specifically included.

### REPORTER'S NOTES

This Section carries forward the substance of former § 236(f).  See 3 Corbin, Contracts § 550 (1962); 4 Williston, Contracts § 626 (3d ed. 1961).

Restat 2d of Contracts, § 207

*Comment a.* Illustration 1 is based on *De Long Corp. v. Lucas, 176 F. Supp. 104 (S.D.N.Y. 1959)*, aff'd, *278 F.2d 804 (2d Cir.)*, cert. denied, *364 U.S. 833 (1960)*; cf. *Loblaw, Inc. v. Warren Plaza, Inc., 163 Ohio St. 581, 127 N.E.2d 754 (1955)* (lessor's covenant against competition with lessee). See also *Houk v. Ross, 34 Ohio St.2d 77, 296 N.E.2d 266 (1973)* (construction favored that least restricts the free use of land).

## Cross Reference

ALR Annotations:

Construction and application of agreement by medical or social work student to work in particular position or at particular location in exchange for financial aid in meeting costs of education. *83 A.L.R.3d 1273*.

Validity and construction of contract between hospital and physician providing for exclusive medical services. *74 A.L.R.3d 1268*.

Validity and construction of "No Damage" clause with respect to delay in building or construction contract. *74 A.L.R.3d 187*.

Landlord and tenant: What amounts to "sale" of property for purposes of provision giving tenant right of first refusal if landlord desires to sell. *70 A.L.R.3d 203*.

Validity and construction of contract exempting agricultural fair or similar bailee from liability for articles delivered for exhibition. *69 A.L.R.3d 1025*.

Validity and construction of provision (Escalator Clause) in land contract or mortgage that rate of interest payable shall increase if legal rate is raised. *60 A.L.R.3d 473*.

Construction and operation of "Equal Opportunities Clause" requiring pledge against racial discrimination in hiring under construction contract. *44 A.L.R.3d 1283*.

Validity and construction of contract under which applicant for admission to home for aged or infirm turns over his property to institution in return for lifetime care. *44 A.L.R.3d 1174*.

Validity and construction of putative father's promise to support or provide for illegitimate child. *20 A.L.R.3d 500*.

"Escalator" price adjustment clauses. *63 A.L.R.2d 1337*.

Special requirements of consumer as giving rise to implied contract by public utility to furnish particular amount of electricity, gas, or water. *13 A.L.R.2d 1233*.

Restat 2d of Contracts, § 207

Digest System Key Numbers:

Contracts 143

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 208*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 9- The Scope of Contractual Obligations > Topic 2- Considerations of Fairness and the Public Interest*

## § 208 Unconscionable Contract or Term

If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

### COMMENTS & ILLUSTRATIONS

Comment:

*a. Scope*. Like the obligation of good faith and fair dealing (§ 205), the policy against unconscionable contracts or terms applies to a wide variety of types of conduct. The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy. Policing against unconscionable contracts or terms has sometimes been accomplished "by adverse construction of language, by manipulation of the rules of offer and acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract." Uniform Commercial Code § 2-302 Comment 1. Particularly in the case of standardized agreements, the rule of this Section permits the court to pass directly on the unconscionability of the contract or clause rather than to avoid unconscionable results by interpretation. Compare § 211.

*b. Historic standards*. Traditionally, a bargain was said to be unconscionable in an action at law if it was "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other;" damages were then limited to those to which the aggrieved party was "equitably" entitled. *Hume v. United States, 132 U.S. 406 (1889)*, quoting Earl of Chesterfield v. Janssen, 2 Ves. Sen. 125, 155, 28 Eng. Rep. 82, 100 (Ch. 1750). Even though a contract was fully enforceable in an action for damages,

equitable remedies such as specific performance were refused where "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." *Campbell Soup Co. v. Wentz, 172 F.2d 80, 84 (3d Cir. 1948)*. Modern procedural reforms have blurred the distinction between remedies at law and in equity. For contracts for the sale of goods, Uniform Commercial Code § 2-302 states the rule of this Section without distinction between law and equity. Comment 1 to that section adds, "The principle is one of the prevention of oppression and unfair surprise (Cf. Campbell Soup Co. v. Wentz, . . .) and not of disturbance of allocation of risks because of superior bargaining power."

*c. Overall imbalance*. Inadequacy of consideration does not of itself invalidate a bargain, but gross disparity in the values exchanged may be an important factor in a determination that a contract is unconscionable and may be sufficient ground, without more, for denying specific performance. See §§ 79, 364. Such a disparity may also corroborate indications of defects in the bargaining process, or may affect the remedy to be granted when there is a violation of a more specific rule. Theoretically it is possible for a contract to be oppressive taken as a whole, even though there is no weakness in the bargaining process and no single term which is in itself unconscionable. Ordinarily, however, an unconscionable contract involves other factors as well as overall imbalance.

**Illustrations:**

1. A, an individual, contracts in June to sell at a fixed price per ton to B, a large soup manufacturer, the carrots to be grown on A's farm. The contract, written on B's standard printed form, is obviously drawn to protect B's interests and not A's; it contains numerous provisions to protect B against various contingencies and none giving analogous protection to A. Each of the clauses can be read restrictively so that it is not unconscionable, but several can be read literally to give unrestricted discretion to B. In January, when the market price has risen above the contract price, A repudiates the contract, and B seeks specific performance. In the absence of justification by evidence of commercial setting, purpose, or effect, the court may determine that the contract as a whole was unconscionable when made, and may then deny specific performance.

2. A, a homeowner, executes a standard printed form used by B, a merchant, agreeing to pay $ 1,700 for specified home improvements. A also executes a credit application asking for payment in 60 monthly installments but specifying no rate. Four days later A is informed that the credit application has been approved and is given a payment schedule calling for finance and insurance charges amounting to $ 800 in addition to the $ 1,700. Before B does any of the work, A repudiates the agreement, and B sues A for $ 800 damages,

claiming that a commission of $ 800 was paid to B's salesman in reliance on the agreement.  The court may determine that the agreement was unconscionable when made, and may then dismiss the claim.

d.  *Weakness in the bargaining process*.  A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party.  But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms.  Factors which may contribute to a finding of unconscionability in the bargaining process include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.  See Uniform Consumer Credit Code § 6.111.

Illustration:

3.  A, literate only in Spanish, is visited in his home by a salesman of refrigerator-freezers for B.  They negotiate in Spanish; A tells the salesman he cannot afford to buy the appliance because his job will end in one week, and the salesman tells A that A will be paid numerous $ 25 commissions on sales to his friends.  A signs a complex installment contract printed in English.  The contract provides for a cash price of $ 900 plus a finance charge of $ 250.  A defaults after paying $ 32, and B sues for the balance plus late charges and a 20% attorney's fee authorized by the contract.  The appliance cost B $ 350.  The court may determine that the contract was unconscionable when made, and may then limit B's recovery to a reasonable sum.

e.  *Unconscionable terms*.  Particular terms may be unconscionable whether or not the contract as a whole is unconscionable.  Some types of terms are not enforced, regardless of context; examples are provisions for unreasonably large liquidated damages, or limitations on a debtor's right to redeem collateral.  See Uniform Commercial Code §§ 2-718, 9-501(3).  Other terms may be unconscionable in some contexts but not in others.  Overall imbalance and weaknesses in the bargaining process are then important.

Illustrations:

4.  A, a packer, sells and ships 300 cases of canned catsup to B, a wholesale grocer.  The contract provides, "All claims other than swells must be made within ten days from receipt of goods." Six months later a government inspector, upon microscopic examination of samples, finds excessive mold in the cans and obtains

a court order for destruction of the 270 remaining cases in B's warehouse.  In the absence of justifying evidence, the court may determine that the quoted clause is unconscionable as applied to latent defects and does not bar a claim for damages for breach of warranty by B against A.

5.   A, a retail furniture store, sells furniture on installment credit to B, retaining a security interest.  As A knows, B is a woman of limited education, separated from her husband, maintaining herself and seven children by means of $ 218 per month public assistance.  After 13 purchases over a period of five years for a total of $ 1,200, B owes A $ 164.  B then buys a stereo set for $ 514.  Each contract contains a paragraph of some 800 words in extremely fine print, in the middle of which are the words "all payments . . . shall be credited pro rata on all outstanding . . . accounts." The effect of this language is to keep a balance due on each item until all are paid for.  On B's default, A sues for possession of all the items sold.  It may be determined that either the quoted clause or the contract as a whole was unconscionable when made.

6.   A, a corporation with its principal office in State X, contracts with B, a resident of State X, to make improvements on B's home in State X.  The contract is made on A's standard printed form, which contains a clause by which the parties submit to the jurisdiction of a court in State Y, 200 miles away.  No reason for the clause appears except to make litigation inconvenient and expensive for B.  The clause is unconscionable.

*f. Law and fact.*  A determination that a contract or term is unconscionable is made by the court in the light of all the material facts.  Under Uniform Commercial Code § 2-302, the determination is made "as a matter of law," but the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect to aid the court in its determination.  Incidental findings of fact are made by the court rather than by a jury, but are accorded the usual weight given to such findings of fact in appellate review.  An appellate court will also consider whether proper standards were applied.

**Illustration:**

7.   A, a finance company, lends money to B, a manufacturing company, on the security of an assignment by B of its accounts receivable.  The agreement provides for loans of 75% of the value of assigned accounts acceptable to A, and forbids B to dispose of or hypothecate any assets without A's written consent.  The agreed interest rate of 18% would be usurious but for a statute precluding a corporation from raising the defense of usury.  Substantial advances are made, and the balance owed is $ 14,000 when B becomes bankrupt, three months after the first advance.  A determination that the agreement is unconscionable on its face, without regard to context, is error.  The agreement is unconscionable only if it is not a reasonable commercial device in the light of all the circumstances when it was made.

*g. Remedies.* Perhaps the simplest application of the policy against unconscionable agreements is the denial of specific performance where the contract as a whole was unconscionable when made. If such a contract is entirely executory, denial of money damages may also be appropriate. But the policy is not penal: unless the parties can be restored to their pre-contract positions, the offending party will ordinarily be awarded at least the reasonable value of performance rendered by him. Where a term rather than the entire contract is unconscionable, the appropriate remedy is ordinarily todeny effect to the unconscionable term. In such cases as that of an exculpatory term, the effect may be to enlarge the liability of the offending party.

### REPORTER'S NOTES

This Section is new; it follows Uniform Commercial Code § 2-302. See Davenport, Unconscionability and the Uniform Commercial Code, 22 U. Miami L. Rev. 121 (1967); Ellinghaus, In Defense of Unconscionability, 78 Yale L.J. 757 (1969); Leff, Unconscionability and the Code -- The Emperor's New Clause, 115 U. Pa. L. Rev. 485 (1967); Shulkin, Unconscionability -- The Code, the Court and the Consumer, 9 B.C. Ind. & Com. L. Rev. 367 (1968); Spanogle, Analyzing Unconscionability Problems, 117 U. Pa. L. Rev. 931 (1969); Murray, Unconscionability: Unconscionability, 31 U. Pitt. L. Rev. 1 (1969); Braucher, The Unconscionable Contract or Term, 31 U. Pitt. L. Rev. 337 (1970); Leff, Unconscionability and the Crowd -- Consumers and the Common Law Tradition, 31 U. Pitt. L. Rev. 349 (1970); Spiedel, Unconscionability, Assent and Consumer Protection, 31 U. Pitt. L. Rev. 359 (1970); Comments, 58 Dick. L. Rev. 161 (1954), 18 U. Chi. L. Rev. 146 (1950); 45 Va. L. Rev. 583 (1959); *Annot., 18 A.L.R.3d 1305 (1968)*.

*Comment a.* Uniform Commercial Code § 2-302 is literally inapplicable to contracts not involving the sale of goods, but it has proven very influential in non-sales cases. It has many times been used either by analogy or because it was felt to embody a generally accepted social attitude of fairness going beyond its statutory application to sales of goods. See *Seabrook v. Commuter Housing Co., 72 Misc.2d 6, 338 N.Y.S.2d 67 (Civ. Ct. 1972)* (apartment lease); *Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971)* (consumer fraud proceeding by Attorney General); *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co., 227 N.W.2d 169, 179-81 (Iowa 1975)* (construction of burglary insurance policy); *Contract Buyers League v. F & F Investment, 300 F. Supp. 210 (N.D. Ill. 1969)* (class action with regard to sales of residential property -- no unconscionability found); see other examples listed in *Albert Merrill School v. Godoy, 78 Misc.2d 647, 357 N.Y.S.2d 378 (Civ. Ct. 1974)*. In many of the cases cited contracts of adhesion were involved. It is to be emphasized that a contract of adhesion is not unconscionable per se, and that all unconscionable contracts are not contracts of adhesion. Nonetheless, the more standardized the agreement and the less a party may bargain meaningfully, the more susceptible the

contract or a term will be to a claim of unconscionability.  See Comment *c* to § 211; Note, Unconscionability and Standardized Contracts, 5 N.Y.U. Rev. L. & Soc. Change 65 (1975); 3 Corbin, Contracts § 559B (Supp. 1980). On adhesion contracts, see 3 id. §§ 559A-I (Supp. 1980).

*Comment c.*  Illustration 1 is based on *Campbell Soup Co. v. Wentz, 172 F.2d 80 (3d Cir. 1948)*. Cf.  *Shell Oil Co. v. Marinello, 63 N.J. 402, 307 A.2d 598 (1973)*, cert. denied, *415 U.S. 920 (1974)* (termination provision in service station franchise while facially neutral, in fact was one-sided in favor of oil company, and consequently was "void as against the public policy of this statute").  Illustration 2 is based on *American Home Improvement, Inc. v. MacIver, 105 N.H. 435, 201 A.2d 886 (1964)*; cf.  *Central Budget Corp. v. Sanchez, 53 Misc.2d 620, 279 N.Y.S.2d 391 (1967)*.

*Comment d.*  For examples of factors weighing in favor of a finding of unconscionability, see *Albert Merrill School v. Godoy, 78 Misc.2d 647, 357 N.Y.S.2d 378 (Civ. Ct. 1974)* (disproportionate levels of education, language difficulty and deceptive practices); *Seabrook v. Commuter Housing Co., 72 Misc.2d 6, 338 N.Y.S.2d 67 (Civ. Ct. 1972)* (long and complex lease printed in small type and containing many highly technical terms; landlord but not tenant represented by counsel; housing a scarce commodity); *Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971)* (goods were of extremely little use to buyers; price was two and one-half times a "reasonable market price"; sellers made many misrepresentations and deceptions; buyers were poor, uneducated and inexperienced); *Wheeler v. St. Joseph Hosp., 63 Cal. App.3d 345, 133 Cal. Rptr. 775 (1976)* (stress of hospital admitting room, superior bargaining position of hospital, failure to call patient's attention to arbitration clause) (it is not clear whether the court was relying on the unconscionability concept or on one limited to contracts of adhesion); *Weidman v. Tomaselli, 81 Misc.2d 328, 365 N.Y.S.2d 681 (Cty. Ct.)*, aff'd, *84 Misc.2d 782, 386 N.Y.S.2d 276 (App. Term 1975)* (overwhelming need for housing, no bargaining as to terms; landlord's dominant position; tenant forced to waive valuable statutory and constitutional rights; attorney's fees due from tenant whenever landlord commenced proceedings after tenant's default, even if suit was unsuccessful).  For examples of cases rejecting unconscionability claims, see *Graziano v. Tortora Agency, 78 Misc.2d 1094, 359 N.Y.S.2d 489 (Civ. Ct. 1974)* (tenant was in real estate business and its principal was a sophisticated businessman; its counsel advised tenant not to sign lease; tenant had successfully litigated a claim based on a lease before); *Curtis Elev. Co. v. Hampshire House, Inc., 142 N.J. Super. 537, 362 A.2d 73 (1976)* (bargaining between experienced businessmen familiar with problems of industry -- provision excused performance in event of a strike and industry had history of labor troubles); *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 20 Cal. App.3d 668, 97 Cal. Rptr. 811 (1971)* (while bargaining strength was unequal, no

unfair imposition would result from arbitration clause's enforcement) (adhesion contract -- "unconscionable" not used in opinion); *Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 519 P.2d 903 (1976)* (disparity of bargaining power alone is not enough); *Royal Indem. Co. v. Westinghouse Elec. Corp., 385 F. Supp. 520 (S.D.N.Y. 1974)* (very large industrial contract between large and knowledgeable companies; equal bargaining power, long negotiations); *Wheeler v. St. Joseph Hosp., supra,* (dissenting opinion) (while hospital admitting room is not an ideal locale for bargaining, arbitration clause did not contain very complicated language and patient, who was entering only for tests, had plenty of time to read and sign the document). See also *Madden v. Kaiser Fdtn. Hosps., 17 Cal.3d 699, 131 Cal. Rptr. 882, 552 P.2d 1178 (1976)*; *Ciofalo v. Vic Tanny Gyms, Inc., 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925 (1961)*. Illustration 3 is based on *Frostifresh Corp. v. Reynoso, 52 Misc.2d 26, 274 N.Y.S.2d 757 (Cty. Ct. 1966)*, rev'd as to damages, *54 Misc.2d 119, 281 N.Y.S.2d 964 (App. Term 1967)*; cf. *State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup. Ct. 1966)* (referral sales, excessive price); *Jones v. Star Credit Corp., 52 Misc.2d 189, 298 N.Y.S.2d 264 (Sup. Ct. 1969)* (poor, uneducated buyers, excessive price); *Toker v. Perl, 103 N.J. Super. 500, 247 A.2d 701 (1968)* aff'd, *108 N.J. Super. 129, 260 A.2d 244 (1970)* (deceptive practice, excessive price). But cf. *Hernandez v. S.I.C. Fin. Co., 79 N.M. 673, 448 P.2d 474 (1968)* (debtor understood English).

*Comment e.* Illustration 4 is based on *Kansas City Wholesale Grocery Co. v. Weber Packing Corp., 93 Utah 414, 73 P.2d 1272 (1937)*; cf. *Hardy v. General Motors Acceptance Corp., 38 Ga. App. 463, 144 S.E. 327 (1928)*; *Wilson Trading Corp. v. David Ferguson, Ltd., 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968)*; *Q. Vandenberg & Sons v. Siter, 204 Pa. Super. Ct. 392, 204 A.2d 494 (1964)*. But cf. *Whitaker v. Cannon Mills Co., 132 Conn. 434, 45 A.2d 120 (1945)*. Illustration 5 is based on *Williams v. Walker-Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965)*; see also *Weidman v. Tomaselli, 81 Misc.2d 328, 365 N.Y.S.2d 681 (Cty. Ct.)*, aff'd, *84 Misc.2d 782, 386 N.Y.S.2d 276 (App. Term 1975)*; cf. Uniform Consumer Credit Code § 2.409. Illustration 6 is based on *Paragon Homes, Inc. v. Carter, 56 Misc.2d 463, 288 N.Y.S.2d 817 (Sup. Ct.)*, aff'd mem., *30 A.D.2d 1052, 295 N.Y.S.2d 606 (1968)*; cf. Uniform Consumer Credit Code § 1.201(9). But cf. *National Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311 (1964)*; *The Monrosa v. Carbon Black Export, Inc., 359 U.S. 180 (1959)* (validity of choice-of-forum clause not decided); *Indussa Corp. v. S.S. Ranborg, 377 F.2d 200 (2d Cir. 1967)* (choice-of-forum clause invalid under Carriage of Goods by Sea Act); *Clinic Masters, Inc. v. District Court, 556 P.2d 473 (Colo. 1976)* (signatory was an educated professional; other party's ties were all with state of forum chosen).

*Comment f.*  Illustration 7 is based on *In re Elkins-Dell Mfg. Co., 253 F. Supp. 864 (E.D. Pa. 1966)*; compare *Royal Indem. Co. v. Westinghouse Elec. Corp., 385 F. Supp. 520 (S.D.N.Y. 1974)*.

## Cross Reference

ALR Annotations:

Doctrine of unconscionability as applied to insurance contracts.  *86 A.L.R.3d 862*.

Construction and application of agreement by medical or social work student to work in particular position or at particular location in exchange for financial aid in meeting costs of education.  *83 A.L.R.3d 1273*.

Validity and construction of "No Damage" clause with respect to delay in building or construction contract.  *74 A.L.R.3d 187*.

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member.  *66 A.L.R.3d 1018*.

Validity and construction of provision (Escalator Clause) in land contract or mortgage that rate of interest payable shall increase if legal rate is raised.  *60 A.L.R.3d 473*.

Employer's termination of professional athlete's services as constituting breach of employment contract.  *57 A.L.R.3d 257*.

Construction of contract for installation of vending machine on another's premises.  *53 A.L.R.3d 471*.

"Unconscionability" as ground for refusing enforcement of contract for sale of goods or agreement collateral thereto.  *18 A.L.R.3d 1305*.

Construction and effect of agreement relating to salary of partners.  *66 A.L.R.2d 1023*.

"Escalator" price adjustment clauses.  *63 A.L.R.2d 1337*.

Validity, construction and effect of contract, option, or provision for repurchase by vendor.  *44 A.L.R.2d 342*.

Validity and effect of promise not to make a will.  *32 A.L.R.2d 370*.

Digest System Key Numbers:

Contracts 1

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Raj Patel

Restat 2d of Contracts, § 208

End of Document



*Restat 2d of Contracts, § 313*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 14- Contract Beneficiaries*

# § 313 Government Contracts

(1)  The rules stated in this Chapter apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach.

(2)  In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a)  the terms of the promise provide for such liability; or

(b)  the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Rationale.* Beneficiaries of government contracts have often been denied rights because of the doctrinal difficulties referred to in the Introductory Note to this Chapter.  Subsection (1) reflects the disappearance of those difficulties, but leaves room for the weighing of considerations peculiar to particular situations. Subsection (2) applies to a particular class of contracts the classification of beneficiaries in § 302.  Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.  In case of doubt, a promise to do an act for or render a service to the public does not have the effect of a promise to pay consequential damages to individual members of the public unless the conditions of Subsection (2)(b) are met.  Among factors which may make inappropriate a direct

action against the promisor are arrangements for governmental control over the litigation and settlement of claims, the likelihood of impairment of service or of excessive financial burden, and the availability of alternatives such as insurance.

**Illustrations:**

1.  B contracts with the United States to carry mail over a certain route.  C, a member of the public, is injured by B's failure to perform his contract.  B is under no contractual duty to C.

2.  B, a water company, contracts with A, a municipality, to maintain a certain pressure of water at the hydrants on the streets of the municipality.  A owes no duty to the public to maintain that pressure.  The house of C, an inhabitant of the municipality, is destroyed by fire, owing to B's failure to maintain the agreed pressure.  B is under no contractual duty to C.

*b.  Tort liability.*  Whether or not members of the public are intended beneficiaries of a government contract, the contractor may be subject to tort liability to them.  The question whether the contractor has an affirmative duty to act may arise in connection with tort liability, and the answer may or may not turn upon the same considerations which determine whether the member of the public is an intended beneficiary.  See Restatement, Second, Torts §§ 314-25; compare Restatement, Second, Agency §§ 354, 378.

*c. Promise to pay damages.*  Government contractors sometimes make explicit promises to pay damages to third persons, and such promises are enforced.  If there is no explicit promise, and no government liability, the question whether a particular claimant is an intended beneficiary is one of interpretation, depending on all the circumstances of the contract.  When there is government liability, and the question of interpretation is in doubt, there is liability if a direct action is appropriate in view of the factors referred to in Comment *a.*

**Illustrations:**

3.  A, a municipality, enters into a contract with B, by which B promises to build a subway and to pay damages directly to any person who may be injured by the work of construction.  Because of the work done in the construction of the subway, C's house is injured by the settling of the land on which it stands.  D suffers personal injuries from the blasting of rock during the construction.  B is under a contractual duty to C and D.

4.  A, a county, enters into a contract with B, a surety company, by which B promises indemnity to a stated amount for any damages caused by clerical errors of clerks in the Registry of Deeds.  C is injured by an error of such a clerk.  C can recover damages from B.

5.   A, a municipality, owes a duty to the public to keep its streets in repair.  B, a street railway company, contracts to keep a portion of these streets in repair but fails to do so.  C, a member of the public, is injured thereby.  He may bring actions against A and B and can recover judgment against each of them.

6.   A, a municipality, awards a construction contract to B.  The contract provides that if through B's act or neglect another contractor on the same project suffers loss and makes a claim against A, B will defend at B's own expense any suit based on the claim and will pay any resulting judgment against A.  C, another contractor on the same project, makes a claim against A based on breach by B of B's contract with A.  The described provision does not enable C to bring a direct action as an intended beneficiary of B's promise.

### REPORTER'S NOTES

Subsection (1) is newly added to avoid any implication that the liability of a government contractor to beneficiaries is broader than that of other contractors.  Subsection (2) is former § 145 rephrased in more general terms.  Paragraph (b) is extended beyond municipalities in view of the increased availability of remedies against the government, but is limited to cases where direct action is appropriate in view of the factors referred to in Comment *a*.  See 2 Williston, Contracts §§ 372-75 (3d ed. 1959); 4 Corbin, Contracts §§ 805, 806 (1951).

*Comment a*.  The category of government contracts is not monolithic.  In addition to the traditional disputes over contracts to provide services to the general public (Illustrations 1 and 2) and to be liable for damages to third parties (Illustrations 3-6), recent cases have involved rights of poor people in federal-state social services agreements, e.g., *Martinez v. Socoma Cos., 11 Cal.3d 394, 113 Cal. Rptr. 585, 521 P.2d 841 (1974)*; *Falmouth Hosp. v. Lopes,    Mass.   , 382 N.E.2d 1042 (1978)*; *Pajewski v. Perry, 363 A.2d 429 (Del. 1976)*; Notes, 27 Hastings L.J. 137 (1975), 88 Harv. L. Rev. 646 (1975); rights of municipal employees hired pursuant to a contract between the federal and local governments, e.g., *Harrison v. Housing Auth. of College Park, 445 F. Supp. 356 (N.D. Ga. 1978)*; rights of unnamed, but interested persons in consent decrees in antitrust cases, e.g., *Bailey v. Iowa Beef Processors, 213 N.W.2d 642 (Iowa 1973)*, cert. denied, *419 U.S. 830 (1974)*; *Control Data Corp. v. IBM, 306 F. Supp. 839 (D. Minn. 1969)*, aff'd, *430 F.2d 1277 (8th Cir. 1970)*; and rights of third parties injured when a contractor fails to comply with contractual requirements governing working conditions, e.g., Just' s, *Inc. v. Arrington Constr. Co., 99 Idaho 462, 583 P.2d 997 (1978)*; *Davis v. Nelson-Deppe, Inc., 91 Idaho 463, 424 P.2d 733 (1967)*; cf.  *Hrushka v. State Dep't of Pub. Works, 117 N.H. 1022, 381 A.2d 326 (1977)*. In deciding whether the agreement was intended to create contractual rights in third parties, the nature of the agreement, the identity of the alleged intended beneficiaries and the specific duty said to have been

created toward them are all factors to be considered.  For a careful discussion of some of these factors, see Just' s, *Inc. v. Arrington Constr. Co., supra*. See also *Kornblut v. Chevron Oil Co., 62 A.D.2d 831, 407 N.Y.S.2d 498 (1978)*; Note, Third Party Beneficiaries and the Intention Standard: A Search for Rational Contract Decision-Making, 54 Va. L. Rev. 1166 (1968). For a criticism of the approach of this Section (in Tentative Draft) and of the Just's, Inc. majority, as based on a legal fiction of intent to benefit rather than a policy of limitation of potential liability, see the dissenting opinion of Donaldson, J., in Just' s, *Inc. v. Arrington Constr. Co., supra*., discussing *H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928)*.

Illustrations 1 and 2 are carried forward from former § 145.  Illustration 2 is supported by *H.R. Moch Co. v. Rensselaer Water Co., supra*, *Davis v. Nelson-Deppe, Inc., supra*, *Cole v. Arizona Edison Co., 53 Ariz. 141, 86 P.2d 946 (1939)*, *Earl E. Roher Transfer & Storage Co. v. Hutchinson Water Co., 182 Kan. 546, 322 P.2d 810 (1958)*; see Annot., 62 A.L.R. 1205 (1929). Contra: *Potter v. Carolina Water Co., 253 N.C. 112, 116 S.E.2d 374 (1960)*; see also *Matternes v. City of Winston-Salem, 286 N.C. 1, 209 S.E.2d 481 (1974)*. As to tort liability in such a case, see *Doyle v. South Pittsburgh Water Co., 414 Pa. 199, 199 A.2d 875 (1964)*.

*Comment c.*  Illustrations 3-5 are based on Illustrations 3-5 to former § 145.  Illustration 3 is supported by *La Mourea v. Rhude, 209 Minn. 53, 295 N.W. 304 (1940)*; *Freigy v. Gargaro Co., 223 Ind. 342, 60 N.E.2d 288 (1945)*; *Anderson v. Rexroad, 175 Kan. 676, 266 P.2d 320 (1954)*; see Annots., 38 A.L.R. 403, 492 (1925), 69 A.L.R. 522 (1930), 138 A.L.R. 936 (1942). As to Illustration 4, compare *Mercado v. Mitchell, 83 Wis.2d 17, 264 N.W.2d 532 (1978)* (carnival license requiring liability insurance).  Illustration 5 was accepted but distinguished in *Oman Constr. Co., v. Tennessee Central Ry., 212 Tenn. 556, 370 S.W.2d 563 (1963)*. Illustration 6 is new; it is based on *Snyder Plumbing & Heating Corp. v. Purcell, 9 A.D.2d 505, 195 N.Y.S.2d 780 (1st Dep't 1960)*.

## Cross Reference

Digest System Key Numbers:

Contracts 187

United States 70(5)

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

End of Document



*Restat 2d of Contracts, § 328*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 15- Assignment and Delegation  >  Topic 2- Mode of Assignment or Delegation*

## § 328 Interpretation of Words of Assignment; Effect of Acceptance of Assignment

(1) Unless the language or the circumstances indicate the contrary, as in an assignment for security, an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

(2) Unless the language or the circumstances indicate the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties, and the obligor of the assigned rights is an intended beneficiary of the promise.

*Caveat*: The Institute expresses no opinion as to whether the rule stated in Subsection (2) applies to an assignment by a purchaser of his rights under a contract for the sale of land.

COMMENTS & ILLUSTRATIONS

Comment:

*a. "Assignment" of duty*. A duty cannot be "assigned" in the sense in which "assignment" is used in this Chapter.   The parties to an assignment, however, may not distinguish between assignment of rights and delegation of duties.   A purported "assignment" of duties may simply manifest an intention that the assignee shall be substituted for the assignor.   Such an intention is not completely effective unless the obligor of the assigned right joins in a novation, but the rules of this Section give as full effect as can be given without the obligor's assent.   As to contracts for the sale of goods, see Uniform Commercial Code § 2-210.

Illustration:

1.  A, an oil company, has a contract to sell and deliver oil to B.  A delivers to C, another oil company, a writing assigning to C "the contract" or "all A's rights and duties under the contract." C is under a duty to B to deliver the oil called for by the contract, and A is surety for C.

*b. Contrary agreement; assignment for security.* This Section states rules of presumptive interpretation which yield to a manifestation of a different intention. In particular delegation and assumption of the assignor's duties is not ordinarily implied where the contract calls for personal performance by the assignor. Again, an assignment as security does not ordinarily delegate performance to the secured party, and the secured party does not assume the assignor's duties. See Uniform Commercial Code §§ 2-210, 9-317. Under §§ 9-102 and 9-104 of the Code a sale of "accounts or chattel paper" is treated as a secured transaction unless it is part of the sale of a business or unless the assignee is to perform the contract. The quoted terms are limited by definitions in §§ 9-105 and 9-106 to "monetary obligations" or "rights to payment." See Reporter's Note to § 317.

**Illustrations:**

2. In Illustration 1, A assigns "the contract" or "all A's rights under the contract" to C, a financial institution. Delivery of the oil is not delegated to C, and C is under no duty to deliver oil.

3. A sells and delivers an automobile to B, the price to be paid in installments, and assigns to C for value "all A's rights under the contract." After B has made all the payments, the automobile is discovered to have been stolen and is retaken by the owner. C is not liable to B for breach of warranty of title; A is.

*c. Land contracts.* By virtue of the right of either party to obtain specific performance of a contract for the sale of land, such contracts are treated for many purposes as creating a property interest in the purchaser and thus as partially executed. The vendor's interest resembles the interest of a mortgagee under a mortgage given as security for the purchase price. An assignment of the vendor's rights under the contract is similar to an assignment of a right to payment for goods or services: ordinarily no assumption of the vendor's duties by the assignee is implied merely from the acceptance of the assignment.

When the purchaser under a land contract assigns his rights, the assignment has commonly been treated like a sale of land "subject to" a mortgage. In this view acceptance of the assignment does not amount to an assumption of the assignor's duties unless the contract of assignment so provides either expressly or by implication. A provision in the land contract that it will bind the "assigns" of the parties does not change this result. See Comment *b* to § 323. The assignee may, however, bind himself by later action such as bringing a suit for specific performance. Decisions refusing to infer an assumption of duties by the assignee have been influenced by doctrinal difficulties in the recognition of rights of assignees and beneficiaries. Those difficulties have now been overcome, and it is doubtful whether adherence to such decisions carries out the probable intention of the parties in the usual case. But since the shift in doctrine has not yet produced any definite

change in the body of decisions, the Institute expresses no opinion on the application of Subsection (2) to an assignment by a purchaser under a land contract.

**Illustration:**

4.   A contracts to purchase land from B.   The contract provides that it is to bind the assigns of the parties.   A assigns "the contract" to C, and B assigns "the contract" to D.   These facts themselves do not show a promise by D; the Institute expresses no opinion as to whether they show a promise by C.

### REPORTER'S NOTES

This Section is revised from former § 164 to follow the phrasing of Uniform Commercial Code § 2-210.   The application of Subsection (2) to land contracts is subjected to a new caveat because of the rejection of the rule stated in former § 164 in *Langel v. Betz, 250 N.Y. 159, 164 N.E. 890 (1928)*.

See 3 Williston, Contracts § 418A (3d ed. 1960); 4 Corbin, Contracts § 906 (1951 & Supps. 1971 & 1980).

*Comment a*.   Illustration 1 is based on *Imperial Ref. Co. v. Kanotex Ref. Co., 29 F.2d 193 (8th Cir. 1928)*; cf. *Art Metal Constr. Co. v. Lehigh Structural Steel Co., 116 F.2d 57 (3d Cir. 1940)*.

*Comment b*.   Illustration 2 follows Uniform Commercial Code § 9-317; cf.   *Miller v. Wells Fargo Bank Int'l Corp., 540 F.2d 548, 558-60 (2d Cir. 1976)*; *Stowell v. Gram, 184 Mass. 562, 69 N.E. 342 (1904)*.   Illustration 3 is based on *Daniels v. Parker, 209 Or. 419, 306 P.2d 735 (1957)*; cf.   *Chatham Pharmaceuticals, Inc. v. Angier Chem. Co., 347 Mass. 208, 196 N.E.2d 852 (1964)*.

*Comment c*.   Illustration 4 is based on the facts of *Langel v. Betz, 250 N.Y. 159, 164 N.E. 890 (1928)*, where the court refused to infer a promise by the purchaser's assignee.   Cf.   *Goldsmith v. Deitchman, 69 N.Y.S.2d 148 (County Court 1947)*.   Accord:   *Henock v. Yeamans, 340 F.2d 503, 505 (5th Cir. 1965)* (Florida and Michigan law); *Kneberg v. H.L. Green Co., 89 F.2d 100 (7th Cir. 1937)* (Illinois law); *Treadway v. Western Cotton Oil & Ginning Co., 40 Ariz. 125, 10 P.2d 371 (1932)*; *Maloyfsky v. Schiraldi, 108 N.J. Eq. 190, 154 A. 404 (Ch. 1931)*, aff'd mem., *110 N.J. Eq. 660, 160 A. 636 (Ct. Err. & App. 1932)*; *Hardinger v. Fullerton, 165 Wash. 483, 5 P.2d 987 (1931)*; *Lingle Water Users' Ass'n v. Occidental Bldg. & Loan Ass'n, 43 Wyo. 41, 57, 297 P. 385, 390 (1931)*; Annot., 59 A.L.R. 954 (1929) (California, Georgia, Indiana, Minnesota, Montana, Nevada, North Carolina, South Dakota, West Virginia).   Contra:   *Prudential Fed. Sav. & Loan Ass'n v. King, 22 Utah 2d 379, 453 P.2d 697 (1969)*; *Lonas v. Metropolitan Mortgage & Sec. Co., 432 P.2d 603 (Alaska 1967)*.   See also *Rose v. Vulcan Material Co., 282 N.C. 643, 194 S.E.2d 521 (1973)* (rejecting Langel v. Betz in a non-land sale context, but not discussing the distinction), 10 Wake Forest L. Rev. 179 (1974); cf.   *Bank of America Nat'l Trust*

*& Sav. Ass'n v. McLaughlin, 152 Cal. App.2d Supp. 911, 313 P.2d 220 (1957)*; *Hodges v. Campbell, 211 Or. 428, 316 P.2d 312 (1957)*; *Radley v. Smith, 6 Utah 2d 314, 313 P.2d 465 (1957)*.

## Cross Reference

ALR Annotations:

Sale of contractual rights; defect in written record as ground for avoiding sale. *10 A.L.R.2d 728*.

What constitutes oil or gas "royalty," or "royalties," within language of conveyance, exception, reservation, devise, or assignment. *4 A.L.R.2d 492*.

Digest System Key Numbers:

Assignments 71 et seq.

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute



*Restat 2d of Contracts, § 344*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 16- Remedies  >  Topic 1- In General*

# § 344 Purposes of Remedies

Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee:

(a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,

(b) his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Three interests.* The law of contract remedies implements the policy in favor of allowing individuals to order their own affairs by making legally enforceable promises. Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract. It does this by attempting to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach. The interest protected in this way is called the "expectation interest." It is sometimes said to give the injured party the "benefit of the bargain." This is not, however, the only interest that may be protected.

The promisee may have changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts. In that case, the court may recognize a claim based on his reliance rather than on his expectation. It does this by attempting to

Restat 2d of Contracts, § 344

put him back in the position in which he would have been had the contract not been made. The interest protected in this way is called "reliance interest." Although it may be equal to the expectation interest, it is ordinarily smaller because it does not include the injured party's lost profit.

In some situations a court will recognize yet a third interest and grant relief to prevent unjust enrichment. This may be done if a party has not only changed his own position in reliance on the contract but has also conferred a benefit on the other party by, for example, making a part payment or furnishing services under the contract. The court may then require the other party to disgorge the benefit that he has received by returning it to the party who conferred it. The interest of the claimant protected in this way is called the "restitution interest." Although it may be equal to the expectation or reliance interest, it is ordinarily smaller because it includes neither the injured party's lost profit nor that part of his expenditures in reliance that resulted in no benefit to the other party.

The interests described in this Section are not inflexible limits on relief and in situations in which a court grants such relief as justice requires, the relief may not correspond precisely to any of these interests. See §§ 15, 87, 89, 90, 139, 158 and 272.

**Illustrations:**

1. A contracts to building for B on B's land for $ 100,000. B repudiates the contract before either party has done anything in reliance on it. It would have cost A $ 90,000 to build the building. A has an expectation interest of $ 10,000, the difference between the $ 100,000 price and his savings of $ 90,000 in not having to do the work. Since A has done nothing in reliance, A's reliance interest is zero. Since A has conferred no benefit on B, A's restitution interest is zero.

2. The facts being otherwise as stated in Illustration 1, B does not repudiate until A has spent $ 60,000 of the $ 90,000. A has been paid nothing and can salvage nothing from the $ 60,000 that he has spent. A now has an expectation interest of $ 70,000, the difference between the $ 100,000 price and his saving of $ 30,000 in not having to do the work. A also has a reliance interest of $ 60,000, the amount that he has spent. If the benefit to B of the partly finished building is $ 40,000, A has a restitution interest of $ 40,000.

*b. Expectation interest.* In principle, at least, a party's expectation interest represents the actual worth of the contract to him rather than to some reasonable third person. Damages based on the expectation interest therefore take account of any special circumstances that are peculiar to the situation of the injured party, including his personal values and even his idiosyncracies, as well as his own needs and opportunities. See Illustration 3. In practice, however, the injured party is often held to a more objective valuation of his

expectation interest because he may be barred from recovering for loss resulting from such special circumstances on the ground that it was not foreseeable or cannot be shown with sufficient certainty. See §§ 351 and 352. Furthermore, since he cannot recover for loss that he could have avoided by arranging a substitute transaction on the market (§ 350), his recovery is often limited by the objective standard of market price. See Illustration 4. The expectation interest is not based on the injured party's hopes when he made the contract but on the actual value that the contract would have had to him had it been performed. See Illustration 5. It is therefore based on the circumstances at the time for performance and not those at the time of the making of the contract.

**Illustrations:**

3. A, who is about to produce a play, makes a contract with B, an actor, under which B is to play the lead in the play at a stated salary for the season. A breaks the contract and has the part played by another actor. B's expectation interest includes the extent to which B's reputation would have been enhanced if he had been allowed to play the lead in A's play, as well as B's loss in salary, both subject to the limitations stated in Topic 2.

4. A contracts to construct a monument in B's yard for $ 10,000 but abandons the work after the foundation has been laid. It will cost B $ 6,000 to have another contractor complete the work. The monument planned is so ugly that it would decrease the market price of the house. Nevertheless, B's expectation interest is the value of the monument to him, which, under the rule stated in § 348(2)(b), would be measured by the cost of completion, $ 6,000.

5. A makes a contract with B under which A is to pay B for drilling an oil well on B's land, adjacent to that of A, for development and exploration purposes. Both A and B believe that the well will be productive and will substantially enhance the value of A's land in an amount that they estimate to be $ 1,000,000. Before A has paid anything, B breaks the contract by refusing to drill the well. Other exploration then proves that there is no oil in the region. A's expectation interest is zero.

*c. Reliance interest.* If it is reliance that is the basis for the enforcement of a promise, a court may enforce the promise but limit the promisee to recovery of his reliance interest. See §§ 87, 89, 90, 139. There are also situations in which a court may grant recovery based on the reliance interest even though it is consideration that is the basis for the enforcement of the promise. These situations are dealt with in §§ 349 and 353.

*d. Restitution interest.* Since restitution is the subject of a separate Restatement, this Chapter is concerned with problems of restitution only to the extent that they arise in connection with contracts. Such problems arise when a party, instead of seeking to enforce an agreement, claims relief on the ground that the other party has

Restat 2d of Contracts, § 344

been unjustly enriched as a result of some benefit conferred under the agreement.  In some cases a party's choice of the restitution interest is dictated by the fact that the agreement is not enforceable, perhaps because of his own breach (§ 374), as a result of impracticability of performance or frustration of purpose (§ 377(1)), under the Statute of Frauds (§ 375), or in consequence of the other party's avoidance for some reason as misrepresentation, duress, mistake or incapacity (§ 376).  Occasionally a party chooses the restitution interest even though the contract is enforceable because it will give a larger recovery than will enforcement based on either the expectation or reliance interest.  These rare instances are dealt with in § 373.  Sometimes the restitution interest can be protected by requiring restoration of the specific thing, such as goods or land, that has resulted in the benefit.  See § 372.  Where restitution in kind is not appropriate, however, a sum of money will generally be allowed based on the restitution interest.  See § 371.

### REPORTER'S NOTES

This Section is new.  Paragraph (1)(a) is based on Uniform Commercial Code § 1-106(1).  See Fuller & Perdue, The Reliance Interest in Contract Damages, 46 Yale L.J. 52 (1936), 46 id. 373 (1937); 5 Corbin, Contracts § 992 (1964 & Supp. 1980); 11 Williston, Contracts § 1338 (3d ed. 1968).

*Comment a*.  Illustrations 1 and 2 are new.  For an exceptional case in which the benefit to the defendant exceeded the loss to the claimant, see *Olwell v. Nye & Nissen Co., 26 Wash.2d 282, 173 P.2d 652 (1946)* (plaintiff "waived" conversion and claimed restitution).

*Comment b*.  Illustration 3 is based on Herbert Clayton & Jack Waller Ltd. v. Oliver, [1930] A.C. 209 (H.L.); cf. Tolvey v. Criterion Film Prods., [1936] 2 All. E.R. 1625 (K.B.); see also Restatement, Second, Agency § 433.
*Contra: Quinn v. Straus Broadcasting Group, 309 F. Supp. 1208 (S.D.N.Y. 1970)*. See Note, 27 U. Miami L. Rev. 465 (1973). Illustration 4 is based on Illustration 4 to former § 346.  Illustration 5 is based on Illustration 3 to former § 346; cf. *Guardian Trust Co. v. Brothers, 59 S.W.2d 343 (Tex. Civ. App. 1933)*, error refused.

## Cross Reference

Digest System Key Numbers:

Contracts 324

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Restat 2d of Contracts, § 344

---

End of Document



Restat 2d of Contracts, § 345

*Restatement of the Law, Contracts 2d - Official Text > Chapter 16- Remedies > Topic 1- In General*

# § 345 Judicial Remedies Available

The judicial remedies available for the protection of the interests stated in § 344 include a judgment or order

(a) awarding a sum of money due under the contract or as damages,

(b) requiring specific performance of a contract or enjoining its non-performance,

(c) requiring restoration of a specific thing to prevent unjust enrichment,

(d) awarding a sum of money to prevent unjust enrichment,

(e) declaring the rights of the parties, and

(f) enforcing an arbitration award.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Nature of remedies.* This Section enumerates the principal judicial remedies available for the protection of the interests defined in the preceding section. It is not intended to be exhaustive, since other remedies such as replevin of a chattel or reformation or cancellation of a writing supplement those listed here. As to reformation, see §§ 155, 166. Nor are the remedies listed mutually exclusive, since a court may in the same action, for example, both require specific performance of a promise and award a sum of money as damages for delay in its performance. The details of the procedure by which such remedies are obtained and enforced vary from one jurisdiction to another and are beyond the scope of this Restatement. In some circumstances a party to a contract is empowered to protect himself or to obtain satisfaction by methods not involving recourse to a court, such as retaking goods or foreclosing on security. The exercise of such a power, whether under a term of the

contract or otherwise, is not a judicial remedy and is not dealt with in this Section. But see Topic 5 as to election and avoidance.

b. *Enforcement*. In most contract cases, what is sought is enforcement of a contract. Enforcement usually takes the form of an award of a sum of money due under the contract or as damages. Damages may be based on either the expectation or reliance interest of the injured party. See § 344. They are subject to the rules stated in Topic 2. A court may also enforce a promise by ordering that it be specifically performed or, in the alternative, by enjoining its nonperformance. In doing so, it protects the promisee's expectation interest. The rules governing the granting of such relief are stated in Topic 3.

c. *Restitution*. Sometimes a party, instead of seeking to enforce a contract under the rules stated in Topics 2 and 3, seeks protection of his restitution interest. If this can be accomplished by requiring the other party to restore a specific thing that is in his hands, a court may order restoration or make restoration a condition of granting relief to the other party. If restoration of the specific thing is not appropriate, the restitution interest may be protected by requiring the other party to pay a sum of money equivalent to the benefit that he has derived from that thing. The rules relating to the prevention of unjust enrichment by restitution, in either kind or money, are stated in Topic 4.

d. *Declaratory judgments*. Declaratory judgments play an important and growing role in the resolution of disputes arising out of contracts. Courts may render declaratory judgments under statutes adopted in nearly all states, and, in some instances, without the aid of statute. Such a judgment declares the legal relations between the parties but does not award damages or order other relief and may be rendered even though no breach of contract has occurred. In most states, including those that have adopted the Uniform Declaratory Judgment Act, courts may also render declaratory judgments in conjunction with other relief. In all states, and in the federal courts under the Federal Declaratory Judgment Act, the decision whether to render a declaratory judgment is discretionary. Because questions relating to declaratory judgments depend largely on statute and are not confined to contract cases, they are not considered in detail in this Restatement.

e. *Enforcement of arbitration awards*. Arbitration also plays an important and growing role in the resolution of contract disputes. Although arbitration is not in itself a judicial remedy, enforcement by a court of an award of an arbitral tribunal is. Statutes relating to the enforcement of such awards, based on either an agreement to arbitrate a future dispute or a submission of an existing dispute, have been enacted in many states. These statutes provide for the transformation of an award into a judgment by means of a summary procedure, without the necessity of bringing an action on the award as was required at common law. This transformation permits

the use of the regular judicial process to enforce the arbitration award.  The passage of these statutes reflects the increasing use of arbitration to settle private disputes and a decline in the judicial hostility to arbitration that had limited its effectiveness.  Because questions concerning the enforcement of arbitration awards depend largely on statute, they are not considered in detail in this Restatement.  But see Comment *a* Illustration 2 to § 366.

### REPORTER'S NOTES

This Section is based on former § 326.  See 5 Corbin, Contracts §§ 990-91, 994 (1954); 11 Williston, Contracts § 1314 (3d ed. 1968).

On declaratory judgments, see Borchard, Declaratory Judgments (2d ed. 1941); 6A Moore, Federal Practice ch. 57 (1974); 3 Weinstein, Korn & Miller, New York Civil Practice § 3001 (1977); 10 Wright & Miller, Federal Practice and Procedure §§ 2751-80 (1973); Wright, Law of Federal Courts 497-503 (3d ed. 1976).  See also Uniform Declaratory Judgments Act; Federal Declaratory Judgments Act, *28 U.S.C. §§ 2201*, *2202* (1976).  On the enforcement of arbitration awards see Domke, The Law and Practice of Commercial Arbitration § 37 (1968); 16 Williston, Contracts § 1923A (3d ed. 1976).  See also Uniform Arbitration Act; United States Arbitration Act, *9 U.S.C. § 1 et seq.*, and, for examples of modern state enforcement procedures, see Cal. Civ. Proc. Code § 1285 et seq. and N.Y. Civ. Prac. Law § 7510.

## Cross Reference

ALR Annotations:

Comment Note. -- Contractual provision as to remedy as excluding other possible remedies.  *84 A.L.R.2d 322*.

Power and standing of personal representative of deceased promisee to enforce a contract made for benefit of a third party.  *76 A.L.R.2d 231*.

Rightsand remedies of tenant upon landlord's breach of covenant to repair.  *28 A.L.R.2d 446*.

Digest System Key Numbers:

Arbitration 83.1

Contracts 324

Declaratory Judgments 142

Implied and Constructive Contracts 3

Restat 2d of Contracts, § 345

Specific Performance 1

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



## *Restat 2d of Contracts, § Scope*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 16- Remedies  >  Topic 2- Enforcement by Award of Damages*

## Introductory Note

This Topic contains rules for enforcement of contracts by means of the award of damages.  The initial assumption is that the injured party is entitled to full compensation for his actual loss.  This is reflected in the general measure of damages set out in § 347.  However, important limitations including those of avoidability, unforeseeability and uncertainty follow in §§ 350-53.  The limitation of certainty can sometimes be overcome, at least in part, through the use of alternative bases for measuring damages (§ 348) or through the use of reliance as a measure of damages (§ 349).  Other sections deal with nominal damages (§ 346), punitive damages (§ 355) and liquidated damages and penalties (§ 356).  Except for the restrictions imposed by the rule that proscribes the fixing of penalties (§ 356), parties are free to vary the rules governing damages, subject to the usual limitations on private agreement such as that on unconscionable contracts or terms (§ 208).  Although interest may be awarded as damages under the rule stated in § 354, for the sake of simplicity specific references to interest have generally been omitted from the illustrations in this Chapter.

Under the rule stated in § 346, a breach of contract ordinarily gives rise to a claim for damages.  For the sake of convenience, the term "a claim for damages" is used in other chapters of this Restatement to refer to a right arising out of breach whether or not it includes a right to specific performance or an injunction as well as damages.  See, for example, the use of that term in §§ 243 and 251.  Although a claim to the price promised to be paid for something or to a sum of money promised to be repaid is, strictly speaking, not a claim for damages, such money claims are generally enforceable in the same way as those for damages.  As to the right of a seller of land to recover the price, see Comment *e* to § 360

### REPORTER'S NOTES

This Topic is based on Topic 2, Damages, of former Chapter 12.  See 5 Corbin, Contracts chs. 55-60 (1964 & Supp. 1980); 11 Williston, Contracts chs. 41-42 (3d ed. 1968); Dobbs, Remedies chs. 3,12 (1973); McCormick,

Restat 2d of Contracts, § Scope

Damages chs. 4-8, 22-28 (1935); Farnsworth, Judicial Remedies for Breach of Contract, 70 Colum L. Rev. 1145 (1970); Peters, Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two, 73 Yale L.J. 199 (1963); Vernon, Expectancy Damages for Breach of Contract: A Primer and Critique, 1976 Wash. U.L.Q. 179.

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document

Raj Patel



## *Restat 2d of Contracts, § 346*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 16- Remedies  >  Topic 2- Enforcement by Award of Damages*

# § 346 Availability of Damages

(1) The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.

(2) If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Right to damages.* Every breach of contract gives the injured party a right to damages against the party in breach, unless the contract is not enforceable against that party, as where he is not bound because of the Statute of Frauds. The resulting claim may be one for damages for total breach or one for damages for only partial breach. See § 236. Although a judgment awarding a sum of money as damages is the most common judicial remedy for breach of contract, other remedies, including equitable relief in the form of specific performance or an injunction, may be also available, depending on the circumstances. See Topic 3. In the exceptional situation of a contract for transfer of an interest in land that is unenforceable under the Statute of Frauds, action in reliance makes the contract enforceable by specific performance even though it gives rise to no claim for damages for breach. See Comment *c* to § 129. A duty to pay damages may be suspended or discharged by agreement or otherwise, and if it is discharged the claim for damages is extinguished. See Introductory Note to Chapter 12. When this happens, the right to enforcement by other means such as specific performance or an injunction is also extinguished. If the duty of performance, as distinguished from the duty to pay damages, has been suspended or discharged, as by impracticability of performance or frustration of purpose, there is then no breach and this Section is not applicable.

Restat 2d of Contracts, § 346

The parties can by agreement vary the rules stated in this Section, as long as the agreement is not invalid for unconscionability (§ 208) or on other grounds. The agreement may provide for a remedy such as repair or replacement in substitution for damages. See Uniform Commercial Code § 2-719.

*b. Nominal damages*. Although a breach of contract by a party against whom it is enforceable always gives rise to a claim for damages, there are instances in which the breach causes no loss. See Illustration 1. There are also instances in which loss is caused but recovery for that loss is precluded because it cannot be proved with reasonable certainty or because of one of the other limitations stated in this Chapter. See §§ 350-53. In all these instances the injured party will nevertheless get judgment for nominal damages, a small sum usually fixed by judicial practice in the jurisdiction in which the action is brought. Such a judgment may, in the discretion of the court, carry with it an award of court costs. Costs are generally awarded if a significant right was involved or the claimant made a good faith effort to prove damages, but not if the maintenance of the action was frivolous or in bad faith. Unless a significant right is involved, a court will not reverse and remand a case for a new trial if only nominal damages could result.

Illustration:

1. A contracts to sell to B 1,000 shares of stock in X Corporation for $ 10 a share to be delivered on June 1, but breaks the contract by refusing on that date to deliver the stock. B sues A for damages, but at trial it is proved that B could have purchased 1,000 shares of stock in X Corporation on the market on June 1 for $ 10 a share and therefore has suffered no loss. In an action by B against A, B will be awarded nominal damages.

*c. Beneficiaries of gift promises*. If a promisee makes a contract, intending to give a third party the benefit of the promised performance, the third party may be an intended beneficiary who is entitled to enforce the contract. See § 302(1)(b). Such a gift promise creates overlapping duties, one to the beneficiary and the other to the promisee. If the performance is not forthcoming, both the beneficiary and the promisee have claims for damages for breach. If the promisee seeks damages, however, he will usually be limited to nominal damages: although the loss to the beneficiary may be substantial, the promisee cannot recover for that loss and he will ordinarily have suffered no loss himself. In such a case the remedy of specific performance will often be an appropriate one for the promisee. See § 307.

Illustration:

2. As part of a separation agreement B promises his wife A not to change the provision in B's will for C, their son. A dies and B changes his will to C's detriment, adding also a provision that C will forfeit any bequest if he questions the change before any tribunal. In an action by A's personal representative against B, the

representative can get a judgment for nominal damages.  As to the representative's right to specific performance, see Illustration 2 to § 307.

### REPORTER'S NOTES

This Section consolidates the rules stated in former §§ 327 and 328.  See 5 Corbin, Contracts §§ 992-96, 1001 (1964 & Supp. 1980); 11 Williston, Contracts §§ 1338-39A (3d ed. 1968).

*Comment b*.  Illustration 1 is based on Illustration 1 to former § 328.

*Comment c*.  This Comment replaces former § 345(1).  The facts in Illustration 2 are taken from Illustration 2 to § 307.

## Cross Reference

ALR Annotations:

Damages for wrongful termination of automobile dealership contracts.  *54 A.L.R.3d 324*.

Awarding damages for delay, in addition to specific performance, of contract for sale of corporate stock.  *28 A.L.R.3d 1401*.

Tenant's right to damages for landlord's breach of tenant's option to purchase.  *17 A.L.R.3d 976*.

Right and measure of recovery for breach of obligation to drill exploratory oil or gas wells.  *4 A.L.R.3d 284*.

Attorneys' fees incurred in litigation with third person as damages in action for breach of contract.  *4 A.L.R.3d 270*.

Measure of damages, to advertiser, for radio or television station's breach or wrongful termination of contract.  *90 A.L.R.2d 1199*.

Private rights and remedies growing out of prize-winning contests.  *87 A.L.R.2d 649*.

Comment Note. -- Contractual provision as to remedy as excluding other possible remedies.  *84 A.L.R.2d 322*.

Measure and elements of damages for breach of contract to marry.  *73 A.L.R.2d 553*.

Measure and items of compensation of contractor under cost-plus contract which is terminated, without breach, before completion.  *28 A.L.R.2d 867*.

Burden of proving value of relief from performing contract in suit based on defendant's breach preventing or excusing full performance.  *17 A.L.R.2d 968*.

Rights and remedies under contract by party to procure insurance on his own life.  *12 A.L.R.2d 983*.

Restat 2d of Contracts, § 346

Digest System Key Numbers:

Contracts 321

Damages 3-14

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



Restat 2d of Contracts, § 362

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 16- Remedies  >  Topic 3- Enforcement by Specific Performance and Injunction*

## § 362 Effect of Uncertainty of Terms

Specific performance or an injunction will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order.

COMMENTS & ILLUSTRATIONS

Comment:

*a.  Reason for requirement.*  One of the fundamental requirements for the enforceability of a contract is that its terms be certain enough to provide the basis for giving an appropriate remedy.  See § 33.  If this minimum standard of certainty is not met, there is no contract at all.  It may be, however, that the terms are certain enough to provide the basis for the calculation of damages but not certain enough to permit the court to frame an order of specific performance or an injunction and to determine whether the resulting performance is in accord with what has been ordered.  In that case there is a contract but it is not enforceable by specific performance or an injunction.

*b.  Degree of certainty required.*  If specific performance or an injunction is to be granted, it is important that the terms of the contract are sufficiently certain to enable the order to be drafted with precision because of the availability of the contempt power for disobedience.  Before concluding that the required certainty is lacking, however, a court will avail itself of all of the usual aids in determining the scope of the agreement.  See Chapter 9, The Scope of Contractual Obligations.  Apparent difficulties of enforcement due to uncertainty may disappear in the light of courageous common sense.  Expressions that at first appear incomplete may not appear so after resort to usage (§ 221) or the addition of a term supplied by law (§ 204).  A contract is not too uncertain merely because a promisor is given a choice of performing in several ways, whether expressed as alternative performances or otherwise.  He may be ordered to make the choice and to perform accordingly, and, if he fails to make the choice, the court may choose for him and order specific performance.  Even though subsidiary

Restat 2d of Contracts, § 362

terms have been left to determination by future agreement, if performance has begun by mutual consent, equitable relief may be appropriate with the court supplying the missing terms so as to assure the promisor all advantages that he reasonably expected.

**Illustrations:**

1.   A and B make a contract under which A promises to convey part of a tract of land to B and B promises to pay $ 100,000 and to build "a first class theatre" on it.   Building the theatre will enhance the value of A's remaining land.   A conveys the land to B, who pays the price but refuses to build the theatre.   A sues B for specific performance.   Specific performance will be refused because of the uncertainty of the terms of the contract, although A can receive damages from B based on the failure to enhance the value of his land if he can prove them with reasonable certainty (§ 352).   See also § 366 on the effect of difficulty in supervision.

2.   A leases land to B for three years, with an option to buy for $ 100,000 on terms of payment to be agreed upon.   B occupies the land, making substantial repairs and improvements, and then accepts the option, tendering $ 100,000 in cash.   A repudiates and B sues A for specific performance.   Specific performance will not be refused on the ground of uncertainty.   Although the terms of payment are uncertain and the parties may have contemplated a period of credit, refusal of specific performance would result in a forfeiture because B has made improvements and the payment tendered is on terms sufficiently favorable to A.   See Illustration 2 to § 33.

3.   A contracts to lease an apartment, with heat and light, to B as soon as the apartment building is completed.   After the building is completed, A refuses to install sufficient equipment for heat and light.   B sues A for specific performance.   Specific performance will not be refused on the ground of uncertainty.

### REPORTER'S NOTES

This Section is based on former § 370.   See also Uniform Commercial Code § 2-204(3).   See 5A Corbin, Contracts § 1174 (1964 & Supp. 1980); 11 Williston, Contracts § 1424 (3d ed. 1968).

*Comment b.*   The facts in Illustration 1 are taken from *Bettancourt v. Gilroy Theatre Co., 120 Cal. App.2d 364, 261 P.2d 351 (1953)*; *Ferrara v. Silver, 138 Cal. App.2d 616, 292 P.2d 251 (1956)*. Illustration 2 is based on Illustration 1 to former § 370; cf.   *City Stores Co. v. Ammerman, 266 F. Supp. 766 (D.D.C. 1967)*, aff'd per curiam, *394 F.2d 950 (D.C. Cir. 1968)*; Illustration 3 is based on Illustration 3 to former § 370.

# Cross Reference

Restat 2d of Contracts, § 362

ALR Annotations:

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member. *66 A.L.R.3d 1018*.

Enforceability, insofar as restrictions would be reasonable, of contract containing unreasonable restrictions on competition. *61 A.L.R.3d 397*.

Specific Performance: Requisite definiteness of provision in contract for sale or lease of land, that vendor or landlord will subordinate his interest to permit other party to obtain financing. *26 A.L.R.3d 855*.

Specific performance of agreement, or provisions thereof, involving partnership at will. *70 A.L.R.2d 618*.

Uncertainty as to terms of mortgage or of accompanying note or bond contemplated by real-estate sales contract as affecting right to specific performance. *60 A.L.R.2d 251*.

Digest System Key Numbers:

Injunctions 57-86

Specific Performance 27-30

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document



*Restat 2d of Contracts, § 364*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 16- Remedies > Topic 3- Enforcement by Specific Performance and Injunction*

# § 364 Effect of Unfairness

(1) Specific performance or an injunction will be refused if such relief would be unfair because

(a) the contract was induced by mistake or by unfair practices,

(b) the relief would cause unreasonable hardship or loss to the party in breach or to third persons, or

(c) the exchange is grossly inadequate or the terms of the contract are otherwise unfair.

(2) Specific performance or an injunction will be granted in spite of a term of the agreement if denial of such relief would be unfair because it would cause unreasonable hardship or loss to the party seeking relief or to third persons.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Types of unfairness.* Courts have traditionally refused equitable relief on grounds of unfairness or mistake in situations where they would not necessarily refuse to award damages. Some of these situations involve elements of mistake (§§ 152, 153), misrepresentation (§ 164), duress (§ 175) or undue influence (§ 177) that fall short of what is required for avoidance under those doctrines. See Paragraph (a) and Illustrations 1, 2 and 3. Others involve elements of impracticability of performance or frustration of purpose that fall short of what is required for relief under those doctrines. See Paragraph (b) and Illustration 4. Still others involve elements of substantive unfairness in the exchange itself or in its terms that fall short of what is required for unenforceability on grounds of unconscionability (§ 208). See Paragraph (c) and Comment *b.* The gradual expansion of these doctrines to afford relief in an increasing number of cases has resulted in a contraction of the area in which this traditional distinction is made between the availability of equitable and legal relief. Nevertheless, the

discretionary nature of equitable relief permits its denial when a variety of factors combine to make enforcement of a promise unfair, even though no single legal doctrine alone would make the promise unenforceable. Such general equitable doctrines as those of laches and "unclean hands" supplement the rule stated in this Section. See Comment *c* to § 357.

**Illustrations:**

1.  A is an aged, illiterate farmer, inexperienced in business. B is an experienced speculator in real estate who knows that a developer wants to acquire a tract of land owned by A and will probably pay a price considerably above the previous market price. B takes advantage of A's ignorance of this fact and of his general inexperience and persuades A not to seek advice. He induces A to contract to sell the land at the previous market price, which is considerably less than the developer later agrees to pay B. A refuses to perform, and B sues A for specific performance. Specific performance may properly be refused on the ground of unfairness.

2.  A and B make a contract under which A is to sell B a tract of land for $ 100,000. B does not tell A that he intends to combine the tract with others as part of a large development in order to prevent A from asking a higher price. $ 100,000 is a fair price for the tract at existing market prices. A refuses to perform and B sues A for specific performance. Specific performance will not be refused on the ground of unfairness. Cf. Illustration 2 to § 171.

3.  A writes B offering to sell for $ 100,000 a tract of land that A owns known as "201 Lincoln Street." B, who mistakenly believes that this description contains an additional tract of land worth $ 30,000, accepts A's offer. On discovery of his mistake, B refuses to perform and A sues for specific performance. Even if the court determines that enforcement of the contract would not be unconscionable under the rule stated in § 153, specific performance may properly be refused on the ground of unfairness. Cf. Illustration 5 to § 153.

4.  A, a milkman, and B, a dairy farmer make a contract under which B is to sell and A to buy all of A's requirements of milk, but not less than 200 quarts a day, for one year. B may deliver milk from any source but expects to deliver milk from his own herd. B's herd is destroyed because of hoof and mouth disease and he fails to deliver any milk. A sues B for specific performance. Even though B's duty to deliver milk is not discharged and B is liable to A for breach of contract, specific performance may properly be refused on the ground of unfairness. Cf. Illustration 12 to § 261.

*b. Unfairness in the exchange.* Unfairness in the exchange does not of itself make an agreement unenforceable. See Comment *c* to § 208. If it is extreme, however, it may be a sufficient ground, without more, for denying specific performance or an injunction. See Illustration 5. A contract, other than an option contract

Restat 2d of Contracts, § 364

on fair terms (§§ 25, 87), that is binding solely because of a nominal payment or by reason of some formality such as a seal or a signed writing will not ordinarily be enforced by specific performance or an injunction. It is, however, unusual to find such unfairness in the exchange itself without some mistake or unfairness in its inducement. In determining the fairness of an exchange, account will be taken of the risks taken by both parties at the time the agreement was made. An exchange that might otherwise seem unfairly favorable to one party may in fact be fair if there is a substantial risk that the other party's performance may never become due. This is so for insurance and other aleatory contracts. See also Illustration 6. Where the agreement is one of modification between parties who are already bound by a contract (§ 89), the overriding duty of good faith and fair dealing (§ 205) imposes a requirement of fairness.

**Illustrations:**

5. A, an individual, contracts in June to sell at a fixed price per ton to B, a large soup manufacturer, carrots to be grown on A's farm. The contract, written on B's standard printed form, is obviously drawn to protect B's interests and not A's; it contains numerous provisions to protect B against various contingencies and none giving analogous protection to A. Each of the clauses can be read restrictively so that it is not unconscionable, but several can be read literally to give unrestricted discretion to B. In January, when the market price has risen above the contract price, A repudiates the contract, and B seeks specific performance. In the absence of justification by evidence of commercial setting, purpose or effect, the court may determine that the contract as a whole was unconscionable when made and may properly deny specific performance on the ground of unfairness regardless of whether it would award B damages for breach.

6. A, a childless widow in her seventies suffering from Parkinson's disease, contracts with B, her niece, to leave B her farm in her will in return for B's promise to care for A for the rest of her life. B immediately resigns her job and begins to care for A, but deterioration of A's condition requires her to go to the hospital within a week and she dies without changing her will. B sues A's estate for specific performance. If the court concludes that the contract was fair when made, in view of the burden of caring for A in her condition and the risk that she might live for a considerable time, it will order specific performance.

*c. Unfair term.* Sometimes a party relies upon an unfair term as a defense in a suit for specific performance or injunction. Even if the term is not unconscionable (§ 208), the court may disregard it and grant the relief sought. See Illustration 7.

**Illustration:**

Restat 2d of Contracts, § 364

7.  A contracts to sell land to B for $ 100,000, payable in five annual $ 20,000 installments with conveyance to be at the time of the last payment.  The contract contains a term providing that "time is of the essence with respect to each installment, and B shall lose all his rights under the contract if he fails to pay any installment when due." See Comment *d* to § 242.  B pays the first installment and takes possession, making improvements and paying the next two installments on time.  When he tenders the fourth payment one month late, A refuses it and brings an action of ejectment.  B sues for specific performance.  The court may refuse to enforce the quoted term on the ground of unfairness.  Specific performance may then properly be granted conditional on payment into court of the fourth installment with interest from maturity and on payment of the last installment on conveyance.

### REPORTER'S NOTES

This Section is based on former § 367.  Former § 366 has been dealt with in Comment *b*.  See 5A Corbin, Contracts §§ 1162-68 (1964 & Supp. 1980); 11 Williston, Contracts §§ 1427, 1428, 1435 (3d ed. 1968).

*Comment a*.  Illustration 1 is based on Illustration 2 to former § 367; *Woollums v. Horsley, 93 Ky. 582, 20 S.W. 781 (1892)*; *McKinnon v. Benedict, 38 Wis.2d 607, 157 N.W.2d 665 (1968)*. Illustration 2 is based on Illustration 3 to former § 367.  Illustration 3 is supported by *Perlmutter v. Bacas, 219 Md. 406, 149 A.2d 23 (1959)*; *Brooks v. Towson Realty, 223 Md. 61, 162 A.2d 431 (1960)*.  Illustration 4 is supported by *Waite v. O'Neil, 76 F. 408 (6th Cir. 1896)*.

*Comment b*.  This comment is based in part on former § 366.  Illustration 5 is based on *Campbell Soup Co. v. Wentz, 172 F.2d 80 (3d Cir. 1948)*. Illustration 6 is based on *Tuckwiller v. Tuckwiller, 413 S.W.2d 274 (Mo. 1967)*; see also *Meyer v. Benko, 55 Cal. App.3d 937, 127 Cal. Rptr. 846 (1976)*.

*Comment c*.  Illustration 7 is based on Illustrations 5 and 6 to former § 374; *McFadden v. Walker, 5 Cal.3d 809, 97 Cal. Rptr. 537, 488 P.2d 1353 (1971)*.

## Cross Reference

ALR Annotations:

Specific performance of agreement for sale of private franchise.  *82 A.L.R.3d 1102*.

Specific performance of lease of, or binding option to lease, building or part of building to be constructed.  *38 A.L.R.3d 1052*.

Restat 2d of Contracts, § 364

Specific Performance: Requisite definiteness of provision in contract for sale or lease of land, that vendor or landlord will subordinate his interest to permit other party to obtain financing. *26 A.L.R.3d 855*.

"Unconscionability" as ground for refusing enforcement of contract for sale of goods or agreement collateral thereto. *18 A.L.R.3d 1305*.

Necessity and sufficiency of allegation, in a suit for specific performance of a contract for the sale of land, as to the adequacy of the consideration or as to the fairness of the contract. *100 A.L.R.2d 551*.

Specific performance of agreement, or provisions thereof, involving partnership at will. *70 A.L.R.2d 618*.

Specific performance of compromise and settlement agreement. *48 A.L.R.2d 1211*.

Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by territorial extent of restriction. *46 A.L.R.2d 119*.

Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by duration of restriction. *45 A.L.R.2d 77*.

Specific performance of provisions of separation agreement other than those for support or alimony. *44 A.L.R.2d 1091*.

Enforceability of restrictive covenant, ancillary to employment contract, as affected by territorial extent of restriction. *43 A.L.R.2d 94*.

Digest System Key Numbers:

Injunctions 21

Specific Performance 16

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---



*Restat 2d of Contracts, § 365*

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 16- Remedies  >  Topic 3- Enforcement by Specific Performance and Injunction*

## § 365 Effect of Public Policy

**Specific performance or an injunction will not be granted if the act or forbearance that would be compelled or the use of compulsion is contrary to public policy.**

**COMMENTS & ILLUSTRATIONS**

**Comment:**

*a. Act or forbearance against public policy.* If the performance of a contract is contrary to public policy, the contract will often be unenforceable under the rules stated in Chapter 8, Unenforceability on Grounds of Public Policy. Its performance may, for example, involve a breach of a duty to a third person arising under tort law, out of a fiduciary relation or under a contract. See §§ 192, 193 and 194. There are, however, situations in which the contract is enforceable but it would be an improper use of judicial power to grant specific performance or an injunction because the act or forbearance that would be compelled would adversely affect some aspect of the public interest or would otherwise be contrary to public policy. In such situations, equitable relief will be refused even though a judgment for damages will be granted. See Illustration 1.

**Illustration:**

1. A is induced to make a contract to sell land to B, to be paid for out of funds of C that B holds as trustee, by B's false representation that such use of C's money is within B's authority as trustee. A sues B for specific performance. Specific performance will be refused on grounds of public policy, since the act that would be ordered would involve a breach of trust, even though B will be held liable in damage for breach of contract.

*b. Compulsion against public policy.* Even though the act or forbearance that would be compelled is not contrary to public policy, the use of compulsion to require that act or forbearance may be contrary to public policy. One example of this general principle is the rule under which a court will refuse to grant specific performance if the character of performance is such that enforcement will impose a disproportionate burden on

Restat 2d of Contracts, § 365

the court (§ 366). Another is the rule under which a court will refuse to grant specific performance of a promise to render personal services or supervision (§ 367). The general principle is not, however, limited to these situations and another important application occurs where equitable relief is denied on the ground that to grant it would give a preference with respect to the assets of an insolvent party.

**Illustrations:**

2. A contracts to give B, a railroad company, a right of way in return for B's promise to locate a station and stop its express trains at a designated place. It later turns out that that place is an inconvenient one for the public and that the disadvantage to B as well as the public of B's promise is performed will be disproportionate to any advantage to A. B refuses to locate the station as promised, and A sues B for specific performance. Specific performance will be refused on grounds of public policy, even though B will be held liable in damages for breach of contract.

3. A borrows money from B and contracts to transfer to him as security 100 shares of stock in X Corporation but does not create a security interest in specific shares. A dies insolvent without having kept his promise. B sues A's administrator for specific performance. Specific performance will be refused on grounds of public policy because it would compel the administrator to commit a breach of his duty as trustee of the asset in his charge, even though A's estate will be held liable in damages for breach of contract.

4. A contracts to manufacture and deliver to B, for a price paid in advance, 100 articles as to which A has a monopoly under a patent. A manufactures 1,000 such articles but refuses to deliver any of them to B. B sues A for specific performance. A becomes insolvent and his other creditors file a petition in bankruptcy. A's trustee intervenes in the suit to protect A's assets. Specific performance will be refused because it would result in a preference, even though A will be held liable for breach of contract. But see Uniform Commercial Code § 2-502.

### REPORTER'S NOTES

This Section is based on former § 369 and on parts of former §§ 362 and 368. See 5A Corbin, Contracts § 1169 (1964); 11 Williston, Contracts § 1429 (3d ed. 1968).

*Comment a.* Illustration 1 is based on Illustration 2 to former § 368.

*Comment b.* As to the policy against preferences, see former § 362. Illustration 2 is based on Illustration 2 to former § 369. Illustration 3 is based on Illustration 1 to former § 362. Illustration 4 is based on Illustration 2 to former § 362; *Jamison Coal & Coke Co. v. Gottra, 143 F.2d 889 (8th Cir.),* cert. denied, *323 U.S. 769 (1944).*

Restat 2d of Contracts, § 365

## Cross Reference

ALR Annotations:

Specific performance of agreement for sale of private franchise. *82 A.L.R.3d 1102*.

Enforceability, insofar as restrictions would be reasonable, of contract containing unreasonable restrictions on competition.

Enforceability of covenant not to compete in infant's employment contract. *17 A.L.R.3d 863*.

Failure of artisan or construction contractor to procure occupational or business license or permit as affecting validity or enforceability of contract. *82 A.L.R.2d 1429*.

Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by territorial extent of restriction. *46 A.L.R.2d 119*.

Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by duration of restriction. *45 A.L.R.2d 77*.

Specific performance of provisions of separation agreement other than those for support or alimony. *44 A.L.R.2d 1091*.

Enforceability of restrictive covenant, ancillary to employment contract, as affected by territorial extent of restriction. *43 A.L.R.2d 94*.

Validity and enforceability of agreement to drop or compromise will contest or withdraw objections to probate, or of agreement to induce others to do so. *42 A.L.R.2d 1319*.

Rights and remedies under contract by party to procure insurance on his own life. *12 A.L.R.2d 983*.

Digest System Key Numbers:

Injunctions 24

Specific Performance 12

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Raj Patel



*Restat 2d of Contracts, § 367*

*Restatement of the Law, Contracts 2d - Official Text > Chapter 16- Remedies > Topic 3- Enforcement by Specific Performance and Injunction*

## § 367 Contracts for Personal Service or Supervision

(1) A promise to render personal service will not be specifically enforced.

(2) A promise to render personal service exclusively for one employer will not be enforced by an injunction against serving another if its probable result will be to compel a performance involving personal relations the enforced continuance of which is undesirable or will be to leave the employee without other reasonable means of making a living.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Rationale of refusal of specific performance.* A court will refuse to grant specific performance of a contract for service or supervision that is personal in nature. The refusal is based in part upon the undesirability of compelling the continuance of personal association after disputes have arisen and confidence and loyalty are gone and, in some instances, of imposing what might seem like involuntary servitude. To this extent the rule stated in Subsection (1) is an application of the more general rule under which specific performance will not be granted if the use of compulsion is contrary to public policy (§ 365). The refusal is also based upon the difficulty of enforcement inherent in passing judgment on the quality of performance. To this extent the rule stated in Subsection (1) is an application of the more general rule on the effect of difficulty of enforcement (§ 366).

*b. What is personal service.* A performance is not a personal service under the rule stated in Subsection (1) unless it is personal in the sense of being non-delegable (§ 318). However, not every non-delegable performance is properly described as a service. An act such as the writing of an autograph or the signing of a diploma may be personal in the sense of being non-delegable even though it is not a personal service, and if that is so specific performance is not precluded. In determining what is a personal service, the policies

reflected in the more general rules on the effect of public policy (§ 365) and of the difficulty of enforcement (§ 366) are relevant. The importance of trust and confidence in the relation between the parties, the difficulty of judging the quality of the performance rendered and the length of time required for performance are significant factors. Among the parties that have been held to render what are personal services within the rule stated in Subsection (1) are actors, singers and athletes, and the rule applies generally to contracts of employment that create the intimate relation traditionally known as master and servant. See Restatement, Second, Agency § 2.

The rule that bars specific enforcement of the employee's promise to render personal service has sometimes been extended to bar specific enforcement of the employer's promise where personal supervision is considered to be involved. The policies against compelling an employer to retain an employee have not, however, prevented courts from ordering reinstatement of employees discharged in contravention of statutes prohibiting discrimination or in violation of collective bargaining agreements.

**Illustrations:**

1. A, a noted opera singer, contracts with B to sing exclusively at B's opera house during the coming season. A repudiates the contract before the time for performance in order to sing at C's competing opera house, and B sues A for specific performance. Even though A's singing at C's opera house will cause B great loss that he cannot prove with reasonable certainty, and even though A can find suitable jobs singing at opera houses not in competition with B's, specific performance will be refused.

2. The facts being otherwise as stated in Illustration 1, B discharges A and A sues for specific performance. Even though singing at B's opera house would have greatly enhanced A's reputation and earning power in an amount that A cannot prove with reasonable certainty, specific performance will be refused.

*c. Availability of injunction.* A contract for personal service is usually exclusive in the sense that it imposes not only a duty to render the service to the other party but also a duty to forbear from rendering it to anyone else. Because specific performance of the duty to render the service is precluded by the rule stated in Subsection (1), the availability of injunctive relief to enforce the duty of forbearance takes on special importance. Subsection (2) indicates the application of the general rule on injunctive relief stated in § 357(2) to this important situation. Under that general rule, an injunction will not be ordered if the remedy in damages would be adequate (§ 359). Damages are likely to be adequate to protect the employer's interest unless the employee's services are unique or extraordinary, either because of special skill that he possesses or because of special knowledge that he has acquired of the employer's business.

Restat 2d of Contracts, § 367

Even if damages are not adequate, however, an injunction will not be granted if its probable result will be to leave the employee without other reasonable means of making a living.  It is not the purpose in granting the injunction to enforce the duty to render the service and, to justify granting it, it should appear that the employee is not being forced to perform the contract as the only reasonable means of making a living.  Furthermore, if the probable result of an injunction will be the employee's performance of the contract, it should appear that the employer is prepared to continue the employment in good faith so that performance will not involve personal relations the enforced continuance of which is undesirable.  These issues are for the exercise of judicial discretion based on such factors as the character and duration of the service, the probability of the renewal of good relations, the extent to which other remedies are adequate, and the probable hardship that will result from an injunction.

**Illustrations:**

3.  A contracts to serve exclusively as sales manager in B's clothing store for a year.  A repudiates the contract shortly after beginning performance and goes to work for C, a competitor of B.  B sues A for an injunction ordering A not to work for C.  Unless A's services are unique or extraordinary, the injunction will be refused.  If, however, A has special knowledge of B's customers that will cause a substantial number of them to leave B and patronize C, the injunction may properly be granted.

4.  The facts being otherwise as stated in Illustration 1, B sues A for an injunction ordering A not to sing in C's opera house.  The injunction may properly be granted.  If, however, C is not a competitor of B, the injunction will not be granted because its principal effect would be indirectly to compel A to continue in B's service.

### REPORTER'S NOTES

Subsection (1) is based on former § 379, but the reference to "supervision" has been deleted.  Subsection (2) is based on former § 380(2).  See 5A Corbin, Contracts §§ 1204-09 (1964 & Supp. 1980); 11 Williston, Contracts § 1423 (3d ed. 1968); Van Hecke, Changing Emphases in Specific Performance, 40 N.C.L. Rev. 1, 16-22 (1961).

*Comment b*.  Illustration 1 is based on Illustrations 1 and 3 to former § 379; *DeRivafinoli v. Corsetti, 4 Paige 264 (N.Y. Ch. 1833)*.  Illustration 2 is based on Illustrations 1 and 5 to former § 379; *Fitzpatrick v. Michael, 177 Md. 248, 9 A.2d 639 (1939)*.  For cases refusing specific performance of an employer's promise on the ground that personal supervision is involved, see *Felch v. Findlay College, 119 Ohio App. 357, 200 N.E.2d 353 (1963)*; *State ex rel. Schoblom v. Anacortes Veneer, 42 Wash. 2d 338, 255 P.2d 379 (1953)*; cf.  *Hoffman Candy & Ice Cream Co. v. Dep't of Liquor Control, 154 Ohio St. 357, 96 N.E.2d 203 (1950)*.

*Comment c.* Illustration 3 is based on *H.W. Gossard Co. v. Crosby, 132 Iowa 155, 109 N.W. 483 (1906)*. The last sentence is based on Illustration 9 to former § 380.  Illustration 4 is based on Illustration 6 to former § 380; Lumley v. Wagner, 1 Deg. M. & G. 604, 42 Eng. Rep. 687 (Ch. 1852); *Shubert Theatrical Co. v. Rath, 271 F. 827 (2d Cir. 1921)*; *Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 51 A. 973 (1902)*. The last sentence is based on Illustration 8 to former § 380.

## Cross Reference

ALR Annotations:

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member.  *66 A.L.R.3d 1018*.

Comment Note. -- Employee's arbitrary dismissal as breach of employment contract terminable at will.  *62 A.L.R.3d 271*.

Validity and construction of contract under which applicant for admission to home for aged or infirm turns over his property to institution in return for lifetime care.  *44 A.L.R.3d 1174*.

Enforceability of covenant not to compete in infant's employment contract.  *17 A.L.R.3d 863*.

Effect of attempt to terminate employment or agency contract upon shorter notice than stipulated in contract.  *96 A.L.R.2d 272*.

Pleading mitigation of damages, or the like, in employee's action for breach of employment contract.  *41 A.L.R.2d 955*.

Rights and liabilities of promoters or incorporators inter se under their contract for issuance of stock to them in return for services.  *8 A.L.R.2d 722*.

Remedies during promisor's lifetime on contract to convey or will property at death in consideration of support or services.  *7 A.L.R.2d 1166*.

Digest System Key Numbers:

Injunctions 60

Specific Performance 13

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

Raj Patel

Restat 2d of Contracts, § 367

---

End of Document



<u>*Restat 2d of Contracts, § 378*</u>

*Restatement of the Law, Contracts 2d - Official Text  >  Chapter 16- Remedies  >  Topic 5- Preclusion by Election and Affirmance*

## § 378 Election Among Remedies

---

If a party has more than one remedy under the rules stated in this Chapter, his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation.

COMMENTS & ILLUSTRATIONS

Comment:

*a. Election among remedies*. The rules stated in this Chapter give a party three basic types of remedies: damages (Topic 2), specific performance or an injunction (Topic 3), and restitution (Topic 4).  The rule stated in this Section precludes a party who has manifested his choice of one of those remedies from shifting to another remedy if such a shift would be unjust because of the other party's reliance on the earlier manifestation.  The mere manifestation of an intention to pursue one remedy rather than another does not, however, preclude a party from making such a shift.  Nor must the shift be made within any particular time.  Only if the other party has materially changed his position in reliance on the original choice is a shift to another remedy precluded by the election of the first.  A change of position is "material" within the meaning of this Section if it is such that in all the circumstances a shift in remedies would be unjust.  This rejection of any doctrine of election in the absence of reliance is consistent with a similar policy in the Uniform Commercial Code.  See Uniform Commercial Code § 2-703 and Comment 1; § 2-711 and § 2-721.  Even if the bringing of an action for one remedy is a manifestation of choice of that remedy, it does not preclude the plaintiff from shifting to another remedy as long as the defendant has not materially changed his position.  Alternative counts seeking inconsistent remedies are generally permitted in the same complaint and a change in remedy may often be made by amendment of the complaint, even at an advanced stage of the action.

Illustrations:

Restat 2d of Contracts, § 378

1.  A contracts to sell a tract of land to B.  A repudiates and B brings an action for damages.  While this action is pending, A makes valuable improvements on the land reasonably believing that B does not intend to pursue his remedy of specific performance.  B then amends his complaint to ask specific performance.  If A's change of position is material, B's claim for specific performance is precluded.

2.  A contracts to transfer his farm to B in return for B's promise to support A for life.  After A has transferred the farm, B repudiates the contract and A sues for specific restitution.  Before any change in B's position, A learns that a part of the farm has been sold by B and amends his complaint to ask for damages for the breach.  A's claim for damages is not precluded.

3.  A contracts to transfer his farm to B in return for B's promise to support A for life.  After A has transferred the farm, B repudiates the contract and A sues for damages.  Before any change in B's position, A discovers that it will be difficult to prove his damages with reasonable certainty and that a judicial sale of B's property including the farm would be unlikely to realize enough to satisfy a judgment and amends his complaint to ask specific restitution.  Specific restitution is not precluded.

*b. Additional circumstances.*  In two situations a party is not precluded from seeking a different remedy, even after reliance on his first choice by the other party, because his shift is justified by additional circumstances.  The first situation is that in which the party made his original choice while ignorant of facts that give him a remedy based on, for example, misrepresentation or mistake and later discovers those facts.  In that situation he is not bound by his original choice because he made it when mistaken.  The second situation is that in which after a party makes his original choice, a later breach by the other party occurs.  In that situation he can pursue any remedy based on the later breach without regard to his original choice.

*c. Remedy not available.*  The rule stated in this Section applies only where a party pursues a remedy that he actually has.  A party is not precluded from pursuing other remedies by the fact that he has made a mistaken attempt to obtain a remedy that is not available to him, even if his original choice has been relied on by theother party.

**Illustrations:**

4.  A makes an oral contract to transfer his farm to B in return for B's promise to support A for life.  After A has transferred the farm, B repudiates the contract and A sues for damages.  B pleads the Statute of Frauds and A's action is about to be dismissed.  A then amends his complaint to ask specific restitution.  Regardless of whether B has changed his position, specific restitution is not precluded.

5.  A makes a written contract to sell a tract of land to B.  A repudiates the contract and B, claiming that both parties were mistaken as to the contents of the writing, sues A for reformation of the writing and for specific performance of the contract as reformed.  The court refuses to reform the writing on the ground that mistake was not proved and B amends his complaint to ask damages for breach of the contract as written.  B's claim for damages is not precluded.

*d.  Other remedy not inconsistent*.  The rule stated in this Section applies only where a party seeks to shift to a remedy that is inconsistent with the one he has chosen.  A party who seeks specific performance or an injunction may, for example, be entitled to damages to compensate him for delay in performance.   See Comment *c* to § 358.  Similarly, a party who seeks restitution may, for example, be entitled to damages to compensate him for costs of transportation of goods that he has incurred.  A later request for such damages in a suit for specific performance or an injunction or in one for restitution is not precluded because it is not inconsistent with that suit.  However, the remedy of specific performance or an injunction and that of damages for total breach of contract are inconsistent.  The remedy of specific performance or an injunction and that of restitution are also inconsistent.  And the remedy of restitution and that of damages for total breach are inconsistent.

**Illustration:**

6.  A contracts to sell a tract of land to B.  A fails to convey the tract and B sues A for specific performance.  B later amends his complaint to add a claim for damages resulting from the delay caused by A's failure.  Regardless of whether A has changed his position, such a further claim is not precluded.

*e.  Other situations distinguished*.  The rule stated in this Section applies only as among the remedies provided for in this Chapter.  It does not, for example preclude a party from pursuing a claim in tort for misrepresentation or a claim for breach of warranty in the sale of goods.  See Uniform Commercial Code § 2-721.  It does not determine whether a party is barred by election from treating his remaining duties of performance as discharged (§ 379).  Nor does it apply in the many instances in which a party makes a choice that affects his substantive rights, such as the choice of an offeree between acceptance (§ 50) and rejection (§ 38), the choice of an intended beneficiary between disclaiming the contract and not doing so (§ 306), or the choice of an infant between affirmance and disaffirmance (§§ 14, 380).  Furthermore, this rule does not apply to situations in which a party is precluded by his delay from enforcing a substantive right, as is the case where one having the power of avoidance loses it by delay (§ 381).  Finally this Section is inapplicable to matters of procedure, such as the requirement that a party choose between inconsistent remedies at some stage of a judicial proceeding, and to

matters governed by the law of judgments, such as merger and bar.  See Restatement, Second, Judgments §§ 17, 18, 19.

### REPORTER'S NOTES

This Section is based on former §§ 381, 382, 383 and 384.  See 5A Corbin, Contracts §§ 1214-27 (1964 & Supp. 1980); 11 Williston, Contracts §§ 1444, 1444A (3d ed. 1968); 1 Palmer, Law of Restitution §§ 3.10, 4.15 (1978); Dobbs, Remedies § 1.5 (1973); Dobbs, Pressing Problems for the Plaintiff's Lawyer in Rescission: Election of Remedies and Restoration of Consideration, 26 Ark. L. Rev. 322 (1972).

*Comment a*.  The rule stated in former § 381(2), under which the mere bringing of an action might amount to an election, is abandoned as no longer representing the weight of authority.  See *Lewis v. Dansker, 68 F.R.D. 184 (S.D.N.Y. 1975)*; see also *Friederichsen v. Renard, 247 U.S. 207, 213 (1918)*; *Ajamian v. Schlanger, 14 N.J. 483, 103 A.2d 9*, cert. denied, *348 U.S. 835 (1954)*; *Parrish v. Tahtaras, 7 Utah 2d 87, 91, 318 P.2d 642, 645 (1957)*. Illustration 1 is based on Illustration 2 to former § 382.  Illustrations 2 and 3 are based on Illustrations 2 and 3 to former § 381.

*Comment b*.  As to the effect of a subsequent breach, see *Seaboard Sur. Co. v. United States, 355 F.2d 139 (9th Cir. 1966)*.

*Comment c*.  Illustrations 4 and 5 are based on Illustrations 2 and 4 to former § 383; cf.  *Riess v. Murchison, 503 F.2d 999 (9th Cir. 1974)*, cert. denied, *420 U.S. 993 (1975)*.

*Comment d*.  Illustration 6 is based on *Greenstone v. Claretian Seminary, 139 Mont. 295, 363 P.2d 161 (1959)*. For cases allowing damages in addition to restitution, see *Runyan v. Pacific Air Indus., 2 Cal.3d 304, 85 Cal. Rptr. 138, 466 P.2d 682 (1970)*; *Rabinowitz v. Marcus, 100 Conn. 86, 123 A. 21 (1923)*.

## Cross Reference

ALR Annotations:

Decree allowing or denying specific performance of contract as precluding, as a matter of res judicata, subsequent action for money damages for breach.  *38 A.L.R.3d 323*.

Recovery on quantum meruit where only express contract is pleaded, under Federal Rules of Civil Procedure 8 and 54 and similar state statutes or rules.  *84 A.L.R.2d 1077*.

Comment Note. -- Contractual provisions as to remedy as excluding other possible remedies.  *84 A.L.R.2d 322*.

Digest System Key Numbers:

Restat 2d of Contracts, § 378

Election of Remedies 2-4

Restatement of the Law, Second, Contracts

Copyright (c) 1981, The American Law Institute

---

End of Document

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

―――――――――――

**RAJ K. PATEL,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Appellee*

―――――――――――

2022-1131

―――――――――――

Appeal from the United States Court of Federal Claims in No. 1:21-cv-02004-LAS, Senior Judge Loren A. Smith.

―――――――――――

**ON MOTION**

―――――――――――

PER CURIAM.

## O R D E R

The United States moves to summarily affirm the United States Court of Federal Claims' judgment dismissing Raj K. Patel's complaint. Mr. Patel opposes.

Mr. Patel brought this suit seeking $3,760,000,000 for breach of a contract with the President of the United States "about living under the stress weapon." Appx47. Mr. Patel further alleged that the government failed to protect his

right of the free exercise of religion, violated his right to privacy, violated the equal protection clause, violated the Takings Clause by taking his "word patterns," and was part of a criminal conspiracy against him. Appx57. The Court of Federal Claims dismissed, and he now appeals.

We agree with the government that the merits of the parties' positions as stated in the opening brief and motions papers are so clear as to warrant summary affirmance. *See Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994). The Tucker Act, 28 U.S.C. § 1491, limits the Court of Federal Claims' jurisdiction to claims for money damages against the United States based on sources of substantive law that "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (citation and internal quotation marks omitted). The Court of Federal Claims correctly concluded that Mr. Patel's allegations were baseless and that it lacked jurisdiction over any of his claims.

Accordingly,

IT IS ORDERED THAT:

(1) The motion is granted. The Court of Federal Claims' judgment is summarily affirmed.

(2) All other pending motions are denied as moot.

(3) Each side shall bear its own costs.

FOR THE COURT

February 11, 2022          /s/ Peter R. Marksteiner
        Date                       Peter R. Marksteiner
                                   Clerk of Court

## **CERTIFICATE OF SERVICE**

I certify that I served a copy of the foregoing filing on 03/08/2022 by e-mail on the below individuals at the following locations:

President Joe Biden (whitehouse.gov)
c/o Dana A. Remus, Chief Counsel
Office of The White House Counsel
1600 Pennsylvania Avenue NW
Washington, DC 20500

Attn'y Gen. Merrick Garland (e-mail)
U.S. Dep't of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Merrick.Garland@usdoj.gov

Robert Ralph Kiepura (ECF)
U.S. Dep't of Justice - Civil Div. (G)
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-4436
Fax: (202) 353-0461
robert.kiepura@usdoj.gov

Matthew M. Graves (e-mail)
U.S. Attorney for the Dist. of Columbia
555 Fourth Street, NW
Washington, DC 20530
Matthew.Graves@usdoj.gov
Ralph.Cox@usdoj.gov
Brian.Hudak@usdoj.gov
Margaret.Chriss@usdoj.gov
Gregg.Maisel@usdoj.gov

Respectfully submitted

/s/ Raj Patel
T.E., T.E. Raj K. Patel (*Pro Se*)
6850 East 21st Street
Indianapolis, IN 46219
Marion County
317-450-6651 (cell)
rajp2010@gmail.com
www.rajpatel.live

Dated: March 8, 2022